1   Robb C. Adkins (SBN 194576)           Lawrence M. Hill (*pro hac vice*)
    radkins@winston.com                   lhill@winston.com
2   Krista M. Enns (SBN 206430)           Alexa Perlman (*pro hac vice*)
    kenns@winston.com                     aperlman@winston.com
3   Seth Weisburst (SBN 259323)           WINSTON & STRAWN LLP
    sweisburst@winston.com                200 Park Avenue
4   WINSTON & STRAWN LLP                  New York, NY 10166-4193
    101 California Street, 35th Floor     Telephone:    (212) 294-6700
5   San Francisco, CA  94111-5840         Facsimile:    (212) 294-4700
    Telephone:   (415) 591-1000
6   Facsimile:    (415) 591-1400

7
    Steffen N. Johnson (*pro hac vice*)   Brooke Goldstein (*pro hac vice*)
8   sjohnson@winston.com                  brooke@thelawfareproject.org
    Lowell D. Jacobson (*pro hac vice*)   Amanda Berman (*pro hac vice*)
9   ljacobson@winston.com                 amanda@thelawfareproject.org
    Adrianne Rosenbluth (*pro hac vice*)  THE LAWFARE PROJECT
10  arosenbluth@winston.com               633 Third Avenue, 21st Floor
    WINSTON & STRAWN LLP                  New York, NY 10017
11  1700 K Street, N.W.                   Telephone:    (212) 339-6995
    Washington, D.C.  20006-3817
12  Telephone:   (202) 282-5000
    Facsimile:    (202) 282-5100
13
    Attorneys for Plaintiffs
14  JACOB MANDEL, CHARLES VOLK,
    LIAM KERN, MASHA MERKULOVA,
15  AARON PARKER, and STEPHANIE ROSEKIND

16              **UNITED STATES DISTRICT COURT**

17             **NORTHERN DISTRICT OF CALIFORNIA**

18  JACOB MANDEL, CHARLES VOLK, LIAM      **Case No**. **3:17-CV-03511-WHO**
    KERN, MASHA MERKULOVA, AARON
19  PARKER, and STEPHANIE ROSEKIND,
                                          **FIRST AMENDED COMPLAINT FOR**
20            Plaintiffs,                 **VIOLATIONS OF 42 U.S.C. § 1983, TITLE**
                                          **VI OF THE CIVIL RIGHTS ACT OF 1964,**
21        v.                              **AND FOR DECLARATORY RELIEF**

22  BOARD OF TRUSTEES of the CALIFORNIA
    STATE UNIVERSITY, SAN FRANCISCO       **DEMAND FOR JURY TRIAL**
23  STATE UNIVERSITY, and, in their official
    and individual capacities, LESLIE WONG,
24  MARY ANN BEGLEY, LUOLUO HONG,
    LAWRENCE BIRELLO, REGINALD
25  PARSON, OSVALDO DEL VALLE,
    KENNETH MONTEIRO, RABAB
26  ABDULHADI, BRIAN STUART, ROBERT
    NAVA, MARK JARAMILLA, VERNON
27  PICCINOTTI, and SHIMINA HARRIS,

28            Defendants.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

SUMMARY OF THE ACTION ...................................................................................... 1

    Exponential Rise in Anti-Semitism ...................................................................... 1

    San Francisco State University ............................................................................. 1

    Assault and Suppression of Free Speech During Mayor Nir Barkat's Address ...................... 2

    The Dangerous Abrogation of First Amendment Rights ...................................... 3

    SFSU's Environment of Pervasive Racial Discrimination ................................... 4

JURISDICTION ............................................................................................................. 6

VENUE ........................................................................................................................... 6

THE PARTIES ................................................................................................................ 6

FACTUAL BACKGROUND .......................................................................................... 10

    Definition of Anti-Semitism ................................................................................. 10

    SFSU's Egregious History of Virulent Anti-Semitism and Civil Rights Violations ............. 11

ALLEGATIONS ............................................................................................................. 17

    The Silencing of Mayor Barkat's Planned Speech Through Violent Threats and
    Intimidation .......................................................................................................... 18

    SFSU's Complicity and its Order to the Police to "Stand Down" ........................ 28

    Defendants' Selective Protection of Free Speech Discriminates Against Jews ..................... 42

    SFSU Sponsors Professor Abdulhadi's Meetings with Terrorists ......................... 54

    The Intentional and Discriminatory Exclusion of Hillel from the "Know Your Rights"
    Fair ....................................................................................................................... 55

    Despite Repeated Promises and Declarations, SFSU Has Failed to Cure these
    Systemic Problems ............................................................................................... 64

FIRST CAUSE OF ACTION .......................................................................................... 65

SECOND CAUSE OF ACTION ..................................................................................... 67

THIRD CAUSE OF ACTION ......................................................................................... 69

FOURTH CAUSE OF ACTION ..................................................................................... 71

FIFTH CAUSE OF ACTION ........................................................................................... 73

SIXTH CAUSE OF ACTION ........................................................................................... 75

REQUEST FOR RELIEF ................................................................................................. 75

DEMAND FOR JURY TRIAL ........................................................................................ 77

**INTRODUCTION**

Jacob Mandel, Charles Volk, Liam Kern, Masha Merkulova, Aaron Parker, and Stephanie Rosekind (Plaintiffs), by and through their attorneys, allege upon knowledge as to themselves and their own conduct, and otherwise upon information and belief, including based on investigation of counsel, the facts stated in the public record, press releases, media reports and articles, as follows:

**SUMMARY OF THE ACTION**

**Exponential Rise in Anti-Semitism**

1.     From 2014 to the present, the frequency of anti-Semitic incidents at colleges and universities has been rising at exponential rates, doubling from 2014 to 2015 and then increasing by 20 percent from 2015 to 2016 (as reflected in an Anti-Defamation League ("ADL") audit of campus incidents).   U.S. college campuses continue to be a "hotbed for anti-Semitism," where Jewish students have faced a 45 percent increase in anti-Semitism of "all forms", including harassment and insults as well as a "sharp spike" in racist and anti-Semitic graffiti and vandalism.   A July 2015 Brandeis University study found that nearly three-quarters of Jewish students had witnessed or experienced anti-Semitism.

**San Francisco State University**

2.     San Francisco State University ("SFSU" or "the University") is among the worst of the worst offenders and is largely recognized as being among the most anti-Semitic campuses in the country.   Plaintiffs bring this action against Defendants Leslie Wong, Mary Ann Begley, Luoluo Hong, Lawrence Birello, Reginald Parson, Osvaldo del Valle, Kenneth Monteiro, Rabab Abdulhadi, Brian Stuart, Robert Nava, Mark Jaramilla, Vernon Piccinotti, and Shimina Harris (collectively the "Defendant Individuals"),[1] and Defendants Board of Trustees of the California State University ("CSU"), and SFSU, to hold Defendants accountable for their violations of Plaintiffs' civil rights and bring about the necessary systemic changes to prevent these problems in the future.

3.     Since SFSU established the College of Ethnic Studies ("COES") in 1968, an extremely disturbing and consistent pattern of anti-Jewish animus has emerged at SFSU which has only gotten worse over time.   SFSU and its administrators have knowingly fostered this

---

[1] Each of the Defendant Individuals are named in their official and individual capacities.

1    discrimination and hostile environment, which has been marked by violent threats to the safety of

2    Jewish students on campus, in part through its support of COES, the Arab and Muslim Ethnicities

3    and Diasporas Initiative ("AMED"), and the General Union of Palestine Students ("GUPS").  SFSU

4    has not merely adopted and embraced an anti-Jewish position—it has systematically supported these

5    departments and this student group as they have doggedly organized their efforts to target, threaten,

6    and intimidate Jewish students on campus and deprive them of their civil rights and their ability to

7    feel safe and secure as they pursue their education at SFSU.

8    　　　　4.　　In 1997, then-SFSU President Robert Corrigan admitted that the school was

9    considered "the most anti-Semitic campus in the nation," and things have only gotten worse for

10   Jewish students on campus since then.[2]  As recently as December 2016, SFSU was ranked among

11   the top 10 worst campuses for Jewish students in North America.[3]  The history of anti-Jewish

12   animus at SFSU—and SFSU's direct role in fostering this animus and in discriminating against

13   Jewish students and members of the San Francisco Jewish community (as detailed further below)—

14   is as abhorrent as it is long.

15   **Assault and Suppression of Free Speech During Mayor Nir Barkat's Address**

16   　　　　5.　　On April 6, 2016, SF Hillel ("Hillel") hosted Nir Barkat, the Mayor of Jerusalem,

17   Israel, to speak on SFSU's campus to Jewish students, non-Jewish students, and members of the

18   community-at-large.  SFSU only permitted the event to take place in an expensive event space far

19   from its central campus.

20   　　　　6.　　Notwithstanding the out-of-the-way location, at the event Plaintiffs were met with a

21   direct assault on their safety and civil rights.  A group of individuals, including many members of

22   the General Union of Palestine Students ("GUPS") commandeered the event and shut it down, using

23   amplified sound to disrupt Mayor Barkat's speech with continuous menacing chants such as "Get the

24   fuck off our campus!" and "Intifada!"

25   　　　　7.　　As the group of shouting students moved closer to Mayor Barkat, Plaintiffs, and other

26
27   ---

[2]  Anthony Chu, "Jewish studies gets SF State's first endowed chair," *GoldenGater* (September 16, 1997).

28   [3]   The rankings are available at https://www.algemeiner.com/the-40-worst-colleges-for-jewish-students-2016/.

2

**FIRST AMENDED COMPLAINT**
Case No. 3:17-CV-03511-WHO

1    SFSU students and members of the community who had come to hear Mayor Barkat speak, huddled

2    together in the chairs in the corner, hoping to somehow hear him despite the amplified shouting

3    (which was a direct violation of the Student Code of Conduct's prohibition on the use of sound

4    amplifiers inside the event, even apart from the threatening content).  This proved to be impossible,

5    as the incessant threats and amplified chants prevented anyone from hearing Mayor Barkat's speech

6    or engaging in dialogue with him.

7           8.    With their verbal assaults, angry gestures, and hostile actions, the disrupting students

8    physically threatened Plaintiffs and others in attendance, who feared for their safety.  The group

9    encroached on those who came to hear the speech and purposefully intimidated them, adjusting their

10   head coverings in a threatening manner, thereby concealing their identities.

11          9.    Students and community members, including Plaintiffs Jacob Mandel, Stephanie

12   Rosekind, Masha Merkulova, and Aaron Parker, sought the protection of campus police, who were

13   present at the event.  But rather than putting a stop to the deliberate efforts to stifle a planned speech

14   and event by an approved student group, and to the physical intimidation of Jewish students and

15   community members, SFSU administrators—who were also present at the event—instead instructed

16   the police to "stand down" and allow the disruption to completely shut down the event.

17                    **The Dangerous Abrogation of First Amendment Rights**

18          10.    The incident at SFSU has become another example of the dangerous assault on First

19   Amendment rights on college campuses by administrators and officials who support the suppression

20   of free speech by elements within the academic community who refuse to allow anyone on campus

21   to hear perspectives with which they disagree.  According to renowned First Amendment jurist

22   Floyd Abrams, college campuses pose the "greatest threat" to free speech in our nation today,

23   largely because of students who "disapprove of the views of speakers whose view of the world is

24   different than theirs and who seek to prevent those views from being heard."  However, according to

25   Mr. Abrams, "the amount of students who will not tolerate the expression of views with which they

26   differ is less important than the sad reality that repetitive acts of speech suppression within and by

27   our academic institutions persist and seem to grow in amount."

28          11.    Universities should be bastions of free expression and academic freedom, not hostile

1    environments where free speech and viewpoints are suppressed with the complicity or deliberate

2    indifference of the administrators and faculty.  The First Amendment requires that government

3    entities, including state universities, not take actions that suppress students' and community

4    members' rights to hear from speakers, or suppress the right of protesters to express their views.

5    More specifically, there is no heckler's veto exception to the free speech rights guaranteed to

6    students at publicly-funded schools, especially state schools, which include the right to speak, the

7    right to hear an invited speaker, and the right to freely and peacefully assemble.  Moreover, any

8    affirmative action by a state actor designed to shut down an individual's exercise of his/her free

9    speech rights, such as a "stand down" order, is a clear violation of the United States Constitution.

10       12.    While often insulted and disgusted by certain speech emanating from GUPS and its

11   members and affiliates, Plaintiffs do not behave in disorderly or menacing ways; disrupt or silence

12   GUPS's speech; or interfere with the exercise of any GUPS-affiliated individuals' right to speak,

13   listen or assemble.  Plaintiffs unequivocally acknowledge the right of any protester on any topic to

14   speak openly, as long as they do not cross a line and incite imminent violence, as long as they are not

15   impeding the rights of another, and as long as they are complying with appropriate time, place, and

16   manner policies.   Contemptible speech and expression at SFSU often makes Plaintiffs feel

17   uncomfortable and vulnerable, and on some occasions, especially when combined with action, it

18   may, in part, contribute to an overall hostile environment at SFSU—particularly when Defendants

19   reveal their preference for anti-Jewish, anti-Israel speech even as it drowns out Plaintiffs' speech.

20   However, Plaintiffs have never believed, and do not now believe, that this vile speech is unprotected,

21   nor do they wish to suppress it.  They simply wish to be guaranteed the same inherent rights to

22   speak, listen and assemble that all other members of the SFSU community—including students and

23   academics who perpetuate the most offensive denigrations of the Jewish people and the Jewish

24   state—are afforded at a university they all share and within which they must coexist.

25   **SFSU's Environment of Pervasive Racial Discrimination**

26       13.    However, this action is not limited to the egregious civil rights violations Plaintiffs

27   suffered at the Mayor Barkat event.  SFSU has fostered and sanctioned anti-Semitism from the

28   highest levels and affirmed the actions of hostile, aggressive, and disruptive students to regularly

violate the rights of Jewish students, including Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern, whom the University promised to provide a safe learning environment the moment it admitted them.  As this complaint details, SFSU has repeatedly denied Plaintiffs' student groups, including Hillel and the Jewish fraternity Alpha Epsilon Pi ("AEPi") (both of which SFSU recognizes as official student organizations), equal access to campus events that welcome other non-Jewish student organizations at the University.  For example, in February of 2017, Hillel was intentionally and surreptitiously barred from a "Know Your Rights" Fair based on its members' religion and ethnicity, with the full knowledge and involvement of SFSU administrators, in clear violation of Plaintiffs' civil rights under the First and Fourteenth Amendments.

14. Plaintiffs Mandel and Volk have been repeatedly targeted and placed in threatening situations on SFSU's campus, *because* they are Jewish, and specifically *because* of clear actions and decisions executed by SFSU, and further permitted, if not endorsed, by its administrators and faculty—who have fostered, fomented, and systematically instilled an anti-Jewish animus at SFSU. Plaintiff Kern, in part because of his physical stature, has not felt physically threatened, but has protected other Jewish students who have felt endangered, and is well aware of similarly situated members of the SFSU Jewish community who have been both physically and verbally threatened and feel unsafe on campus.

15. SFSU has created an environment of invidious discrimination in which Plaintiffs Mandel, Volk, and Kern, as Jewish students who are open about their Jewish identities, feel vulnerable, intimidated, and threatened on their own campus, and are not able to participate in their education, or benefit from educational and other events planned for their campus community, the way that other, non-Jewish students do.

16. Having been subjected to this pervasive, hostile, and administration-sanctioned and facilitated anti-Jewish environment, Plaintiffs have determined that bringing this action is necessary to compel SFSU to fulfill its statutory and Constitutional obligations.  Defendants must ensure that members of its Jewish community feel safe in openly revealing their identity and beliefs and that they enjoy equal access to the educational and experiential privileges and opportunities afforded to all other SFSU students.  Defendants must also make the Plaintiffs whole for their violations of

Plaintiffs' fundamental civil rights and for the impact of Defendants' deliberate indifference to these violations and to SFSU's hostile, discriminatory, anti-Jewish environment.

## JURISDICTION

17.     This Court has subject matter jurisdiction over the entire action pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (a)(4), as Plaintiffs bring claims under the First and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*).

18.     The Court has personal jurisdiction over the Defendant Individuals because, upon information and belief, each of the Defendant Individuals either resides in the Northern District of California or has sufficient contacts with the Northern District of California due to their employment or relation to SFSU to establish this Court's jurisdiction over them.   The Court has personal jurisdiction over Defendants CSU and SFSU because each is based in and operates in California.

19.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

20.     This Court has jurisdiction to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## VENUE

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims for relief stated in this Complaint occurred in this District, and because Defendants are subject to personal jurisdiction in this District or may be found in this District.

## THE PARTIES

22.     Plaintiff Jacob Mandel is the former student President of Hillel at SFSU and was a registered student at SFSU through December 2016.  Mr. Mandel graduated in January 2017.  While he was a student at SFSU, he organized and attended the Mayor Barkat event on April 6, 2016, and like the other attendees, was precluded from hearing Mayor Barkat speak or otherwise meaningfully participating in the event and expressing his own views.  Moreover, due to the intentional exclusion of Hillel from the "Know Your Rights" Fair, Mr. Mandel was denied the opportunity to equally participate in and benefit from that event.    Mr. Mandel has faced repeated, unexplained or

6

1    inadequately explained denials by the University for requests to have tabling permits at campus

2    events when requested on behalf of Hillel and his fraternity, both of which are recognized as Jewish

3    student organizations, where other groups had their permits granted without issue.  Mr. Mandel

4    routinely had to personally locate Defendant Lawrence Birello on campus to get any sort of an

5    explanation regarding these unjustified denials.  Mr. Mandel has been verbally and physically

6    threatened and targeted on SFSU's campus based on his Jewish identity, and has personally

7    experienced the University's intentional discrimination and deliberate indifference to SFSU's

8    pervasively hostile anti-Jewish environment.  These experiences have caused Mr. Mandel to miss

9    class at SFSU and have deprived Mr. Mandel of equal access to the educational opportunities or

10   benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who

11   choose to not be open about their Jewish identity.

12          23.     Plaintiff Charles Volk is a Jewish student at SFSU and at all times material to this

13   action has been registered at SFSU.  Mr. Volk was President of a group on campus working to create

14   a Jewish mural as part of the Cesar Chavez Student Center (to go along with the 15 murals

15   "commemorating the cultural and ethnic diversity of [the SFSU] community, including African-

16   American, Pacific Islander, Hispanic, Palestinian, and Native American murals)—but the group's

17   efforts were thwarted by SFSU.  Like Mr. Mandel, Mr. Volk has faced repeated, unexplained and/or

18   insufficiently explained denials by the University for properly-requested table permits at campus

19   events for his Jewish fraternity (AEPi), where other groups had their permits granted without issue.

20   Mr. Volk attended the Mayor Barkat event on April 6, 2016, and like the other attendees, was unable

21   to hear the Mayor speak or otherwise meaningfully participate in the event and express his own

22   views.  Due to the intentional exclusion of the Jewish student group from the "Know Your Rights"

23   Fair in February 2017, Mr. Volk was denied the opportunity to equally participate in and benefit

24   from that event.  Mr. Volk has been verbally and physically threatened on SFSU campus based on

25   his Jewish identity, and has personally experienced the University's intentional discrimination and

26   deliberate indifference to SFSU's pervasively hostile and discriminatory environment.  These

27   experiences have forced Mr. Volk to miss class at SFSU and have deprived Mr. Volk of equal access

28

7

to the educational opportunities or benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who choose to not be open about their Jewish identity.

24.     Plaintiff Liam Kern is a Jewish student at SFSU and at all times material to this action has been registered at SFSU.  Like Mr. Mandel and Mr. Volk, Mr. Kern faced repeated, unexplained or insufficiently explained denials by the University for properly-requested table permits at campus events for his Jewish fraternity (AEPi), where other groups had their permits granted without issue. Mr. Kern attended the Mayor Barkat event on April 6, 2016, and like the other attendees, was unable to hear the Mayor speak or otherwise meaningfully participate in the event and express his own views.  Due to the Jewish student group's intentional exclusion from the "Know Your Rights" Fair in February 2017, Mr. Kern was denied the opportunity to equally participate in and benefit from that event.  Mr. Kern has been verbally assaulted on SFSU's campus based on his Jewish identity, and has personally experienced the University's intentional discrimination and deliberate indifference to SFSU's pervasively hostile anti-Jewish environment.  These experiences have forced Mr. Kern to avoid enrolling in classes at SFSU that otherwise interested him and/or filled requirements toward the completion of his degree, where his Jewishness would make him a target of harassment and subject him to personal attack and unfair and prejudicial treatment.  For example, when he wanted to take an International Relations class, he signed up for an online class instead of one offered through COES for these reasons.  As a result, he could not benefit from the many advantages of a live class where students and faculty engage in debate and a free exchange of ideas. Mr. Kern has been deprived of equal access to the educational opportunities or benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who choose to not be open about their Jewish identity.

25.     Plaintiff Masha Merkulova is a Jewish member of the community who came to SFSU with her son on April 6, 2016 to hear Mayor Barkat's speech.  Like the other attendees, she was deprived of the right to hear Mayor Barkat's speech or otherwise meaningfully participate in the event and express her views.  She was among the group of attendees verbally and physically threatened by the disruptive individuals at the event.

26.     Plaintiff Aaron Parker is a member of the Jewish community who came to SFSU on

8

April 6, 2016 to hear Mayor Barkat's speech. Like the other attendees, he was deprived of the right to hear Mayor Barkat's speech or otherwise meaningfully participate in the event and express his views. He was among the group of attendees verbally and physically threatened by the disruptive individuals at the event.

27.     Plaintiff Stephanie Rosekind is a member of the Jewish community who came to SFSU on April 6, 2016 to hear Mayor Barkat's speech. Like the other attendees, she was deprived of the right to hear the Mayor's speech or otherwise meaningfully participate in the event and express her views. She was among the group of attendees verbally and physically threatened by the disruptive individuals at the event.

28.     Defendant Board of Trustees of the California State University adopts regulations and policies governing the entire CSU system, including SFSU. Board committees control educational policy, finance, campus planning, facilities, and other areas for the CSU system, including SFSU.

29.     Defendant SFSU is a state university located in San Francisco, California. SFSU is part of the CSU system.

30.     Defendant Leslie Wong is the President of SFSU.

31.     Defendant Mary Ann Begley is SFSU's Interim Associate Vice President and Dean of Students.

32.     Defendant Luoluo Hong is SFSU's Vice President for Student Affairs & Enrollment Management, Title IX Coordinator & DHR Administrator.

33.     Defendant Lawrence Birello is SFSU's Student Organization Coordinator.

34.     Defendant Reginald Parson is currently SFSU's Deputy Chief of Police, but served as Chief of Police during the Mayor Barkat event on April 6, 2016.

35.     Defendant Osvaldo del Valle is SFSU's former Assistant Dean of Students & Director of Student Conduct.

36.     Defendant Kenneth Monteiro is SFSU's Dean of COES.

37.     Defendant Rabab Abdulhadi is a professor within COES, GUPS's faculty advisor, and AMED's Senior Scholar.

38.     Defendant Brian Stuart is SFSU's Assistant Dean of Students & Director, New

9

Student Programs.

39.     Defendant Robert Nava is SFSU's Vice President of University Advancement.

40.     Defendant Mark Jaramilla is SFSU's Coordinator, Meeting & Events Services.

41.     Defendant Vernon Piccinotti is SFSU's Event & Technical Services Manager.

42.     Defendant Shimina Harris is SFSU's current Assistant Dean of Students & Director, Student Conduct.

### FACTUAL BACKGROUND

### Definition of Anti-Semitism

43.     The U.S. State Department has adopted the following working definition of anti-Semitism by the European Monitoring Center on Racism and Xenophobia: "Anti-Semitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[4]   Among the examples of anti-Semitism listed by the State Department on its website are:

- Calling for, aiding, or justifying the killing or harming of Jews (often in the name of a radical ideology or an extremist view of religion);

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as a collective—especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions;

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, the state of Israel, or even for acts committed by non-Jews;

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust;

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interest of their own nations;

- Using the symbols and images associated with classic anti-Semitism to characterize Israel or Israelis;

- Drawing comparisons of contemporary Israeli policy to that of the Nazis;

- Denying the Jewish people their right to self-determination, and denying Israel the right to exist.

---

[4]   *See* https://www.state.gov/s/rga/resources/267538.htm.

FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

### SFSU's Egregious History of Virulent Anti-Semitism and Civil Rights Violations

44.     In 1968, students at San Francisco State College (now SFSU) from the Third World Liberation Front and Black Student Union initiated the longest campus strike in U.S. history.  They demanded that the College establish a separate College of Ethnic Studies, which the students hoped would provide minority students with an education focused on identity politics, social justice, and freedom from oppression.  In the spring of 1969, the College's acting president established COES.[5]

45.     Unfortunately, part of the legacy that evolved from COES has been an extremely disturbing pattern of blatant anti-Jewish animus at SFSU.  Based on the State Department's definition or any other reasonable one, SFSU has a long and documented history of institutionalized anti-Semitism.  The summary that follows is only a partial list of the more significant anti-Semitic incidents at SFSU that have contributed to its continued reputation as one of the most anti-Semitic college campuses in the United States.

46.     In 1973, the General Union of Palestine Students (GUPS) founded a chapter at SFSU.  GUPS's official website has referred to the "so-called holocaust," and has included links to articles calling the Holocaust "the lie of the century" and asserting that stories of the Holocaust are created to benefit Jews. On information and belief, GUPS's history of ties to groups supporting terrorism, including the Palestine Liberation Organization (PLO) and the Palestinian Authority (PA), is equally disturbing. In addition to the PLO's and the PA's long history of complicity in the commission of deadly terrorist attacks, as recently as 2015, both the PLO and the PA were held liable by the U.S. federal court in the Southern District of New York for knowingly supporting six terrorist attacks against American and Israeli civilians during a period known as the "Second Intifada," and a jury verdict awarded $655 million to the victims.

47.     In 1994, a ten-foot mural was erected on SFSU's student union building that portrayed yellow Stars of David intertwined with dollar signs, skulls and crossbones, and the words "African Blood."  Following complaints from members of the Jewish community who were deeply

---

[5]   For a more detailed study on the history of anti-Semitism at SFSU and many of the events discussed in this complaint, see Chapter 18 of *Identity Politics, the Pursuit of Social Justice, and the Rise of Campus Antisemitism: A Case Study*, written by Tammi Rossman-Benjamin (Alvin H. Rosenfeld, Ed.), Indiana University Press (June 19, 2013).

1  offended by the anti-Semitic tropes in the mural, the mural was painted over, but the paint was

2  washed off by the mural's supporters, and the mural had to be sand-blasted, with sixty police officers

3  in riot gear positioned to protect the sandblasters from an angry mob who wanted the mural to be left

4  untouched.

5      48.    In 1997, a banner depicting an Israeli flag with a swastika, next to an American flag

6  with a dollar sign, was hung over the same wall where the 1994 mural had been painted.  During this

7  time period, Jews were regularly stereotyped and targeted on campus. Specifically, the national

8  spokesman for the Nation of Islam, Khalid Abdul Muhammad, who was invited to speak on SFSU's

9  campus, said that Jews are "rich power brokers" and "bloodsuckers" who preyed on African-

10  Americans and their community.

11      49.    In April of 2002, posters appeared around campus advertising an event called

12  "Genocide in the 21st Century."   The event was sponsored by GUPS, the Muslim Student

13  Association ("MSA"), and Associated Students, Inc. ("ASI") of SFSU, each of which was listed on

14  the posters.  The posters featured a dead baby on the label of a soup can, surrounded on either side

15  by Israeli flags.  Perpetuating age-old blood libels against the Jewish people like those described in

16  the notorious "Protocols of the Elders of Zion," which was often used by the Third Reich as a

17  justification for the Holocaust, the poster described this image as:  "Made in Israel -- Palestinian

18  Children Meat, Slaughtered According to Jewish Rites Under American License."



FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

Despite (or perhaps because of) the expected reaction by many on campus to these posters, the GUPS/MSA/ASI event occurred as planned and drew a large audience.

50.     Hillel is an SFSU recognized student group, and has been an SFSU-recognized student group at all times relevant to this Complaint.[6]

51.     In May of 2002, Hillel held a "Peace in the Middle East" Rally.  When a group of approximately 50 students stayed behind to clean up, conduct a prayer service, sing Hebrew songs, and hear speeches, a group of GUPS members and other individuals surrounded the remaining students.  The group shouted at the Jewish students that "Hitler didn't finish the job," "Get out or we'll kill you," and "Go back to Russia."  When Professor Laurie Zoloth, then-director of the Jewish Studies program at SFSU, asked SFSU police and SFSU administrators to keep the group 100 feet away from the Jewish students, the police told her that they had been directed to refrain from arresting disruptive GUPS members.  Professor Zoloth described the scene as follows:

> As the counter-demonstrators poured into the plaza, screaming at the Jews to "Get out or we will kill you" and "Hitler did not finish the job," I turned to the police and to every administrator I could find and asked them to remove the counter-demonstrators from the plaza, to maintain the separation of 100 feet that we had been promised. The police told me that they had been told not to arrest anyone, and that if they did, "it would start a riot." I told them that it already was a riot . . . .

> The police could do nothing more than surround the Jewish students and community members who were now trapped in a corner of the plaza, grouped under the flags of Israel, while an angry, out of control mob, literally chanting for our deaths, surrounded us . . . . There was no safe way out of the Plaza. We had to be marched back to the Hillel House under armed S.F. police guard, and we had to have a police guard remain outside Hillel.

As explained further below, this excuse that the police had been directed to stand down has emerged as a pattern at SFSU when the rights of Jewish students and community members are at stake—SFSU allows for mob rule at the expense of civil rights, where the loudest and most aggressive group rules the day.  Furthermore, SFSU continues to affirm its preference for those targeting the Jewish community by claiming to handle such incidents successfully by *removing* the Jewish students from their lawful assembly without allowing them the opportunity to exercise their

---

[6]     The SFSU Student Organization Directory is available at http://www.sfsu.edu/~sicc/organizationdirectory.html.

free speech rights.  Actively choosing to allow the "free speech" of near-violent disruptors instead of guaranteeing both the safety and free speech rights of the lawfully assembled group is contrary to the letter and spirit of the United States and California Constitutions.

52.     President Corrigan later described those GUPS members and others who had surrounded the Jewish students as a "terribly destructive" group engaging in "intimidating behavior and statements too hate-filled to repeat."

53.     In June of 2002, President Corrigan announced that, based on an investigation of GUPS students' conduct during the May 2002 incident, GUPS would be put on probation and would lose funding for one year.  GUPS and members of MSA were so outraged that they had been disciplined for their violent and threatening conduct to the Jewish students that they lodged a federal complaint against SFSU and demanded the establishment of an Arab and Islamic Studies program.

54.     Shortly thereafter, President Corrigan established the President's Task Force on Inter-Group Relations, which recommended in December 2002 that an Arab and Islamic Studies department be established (even though an initiative in Middle East and Islamic Studies had already been launched at SFSU).  The new program was the SFSU-funded Arab and Muslim Ethnicities and Diasporas Initiative (AMED), and it was established in the spring of 2007 under the umbrella of COES.  GUPS is closely affiliated with AMED and COES, with all or nearly all its student members studying in various COES programs. GUPS's faculty advisor, Rabab Abdulhadi, is listed as an AMED "Senior Scholar" and the Associate Professor of Ethnic Studies/Race and Resistance Studies. The founding of AMED in 2007, notwithstanding the existence of the initiative in Middle East and Islamic Studies, stands in stark contrast to repeated threats to abolish the Jewish Studies department by the SFSU administration under President Wong.  In 2014, President Wong, the Provost, and the interim College Dean—three of the most powerful university administrators—called together every member of the Jewish Studies faculty and, in an unprecedented show of administrative force, threatened to revoke their status as a university department.  These administrators claimed that the Jewish Studies department was overstaffed and shamed the professors as a group, accusing them of not pulling their weight in a cash-strapped institution.  In reality, the Jewish Studies department was and remains a shining example of a town-gown partnership, having nearly $7 million in

14

1   departmental endowments and five-figure annual gifts from many generous donors.  Jewish Studies

2   faculty members and Jewish leaders in the San Francisco community have repeatedly asked

3   Defendant Wong to disavow this threat and show his support for the small, but highly successful

4   department; even given the many opportunities to respond to direct requests for such a statement, he

5   has never done so.

6       55.    After the events of the spring of 2002, GUPS—with the encouragement of COES,

7   AMED, GUPS's faculty sponsorship, and ultimately the SFSU administration—began a campaign of

8   events on campus that continues to this day, that threatens Jews in the SFSU community and which

9   is largely responsible for the establishment of a pervasively hostile social and educational

10  environment for Jewish students at SFSU.

11      56.    For example, in July 2006, GUPS held a convention on campus for Al-Awda, a

12  coalition that opposes Israel's right to exist as a Jewish state and advocates for resistance "by any

13  means necessary."  Al-Awda's co-founder, Dr. Jess Ghannam, was an adjunct faculty member in

14  COES and had been a member of the SFSU President's Task Force on Inter-Group Relations.  He

15  later co-founded the U.S. Campaign for the Academic and Cultural Boycott of Israel along with

16  GUPS's faculty advisor and AMED's Senior Scholar, Rabab Abdulhadi.  Al-Awda is a leading

17  organization in the inherently anti-Semitic "BDS" movement which calls for the boycott,

18  divestment, and sanctions against Israel, and for targeted economic discrimination against Israeli

19  Jews, in an aim to isolate, delegitimize and ultimately bankrupt the Jewish state and economically

20  marginalize Jewish people.  Many BDS activist individuals and entities receive support from

21  American Muslims for Palestine (AMP), itself an entity employing individuals who have known ties

22  to terrorist organizations such as the designated foreign terrorist group Hamas.  On information and

23  belief, AMP is the most important financial sponsor and organizer for the BDS movement and for

24  Students for Justice in Palestine (SJP), a student organization with over 120 chapters in the United

25  States that grew out of GUPS as a separate, but closely related, student organization, primarily

26  responsible for organizing anti-Israel activity on campuses.  The "anti-normalization" mandate of the

27  BDS movement requires that activists disrupt, isolate, and silence all opposing viewpoints, even

28  moderate opinions such as those acknowledging Israel's actual existence, right to existence, or

15

1    advocating for a peaceful two-state solution to the Arab/Israeli conflict.

2         57.    But the 2006 convention only marked the start of Al-Awda's deepening connections

3    with SFSU.  Rabab Abdulhadi, a keynote speaker at the SFSU Al-Awda conference, became director

4    and Senior Scholar of AMED at SFSU shortly thereafter.  Michel Shehadeh, who also spoke at the

5    Al-Awda conference while under investigation by the U.S. government for potential charges of

6    aiding terrorist groups and violating federal material support for terror laws, became a Research

7    Associate at AMED in 2007.

8         58.    In 2006, GUPS commissioned a mural to be painted on the student union building

9    that included an image of a character named Handala, an established anti-Semitic symbol, holding a

10   key in one hand (with "return" written in Arabic) and a sword in the other.  The key represents the

11   destruction of Israel as a Jewish state and the sword represents a violent means to target Jews.  Dr.

12   Abdulhadi, AMED's Senior Scholar, drafted a brochure in honor of the inauguration of the mural's

13   unveiling, which coincided with several celebratory events sponsored by GUPS, AMED, and COES.

14   Ultimately, after significant condemnation from the Jewish community, the version of the mural that

15   was painted did not include that particular image.

16        59.    GUPS, AMED, and COES continued to sponsor on-campus events, including a major

17   academic conference in October 2009 entitled "Ethnic Studies 40 Years Later: Race, Resistance,

18   Relevance," and in November 2009 entitled "BDS: A Quest for Justice, Human rights and Peace,"

19   that advocated for the elimination of the Jewish state of Israel and in support of the BDS movement.

20   AMED Director Rabab Abdulhadi and the Dean of COES, Dr. Kenneth Monteiro, were integrally

21   involved in these events.  The open, direct, and substantial support and funding from SFSU's AMED

22   Program, SFSU's COES, and their leaders and faculty members has sent a clear message to SFSU

23   students and the SFSU community that the racist and discriminatory nature of these events should be

24   not only condoned, but celebrated.  Especially given the threatening rhetoric and attack on the

25   legitimacy and very existence of the Jewish state of Israel, these events sponsored and celebrated by

26   SFSU are unequivocally anti-Semitic based on the working definition adopted by the U.S. State

27   Department.

28

FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

## ALLEGATIONS

60.     The anti-Jewish animus pervading SFSU's campus is as ubiquitous as it is hostile. Jews are at best ignored, but more often ostracized in every corner of the university community. While other groups are able to host events, obtain permits and participate in "tabling" at student fairs, Jewish groups are customarily forced to fight for these basic rights as tuition-paying students, no matter how hard they work to follow processes correctly and avoid controversy. For no discernible reason other than their Jewishness, Jewish groups were not permitted to participate in the "Know Your Rights" Fair or in the August 2016 student group recruitment fair. The permits they seek, which are required for them to have tables at other on-campus and recruiting events are routinely denied without explanation. Jewish students who publicly display their Jewish identities or support the existence of a Jewish national homeland are made to feel unwelcome in a host of classes offered under the umbrella of COES. While murals exist representing a wide and diverse array of various university minority constituencies (including Pacific Islander students, Hispanic students, Palestinian students, and Native American students), and despite repeated requests by Jewish students for their own representative mural, permission was never granted, even after an official "Jewish Mural Project" team, led by Plaintiff Charles Volk, worked with the university community to try and install one. Jewish events—including those that have no Israel-related purpose or messaging—are systematically shut down by raucous mobs, with the imprimatur of the university. Jewish community members are faced with verbal assaults including genocidal chants and expletives, and are forced to watch as the very state actors under whose protection they remain, embolden the attacks in a number of ways, while ignoring the civil rights and the right to safety of the Jewish members of the SFSU community.  In a deliberate attempt to exclude Jews from the SFSU community, one of the most significant events Jewish students organized, featuring Jerusalem Mayor Nir Barkat, was consigned to the outskirts of campus while the Jewish students were forced to pay for an expensive room to host him, and the SFSU Code of Student Conduct was ignored when Jewish students most depended on it.  Jews are often afraid to wear Stars of David or yarmulkes on campus, and regularly text their friends to describe potential safety issues and suggest alternate,

FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

1 often circuitous, routes to campus destinations.  Jewish students are not treated or accepted as equals,
2 and their rights are not protected, in the hostile environment for them that is SFSU.

3 **The Silencing of Mayor Barkat's Planned Speech Through Violent Threats and Intimidation**

4    61.  Starting the morning of March 28, 2016, Hillel, a recognized Jewish student group on
5 campus arranged for Nir Barkat, the Mayor of Jerusalem, to speak at the University, clearing the
6 event with SFSU nine days beforehand.  The event was titled: "Jerusalem Mayor Nir Barkat: How is
7 a Visionary From the High-Tech Sector Leading a Diverse and Scrutinized City?"  It was scheduled
8 to run from 2:00 p.m. to 3:00 p.m. on April 6, 2016.

9    62.  On March 29, 2016, Oliver Benn, SF Hillel Director, emailed Defendant Reginald
10 Parson, Defendant Luoluo Hong, Defendant Mary Ann Begley, and SF Hillel Assistant Director
11 Rachel Nilson, saying "I think the main thing is to make sure that the Dean of Students/campus
12 police have a really seriously thought out protocol in place for: 1) if people try to block access to
13 wherever the event will be held; 2) If people disrupt the event in an organized way either briefly or
14 to try to cancel it. I have no idea if #1 is likely, but #2 is quite likely based on past GUPS actions and
15 the atmosphere on similar issues on other campuses state-wide and nation-wide."  With more than a
16 full week to prepare, after this warning and based on experience, the university knew and should
17 have known that a protest—and likely an unlawful one—was a near-certain eventuality.

18    63.  Mr. Mandel, as Campus Engagement Intern and Hillel Student President, organized
19 the permits to attempt to secure a room for Mayor Barkat's speech.  Mr. Mandel first sought to
20 secure Jack Adams Hall in the Cesar Chavez Student Center (CCSC) in the heart of the campus—but
21 it was unavailable.  Then, Hillel received confirmation from Defendant Larry Birello, Coordinator of
22 Student Activities and Events, that the event had been assigned to a different room in CCSC, Rosa
23 Parks A-C.  On information and belief, as Student Organization Coordinator, Defendant Birello's
24 responsibilities include management of student organization events such as Mayor Barkat's speech.
25 SFSU's website directs questions regarding orientation sessions for student organizations, reserving
26 space on campus, completing event applications, or securing tabling permits to Mr. Birello.  On
27 information and belief, Defendant Jaramilla, as Coordinator of Meeting & Event Services, and
28 Defendant Piccinotti, as Event & Technical Services Manager, Student Affairs and Enrollment

18

Management, are also responsible for properly coordinating and managing events at SFSU, including those sponsored by student organizations.  SFSU's website lists both Defendants Birello and Jaramilla as members of the Campus Safety Committee Roster.  SFSU's website directs questions regarding event reservations and event planning meetings to Piccinotti, and Piccinotti is listed on SFSU's website as a source of information on event requirements and best practices.

64.     On information and belief, Defendants Begley, Hong, Stuart, Birello, Piccinotti, and Jaramilla collectively executed the University's effort to move the Barkat event away from CCSC and to require Hillel's payment to host the event.  On information and belief, these Defendants were also responsible for SFSU's inadequate preparation before the event and the unacceptable way the University handled the event as it was being shut down.  Each of these actions by Defendants violated Plaintiffs' rights under the First and Fourteenth Amendments.

65.     The following documents reflect a mysterious change in the availability of a room for the event in CCSC:

- According to the timeline prepared by Defendant Begley, on March 29, 2016, "Begley expresses concern about the use of classroom space and suggests that they use Seven Hills instead. However, SF Hillel Assistant Director Rachel Nilson "stated…that she really wished to keep the event in CCSC."

- An email sent the morning of March 30, 2016 from Monolito Montego Twyman, Greek and Student Organization Advisor, to Defendants Begley, Stuart, Birello, and Piccinotti stated that "SF Hillel has acquired one of the Rosa Parks rooms for their event (per my suggestion). I will check with Mark to find out which room so we can further plan for possible protestors."

- Also according to Defendant Begley's timeline, Defendant Hong stated in an email that "her preference is that the event is not held in the CCSC." The following day, March 31, 2016, Hong emailed Hillel Director Oliver Benn and said "she knows that Begley has been in touch and that we may ask for flexibility on the location."

- On April 1, 2016 at 1:47 p.m., SF Hillel received an email with booking number 19861, with the status "Tentative/Pending SICC (Student Involvement and Career Center) Review."

- At 2:06 p.m., ASI (Aimee Barnes) emailed Defendant Jaramilla saying "unfortunately your reservation has been put under conflict." Just a few minutes later, at 2:12 p.m., Defendant Birello emailed SF Hillel saying "this is approved as an authorized organization/member event. Good luck and we hope there is a great turnout!"

- Defendant Mark Jaramilla, SFSU's Meeting & Events Coordinator, then emailed Mr. Mandel to inform him that there was a "scheduling conflict" and that the Rosa Parks A-C room was no longer available.

- SF Hillel Assistant Director Nilson responded at 4:07 p.m. to Defendant Birello saying "We are confused, because one of our members (Sam Boikaner) who is an ASI rep, received a voicemail from Mark from Associated Students/CCSC telling him to tell Hillel that the room is unavailable to us."

- At 5:14 p.m. that afternoon, Defendant Jaramilla emailed Defendant Birello saying "Unfortunately, I have a conflict event in our schedule and can no longer host this event."

- At 5:15 p.m., Aimee Barnes emailed Defendant Jaramilla, "here is the email, and I see no indication of conflict. I just spoke with Dean Begley. I informed her RP is not available. Email to be sent shortly."

- At 5:17 p.m., Defendant Begley emailed Defendant Birello and others saying, "I just got off the phone with Aimee and have confirmed that Rosa Parks A-C is in fact NOT available on April 6th and no other spaces are open in the CCSC that day. The only other option under consideration right now is Seven Hills."

66.     Any room in CCSC would have been free of charge for Hillel to use, unlike any room in the Seven Hills Conference Center ("Seven Hills"), a venue owned by an independent entity, Sodexo Corporation, located in the housing district of campus and comparatively far from the center of campus. Nilson later followed up with alternative options more central on campus than Seven Hills, asking Defendant Begley, "Is it possible at all to host in the bottom of the STTC? We hosted the Seder there a few years ago. Or, I know there is a room at the top floor of the humanities which hosts speakers as well. Thanks!"

67.     Defendants communicated that they did not want the Barkat event to occur on the main campus, even after it was made abundantly clear by SF Hillel staff that they hoped to host the event in CCSC to ensure that the maximum amount of students could attend the event and engage with the Mayor. Defendant Luoluo Hong told the SFSU University Police Department (UPD) Chief, Defendant Reginald Parson, and Defendant Mary Ann Begley, "my preference is that we defer until later and if they can, wish them well in finding another location. However, if we are stuck, then I would actually prefer anything away from CCSC. Student Life Annex if possible. If there is any incident, we are going to so regret we agreed to do this..." Defendant Hong also emailed Defendant Wong saying "Just for the record… think this is not a good time to be hosting an event like this. I would personally rather ask that he defer the date to later in April, and if that is not possible wish him well and along to another venue. I am very worried that everyone is on edge after the semester we have been having, so we have powder kegs all over campus in search of a lit fuse." Defendant

1    Mary Ann Begley emailed Defendant Luoluo Hong, Defendant Brian Stuart, and Defendant

2    Reginald Parson that "Lee, from Student Activities and Events, just made Brian Stuart and me aware

3    of a classroom request for a student org event that will likely feature a controversial speaker and may

4    draw protest activity. Hillel is the event sponsor. The proposed speaker is the Mayor of Jerusalem.

5    They are requesting classroom space…If this may draw protest activity, I'm concerned about

6    reserving classroom space during the middle of the day. We may direct them to Seven Hills or

7    another location that would have less impact on classes in the area." Defendants' communications

8    confirm that they would prefer to suppress speech by a visiting foreign dignitary prepared to engage

9    the campus community in productive dialogue, rather than confront the hostile forces operating to

10    silence debate and shut down dissent on SFSU's campus.  Further, Defendants chose to penalize a

11    registered student group, Hillel, by forcing it to pay for an out-of-the-way event space.

12          68.    After conveying to SF Hillel that no rooms were available in CCSC, the

13    administrators required Mr. Mandel—on behalf of SF Hillel—to pay for a room in Seven Hills.  Mr.

14    Mandel delivered a check for $356.50 to the office manager of Seven Hills.  Most SFSU students

15    Mr. Mandel spoke with had no idea where Seven Hills was located.  It is beyond cavil that removing

16    an event to a location on the outskirts of the campus has the effect of decreasing the number of

17    individuals who attend, as compared to the same event taking place in the main, centrally located

18    student center building.   On information and belief, fewer students and community members

19    attended the Barkat event due to its out-of-the-way location and because Hillel's opportunity to

20    publicize the event was significantly impacted by the University's delay in confirming the location.

21    Plaintiffs know of no other group that has had a similar event purposefully removed to a non-central

22    campus location and forced to pay a substantial fee when, on information and belief, there were open

23    CCSC rooms available at no charge.  In the days prior to the event, SF Hillel Deputy Director Rachel

24    Nilson communicated with a representative of SFSU UPD, Dave Rodriguez, to discuss the event.

25    Mr. Rodriguez told them that they expected protesters, and they were planning to erect protest

26    barriers and a designated protest area (which the police called a "free speech zone") outside Seven

27    Hills during the event.

28          69.    Pursuant to their discussion with SFSU UPD, SF Hillel Assistant Director Rachel

Nilson emailed the Dean of Students confirming that conversation, and asking what types of disruptions inside the facility would trigger a disruptor being ejected.  SFSU's commissioned investigative report confirmed that the Dean did not respond, claiming that the email was not seen "until moments" before the Mayor Barkat event was set to begin, far too late for the police officers and the event attendees to have a common understanding as to whether and how SFSU's policies would be enforced and attendees' rights would be protected.

70.     On April 4, 2016, SFSU UPD Chief Reginald Parson communicated via email to Luoluo Hong and Mary Ann Begley that he planned to erect a protest area "so people who are against the event can assemble." He stated that "if there's a disruption, we will need a Citizen's Arrest form completed and signed by someone from SF Hillel to remove people from the event." However, on information and belief, this information was never communicated to anyone officially affiliated with SF Hillel, and during the event, when Plaintiff Aaron Parker told Chief Parson that he agreed to complete and sign a Citizens' Arrest form in order to bring the event back to order, no form was provided to him.

71.     Plaintiffs each arrived at the event before it began.  When the event started, there were two plain-clothes officers present.  There was also a plain-clothes police officer positioned closer to Mayor Barkat.  Approximately 30 individuals (mostly members of GUPS and their allies from COES) began filing into Seven Hills a few minutes after the Mayor's arrival and sat together in the same part of the room.  Before Mayor Barkat began his speech, Rachel Nilson acknowledged the GUPS students and welcomed them to the event along with the other attendees.

72.     On information and belief, shortly after Mayor Barkat began his speech, Lubna Morrar, the President of GUPS, and GUPS Vice President Linda Ereikat were sitting next to each other and texting each other.  At some point, Lubna gave a signal to Linda, and they began leading the entire group in the loud shouting of antagonizing and threatening phrases such as "Get the fuck off our campus," "We don't want you on our campus," "From the river to the sea, Palestine will be free," "If we don't get no justice, then you don't get no peace," "1-2-3-4, we don't want your racist war, 5-6-7-8, Israel is an apartheid state," "Long live the Intifada! Intifada, intifada!," and more, directed at Mayor Barkat, Plaintiffs, and the other students and audience members who came to hear

1   Mayor Barkat speak.

2       73.     SFSU's commissioned investigation of the Mayor Barkat event concluded that

3   campus administrators understood the violent and threatening nature of these chants.  In particular, a

4   campus administrator explained that chanting "Intifada!" is synonymous with calling for an "armed

5   uprising" and that "From the river to the sea, Palestine will be free" meant that "there should be no

6   Israel and there is no place for Jews."

7       74.     The Mayor stopped speaking as he could not be heard.  Plaintiffs expected that the

8   disruptive students would be asked to quiet down, to leave, or if they would not agree to do either, to

9   be removed if necessary.  Despite the presence of SFSU police, including Chief Reginald Parson, as

10  well as Dean of Students Mary Ann Begley, SFSU did not take the basic steps necessary to allow the

11  speech to continue.

12      75.     The disruptive individuals were emboldened by the decisions of the administration to

13  allow the disruption to continue and escalate, despite the existence of the designated protest area and

14  the ramifications on the rights of audience members. The group began using a microphone and an

15  amplifier to completely drown out the Mayor's voice.  The disruption began less raucously, but as

16  administrators and police were clearly sanctioning it in standing by and standing down, the

17  disruptors increasingly ramped up their verbal attacks and threatening gestures.

18      76.     An investigation of the Mayor Barkat event commissioned by SFSU concluded that

19  the group's use of amplified sound violated school policy, and that it disrupted the event.

20      77.     Mayor Barkat gestured to those who were trying to hear him, including Plaintiffs, to

21  form a huddle around him so he could try and speak to them above the amplified shouting of the

22  disruptive students.  Plaintiffs still could not hear what he was saying, even though they were all in a

23  circle no more than a few feet away from him.

24      78.     Plaintiffs were threatened and intimidated by the group's encroaching physical

25  presence and threats of "intifada," which refers to a violent uprising and the commission of terrorist

26  acts by Palestinians against Jews.  The term "intifada" is a common genocidal slogan used by

27  Palestinians to refer to violent attacks against Jews.  The conventional reaction by a Jewish

28  individual who is aware of the term's meaning is visceral and painful. The professed goal of those

1   engaged in an intifada is to kill or maim as many people as possible and to wage a psychological war

2   to instill deep fear in Israeli civilian population.  Defendant Abdulhadi's "Academia.edu" profile

3   page features an image calling for a "Third Intifada," a terrorist mutiny by Palestinians against Jews

4   in Israel.

5         79.   As the disruptive individuals were shouting, some covering their faces with keffiyehs

6   and advancing toward Plaintiffs, many of the audience members feared for their safety and for the

7   safety of the other individuals who had come together to hear from, and engage with, Mayor Barkat.

8   Mr. Mandel asked Defendant SFSU Police Chief Reginald Parson, who was present in the room,

9   how they were going to address this situation.  Chief Parson told Mr. Mandel that he would try to get

10   the group to move to the designated protest area so that Mayor Barkat's speech could proceed.

11         80.   The use of a sound amplifier to drown out and shut down a student group event in this

12   way was expressly against University policies (specifically Sections IV.C. and VI of SFSU's

13   University Executive Directive #89-13: Time, Place, and Manner: Use of Buildings and Grounds, in

14   addition to several broader policies the group violated from SFSU's Code of Student Conduct).  This

15   indisputable violation of both the SFSU Code of Student Conduct and/or the Seven Hills Conference

16   Center rules has been acknowledged by Defendants Leslie Wong, Mary Ann Begley, Reginald

17   Parson, Brian Stuart, Lawrence Birello, and Osvaldo del Valle.

18         81.   Defendants Wong, Begley, Stuart, Parson, Hong, Nava and del Valle have also

19   conceded several other apparent violations of SFSU's Code of Student Conduct, state civil and

20   criminal law, and federal law by the disruptors during the event:

21       •   Defendant President Wong emailed the SFSU community on April 7, 2016, the
    day after the event, that "the Mayor's talk, held at Seven Hills, was disrupted by a

22   small but loud group of protestors. Members of our community who attended the
    event were deprived of an opportunity to hear from the mayor." He then sent a

23   personal email to concerned community members saying "I was troubled by
    reports coming to me from my police and security team this morning. They are

24   completing their investigatory work especially with regard to the potential
    violation of a number of student conduct codes which will inform the formal

25   conduct hearings. We do not condone their behavior and I am quite saddened by
    it. But our conduct processes will now take over."

26

27       •   On April 26, 2016, Defendant Begley emailed the two disruption leaders, also the
    leaders of GUPS, pertaining to the student conduct process. She wrote "First, I

28   want you to know that we support your right as individuals and as an organization
    to speak freely about issues that you feel are unjust; this message is _not_ about the

content of your protest on April 6th. Rather, this message is about how to go about protesting without violating University policy or law. While no criminal laws were violated on April 6th, there were alleged university policy violations." Later, she wrote to the same individuals that "Regarding the conduct review, [Redacted] will be receiving notice from the Office of Student Conduct to come in for a meeting to discuss the charges being filed against your student organization based on the alleged violations of the Code of Student Conduct. I anticipate that you will receive notice as early as this week. Additionally, I would welcome the opportunity to meet with you to review the Conduct and Time, Place, and Manner policies." Furthermore, in her narrative of the event, Defendant Begley wrote, "based on my observation, members of GUPS participated in behavior that was in violation of campus policies. They are as follows":

- Violation of the Time, Place, and Manner Policy: Employing unauthorized sound amplification
- Violations of the Code of Conduct (EO 1098):
  - Willful, material and substantial disruption or obstruction of a University-related activity, or any on-campus activity.
  - Participating in an activity that substantially and materially disrupts the normal operations of the University, or infringes on the rights of members of the University community.
  - Disorderly, lewd, indecent, or obscene behavior at a University related activity, or directed toward a member of the University community.
  - Violation of any published University policy, rule, regulation or presidential order.
  - Failure to comply with directions of, or interference with, any University official or any public safety officer while acting in the performance of his/her duties.

- In his narrative of the event, Defendant Brian Stuart lists code violations including:
  - Time, Place, Manner Policy (University Executive Directive #89-13): Employing unauthorized sound amplification
  - Student Code of Conduct (Executive Order #1098):
    - Willful, material and substantial disruption or obstruction of a University-related activity, or any on-campus activity.
    - Participating in an activity that substantially and materially disrupts the normal operations of the University, or infringes on the rights of members of the University community.
    - Disorderly, lewd, indecent, or obscene behavior at a University related activity, or directed toward a member of the University community.
    - Violation of any published University policy, rule, regulation or presidential order.
    - Failure to comply with directions of, or interference with, any University official or any public safety officer while acting in the performance of his/her duties.

- On May 3, 2016, University Counsel Daniel Ojeda emailed Luoluo Hong, Mary Ann Begley, and Osvaldo del Valle saying "I noticed the following conduct procedures SFSU has developed in cases involving student organizations: http://www.sfsu.edu/~sicc/socb.html. These would seem to apply to GUPS. Are you *not* applying these in the case pending against GUPS? If not, why not? I'm asking because I'm anticipating more questions on these issues from the attorneys

who are representing the students and GUPS and I want to be sure I understand the process SFSU is following, and the rationale for the campus approach."

- Defendant Robert Nava wrote in an April 12, 2016 email that "The protest was disruptive and the protestors did not follow campus policies and guidelines. The office of Student Affairs is reviewing possible administrative sanctions" and in an email on May 10, 2016 that "the Mayor's talk held at Seven Hills was disrupted by a small but loud group of protestors. The protestors used bull horns and infringed on the right of the speaker to express his views and denied the audience the right and opportunity to listen to the presentation."

- Defendant Osvaldo del Valle told the primary orchestrators of the disruption during the student conduct process that "what you did was not free speech, but in fact free speech suppression. You impeded another group's ability to engage in free dialogue with your disruption." One of the students then replied that the event had continued, and del Valle said, "yes, by huddling together so that they could here the mayor over the noise you were making (sic). That is not free speech or civil dialogue. You in fact attempted to shut down the event or at minimum disrupt the event."

- While Defendant Reginald Parson states on multiple occasions that no criminal law violations occurred at the event, his own behavior and the notes in his written report establish the opposite conclusion.

  - California Penal Code § 403. [Disruption of lawful assembly] says that "every person who, without authority of law, willfully disturbs or breaks up any assembly or meeting that is not unlawful in its character, . . . is guilty of a misdemeanor." The cursory police report filed after the event describes a clear violation of PC § 403. The California Supreme Court in *In re Kay*, 1 Cal. 3d 930 (1970), said that § 403 requires that the defendant substantially impair the conduct of the meeting by intentionally committing acts in violation of implicit customs or usages or of explicit rules for governance of the meeting of which he knew, or as a reasonable man should have known. The internal campus police report describes a 15-minute speech stoppage, although in fact the speech was stopped for nearly an hour, the entire time allotted for the event. The report also describes microphone and sound amplification devices being used *outside of* the designated protest area.

  - According to California Penal Code § 407 [Unlawful assembly], "Whenever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner, such assembly is an unlawful assembly." The UPD report's description of the conduct (specifically, the use of microphones and amplifiers) is an unlawful assembly as defined in PC § 407.  Furthermore, the police report and the conduct of the officers during the event corroborate the fact that the police themselves believed the protest to be unlawful. If the protest had been a lawful assembly, the police would have lacked the authority to ask the protesters to move to the designated area, and to twice attempt to achieve 'compliance,' with 'negative results,' as the report describes."

  - Defendant Parson, President Wong, and others stated repeatedly that Parson requested several times that the disruptors cease the disruption and allow the event to continue, but they refused to disperse or relocate to the designated protest area. If this is true, it describes an unequivocal violation

of California Penal Code § 148. (a)(1): "Every person who willfully resists, delays, or obstructs any public officer, peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment." The police report describes a clear violation of PC § 148, which occurred when the officers were unable to "gain compliance" and when the female protestor nodded side-to-side indicating her refusal to comply.

Nevertheless, no actions were ever taken by SFSU against the disruptive students, no disciplinary charges were ever filed, and no sanctions were ever imposed against GUPS, Lubna Morrar, Linda Ereikat, or any other individuals responsible for committing these acknowledged violations. Instead, they received an email saying "Dear [Redacted], This letter serves as notification that the Office of Student Conduct will not be moving forward with the complaint received alleging your possible involvement in a Conduct Code violation on April 6, 2016. We arrived at this decision following a complete review of the complaint, including the informational interview we had with you on Monday, May 9, 2016. However, let our conversation today serve as a verbal warning regarding your behavior that may be alleged to have violated the Code of Student Conduct…We thank you for meeting with us and cooperating in this review. We now consider this matter resolved."  The determination not to pursue any disciplinary action was made the day before the resolution of the COES hunger strike, which included 27 demands of the university in order to end—one of which was protection of COES students facing any sanctions related to the disruption of the Barkat event. On May 11, 2016, a Joint Agreement was announced between SFSU and COES to end the hunger strike. Defendant Wong's statement "affirm[ed] that [SF State] does not intend to take disciplinary action against any students, staff, faculty or administrators who have taken part in protest and advocacy efforts specifically for their participation in these activities."

82.    According to SFSU's published "ADVISOR REQUIREMENTS," faculty advisors to student organizations must "[a]ssist SAE [Student Activities & Events] and the University in upholding University policy."  SFSU specifically discusses the University's Non-Discrimination Policy and the Time, Place, and Manner Policy as policies faculty advisors must help to uphold.  The SFSU document that lists these requirements adds as to the Time, Place, and Manner Policy: "No

1  amplified sound unless registered with an event."  The SAE website also states that "[t]he advisor

2  should assist the student organization to adhere to all University policies, as well as federal and state

3  law."  On information and belief, Defendant Abdulhadi, as GUPS's faculty advisor, chose to

4  disregard these advisor requirements as they applied to GUPS's conduct surrounding the Barkat

5  event, in violation of Plaintiffs' civil rights.

6  83.    In an official University Statement dated June 20, 2017 and published on SFSU's

7  website,[7] the University acknowledged that the incident that occurred during the Barkat event was

8  fueled by anti-Semitism, saying: "***The disruption of the event featuring Jerusalem Mayor Nir***

9  ***Barkat in spring 2016 and bias incidents that were reported this year were ugly reminders that***

10 ***anti-Semitism, like all forms of discrimination, is real and our community has work to do***."

11 (Emphasis added.)

12               **SFSU's Complicity and its Order to the Police to "Stand Down"**

13 84.    According to the SFSU commissioned report, as well as numerous statements from

14 Defendants, Chief Parson approached the shouting and threatening individuals a few minutes after

15 they produced the microphone and asked them to leave, but was ignored. There was no threat of

16 arrest or other action behind this purported request.  Chief Parson approached Mr. Mandel and told

17 him that he would have liked to remove the disruptors, however, "the University" (including

18 Defendants Mary Ann Begley, Larry Birello, and the other administrators present) had instructed

19 him and the police to "stand down."  Chief Parson admitted to Mr. Mandel that the police were being

20 directed to ignore protocol, which was to remove the protesters and move them to the designated

21 protest area.  Mr. Mandel spoke to other uniformed officers that had arrived, including Sergeant Lee,

22 and they also told him that, despite their protocol, the University had instructed them to stand down.

23 85.    Plaintiff Jacob Mandel had been honored and excited for the Barkat event and proud

24 of the hard work he had put into organizing Mayor Barkat's visit to SFSU.  In the moments before

25 the event began, he had shared his excitement with Mayor Barkat that, after enduring so much

26 antagonism against Jews on campus, they had now brought a renowned Jewish speaker to campus.

27

28 [7] This University Statement is available at https://news.sfsu.edu/announcements/san-francisco-state-university-statement-disputing-lawsuit-affirming-commitment.

1   Mr. Mandel felt that, among many other things, the Mayor's visit helped validate the SFSU Jewish

2   population, on a campus where Jewish students and community members were so often abandoned

3   by the administration.  Unfortunately, as the event was shut down by the shouting group of GUPS

4   members and others, Mr. Mandel's excitement was replaced by fear and anger, as he was scared for

5   both himself and his fellow students, and frustrated with the administration's actions which led the

6   event to be shut down.  He felt overcome by the devastating realization that the administration would

7   continue to deny the basic civil rights of the audience, just as they had always refused to treat Jews

8   equally on campus.  He was upset that his hard work on the event had been ruined.  He felt a sense

9   of responsibility to try and solve the problem for his fellow Jewish students and community

10  members, but also felt totally helpless, as things had moved so far beyond his control and into the

11  exclusive control of SFSU and its officials.

12          86.   Plaintiff Charles Volk came to the event excited to hear Mayor Barkat's speech,

13  looking forward to learning from a foreign dignitary representing one of the world's most

14  consequential cities, right on his own university campus.  He sat front and center.  However, that

15  excitement turned to a sickening feeling as the shouting and threats continued.  He felt distraught by

16  what he had seen, watching two of his friends cry from the trauma.  It was clear to him that the

17  chanting individuals had every intention of making the Jews in the room feel intimidated and that

18  they reveled in threatening them.  He sensed the clear hate in their words, voices, and actions.  He

19  wanted to help his crying classmates but did not know how.  When Mr. Volk saw one of the

20  individuals cover his face with a keffiyeh while continuing to shout anti-Semitic threats, he felt

21  particularly distressed, sensing that the disruptors wished to conceal their identities to avoid the

22  consequences of their unlawful activity.

23          87.   Plaintiff Liam Kern spoke with one of the police officers, who told him (incorrectly)

24  that the individuals had not violated any rules so the police would not be doing anything to prevent

25  them from shutting down the event.  A crying female student positioned herself behind him in fear.

26  He was frustrated and upset that his fellow students felt physically threatened and unsafe, and that

27  the University itself had put these students in such a vulnerable position.  The distraught Jewish

28  students wanted to stay in a group even after the event, walking to Hillel together.

88.     Plaintiff Aaron Parker asked a uniformed police officer (who had arrived after the event started) what the police were going to do to allow the event to proceed.  The officer told Mr. Parker that he was waiting for approval from Chief Parson before taking action, and he identified Chief Parson, who was not in uniform.  Mr. Parker told Chief Parson he did not feel safe.  Chief Parson asked Mr. Parker if he would complete a Citizen's Arrest form.  Mr. Parker told Chief Parson that he did not know what that involved but if it would lead the police to take necessary action to allow the event to continue, then he would complete the form.  Chief Parson never returned with the form.  Mr. Parker witnessed the administrators and Chief Parson speaking with each other at the back of the room.  He was soon after informed by SFSU University Corporation Director Jason Porth, who had also spoken to the administrators in the back of the room, that the administrators did not want to remove the disrupting individuals so as to protect *their* rights.

89.     Plaintiff Masha Merkulova stepped into the hall to call 9-1-1.  After her call was transferred, she was informed that plain-clothes police officers were already present at the event.  As she was hanging up, uniformed police officers began to arrive.  Back in the room, police officers eventually told her that they had been directed not to intervene in order to protect the disruptors' "free speech."

90.     Plaintiff Stephanie Rosekind told a uniformed officer that she did not feel safe.  It was so unrelentingly loud that it was difficult for them to converse.  The officer seemed to acknowledge her comment but he offered no other response—she did not understand the lack of intervention even after she had told the police that she feared for her physical safety.  When Mr. Parker tried to update her about his conversation with police and Mr. Porth, she could barely hear him because of the volume of the amplified chanting and shouting from the GUPS members and their supporters.

91.     Plaintiffs could not understand why the administrators would instruct the police to stand by and proactively further the erosion of their constitutionally protected rights.  They felt powerless, scared for their safety, and betrayed by Defendants for their decision to license the explicit threats targeting Jewish students and community members.  But for the express instruction of Defendants to violate protocol and refrain from addressing the improper disruption, Mayor Barkat's speech would have been able to proceed, and Plaintiffs would have been spared the threats

30

1   to their safety and the interference with their civil rights.

2       92.     After conversing with Chief Parson, Mr. Mandel approached Defendants Begley and

3   Birello asking what next steps would be taken to allow the event to proceed; they told him that the

4   situation was being dealt with internally and that he should "not worry about it."  The administrators

5   left shortly thereafter without taking any steps to remove the disruptive group, enable the event to

6   proceed, or protect the students, the audience members, or Mayor Barkat.

7       93.     Plaintiffs were then forced to stand by, in fear of threatened violence by the

8   disruptors, while the entire event was completely shut down, along with Mayor Barkat's right to

9   speak, and Plaintiffs' and other audience members' rights to listen, engage, and assemble.  After

10  Mayor Barkat left the room, the disrupting individuals cheered proudly and continued to shout "Get

11  the fuck off our campus!" to the Plaintiffs and other Jewish students and Jewish members of the

12  community who remained in the room, clearly directing their vitriol at Plaintiffs and other attendees.

13  Again, no one employed by SFSU intervened, at the explicit instruction of SFSU and in violation of

14  established protocol.

15      94.     The report summarizing SFSU's commissioned investigation faulted Student Affairs,

16  run by Defendant Luoluo Hong, for failing to adequately prepare for the Mayor Barkat event.

17  Student Affairs did not contact GUPS, despite the likelihood that GUPS would protest at the Mayor

18  Barkat event.  Nor did Student Affairs actively work with SF Hillel or any other groups to address

19  how protests could be accommodated without disrupting the event, even after repeated attempts by

20  SF Hillel Director Oliver Benn to work together to preempt the anticipated disorder.

21      95.     The report also concluded that Student Affairs' inaction at the Mayor Barkat event

22  impliedly sanctioned the protest.  The report recognized that "It is undisputed that none of the

23  Student Affairs administrators who were present at the Event approached, engaged with, or

24  attempted to manage the protestors."  Chief Parson also faulted Student Affairs for failing to engage

25  the leaders of GUPS about civil discourse and time, place, and manner limitations, and leaving him

26  as "the only one saying stop."  The report concluded that "the protestors were taking their cue from

27  Student Affairs officials who were not approaching them"—thereby emboldening them.

28      96.     By aiding, abetting, and condoning the disruptors' actions within the event room,

1   Defendants violated SFSU's Time, Place, and Manner policy, knowingly giving the disruptors free

2   reign to ruin the Barkat event and condoning their prohibited use of sound amplifiers to increase the

3   volume of their threatening avowals and disruptive chants to the point where no one in the room

4   could hear Mayor Barkat speak.   Like all of the aforementioned statements by Defendants

5   acknowledging wrongdoing by GUPS, Morrar, and Ereikat, SFSU's commissioned investigation of

6   the Mayor Barkat event confirmed that the presentation was in fact disrupted, and the GUPS students

7   interviewed for that report plainly stated that their intent was to disrupt Mayor Barkat's speech.   The

8   report also noted that the Dean of Students recognized that the protest was louder than the Mayor,

9   even with his microphone, once the disrupting individuals began utilizing their own portable sound

10  amplifier.

11          97.     Although SFSU UPD had designated a separate "free speech zone" for protesters in

12  order to allow them their own right to demonstrate without infringing upon the rights of the Plaintiffs

13  and other attendees to hear Mayor Barkat speak, SFSU officials instructed UPD to "stand down"

14  when the group refused to be confined to their designated area and used amplification equipment to

15  wholly drown out Mayor Barkat's efforts to speak in the pre-approved and paid-for event.   The

16  determination by SFSU administrators to issue a "stand down" directive and allow the disruption to

17  continue in order to protect the disrupting students' "free speech rights" directly contravened the

18  purpose of the "free speech zone": In setting up a "free speech zone" *outside* the event room,

19  administrators and UPD acknowledged that a disruption *inside* the room—especially one in clear

20  violation of SFSU's time, place, and manner policies that continued the entire time allotted for the

21  event—did not constitute free speech.

22          98.     The SFSU police officers acknowledged that these individuals were violating the law

23  and the SFSU Code of Student Conduct, but because of the "stand down" order, they acted contrary

24  to protocol, SFSU policy, and state and federal law.   As such, Defendants ensured the suppression of

25  free speech, creating an environment of physical intimidation and fear in which this group—in clear

26  violation of University policies that were implemented to ensure the protection of free speech—

27  effectively shut down the event.   The suppression of free speech at the Mayor Barkat event would

28  not have occurred had SFSU not proactively supported these individuals and discriminated against

32

members of the Jewish community.

99.     Defendants' behavior surrounding the Barkat event is a continuation of their systemic pattern of supporting the misconduct of students who regularly violate the rights of Jewish students, and failing to adequately protect Jewish students' rights or their physical safety. By doing so, Defendants have created a pervasively hostile environment in which Plaintiffs, as Jewish students, feel fearful, intimidated, and threatened walking on campus, attending classes, and participating in other SFSU events. For example, the day after the Mayor Barkat event, Plaintiff Charles Volk felt sufficiently threatened by a member of GUPS in one of his classes that he felt forced to leave midway through class—something he had never done before.  He was unable to concentrate in class while feeling the kind of stress brought on by the events of the day before and the glaring focus of the GUPS member in his class.  Realizing he could not focus or benefit from the class, he knew there was no point in staying for the remainder of class when he felt so uncomfortable.  Plaintiffs Mandel and Volk routinely experienced a similar inability to focus, concentrate, and fully participate in class when anti-Jewish events and sentiment, and the support from SFSU of these events and this sentiment, became overwhelming.

100.     After the Barkat event, a student whose name was redacted emailed President Wong to express his feelings, saying that he found "the actions of the protestors to be very inappropriate and threatening…As a Jewish student, I felt threatened and was legitimately worried that one of them would eventually try to use a weapon on those of us who attended the event to hear the Jerusalem Mayor speak.  This fear was generated from the event a few years ago where the GUPS president posted an image of him with a knife saying that he wanted to kill Israeli soldiers. Furthermore, I heard that, until recently, the school was not going to allow Nir Barkat to speak because the school was afraid of the social controversy that could come of this. If this is true, my question is why is the school not allowing certain individuals to speak because they may cause some students to become violent, instead of prevent violent students to have the opportunity to cause harm. I have invested 6 years of my life into attending SFSU, and I wish that I didn't feel like there's individuals at my college who may pose a danger to myself while I attend classes on campus."  On information and belief, this student did not receive a response.

101.   Defendants' conduct intentionally encouraged and benefited the disruptive individuals who were threatening the Jewish individuals with violence, as they shouted "Get the fuck off our campus!" and "Intifada!" not only to Mayor Barkat, but also to Plaintiffs and other Jewish students and community members who attended the event.   Defendants' conduct intimidated Plaintiffs through Defendants' complicity in the violent threats and the deliberate indifference to the clear violations of Plaintiffs' civil rights.   The threat to Plaintiffs' physical safety and their constitutional rights was amplified by the fact that the attendees were under Defendants' power and protection.   The University deliberately instructed its campus police to "stand down," creating and contributing to an unsafe and threatening environment for Plaintiffs and other Jewish students and members of the community.

102.   On information and belief, Defendant Parson had informed SFSU administrators regarding the need for a separate protest area and his intention to establish one for the Barkat event. These SFSU administrators were well aware of SFSU's policies that prevented speakers at approved events from being silenced, of the prohibition against protesters using amplified sound at a student event, and of the various violations of both law and the Code of Student Conduct committed when students and members of the community are verbally and physically threatened.

103.   However, Defendant administrators nevertheless sanctioned the continuation of the protest beyond the protest area, even after the group began frightening attendees by covering their faces to conceal their identities while chanting genocidal slogans and expletives in close physical proximity.

104.   The conduct of SFSU and its administrators during this incident was especially egregious and dangerous, since the administrators gave the order to have police "stand down" at the same time that the disruptive group became increasingly threatening.   This action by Defendants exemplifies their utter indifference to direct true threats against Jewish individuals who attended the event, including Plaintiffs.

105.   Additionally, instead of providing support for its Jewish students following Mayor Barkat's speech, the environment on campus was so toxic for Jewish students that some Jewish students did not feel comfortable going to their classes, or even walking on the campus with

1   anything on their clothing or person that could identify them as being Jewish.

2   106.   On April 26, 2016, Mary Ann Begley, the Interim Associate Vice President & Dean

3   of Students, emailed GUPS and stated that despite the threatening statements and genocidal chants

4   hurled at both Mayor Barkat and Jewish students, the administration affirmed that it had no issue

5   with the "content of [GUPS's] protest of the event."   Yet SFSU's commissioned investigation

6   recognized that Dean Begley, in a timeline written on or about April 15, 2016, had concluded that

7   the disrupting students violated campus policies at the Mayor Barkat event.  Nevertheless, she chose

8   not to take any action on the day of the protest.  The report also noted that following the event, the

9   Assistant Director of SF Hillel was assured by Dean Begley that the disruptors' identities were all

10  known to Student Affairs and that there would be follow-up.  Yet not a single student was punished

11  or otherwise faced any discipline for their misconduct and acute violations of the Student Code of

12  Conduct.

13  107.   When Osvaldo del Valle, then the Assistant Dean of Students and Director of Student

14  Conduct, met with the two primary instigators of the disruption to carry out the full student conduct

15  process, he asked them why Mayor Barkat would "travel half way around the world to come to SF

16  State? … Why come to a second tier state school that has no significant Jewish population and has a

17  reputation for being anti-semetic (sic)?" Del Valle then told the students that "there response to his

18  visit was exactly what he was hoping to happen (sic). 'You have been plaid, (sic)'" he said, "and

19  proceeded to inform them it was the mayor's intention to come to campus to illicit (sic) such

20  behavior from students such as yourself to galvanize the Jewish American community for political

21  gain. To what end, we do not know." According to the meeting minutes memorializing this

22  discussion, del Valle later "informed the students that they have to stop romanticizing uncivil styles

23  of protests because those are extreme measure that if they are employed should only be employed

24  after ALL other recourses have been exhausted."

25  108.   One of the student leaders of the disruption then claimed that she had a First

26  Amendment right to protest, to which del Valle responded, "what you did was not free speech, but in

27  fact free speech suppression. You impeded another group's ability to engage in free dialogue with

28  your disruption." The student replied that the event had continued, and del Valle said, "yes, by

35

1   huddling together so that they could here (sic) the mayor over the noise you were making. That is
2   not free speech or civil dialogue. You in fact attempted to shut down the event or at minimum
3   disrupt the event."

4   109.   Even after acknowledging the students' clear violations of the Student Code of
5   Conduct, del Valle told them that the student conduct process was meant to be "educational" and
6   that "GUPS was used (in effect) by both the Golden Gate Xpress and Hillel and the Mayor of
7   Jerusalem. The Xpress who egged them on to protest and the Mayor for his own self interest." After
8   intimating that the two instigators of the campus code-violative disruption were actually victims of a
9   Jewish conspiracy, Del Valle then issued a "No Action Letter with a verbal warning." Del Valle
10  concluded that the "students have learned from their mistakes and are not likely to repeat the
11  behavior."  On information and belief, no oversight of del Valle's determination was performed, and
12  neither the disruptors nor GUPS ever faced any consequences whatsoever for their behavior.

13  110.   In July 2016, in the middle of the investigation into the Barkat disruption, SFSU
14  replaced Defendant del Valle with Defendant Shimina Harris as Assistant Dean of Students &
15  Director, Student Conduct.  On information and belief, as Director of Student Conduct, Defendant
16  Harris had full responsibility for the Student Conduct office, including the imposition of
17  consequences for any SFSU students or student organizations that violate the Code of Student
18  Conduct.  SFSU's commissioned report finds that the students' "disruptive conduct violated San
19  Francisco State University's 'Time, Place and Manner' policy."  The same report stated that the
20  Chief of Police Parson "agreed" that the students had violated this policy.  SFSU has not imposed
21  any consequences on the students or student organizations that violated this policy or other
22  provisions of the Code of Student Conduct at the Barkat event.  Defendant Harris was Director of
23  Student Conduct when SFSU's commissioned report was released.  On information and belief, she
24  has done nothing to address these violations.

25  111.   It took President Wong more than three weeks after the Mayor Barkat incident to
26  issue any formal response. On April 13, 2016, more than a week after the event, Dr. Marc Dollinger,
27  SFSU's Goldman Chair in Jewish Studies, emailed President Wong saying that the San Francisco
28  Jewish community was concerned with his lack of attention to the matter. "Given that we are weeks

1   out of any substantial statement, they [the SF Jewish community] expressed concern about what they

2   should say to their constituents. Perhaps there might be some sort of intermediate statement issued

3   that would address 'the elephant in the room' i.e. the administration silence, and perceived

4   agreement, to either the protestors' right to shut down the talk, or to the very content of their shouts .

5   . . each day seems to increase the heat."  On April 14, 2016, Dr. Dollinger emailed President Wong

6   that "the Bay Area Jewish newspaper, *The J* … includes three separate pieces related to last

7   Wednesday's incident. They give a news article with an overview of what happened as well as a

8   reprint of [Plaintiff] Aaron Parker's blog. Finally, the editorial board has devoted its space to a

9   critique of events. In terms of this having legs, I believe it will get even bigger in the next day or

10   two. For those who take the time to scroll through the comments, links to your AMED speech

11   [declaring that GUPS is the 'very purpose of this great university'] are there, moving it from perhaps

12   the more marginal blogs into the mainstream Jewish press."

13       112.   It was not until April 25, nearly three weeks after the disruption occurred, that

14   President Wong began to draft a response.  Alison Sanders, assistant to President Wong, reached out

15   to Dr. Dollinger and Dr. Fred Astren, Chairman of the Department of Jewish Studies, to say that she

16   was "working with President Wong on his piece for *The J*.  He would really appreciate it if you'd be

17   willing to review the draft before we send this out to the community."  Dr. Astren and Dr. Dollinger

18   replied with extensive edits and comments.  The fact that President Wong refused to address the

19   problem without repeated requests from the Jewish community, and the fact that, even while

20   acknowledging the existence of a problem, he refused to take action beyond an empty letter that was

21   largely drafted by someone else, demonstrates his deliberate indifference to the struggles that Jewish

22   individuals face at SFSU. In waiting three weeks to make a statement, Defendant Wong left Jewish

23   people vulnerable to active and continued hostility directed at them on account of their religion,

24   while energizing the constituency responsible for targeting, harassing and intimidating them.

25   President Wong's op-ed was never distributed to the SFSU community-at-large.  The conscious

26   decision not to publish a statement to the SFSU community regarding the rights of Jewish students

27   reaffirmed SFSU's hostility towards them and the administration's acute and deliberate failure to

28   cure the situation. The op-ed seems to have been submitted only after the Jewish community's

1   immense distress was repeatedly brought to President Wong's attention, only for consumption by the

2   Jewish community, and only for the exclusive purpose of quieting the community, without any

3   intention of actually addressing the systemic problems the op-ed described.

4        113.   The report summarizing SFSU's commissioned investigation of the Mayor Barkat

5   event confirms that three students affiliated with Hillel filed complaints regarding the misconduct of

6   the GUPS disruptors at the Mayor Barkat event shortly after the failed event took place.  However,

7   not one of these complaints received any acknowledgment, let alone an adequate response, from

8   Student Affairs or Student Conduct.  The investigator noted that these complaints were not provided

9   to her in in her initial interviews with either the Dean of Student Conduct or the Dean of Students,

10   and she only received these complaints after several requests for copies, well over a month after the

11   initial interviews.  The investigator believed that this delay "further exhibits the lack of attention

12   given to the three students and their concerns" by the SFSU administration.

13        114.   On June 3, 2016 President Wong held a meeting with prominent members of the San

14   Francisco Jewish community, including Plaintiff Mandel in his capacity as Hillel's Student

15   President, as concern over the event continued to grow.  The meeting attendees had several specific

16   requests for changes to campus culture and policies that would make SFSU's campus environment

17   more welcoming and safer for Jewish students. The requests included a commitment to First

18   Amendment and time/place/manner policy enforcement and training; a swift and strong response to

19   discrimination, harassment, or the interference with the free speech rights of anyone on campus;

20   physical safety and inclusion of Jews on campus; and a commitment to funding and staffing the

21   Department of Jewish Studies. Plaintiffs Mandel, Volk, and Kern have each taken classes in the

22   Jewish Studies program. President Wong expressed his displeasure with this list of "demands," and

23   Mr. Mandel, who was present at the meeting, explained that these requests should not be considered

24   "demands" but "recommendations" to make students like him feel safer and more accepted at SFSU.

25        115.   On information and belief, during the same meeting, President Wong expressed that

26   he partially blamed Hillel for the outcome of the event because Hillel did not give him or the

27   University enough time to prepare for the Mayor Barkat event.  But Hillel met all of its obligations

28   when it provided the SFSU administration with advanced notice that it was sponsoring a speaker that

1    would require heightened security.  Hillel Director Oliver Benn responded to President Wong's

2    remarks by asking him why, if he did not feel that safety could be guaranteed, he did not say so at

3    the time that he was initially informed of Hillel's intention to bring the Mayor to campus.  For

4    example, in a March 29, 2016 email from Benn to SFSU administrators, a week before the event was

5    scheduled to occur, Benn warned the administration that high security and a pre-arranged strategy

6    was needed to ensure the event's safe occurrence because of the extreme likelihood that a group of

7    individuals, specifically GUPS members, would try to disrupt or cancel the event. There is no doubt

8    that the University knew *and* should have known of the potential for a raucous and potentially

9    violent disruption, with plenty of time to prepare adequately to ensure the free speech and free

10   association rights, and the safety, of the attendees.

11          116.    During the June 3, 2016 meeting, President Wong also attempted to distance himself

12   from Jewish students and their serious distress regarding SFSU's campus culture and environment.

13   Prior to the meeting, Wong had sent an email directing Hillel to send future concerns to either Dr.

14   Luoluo Hong, Dean Begley, and Police Chief Reginald Parsons. Wong explained that he was "not

15   divorcing [himself] from you or Hillel.  But there are institutional processes that must not be

16   compromised if our service and awareness is to reflect 'best practices.'"  In the meeting, he

17   complained that Jewish student concerns took up a disproportionate amount of his time.  He also

18   expressed that Jewish students had too much access to the President of the University and reiterated

19   his request that they instead reach out to lower level officials, thereby invoking an anti-Semitic trope

20   of Jewish power.  When confronted about this comment, he refused to acknowledge that this

21   reference to Jews' disproportional power was a well-established anti-Semitic stereotype, attributable

22   directly to the aforementioned "Protocols of the Elders of Zion," even after Jewish leaders present in

23   the meeting explained the history of such comments and described their personal offense at the

24   insinuation.  On information and belief, one of the Jewish SFSU professors present in the meeting

25   asked President Wong if his sentiment had been adopted from the GUPS statement on the Barkat

26   disruption, which was posted on the GUPS Facebook page, but has since been taken down.

27   Defendant Wong nodded "yes." Concerned and confused as to why Wong was regurgitating

28   disturbing anti-Semitic tropes ascertained straight from GUPS itself, and why he was not walking

the statement back after such a revelation, a Jewish community leader reiterated that the "Zionist power" and "Jewish power" allusion was categorically anti-Semitic.  Wong again nodded "yes."

117.   In a follow up letter from all of the meeting's attendees memorializing the conversation, the Jewish leadership again mentioned the offensive nature of President Wong's "Jewish power" implication, to give Wong the opportunity to express regret for having perpetuated it. He did not. When Goldman Chair in Jewish Studies, Marc Dollinger, again brought up the topic in a December meeting with Defendant Wong and other Jewish community members, Wong replied: "I am the president of all students, not just the Jews."

118.   In November 2016, President Wong requested that several Jewish faculty members come to an on-campus meeting between SFSU and a major Jewish community philanthropic organization, the Koret Foundation.  Koret had pledged to give a $1.7 million gift to SFSU, but had held back because of concerns about anti-Jewish animus on campus, especially after the shut-down of Mayor Barkat's speech and the lack of a sufficient response from SFSU following the event.  On information and belief, the intent of the request was to have Jewish faculty members, simply by virtue of their Jewish identity, reassure the donor so that the donor would not withhold its pledge.

119.   On information and belief, the faculty members to whom this request was made felt that they were put in an impossible position.  They did not want SFSU to lose the gift, which would hurt the students, but they were also not willing to whitewash the extent of the University's "Jewish problem" to protect the administration from the Koret Foundation's entirely appropriate examination.  The faculty requested a separate meeting with President Wong in advance of the Koret meeting, which took place on December 8, 2016.  On information and belief, at this meeting, President Wong remarked that in his entire career he had never had a donor invoke "political reasons" to withhold a gift.  One of the faculty members inquired whether political reasons referred to the anti-Israel or anti-Zionist culture on campus.  President Wong corrected the faculty member and said that political reasons referred to the general campus climate for Jews.  Given that the climate for Jewish students is pervasively hostile, discriminatory, and threatening in every sense, the faculty member explained to Wong:  "**The physical safety of Jewish students is never a political issue.**"  President Wong responded:  "**On this we will have to agree to disagree.**"

40

120.    President Wong's dismissal of the physical safety of Jewish students as only a "political issue" was displayed throughout SFSU's refusal to investigate physical threats to Plaintiff Jacob Mandel when he was the Student President of Hillel.  Shortly after the Mayor Barkat event, Mr. Mandel was physically intimidated by a male student who separated himself from a group of Ethnic Studies protesters as Mr. Mandel walked by.  This student hastened himself towards, walked directly at, and stopped immediately in front of Mr. Mandel, less than one foot away, scowling at him threateningly.  Because of his aggressive physical posture, Mr. Mandel thought that this student was deliberately trying to initiate an altercation and was about to strike Mr. Mandel.  Mr. Mandel had been similarly "stared down" before by GUPS members at various times on campus in other instances, and has felt unsafe on campus since his freshman year.  Mr. Mandel has missed class due to concerns about his physical safety.  Mr. Mandel reported these and other concerns to SFSU (including EO 1097 claims[8] on April 6, 2016 and May 2, 2016) and SFSU refused to act upon them. In fact, the report of SFSU's commissioned investigation of the Mayor Barkat event confirms that the University took no action on Mr. Mandel's complaints relating to the Mayor Barkat event until June 10, 2016, at which point Mr. Mandel was not even on campus, after having left Mr. Mandel continuously vulnerable for more than two months.

121.    On May 12, 2017, California State University Chancellor Timothy White weighed in on the ubiquitous anti-Semitism at SFSU, in response to a letter-writing campaign pursued principally by a San Francisco Jewish community organization, the Jewish Community Relations Counsel (JCRC). Chancellor White declared his full support of President Wong, after saying that "the CSU and SFSU are committed to inclusive academic excellence and the promotion of safe, welcoming and academically rigorous learning environments for all students, as well as for faculty, staff and guests … As a public university – and consistent with our mission and requirements of both the State and Federal Constitution – we also allow speech and protest of all persuasions on our campuses, even if we strongly disagree with or find repugnant the perspective being offered, and as long as the speech complies with our content-neutral campus time, place and manner policy. I

---

[8] Executive Order 1097 is the CSU systemwide policy prohibiting discrimination, harassment, or retaliation.

1   strongly and unequivocally support President Wong's on-going and new efforts to improve the

2   climate at SFSU."  Despite Chancellor White's awareness of these issues, they continue to remain

3   unaddressed.

4       122.    Eleven months after the shut-down of Mayor Barkat's speech, SFSU held a meeting

5   with Jewish leaders to discuss the University's follow-up to the Barkat event.  During that meeting,

6   Ms. Begley admitted, as President Wong has also reluctantly admitted, that mistakes were made by

7   the administration in handling the Mayor Barkat event.  Unfortunately, despite these admissions,

8   SFSU has done nothing to acknowledge the impact of those mistakes or take the crucially necessary

9   steps to prevent them in the future, or to address SFSU's active involvement in and tacit approval of

10  the rampant and ubiquitous discriminatory actions targeting Jews on campus, thereby failing to cure

11  the hostile environment.

12            **Defendants' Selective Protection of Free Speech Discriminates Against Jews**

13      123.    SFSU's long-engrained history of fomenting anti-Jewish animus on campus, not

14  surprisingly, includes an equally long list of anti-Semitic speakers at events sponsored, funded,

15  promoted, and celebrated by the University and its administrators and faculty, coupled with special

16  solicitude towards other groups on campus that support terrorism and/or radical anti-Jewish views.

17  As stated in the introduction, Plaintiffs acknowledge the First Amendment rights of those with

18  opposing viewpoints, even those they find vile and offensive, so long as the line is not crossed into

19  inciting imminent violence.  The following examples are noteworthy to demonstrate the rabidly anti-

20  Semitic speech and conduct that is supported on campus, as compared with the assault on the free

21  speech rights of Plaintiffs and other Jews:

22  ▪   In 1994, well-known anti-Jewish activist Ralph Schoenman spoke on campus, in an event
        whose fly and flyers for the event advertised that students could "come and find out why
23      the Zionists hide behind the term 'anti-Semitic' when they are condemned by the masses
        for their evil actions against helpless people."

24
    ▪   In 1995, former student body president Troy Buckner-Nkrumah wrote an op-ed piece in
25      SFSU's student newspaper that accused Jews of controlling Congress and the media.  His
        article also said "I support Palestinian groups like Hamas who have not sold out their
26      land and continue to put bullets in settlers."

27  ▪   In 1997, Khalid Muhammad spoke on campus, in an event whose flyers listed tickets
        prices as $7 for students and $15 for "Zionists, Uncle Toms and other white
28      supremacists," and made the following statements:

                                            42

"The practice of those freakish Rabbis [circumcision] is that they place their lips on the penis of these young boys and after they have cut the foreskin back, suck the blood from the head of the penis of their own young boys."

"The Federal Reserve is privately owned and a so-called Jew controls the Federal Reserve. . . . Talking about the National Debt, the Federal Debt, someone should ask, well who the hell do we owe. . . . And who in the world has that much money that we would get in debt with them. . . . Who are the rich power brokers behind the scenes? . . . Why is the Federal Reserve controlled by the so-called Jew?"

"Our entertainers, our basketball players, our football players, our track stars, our baseball players, our entertainers and athletes are in the palm of the white Zionist Jew's hand."

- In 2000, Jewish students participating in a pro-Israel student rally on Malcolm X Plaza were spat upon by GUPS demonstrators.

- In 2002, on Holocaust Memorial Day (Yom HaShoah), Malik Ali, the first Muslim student body president at SFSU reportedly known for supporting Hamas and Hezbollah and equating Jews and Nazis, praised suicide bombings against Israeli targets and said that Israelis should return to Germany, Poland and Russia.

- That same day, Jewish students' Yom HaShoah-commemoration on campus—an event that commemorates the Holocaust and which is unrelated to Israel or Zionism—was disrupted by scores of anti-Israel protesters, including some urging Palestinian suicide bombers to "Go, honey, go!" and one speaker decrying "Zionist Power."

- At the October 2009 COES conference, Malik Ali spoke on campus again and closed his speech with the following words about SFSU:

"If you are a radical or revolutionary or progressive, San Francisco State is home court. This is a Zionist-free zone! And that is why the Zionists have to hide behind the Republican party. The Zionists cannot come out on this campus and say, "We're Zionists!" They can't do it! It's *a Zionist-free campus*! . . . We've had Muslim student body presidents here. I was the first one! Do you know we had [Sharia compliant] emergency loans, interest free? Interest-free emergency loans   -- we took over the student government -- you have to know this history! I was the first Muslim student body president…and this troublemaker to my left [fellow panelist Hatem Bazian] was the third. And we understood: This is San Francisco State! Bring 'em out into the open, because they're like a night flower. There are certain flowers that blossom at night, but when the sun comes out they go back in  -- that's the Zionist Jew. That's the Zionist Jew! At the nighttime they come out, but once the sunshine comes out, once the light is put on them, they scatter. But bring 'em out into the open! This is *a Zionist-free zone*, this is *our home court*, and we'll make sure we *keep* it our home court."

- A November 2009 SFSU event featured Omar Barghouti, one of the founding members of the BDS movement. Barghouti, a notorious anti-Semite, publicly and vehemently calls for the destruction of the Jewish state and for "euthanasia" of Zionism – the right of the Jewish people to safety, freedom and self-determination in their historic homeland. These events both directly and indirectly advocate for harm to Jewish people.

- On September 30, 2015, SFSU hosted Palestinian "human rights activist" Bassem Tamimi in an event sponsored by GUPS and AMED.  Numerous members of the Tamimi family have been imprisoned for the murder of Jews and Israelis, including his cousin Ahlam Tamimi for participating in the infamous 2001 Sbarro bombing.  While on his

nationwide speaking tour, Tamimi reposted on Facebook modern variants of the vile anti-Semitic "blood libel," alleging that Israelis arrest Palestinian children to steal their organs, which is covered up by the "Zionist" controlled media.  Tamimi secured his visa for his tour of nationwide speaking events by fraudulently concealing arrests and convictions for his efforts to start a "third intifada," and the discovery of his criminal past resulted in the revocation of his visa.

124.    The University's direct action and complicity in preventing Mayor Barkat's speech stands in direct contrast to these repeatedly sponsored and supported events focused on speech *against* Jews and/or the Jewish state of Israel, wherein the term Jew and Zionist is used interchangeably by the speakers during their bigoted presentations.  Plaintiffs and other Jewish students are clearly not the beneficiaries of equal protection as it relates to free speech at SFSU.

125.    In contrast, SFSU has bent over backwards to protect the most trivial concerns of students and faculty hostile to Jews, even seeking to punish clearly protected speech and responding rapidly and publicly in condemning such disfavored viewpoints.  In 2006, after the defacing of the flags of [U.S. State Department designated foreign terrorist groups] Hamas and Hezbollah at an on-campus anti-terrorism rally by the SFSU College Republicans, SFSU sought to discipline the group and two of its officers for violating unconstitutionally vague provisions of the Student Code of Conduct.  That the conduct that SFSU sought to punish was "core political expression in a classic public forum" did not dissuade SFSU from its efforts to protect the sensibilities of other student groups, including supporters of Hamas and Hezbollah.  On October 17, 2016, posters branding SFSU associate professor of Ethnic Studies and GUPS faculty adviser Rabab Abdulhadi as a collaborator with terrorists were plastered throughout campus by a totally independent organization, the David Horowitz Freedom Center, with which SFSU's Jewish community had (and continues to have) no relationship whatsoever.  President Wong *immediately* issued a statement that very day declaring the posters to be "an attack on our whole campus community," and stating that "a line has been crossed."

126.    When nearly identical speech or conduct is performed by both Hillel and any group or individual affiliated with COES, there is a clear and irreconcilable dichotomy in the responses issued by Defendant Wong, Defendant Monteiro, and other university administrators. For example:

- When Omar Barghouti, BDS movement founder and outrageous anti-Semite who

44

frequently calls for the genocidal annihilation of the Jewish state (including all of its inhabitants), was invited to speak at SFSU, Defendant Kenneth Monteiro defended the discussion, citing academic freedom. He wrote that "removing my association with our students because of whom they have chosen to listen to would produce a chilling effect for them on their expression of their right to expression and communication. I have spoken at a number of student events where one or more speakers were quite controversial, even where I vehemently disagreed with one or more of them … The right to expression and congregation that I am supporting as an academic is that of our students who invited me." However, ironically, while weighing in on the Barkat event and subsequent chaos, Defendant Monteiro equated Mayor Barkat with the "KKK or a Nazi" and expressed extreme disapproval with the suggestion that Barkat had been re-invited to SFSU. He wrote, without any factual basis for such allegations, "I understand why for Palestinian members of our community and allied members of the community, inviting the Mayor is akin to inviting a member of the KKK member or Nazi party. He is a known supporter of using live ammunition on protestors in Jerusalem and also a supporter of Israel's policy allowing assassination of Palestinian dissidents. Specifically, this policy puts the lives of some of the members of our SFState community in danger when they are anywhere in the world…I wonder why the campus treated his visit with such little preparation. Typically, when we know a speaker associated with potentially volatile viewpoints will be on campus, we usually alert the campus, prepare both for his speech and also for protest, and consider the potential for teachable/learnable moments…**I am concerned that the university is on record as offering a university invitation to the Mayor to return, putting an institutional imprimatur on his presence, particularly as we are adjudicating a complaint that involves his presence…"**

- In early May 2016, following the University's declaration that COES and all other groups would face budget cuts, Defendant Abdulhadi effectively conscripted Ethnic Studies students—most of which are also members of GUPS—to demand increased funding for COES by staging a hunger strike in the middle of SFSU's campus. Four students participated in the strike for a week, at nearly all times surrounded by a screaming mob of protestors carrying Palestinian flags and demanding $8 million from the university, as well as a commitment from President Wong *not to investigate GUPS students for disruption of the Barkat incident*. Defendant Wong decided to engage in negotiations with these students and consider their 26 demands. In addition to agreeing not to investigate or punish those responsible for the Barkat disruption (or any other "advocacy"), Wong agreed to pay $482,806 "in support of advancing the College [of Ethnic Studies] -- in addition to the $250,000 commitment for AY 2016-17 earlier already made by the President."  In his statement addressing the Joint Agreement ending the hunger strike, Defendant Wong agreed that "the President and the students and faculty in the College of Ethnic Studies commit to meeting regularly to review, analyze and plan for the remaining demands not addressed directly in today's negotiations." Conversely, when Jewish community members, along with then-Hillel President, Plaintiff Jacob Mandel, communicated their reasonable desire to be treated as equals on campus; to see the enforcement of all students' constitutionally protected rights; and to feel secure in the future existence of the Department of Jewish Studies, Defendant Wong communicated on various occasions that he was "upset" about the "list of demands," that he "would not at this time respond to your demands," and ultimately, that four out of six of the reasonable suggestions offered by the Jewish community should be addressed through other process and/or administrators, including the Dean, the Provost, and the ORSP (Office of Research and Sponsored Programs).

- On information and belief, during the hunger strike and at other times in the last several years, Defendant Wong closed down the fifth floor of the administration building, where his office is located, and sent administrators to work from home, out of fear of dangerous demonstrations outside his office by individuals affiliated with COES. Although

frightened for his own personal safety, and in sending staff away from the building, acknowledging the potential that they could face threats or harm, Defendant Wong did not acknowledge the reasonable fears of members of the SFSU Jewish community. While protecting himself and his staff from the same people threatening the physical security of Jewish students, several EO 1097 complaints (including those filed by Defendant Mandel on April 6, 2016 and May 2, 2016) sat pending, but disregarded.

- When pro-Israel website "Canary Mission" posted pages identifying the two primary orchestrators of the Barkat disruption, SF Hillel Director Oliver Benn alerted university administrators that students had been exposed and that the university may want to offer support. Defendant Begley emailed Defendant Stuart on the next business day, saying "Could you please make it a priority today to contact these two students to…talk to them about any safety concerns they have as a result. I would also loop Reggie in as well." Stuart wrote to them saying "If there is anything you feel the Office of the Dean of Students can assist with, particularly in regards to your safety and security on campus, please do not hesitate to contact me." In contrast, on information and belief, and with full knowledge of the subjective feelings of fear and physical vulnerability felt by the SFSU Jewish community, not one Defendant unilaterally approached a single Plaintiff or other Jewish community member to offer support or safety after the Barkat event, nor during or after the COES hunger strike, nor during or after the time when Mohammad Hammad social media threats were exposed, nor during or after campus events such as the one involving the "My Heroes Have Always Killed Colonizers" stencils, nor before or during the time that former GUPS Student President Mohammad Hammad was stealthily "readmitted" to campus (after posting a picture of himself with a knife stating that he wanted to murder Israeli soldiers). In fact, when Jewish students proactively filed grievance reports alerting administrators that they felt physically unsafe on campus, those reports were ignored.

- Although Defendant Wong wasted no time in condemning the Horowitz posters, it took weeks for him to declare any opposition to a racist, anti-Semitic, on-campus postering campaign recently undertaken by the Workers Union Party, an organization with a long and proud history of anti-Jewish animus. Even after being informed via a letter from students that the posters targeted them as Jews, President Wong refused to respond publicly for several weeks, ultimately sending an email at 7:19 p.m. Pacific time on Friday, June 16, 2017, just as the weekend began and while there were no students on campus. While the Horowitz posters were immediately condemned as Islamophobic, anti-Semitic speech is almost always protected or ignored by the SFSU administration.

- Similarly, when Defendant Abdulhadi faced harsh criticism after taking a publicly-financed trip to Palestinian territories in order to meet with notorious members of U.S.-, E.U-, U.K., and Canadian-designated foreign terrorist organizations, Defendant Wong came out in full support of Abdulhadi's "academic freedom." SFSU's official statement declared that "San Francisco State University will continue to respect academic freedom, and we will not censor our scholars nor condone censorship by others." While wholeheartedly endorsing Defendant Abdulhadi's "academic freedom" to spend SFSU money to travel and engage in pro-terror meetings, Defendant Wong is yet to take any steps to actually address the assault on Jewish students' civil rights at SFSU, or Jewish students' academic freedom on campus.

127.    During a November 7, 2013 rally on campus, GUPS organizers handed out stencils so people could paint placards saying "**My heroes have always killed colonizers**," and stencils of a picture of Leila Khaled, wearing a keffiyeh and carrying a machine gun, with the declaration

"Resistance is not Terrorism."  Khaled is an internationally-recognized PFLP terrorist, notorious as the first female plane hijacker, who hijacked two planes and committed several other terror attacks, including the assassination of a Jewish member of the Knesset (Israeli parliament).

 

128.    GUPS was literally encouraging its fellow students to embrace the cold-blooded murder of Jewish civilians, the President of GUPS at SFSU, Mohammad Hammad, posted the following on Tumblr after the rally:



129.    That same message, "My Heroes Have Always Killed Colonizers" was written in chalk on the stage on Malcolm X Plaza in a "State of Emergency" rally held on December 5, 2013:



130.    After the rally encouraging the stenciling and distribution of these pro-"killing" signs, President Wong issued a statement that for the first time was critical of GUPS's conduct in any meaningful sense, although it did not even identify GUPS and still failed to promise any action to protect Jews—the direct victims of these threats.  President Wong merely stated that he was "deeply disturbed" and "dismayed by the glorification of violence" in the message.  He elaborated that "[t]here is no place at SF State for celebrating violence or promoting intolerance, bigotry, anti-Semitism or any other form of hate-mongering," and noted that "[e]ngaging in expressions that threaten and intimidate" are counter to the university goals of "maintain[ing] a safe environment" "where dialog, debate, and the marketplace of ideas are cherished."

131.    On information and belief, GUPS and AMED were outraged to hear any criticism from President Wong, even though it did not even mention them by name, but referred only to "several student organizations."

132.    Wong responded by retracting his earlier condemnation and adopting a position of wholesale indifference to Jewish students, and now embracing "free speech in all its forms" in a letter to the campus in December 2013:

▪    "Universities, especially public universities, play an essential role in fostering
        debate. We treasure this role at our campus, where social justice is a strategic

48

priority and our commitment to free speech runs deep.  We work hard to achieve a balance where both expression and safety are fostered.

- First and foremost, **I ask that you stay firmly committed to free speech**.  Strong opinions—and strong disagreements—are essential to the life of our democracy, and the life of our university. **While one may want to step in and sanction a student or colleague for speech we find repugnant, our obligation is to allow the lawful airing of views.**

- Second, **trust that I will step in when speech or actions cross the line into violations of law or University policy**. **I am absolutely committed to maintaining a safe environment.** In both recent cases, for example, we have conducted thorough threat assessments with law enforcement, increased campus safety measures, facilitated dialogue with student groups, offered counseling resources and initiated the student conduct review process**. I am confident these actions protect both the safety and the rights of our campus community...**

- Third, **keep an open mind**.  I have spoken before about the obligation to own your own mind. Issues being debated on campus can capture widespread attention.  This can be a welcome contribution to the dialogue. It can also be a source of confusion, misinformation, and pressure to subvert our processes.  **Each of us at this university is a scholar—whether student, faculty member or staff—and each of us has the obligation to form opinions and take action based on exploring, analyzing and carefully listening before drawing conclusions.**

133.    Mohammad Hammad, the 2014 president of GUPS at SFSU, repeatedly posted his fantasies about stabbing and killing Israelis and Israel supporters on social media websites. Alarmingly, one of Hammad's posts was a picture of himself brandishing a large knife with a caption that read:

> **I seriously can not get over how much I love this blade.  It is the sharpest thing I own and cuts through everything like butter and just holding it makes me want to stab an Israeli soldier.**



FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

Other violent social media posts by Hammad include, but are not limited to:

- Reposting another picture of a large sword and adding his own commentary: "I WANT IT IMAGINE ME CUTTING OFF THE HEADS OF THOSE IN THE IDF WITH THIS"

- Posting, on a different Tumblr account, his fantasies of killing specific IDF soldiers (some of whom were enrolled at SFSU at the time):

    I'm sitting here looking through pictures of that f—ing scum [name removed to protect the soldier] … Anyone who thinks there can be peace with animals like this is absolutely delusional, and the only 'peace' I'm interested in is the head of this f—ing scum on a plate, as well as the heads of all others like her, and all others who support the IDF. The Liberation of Palestine can only come through the destruction and decimation of this Israeli plague and it can't possibly come soon enough.

- In response to a query "how can I help actively support palestine?" Hammad responded that the person should join a designated terrorist group (PFLP) and murder Israelis:



/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

- ▪ Posting a picture of himself brandishing a knife as his Facebook profile picture on December 8, 2012, commenting on it, "The IDF won't stand a chance heh"



- ▪ "Oh/And, tomorrow is (hopefully) the day I find out if **I will be the President of the General Union of Palestine at my school . . . Hopefully I'll be able to radicalize half of our population and bring them back with me as fighters.**"



/ / /

/ / /

/ / /

- A post about "Kill[ing] most people," including "colonizers" (i.e., Israelis):



- "There are children shouting outside and I want to set them on fire;"
- "I think about killing a lot/and some of you are usually the targets of my daydreams;"

134. One of Hammad's political science classes was attended by an Israeli student who had served in the Israeli Defense forces (IDF), Shachar Ben-David, who had openly and repeatedly spoken about her military service and her support for Israel in class. After Ms. Ben-David realized that her classmate was the same person making these lurid threats against IDF soldiers such as herself, she became afraid for her safety. She was uncomfortable even being in the same room as Hammad, and sought and eventually received an accommodation to take her final exam in a separate room. Ms. Ben-David also went to the Dean of Student Life to discuss how to deal with these violent threats by Hammad, which Ms. Ben-David reasonably felt were directed at her. The Dean of Student Life suggested a psychological referral for her feelings and offering a campus security escort if she felt unsafe, but refused to do anything to actually address the problem itself—Hammad and his violent threats. Ms. Ben-David made sure that someone knew where she was at all times during finals week, and did not walk alone around campus. Ms. Ben-David had a Campus Police security escort walk her to her car at night that week, which she had not done at any other time previously at SFSU.

135. After hearing nothing from President Wong elucidating a plan to ensure the safety and well-being of Jewish students like Ms. Ben-David after Hammad's multiple violent and threatening messages, including messages implying that he was actively recruiting students to

engage in terrorist acts, the AMCHA Initiative, a nonprofit Jewish civil rights organization that seeks to combat anti-Semitism at institutions of higher education, sent all of the threatening social media postings and multiple letters to President Wong documenting the ties between GUPS and its president, Hammad, and faculty adviser Professor Rabab Abdulhadi, and the PFLP.  Robert Nava, SFSU's Vice President for University Advancement, reported to the *Jewish Press* in 2014 that Hammad was "no longer a student on campus," and was no longer in student housing or enrolled at SFSU.  However, Hammad remained a registered student at the University and was *surreptitiously permitted back on campus* to complete his degree and receive his diploma – without any warning to the Jewish community and without the implementation of any measures of protection for those students and professors who reasonably feared for their safety in Hammad's presence.  Any comfort or relief Jewish students had from being informed that Hammad was "no longer a student on campus" was entirely artificial, and in fact they were in more danger than had no action been taken, as SFSU gave them the impression that they could essentially let their guard down, even though in reality, they unknowingly remained vulnerable to Hammad's chilling threats.  It is not clear whether SFSU actually ever formally suspended him.

136.    Despite all of GUPS's intentionally threatening and hostile actions toward Jewish students, and its student President's extremely disturbing, explicit, and frequent threats of violence, President Wong has consistently gone out of his way to *praise* and *encourage* the group.  As one example, in April 2015, after GUPS President Mohammad Hammad's brandishing his knife in a post that directly targeted Ms. Ben-David and others (and regarding which Ms. Ben-David formally complained to the University), President Wong addressed AMED and GUPS in remarks that were filmed.  During this address, President Wong offered his "personal congratulations" to the student leadership of the same group that would take credit for shutting down Mayor Barkat's event and request that SFSU exclude Jewish students from the "Know Your Rights" Fair:

> **I want to offer my personal congratulations to the student leadership of GUPS. They have been an inspiration for me. And they have helped me when I have to tell other community groups to mind their own business. <u>GUPS is the very purpose of this great university.</u>**

The "help" President Wong had needed to "tell other community groups to mind their own business"

1    was a thinly-veiled reference to Jewish students and Hillel for daring to seek equal treatment and

2    protection of their civil rights and physical safety on SFSU's campus—an effort that because of

3    SFSU's open discrimination, antagonism, and deliberate indifference, has forced Plaintiffs to bring

4    this action.

5                **SFSU Sponsors Professor Abdulhadi's Meetings with Terrorists**

6        137.    Moreover, in 2014, Dr. Rabab Abdulhadi, a professor in SFSU's College of Ethnic

7    Studies (in addition to her role as GUPS faculty adviser), was awarded $7,000 of SFSU's taxpayer

8    funds to travel to the Middle East to conduct "research."  On information and belief, a second SFSU

9    Professor, Joanne Barker, joined Abdulhadi on this trip.  The real purpose of Abdulhadi's trip was to

10   meet with representatives of designated Islamist terror organizations, including the convicted

11   hijacker and Popular Front for the Liberation of Palestine terrorist, Leila Khaled, whom Abdulhadi

12   describes as a "Palestinian feminist icon," an "icon in liberations movements and…an icon for

13   women's liberation."  Abdulhadi also met with, among others, Sheikh Raed Salah, who has been

14   repeatedly jailed on charges of incitement to terrorist violence.

15       138.    A coalition of Jewish civil rights and Israel advocacy groups led by AMCHA sent a

16   letter to the California State Controller, John Chiang, making the state aware of Professor

17   Abdulhadi's use of state taxpayer dollars to fund her "political solidarity tour," as quoted by the

18   Professor herself, throughout the Middle East.  In a brief statement released on or about June 19,

19   2014, President Wong stated that he knew of Abdulhadi's whereabouts in the Middle East, that the

20   allegations against Abdulhadi for misusing university funds "have no merit," and that SFSU "will

21   not censor our scholars nor condone censorship by others."  SFSU went even further to admonish

22   AMCHA "for their continued ill intent and propaganda style tactics," even though there was ample

23   evidence of Professor Abdulhadi's meetings with terrorists on SFSU's dime.

24       139.    Abdulhadi also spearheaded the establishment of a formal collaboration with a

25   written Memorandum of Understanding between SFSU and An-Najah National University in the

26   West Bank, a known recruitment facility for Hamas, a designated foreign terrorist group, including

27   Hamas's efforts to recruit suicide bombers.  Hamas itself has called An-Najah a "greenhouse for

28   martyrs."  Nevertheless, this Memorandum of Understanding explicitly included a student exchange

program through which students indoctrinated to hate Jews would be sent to San Francisco and SFSU students would travel to An-Najah where they would likely be radicalized in ways that could further endanger Jewish students on campus when they return, or at least exacerbate the already hostile environment for Jews on campus at SFSU.

140.    According to one of Mohammad Hammad's social media posts, in which he bragged about "taking down Hillel morons," Hammad wrote that "there was an offer by my professor [Abdulhadi] for me to join her and a delegation that she is taking to Palestine on a 10-Day trip...But most of all [t]he thing that has me fangirling and going crazy is . . . I WILL GET TO MEET LEILA KHALID . . . . I woke up this morning thinking it would be just another shitty Wednesday [b]ut just LEILA KHALID . . . #i'm super excited."  It is unknown whether Defendant Abdulhadi invited other current or former SFSU students on this trip that culminated in the Memorandum of Understanding with An-Najah.

141.    Furthermore, on information and belief, in order to succeed in Dr. Abdulhadi's class, or nearly any other class in the Ethnic Studies Department, students must pass a political litmus test, a central feature of which is a commitment to anti-Zionism.  For example, papers that do not espouse anti-Zionism, or merely argue in favor of Israel's right to exist, will not be respected or well-graded by the professor, no matter their academic merit.  On information and belief, there have been Ethnic Studies classes that deny the existence of the Jewish state in class materials.  Both faculty and many Jewish students, including Plaintiffs, believe that Jewish students would be unfairly targeted if they were to enroll in courses in COES, especially those taught by Dr. Abdulhadi.

**The Intentional and Discriminatory Exclusion of Hillel from the "Know Your Rights" Fair**

142.    Mr. Mandel's, Mr. Volk's and Mr. Kern's rights of free speech, association, and religious expression were infringed upon by SFSU's coercion and intentional exclusion of Hillel from the "Know Your Rights" Fair held on Tuesday February 28, 2017 at Jack Adams Hall in the Cesar Chavez Student Center, located in SFSU's main campus center.  This was the same venue that Hillel had sought to secure for the Mayor Barkat event but was denied without legitimate explanation.

143.    On information and belief, Defendant Birello (as Student Organization Coordinator),

55

1   Defendant Jaramilla (as Coordinator of Meeting & Event Services), and Defendant Piccinotti (as

2   Event & Technical Services Manager) are each responsible for coordinating and managing student

3   organization events such as the "Know Your Rights" Fair, including ensuring that no registered

4   student organization is intentionally discriminated against, improperly excluded, or otherwise subject

5   to violations of established SFSU policies (including the Non-Discrimination Policy) or state or

6   federal law.  On information and belief, despite these responsibilities, Defendants Birello, Jaramilla,

7   and Piccinotti (like the other Defendants named in the Third and Fourth Causes of Action) allowed

8   the admitted intentional discrimination and exclusion of Hillel to occur, choosing not to address

9   Hillel's intentional exclusion in any way.  Allowing this exclusion of Hillel violated Plaintiffs' rights

10   under the First and Fourteenth Amendments.

11       144.   The fair was an official SFSU event, sponsored by the SF State California Faculty

12   Association, the Cesar E. Chavez Institute, the College of Ethnic Studies, the Dream Resource

13   Center, the Ethnic Studies Student Organization, General Union of Palestine Students, Improving

14   Dreams, Equity, Access and Success (IDEAS), and the Muslim Student Association.   This

15   intentional exclusion from the "Know Your Rights" Fair at Jack Adams Hall denied Plaintiffs their

16   First Amendment rights, their constitutional right to equal protection, and other rights under the laws

17   of the United States and California.  Further, SFSU provided unequal and inferior accommodation to

18   Jewish students and community members because of their beliefs and their Jewish identities by

19   purposefully choosing to exclude Hillel from the "Know Your Rights" Fair.

20       145.   According to the "Know Your Rights" Fair page on SFSU's website

21   (http://cci.sfsu.edu/resist), the event was "an informational and training fair for vulnerable

22   populations who may be feeling targeted in the new political climate in the country since the

23   presidential election."

24       146.   Jewish members of the SFSU community are certainly a "vulnerable population who

25   may be feeling targeted in the new political climate in the country since the presidential election."  In

26   addition to the history of anti-Jewish events on campus environment discussed above, Plaintiffs

27   point to the following:

28

a.      According to the Anti-Defamation League (ADL), American Jews faced a 34 percent increase in anti-Semitic incidents from 2015 to 2016, and an alarming 86 percent increase in the first three months of 2017. The ADL further reported that "there were nearly as many incidents of anti-Semitic bullying and vandalism at K-12 schools in [the first three months of 2017] as took place in all of 2016." Persecution of Jews skyrocketed on the Internet during the presidential campaign; the ADL found that there were 2.6 million anti-Semitic tweets sent during a 12 month period. ADL CEO Jonathan Greenblatt stated that "[t]here's been a significant, sustained increase in anti-Semitic activity since the start of 2016 and what's most concerning is the fact that the numbers have accelerated over the past five months," i.e., since the 2016 presidential election. Nowhere is this problem more prevalent than it is at SFSU.

b.      The surge in anti-Semitic threats and incidents after the 2016 presidential election was widely reported, and included bomb threats, desecration of Jewish cemeteries, harassment, physical threats, vandalism and assault. In the first three months of 2017, there were 155 incidents of vandalism at Jewish homes or institutions; 380 incidents of anti-Semitic harassment; and 6 incidents of anti-Semitic assault nationwide. In California alone, there were 21 incidents of vandalism and 66 incidents of harassment reported during that period. California, with its comparatively large Jewish population, has consistently ranked as the second-highest state in the union in terms of the number of anti-Semitic incidents.

c.      Most relevant, anti-Semitic incidents at colleges and universities have been rising at exponential rates, doubling from 2014 to 2015[9] and increasing from 90 to 108—another 20 percent—from 2015 to 2016.[10]  Researchers have found that U.S. college campuses continue to be a "hotbed for anti-Semitism," finding a 45 percent increase of anti-Semitism of "all forms" including harassment and insults as well as a "sharp spike" in racist and anti-Semitic graffiti and vandalism following the election. These illustrations often portray swastikas and other Nazi imagery.

d.      According to the FBI hate crimes statistics from 2015 (the most recent year

---

[9] *See* https://www.adl.org/news/press-releases/adl-audit-anti-semitic-assaults-rise-dramatically-across-the-country-in-2015.
[10] *Id.*

FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

1    calculated), anti-Jewish incidents accounted for 52.1 percent of all religiously motivated hate crimes.

2    Muslims were the victims 21.9 percent of the time, followed by Catholics, Protestants and

3    atheists/agnostics. As previously mentioned, for many years, Jews have been targeted nearly three

4    times as often as the next-most-targeted religious group.

5          147.    For all these reasons, Plaintiffs are part of such a vulnerable population, especially as

6    students directly experiencing the anti-Jewish animus on campus and facing the hostile, pervasive,

7    and discriminatory environment which has been fostered by Defendants at SFSU and designed to

8    target Jews.  Any suggestion that Jews are not marginalized and not entitled to engage in, or be

9    represented during, campus discussions of vulnerable populations, is itself a tragic but ironic

10   example of the classic anti-Semitic stereotype of Jews as a disproportionately powerful population.

11         148.    The fair advertised (through the SFSU website) that it would include "student groups"

12   and that "[t]ogether, we will attempt to inform our students, faculty, staff and public about potential

13   threats to their rights given the new political reality."  The "goal is to inform the public about our

14   rights and how we can defend ourselves and become involved in the resistance movement."

15   Plaintiffs, seeking to both share and receive information about their experience as a vulnerable,

16   targeted population, and engage in discussions addressing ways to handle potential threats to their

17   rights or their bodily integrity, sought to participate in, and benefit from the fair. They expected and

18   planned to participate as members of the student group that represents them: Hillel.

19         149.    Plaintiffs had a right for their student group, Hillel, to be included in the fair, on the

20   same basis as and with equal opportunity to participate as any other group. Plaintiffs and other

21   similarly situated students had a right to participate, to be informed of their rights, and to engage in

22   constructive dialogue pertaining to the protection of those rights. However, on information and

23   belief, other groups—namely GUPS—threatened to pull out of the fair if Hillel were included.

24         150.    On information and belief, Hillel was invited to the fair by accident, and once the

25   invitation had been extended, the event's organizers (including COES, GUPS and MSA) worked to

26   find a way to rescind. Jason Steckler, SF Hillel's Israel engagement associate, received an email

27   addressed to his personal account, asking if he would like to table at the event. He responded in his

28   capacity as a Hillel staff member and on behalf of Hillel, indicating a desire to participate. He was

then subjected to a viewpoint-based test before being initially invited to participate in the fair: the organizers asked his opinion about a postering campaign by an independent, off-campus group, the David Horowitz Freedom Center, with which Plaintiffs and Hillel had no affiliation whatsoever (nor do they today). After providing what was apparently a satisfactory response to the questions regarding these posters, Jason received word that Hillel was welcome to participate. However, after receiving this confirmation, on information and belief, SFSU consciously and intentionally decided to exclude Hillel from the event, and did so by surreptitiously changing the cut-off date for registration with the goal of excluding Hillel and Jewish students from the event.  The organizing committee for the fair, including COES and GUPS, with SFSU's knowledge and approval, cut off registration to purposefully exclude this recognized Jewish student group, excluding other groups in the process in an effort to cover up this active discrimination. Defendant Begley was made aware of the fair organizers' intention to exclude Hillel thirteen days in advance of the event, having been informed by the director of the Dream Center, an on-campus group dedicated to immigrants' rights. Defendant Begley told the organizers, including several members of the SFSU faculty, that excluding Hillel would be a problem. Two days before the event, Hillel Director Oliver Benn contacted Defendant Begley to express his regret that SFSU was hosting a campus-wide event such as this one without ensuring sufficient space for the recognized Jewish group to participate. With full awareness of the premeditated nature of Hillel's segregation, and with full authority as the Dean of Students to force inclusion, Begley decided to allow the organizers to proceed with impunity. Defendant Monteiro became aware that a problem was unfolding and declared that he would be reversing his previous acceptance of an invitation to deliver a keynote address at the event. However, as the Dean of COES, with apparent awareness of a problem so substantial that he would refuse to deliver his remarks, he was empowered to compel the event's organizers to include all interested student groups—including those who were innocent bystanders, denied access only to cover up a proactive undertaking meant to exclude one group and one group only—or else to shut the event down.

151.    Deliberately excluding Hillel resulted in the denial of SFSU's Jewish student population of their right to engage in dialogue or receive information or preparation relevant to their

1    personal safety and academic equality on campus. This action had the effect of violating Plaintiffs'

2    (and other Jewish and non-Jewish SFSU community members') First Amendment rights, their

3    constitutional right to equal protection, and other rights under federal and state law.

4         152.    Excluding the campus Jewish community from equal participation in the "Know

5    Your Rights" Fair, the stated goal of which was to provide reassurance to "vulnerable populations"

6    in view of the 2016 presidential election—is as absurd as it is discriminatory.   There is no

7    community that could be better served by such an "informational and training" event. America's

8    Jewish communities have, before the 2016 election and even more so since then, been

9    disproportionately victimized by hate crimes and religious biases as compared to any other religious

10   group.

11        153.    Defendants are responsible for these violations of Plaintiffs' rights because of their

12   direct active involvement in the intentional and deceptive exclusion of Hillel from the "Know Your

13   Rights" Fair.   Despite its guarantees to provide all students with a safe environment for the free

14   exchange of information and ideas, SFSU has a history of failing to protect its Jewish students and

15   encouragement of those who threaten them, and SFSU administrators have gone so far as to

16   acknowledge the University's reputation for anti-Semitism in writing.   In the context of a campus

17   event informing marginalized populations of their rights, Defendants chose to once again deny the

18   rights of SFSU's most marginalized population.   By their improper, deceptive, and coercive actions,

19   Defendants suppressed the free speech and other civil rights of the Plaintiffs and other Jewish

20   members of the SFSU community, including a denial of their entitlement to full and equal

21   accommodations, advantages, and privileges, based on animus deriving from their identity, religion,

22   and/or ethnicity.

23        154.    This suppression of free speech and violation of Plaintiffs' rights occurred as a direct

24   result of SFSU's conscious and proactive support of the other student groups and organizations who

25   were knowingly and intentionally discriminating against members of the Jewish community by

26   excluding Hillel from the fair.   SFSU has falsely represented, to Plaintiffs and others, that it is a

27   place that guarantees tolerance and diversity on campus. This incident reflects another clear example

28   of SFSU's intentional discrimination against members of its Jewish community. SFSU has fomented

anti-Jewish animus from the highest levels, conspired with and affirmed the rights of hostile, aggressive and disruptive students to regularly violate the rights of Jewish students (including through threats of bodily harm), and failed to protect the rights or physical safety of the Jewish campus community. By doing so, SFSU has created a racist environment in which Jewish students feel fearful, intimidated, and threatened on campus, and are not able to participate in, or benefit from their campus community the way that other, non-Jewish students do.

155.   Intentional targeting and exclusion, such as that which occurred at the "Know Your Rights" Fair, signals to Jewish individuals that they will be in danger if they openly reveal their identity or beliefs. Indeed, SFSU's Jewish students have deliberately taken circuitous routes to on-campus destinations in order to avoid hostile, potentially dangerous situations; have communicated regularly with friends to alert one another when and where to discard any AEPi fraternity clothes and hide any outwardly identifiable signs of Jewish identity; and have informed the administration on numerous occasions that the discriminatory and hostile campus culture has made them unable to enjoy the benefits and privileges of enrollment at SFSU.  In a meeting between Defendant Wong and Hillel students, memorialized in an email from SF Hillel Director Oliver Benn, Jewish students had "expressed their fears of wearing Stars of David or otherwise outwardly identifying as Jewish on campus, because of the way Israel, Zionism and Judaism are treated in some quarters on campus, including in the classrooms." With full knowledge that the campus climate is impeding Jewish students' ability to fulfill their academic pursuits at SFSU, Wong remains indifferent to their plight.

156.   The decision to exclude Hillel from the event was made and then sanctioned by high-ranking university officials.  SFSU's exclusion of this recognized Jewish student group is part of the University's larger systemic pattern of discrimination against Jewish students.  It is unsurprising that the University fosters a campus culture that is not inclusive of Jewish students, as SFSU officials frequently decline to take public stances in support of the equal rights of the Jewish community, even when it is expressly targeted and refused equal access and opportunity on campus.  Instead, university officials dismiss any obligation to speak out against discrimination, hostility, or threats against Jewish students—even when repeatedly carried out by SFSU itself—as a "political issue." University officials then accuse Jewish students and community members of requesting and

expecting disproportionate attention from the administration.

157.    SFSU commissioned a separate report on Hillel's exclusion from the "Know Your Rights" Fair, but to date, has not released that report to the public.   On information and belief, a summary of the report's findings was released to certain individuals on or about July 21, 2017.  On information and belief, the full report was released to certain individuals on or about August 18, 2017, both of which included findings that Hillel was in fact intentionally excluded from the "Know Your Rights" Fair under false pretenses, and that the Fair's organizers were responsible for retaliation and intentional discrimination against Hillel and Jewish students at SFSU.

158.    According to an article in JWeekly, an SFSU communications officer stated in an August 4, 2017 email to that newspaper that the investigation found "San Francisco Hillel was improperly excluded from the Know Your Rights Fair by the self-organized and self-appointed planning committee … The unfortunate decision by this group to exclude Hillel from the Fair represents an unacceptable breach of the University's values, policies, and standards for inclusion and respect expected of all members of our University community."

159.    As reported in JWeekly, in an August 7, 2017 email to that newspaper, SF Hillel Executive Director Oliver Benn said of the report: "The university found discrimination and retaliation against Hillel. Given this finding, the unanswered question is what the university will do to address what [SFSU President Les] Wong has himself described as 'institutionalized anti-Semitism,' rather than just the 'campus climate' generally."

160.    Defendant Abdulhadi also acknowledged that Hillel was intentionally excluded from the "Know Your Rights" Fair, publishing her thoughts regarding the Fair in the online publication *Mondoweiss*: "[T]he organizers [of the 'Know Your Rights' Fair] refused to allow a member of a privileged white group [referring to Hillel] whose members feel entitled to be represented everywhere and anywhere they deem the event to be of interest irrespective of the event's goals." Abdulhadi wrote that "[b]ecause the organizers dared challenge the status quo, student and faculty organizers," including, on information and belief, herself, "have been subjected to systematic interrogation, harassment and administrative retaliation by the university."   Apparently based on reading the unreleased SFSU report, Abdulhadi also wrote that "[t]he university frame[d] the fact

that Hillel did not have a table at the KYR Fair as anti-Semitic."

161.    In another article published in *Mondoweiss*, GUPS member and COES Graduate Student Assistant Saliem Shehadah, one of the self-described organizers of the Fair, also admitted that Hillel was intentionally excluded:  "SF Hillel was not issued a table at the Fair by the organizers after discussion of Hillel and its ill fit in the mission of the Fair."  Shehadah wrote that their intent in organizing the fair "was to provide resources and information for vulnerable communities to protect themselves," and that providing a table to Hillel "is akin to giving a table to ICE at a gathering of undocumented communities, or having the Ferguson Police Chief table at an event discussing police brutality against black teenagers."  Based on this thinking, Shehadah explained, the "Know Your Rights" Fair planning committee "acknowledged, by consensus, that there was no table for Hillel given the strain on capacity and the clear problems with Hillel's presence at a table based on Hillel's conduct."  He added that "GUPS and other Arab groups noted that they would pull out of the Fair if Hillel was given a table."

162.    As GUPS's faculty advisor, SFSU imposes a published requirement on Defendant Abdulhadi to assist Student Activities & Events and the University "in upholding University policy," including SFSU's Non-Discrimination Policy.   SFSU's website also states that faculty advisors should assist their student organizations in adhering to federal and state law.  On information and belief, Defendant Abdulhadi chose to disregard these advisor requirements as they applied to GUPS's conduct surrounding the "Know Your Rights" Fair, in violation of Plaintiffs' civil rights.

163.    As the Dean of Student Conduct, Defendant Shimina Harris is obligated to ensure that any students who "unacceptabl[y] breach[ed] the University's values, policies and standards" face consequences for their actions. This is especially crucial when students' behavior contributes to a pervasively hostile environment for certain students in the SFSU community who feel ostracized and marginalized because of their religious identities, and when that behavior is explicitly sanctioned and furthered by state actors who share the same anti-Jewish animus. On information and belief, with full knowledge of the conduct that the University has itself called "improper[] exclu[sion]," Defendant Harris chose not to reprimand or discipline in any way the students involved in the intentional discrimination against Hillel vis-à-vis the "Know Your Rights" Fair that occurred nearly

six months ago. This intentional refusal to hold the perpetrators accountable for their actions violates the inalienable free speech and equal protection rights of Plaintiffs.

### Despite Repeated Promises and Declarations, SFSU Has Failed to Cure these Systemic Problems

164.    Recent actions by SFSU's administration to address these issues, including a sham re-invitation of Mayor Barkat to return to SFSU, and recent emails sent from President Wong about these issues are disingenuous responses.  They fundamentally fail to acknowledge or address the civil rights and physical safety of Plaintiffs and other Jewish students and members of the community on SFSU's campus, and are designed simply to placate donors.

165.    On May 12, 2017, Chancellor White emailed the entire SFSU community, congratulating President Wong on the creation of "three new positions … to bring professionals to campus to focus on human relations, community inclusion and equity initiatives. Other efforts currently underway at SFSU include investigations of past alleged violations of our policies, new and/or refined policy and practice considerations, and formation of a broad, cross-university community task force charged with goals and developing an action plan for SFSU." The Chancellor's statement overlooked the fact that President Wong has been promising the same systemic changes for many months, without any identifiable action having been taken, and while the campus climate for Jews in fact deteriorated.

166.    President Wong stated in an interview in early May 2017 that he was just "starting to understand better . . . anti-Semitism throughout the United States and our campus."  Wong admitted that the campus was "tense in terms of anti-Semitism. . . . I wouldn't pick anti-Semitism as saying it's our only problem, but I think it's a significant issue we are trying to confront."

167.    When specifically asked whether Zionists are welcome at SFSU, President Wong refused to provide the only proper answer: "Yes."  Instead, President Wong demurred, stating "That's one of those categorical statements I can't get close to. . . . Am I comfortable opening up the gates to everyone?  Gosh, of course not."

168.    In a May 10, 2017 meeting with several Jewish students, President Wong clarified that in answering that question, his understanding of the term "Zionism" was "the right of every

Jewish person to be Jewish."  While that definition is at best highly idiosyncratic, by President Wong's own words and definition, he had refused to state unequivocally that Jews who wanted to be Jews were welcome at SFSU.

169.    In a recent letter dated May 30, 2017, written in response to five Jewish students who had emailed him about their concerns on campus, President Wong finally "acknowledge[d] that institutionalized anti-Semitism is part of what we at SF State must confront and mitigate," and that "we cannot pretend to be immune from the realities of anti-Semitism."  President Wong further promised to "lead a university-wide effort to seek solutions to the anti-Semitism on this campus." These empty and overly general statements, which amount to no real commitments beyond promises to form committees to study the long-standing problem, fail to address the very real and immediate concerns of Jewish students on campus regarding their rights and physical safety.  These statements are also nearly identical to the promises that President Wong has made repeatedly, including in the wake of the Mayor Barkat event.  Each time, there has been a total lack of any follow up from him or other University officials.

## FIRST CAUSE OF ACTION

### CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

### (Mayor Barkat Event -- April 6, 2016)

**(Asserted by all Plaintiffs against Defendants Leslie Wong, Mary Ann Begley, Luoluo Hong, Lawrence Birello, Reginald Parson, Osvaldo del Valle, Kenneth Monteiro, Rabab Abdulhadi, Brian Stuart, Robert Nava, Mark Jaramilla, Vernon Piccinotti, and Shimina Harris ("Defendant Individuals"))**

170.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

171.    Under the First Amendment to the United States Constitution, States "shall make no law… abridging the freedom of speech… or the right of the people to peaceably assemble...."  The First Amendment applies to state university campuses.

172.    SFSU is a state university, and part of the California State University system.

173.    Defendant Individuals are state actors.

174.     Defendant Individuals, have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their First Amendment rights, including but not limited to the right to assemble, the right to listen or the right to hear, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by deviating from normal protocols, state law, and the SFSU Code of Student Conduct, and by giving an affirmative "stand down order" to campus police, during Jerusalem Mayor Nir Barkat's planned speaking event.  Defendant Individuals' conduct before and during this previously anticipated disruption prevented Mayor Barkat from speaking in a way that Plaintiffs could hear him and/or engage in dialogue with him.

175.     Defendant Individuals, have, in their individual and official capacities, violated Plaintiffs' First Amendment rights (including but not limited to the right to assemble, the right to listen or the right to hear) by preventing Plaintiffs from proceeding with and participating in the planned and approved event hosting Mayor Barkat as a speaker duly invited by an SFSU student group on April 6, 2016.

176.     Defendant Individuals have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their rights as secured by the First Amendment to the United States Constitution, by improperly instructing faculty, administrators, SFSU police, and other student organizations as to the appropriate way to handle disruption of campus speakers, even after committing to a training program and the implementation of new and adequate university policies following the culmination of the university-commissioned investigation into the Mayor Barkat disruption.

177.     This deprivation of Plaintiffs' rights secured by the First Amendment was caused by Defendant Individuals acting under color of state law.

178.     As Defendant Individuals, acting under the color of state law, have deprived Plaintiffs of rights or privileges secured by the Constitution, they are liable to Plaintiffs for damages in their individual capacities.

179.     Defendant Individuals are persons under 42 U.S.C. § 1983.  Plaintiffs seek—and are entitled to—injunctive relief based on Defendant Individuals' conduct in their official capacities.

180.     Defendant Individuals' failure to comply with the First Amendment to the United States Constitution on April 6, 2016 has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, unless and until Defendant Individuals are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the First Amendment to the United States Constitution.

181.     There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Plaintiffs' rights under the First Amendment, or if such an interest does exist, the state action undertaken by Defendant Individuals was not narrowly tailored to serve such an interest.

## SECOND CAUSE OF ACTION

### CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

### (Mayor Barkat Event -- April 6, 2016)

**(Asserted by all Plaintiffs against Defendants Leslie Wong, Mary Ann Begley, Luoluo Hong, Lawrence Birello, Reginald Parson, Osvaldo del Valle, Kenneth Monteiro, Rabab Abdulhadi, Brian Stuart, Robert Nava, Mark Jaramilla, Vernon Piccinotti, and Shimina Harris ("Defendant Individuals"))**

182.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

183.     Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

184.     SFSU is a state university, and part of the California State University system.

185.     Plaintiffs are Jewish.

186.     Defendant Individuals are state actors.

187.     Defendant Individuals, have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution by deviating from normal protocols, state law, and the SFSU Code of Student Conduct during Jerusalem Mayor Nir Barkat's planned speaking event, leaving Plaintiffs vulnerable to violations of their civil rights by a previously anticipated disruption

which successfully and intentionally prevented Mayor Barkat from speaking in a way that Plaintiffs could hear him, engage in dialogue with him, or peaceably assemble.

188.    Defendant Individuals, have, in their individual and official capacities, discriminated against and continue to discriminate against Plaintiffs on the basis of their Jewish identities, violating their Fourteenth Amendment rights to equal protection of the laws, by preventing Plaintiffs from proceeding with and participating in the planned event hosting Mayor Barkat as a duly invited speaker at an approved event hosted by an SFSU student group on April 6, 2016.

189.    Defendant Individuals have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their rights as secured by the Fourteenth Amendment to the United States Constitution, by improperly instructing faculty, administrators, SFSU police, and other student organizations as to the appropriate way to handle disruption of campus speakers, even after committing to a training program and the implementation of new and adequate university policies following the culmination of the university-commissioned investigation into the Mayor Barkat disruption.

190.    Defendant Individuals have either intentionally discriminated against Plaintiffs, as Jewish students and community members or acted with deliberate indifference, including by responding to known discrimination in a manner that is clearly unreasonable.

191.    Despite multiple complaints in writing to SFSU, including to certain Defendant Individuals, Defendant Individuals continue to fail to ensure that Plaintiffs, as Jewish individuals, are treated equally and that their civil rights on campus are protected.

192.    This deprivation of Plaintiffs' rights secured by the Fourteenth Amendment was caused by Defendant Individuals acting under color of state law.

193.    As Defendant Individuals, acting under the color of state law, have deprived Plaintiffs of rights or privileges secured by the Constitution, they are liable to Plaintiffs for damages in their individual capacities.

194.    Defendant Individuals are persons under 42 U.S.C. § 1983.  Plaintiffs seek—and are entitled to—injunctive relief based on Defendant Individuals' conduct in their official capacities.

195.    Defendant Individuals' failure to comply with the Fourteenth Amendment to the

United States Constitution on April 6, 2016 has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, unless and until Defendant Individuals are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the Fourteenth Amendment to the United States Constitution.

196.   There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Plaintiffs' rights under the Fourteenth Amendment, or if such an interest does exist, the state action undertaken by Defendant Individuals was not narrowly tailored to serve such an interest.

### THIRD CAUSE OF ACTION

**CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

**("Know Your Rights" Fair -- February 2017)**

**(Asserted by Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern against Defendants Leslie Wong, Mary Ann Begley, Luoluo Hong, Lawrence Birello, Kenneth Monteiro, Rabab Abdulhadi, Brian Stuart, Robert Nava, Mark Jaramilla, Vernon Piccinotti, and Shimina Harris ("KYR Defendant Individuals"))**

197.   Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

198.   Under the First Amendment to the United States Constitution, States "shall make no law… abridging the freedom of speech… or the right of the people to peaceably assemble...."  The First Amendment applies to state university campuses.

199.   SFSU is a state university, and part of the California State University system.

200.   Plaintiffs are Jewish.

201.   The KYR Defendant Individuals are state actors.

202.   The February 2017 "Know Your Rights" Fair was sponsored and administered by SFSU and the KYR Defendant Individuals, who intentionally excluded Hillel from the fair based on the Jewish identity of Hillel's members, including Plaintiffs.

203.   The KYR Defendant Individuals have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their First Amendment rights, including but not limited

69

to the right to assemble, the right to listen or the right to hear, as made applicable to the States by the Fourteenth Amendment, by denying the Jewish student organization to which Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern belong—and thereby denying Plaintiffs—the opportunity to speak and hear about their rights at the February 2017 "Know Your Rights" Fair as members of a "vulnerable population...feeling targeted" in the political climate at the time.

204.     The KYR Defendant Individuals have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their rights as secured by the First Amendment to the United States Constitution, by inadequately training faculty, administrators, and other student organizations as to the appropriate way to administer university events.

205.     The KYR Defendant Individuals have either intentionally discriminated against Plaintiffs, as Jewish students or acted with deliberate indifference, including by responding to known discrimination in a manner that is clearly unreasonable.

206.     Despite multiple complaints in writing to SFSU, including to certain KYR Defendant Individuals, the KYR Defendant Individuals continue to fail to ensure that Plaintiffs, as Jewish students, are treated equally and that their civil rights on campus are protected.

207.     This deprivation of Plaintiffs' rights secured by the First Amendment was caused by KYR Defendant Individuals acting under color of state law.

208.     As KYR Defendant Individuals, acting under the color of state law, have deprived Plaintiffs of rights or privileges secured by the Constitution, they are liable to Plaintiffs for damages in their individual capacities.

209.     The KYR Defendant Individuals are persons under 42 U.S.C. § 1983.   Plaintiffs seek—and are entitled to—injunctive relief based on the KYR Defendant Individuals' conduct in their official capacities.

210.     The KYR Defendant Individuals' failure to comply with the First Amendment to the United States Constitution in their conduct related to the "Know Your Rights" Fair in February 2017 has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs who remain on campus, unless and until the KYR Defendant Individuals are ordered by this Court to appropriately

1    and permanently change their policies, practices, and procedures that affect the civil rights protected

2    by the First Amendment to the United States Constitution.

3         211.    There exists no overriding or even legitimate governmental state interest, let alone a

4    compelling one, to justify these violations of Plaintiffs' rights under the First Amendment, or if such

5    an interest does exist, the state action undertaken by KYR Defendant Individuals was not narrowly

6    tailored to serve such an interest.

7                                    **FOURTH CAUSE OF ACTION**

8    **CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FOURTEENTH**
     **AMENDMENT TO THE UNITED STATES CONSTITUTION**
9

10                          **("Know Your Rights" Fair -- February 2017)**

11              **(Asserted by Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern against**
                                   **KYR Defendant Individuals)**

12        212.    Plaintiffs reallege and incorporate by reference each and every allegation above as if

13   fully set forth herein.

14        213.    Under the Fourteenth Amendment of the United States Constitution, a State shall not

15   "deny to any person within its jurisdiction the equal protection of the laws."

16        214.    SFSU is a state university, and part of the California State University system.

17        215.    Plaintiffs are Jewish.

18        216.    The KYR Defendant Individuals are state actors.

19        217.    The February 2017 "Know Your Rights" Fair was sponsored and administered by

20   SFSU and the KYR Defendant Individuals, who intentionally excluded Hillel from the fair based on

21   the Jewish identity of Hillel's members, including Plaintiffs.

22        218.    The KYR Defendant Individuals have, in their individual and official capacities,

23   deprived and continue to deprive Plaintiffs of equal protection under the laws, as secured by the

24   Fourteenth Amendment to the United States Constitution, by denying the Jewish student

25   organization to which Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern belong—and thereby

26   denying Plaintiffs—the opportunity to speak and hear about their rights, and peaceably assemble, at

27   the February 2017 "Know Your Rights" Fair as members of a "vulnerable population...feeling

28   targeted" in the political climate at the time.

219.   The KYR Defendant Individuals, have, in their individual and official capacities, discriminated against and continue to discriminate against Plaintiffs on the basis of their Jewish identities, violating their right to equal protection, as secured by the Fourteenth Amendment to the United States Constitution, by denying the Jewish student organization to which Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern belong—and thereby denying Plaintiffs—the opportunity to meaningfully participate in the "Know Your Rights" Fair.

220.   The KYR Defendant Individuals have, in their individual and official capacities, deprived and continue to deprive Plaintiffs of their rights as secured by the Fourteenth Amendment to the United States Constitution, by inadequately training faculty, administrators, and other student organizations as to the appropriate way to administer university events.

221.   The KYR Defendant Individuals intentionally discriminated against Plaintiffs, as Jewish students.

222.   Despite multiple complaints in writing to SFSU, including to certain KYR Defendant Individuals, the KYR Defendant Individuals continue to fail to ensure that Plaintiffs, as Jewish students, are treated equally and that their civil rights on campus are protected.

223.   This deprivation of Plaintiffs' rights secured by the Fourteenth Amendment was caused by KYR Defendant Individuals acting under color of state law.

224.   As KYR Defendant Individuals, acting under the color of state law, have deprived Plaintiffs of rights or privileges secured by the Constitution, they are liable to Plaintiffs for damages in their individual capacities.

225.   The KYR Defendant Individuals are persons under 42 U.S.C. § 1983.   Plaintiffs seek—and are entitled to—injunctive relief based on the KYR Defendant Individuals' conduct in their official capacities.

226.   The KYR Defendant Individuals' failure to comply with the Fourteenth Amendment to the United States Constitution in their conduct related to the "Know Your Rights" Fair in February 2017 has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs who remain on campus, unless and until the KYR Defendant Individuals are ordered by this Court to

1    appropriately and permanently change their policies, practices, and procedures that affect the civil

2    rights protected by the Fourteenth Amendment to the United States Constitution.

3          227.    There exists no overriding or even legitimate governmental state interest, let alone a

4    compelling one, to justify these violations of Plaintiffs' rights under the Fourteenth Amendment, or

5    if such an interest does exist, the state action undertaken by KYR Defendant Individuals was not

6    narrowly tailored to serve such an interest.

7                              **FIFTH CAUSE OF ACTION**

8    **CLAIM UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d** *et seq.*

9                **(Asserted by Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern**
                            **against Defendants CSU and SFSU)**
10

11         228.    Plaintiffs reallege and incorporate by reference each and every allegation above as if

12   fully set forth herein.

13         229.    SFSU and CSU receive financial assistance from the United States Department of

14   Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964 ("Title

15   VI").

16         230.    Discrimination against Jews is prohibited under Title VI, as reflected in the written

17   policies of the Department of Education's Office for Civil Rights.

18         231.    Plaintiffs Mandel, Volk and Kern are Jewish, and their status and identification as

19   Jews brings them within the scope of Title VI's protections.

20         232.    Plaintiffs Mandel, Volk and Kern have been excluded from participation in, and have

21   been denied the benefits of educational and other programs at SFSU.

22         233.    Plaintiffs Mandel, Volk and Kern have been subjected to discrimination by SFSU and

23   CSU based on their Jewish ancestry and religion.  SFSU's and CSU's actions and conduct had, and

24   continue to have, a differential or disparate impact upon Plaintiffs Mandel, Volk, and Kern as Jews.

25   SFSU's and CSU's actions and conduct were, and continue to be, intended to treat Plaintiffs Mandel,

26   Volk and Kern differently as Jews than similarly situated non-Jewish students.

27         234.    SFSU and CSU have directly and intentionally discriminated against Plaintiffs

28   Mandel, Volk and Kern.

235. SFSU and CSU have also failed to prevent harassment and intimidation of, and discrimination against, Plaintiffs Mandel, Volk and Kern by other SFSU students, faculty, and administrators.

236. Plaintiffs Mandel, Volk and Kern are entitled to appropriate injunctive relief under Title VI, as SFSU and CSU have had knowledge of, and have been and continue to be deliberately indifferent to a racially hostile environment that is severe, persistent, and pervasive.

237. Plaintiffs Mandel, Volk and Kern are entitled to monetary damages under Title VI, as SFSU and CSU have had knowledge of, and have been and continue to be deliberately indifferent to a racially hostile environment that is so severe, persistent and pervasive.

238. The racially hostile environment at SFSU is sufficiently severe, persistent, and pervasive that it can be said to deprive Jewish students, including Plaintiffs Mandel, Volk and Kern, of equal access to the educational opportunities and benefits provided by SFSU and CSU.

239. SFSU and CSU are not only aware of the racially hostile environment towards Jewish students, they themselves have actively and intentionally engaged in and condoned this pattern of severe and/or pervasive discrimination.

240. SFSU and CSU acted with deliberate indifference towards the pervasively hostile, anti-Jewish environment Plaintiffs Mandel, Volk and Kern, as Jewish students, face at SFSU.

241. SFSU also acted with deliberate indifference to the discrimination and other unlawful acts against the Plaintiffs as stated herein which were objectively offensive, severe, and/or pervasive, and in violation of Title VI.

242. SFSU and CSU have failed to cure or otherwise adequately address this discrimination against Plaintiffs or the racially hostile environment suffered by Plaintiffs and other Jewish students on SFSU's campus.

243. Plaintiffs have suffered damages as a result of the violations of Title VI by SFSU and CSU as set forth above.

/ / /

/ / /

/ / /

## SIXTH CAUSE OF ACTION

**CLAIM UNDER THE DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 and 2202**

**(Asserted by Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern against all Defendants)**

244.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

245.    Plaintiffs are entitled to obtain declaratory relief pursuant to 28 U.S.C §§ 2201 and 2202.

246.    Providing Plaintiffs with declaratory relief will clarify the rights of the Plaintiffs and similarly situated individuals, and settle the legal issues presented in an efficient matter.  Plaintiffs seek declaratory relief based on the conduct of Defendant Individuals in their official capacities.

247.    As set forth above, Defendants have violated Plaintiffs' rights under the Title VI of the Civil Rights Act of 1964 42 U.S.C. §§ 2000d *et seq*, giving rise to an actual controversy such that the Court can accurately determine the facts, resolve the conflict, and grant specific and conclusive relief.

248.    As set forth above, Defendants have violated Plaintiffs' rights under the First Amendment and Fourteenth Amendments of the United States Constitution, giving rise to an actual controversy such that the Court can accurately determine the facts, resolve the conflict, and grant specific and conclusive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs have suffered an irreparable injury for which remedies available at law are inadequate to compensate for, and considering the balance of hardships between Plaintiffs and Defendants a remedy in equity is warranted, and the public interest would not be disserved by permanent injunctive relief, Plaintiffs respectfully request that the Court enter judgment against Defendants alleged in this Complaint and award the following relief:

a.    An injunction preliminarily and permanently enjoining Defendants and their agents from establishing, maintaining, or executing policies, practices, or procedures that penalize, discriminate against, or violate the free speech or

1              equal protection rights of Jewish students or visiting Jewish members of the

2              community in any way;

3       b.      Declaratory judgment, adjudging and declaring that the actions of Defendants:

4              1.      Violated, and continue to violate, the First Amendment of the United

5                     States Constitution;

6              2.      Violated, and continue to violate, the Equal Protection Clause of the

7                     Fourteenth Amendment of the United States Constitution;

8              3.      Violated, and continue to violate, the requirements of Title VI of the

9                     1964 Civil Rights Act, 42 U.S.C. §§ 2000d *et seq.*

10      c.      Monetary damages for intentional discrimination in an amount to be proven at

11              trial;

12      d.      Compensatory damages for the emotional distress suffered by Plaintiffs

13              caused by Defendants' denial of equal protection of the laws and Defendants'

14              violation of Plaintiffs' First Amendment rights, in an amount to be proven at

15              trial;

16      e.      Damages for Defendants' denial of equal protection of the laws pursuant to

17              the Fourteenth Amendment and Defendants' violation of Plaintiffs' First

18              Amendment rights;

19      f.      Punitive damages to sanction Defendants' deliberate misconduct and to deter

20              Defendants and others from engaging in similar racially discriminatory and

21              retaliatory actions in the future; and

22      g.      Plaintiffs' reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, costs of

23              suit and reasonable expenses;

24      h.      Pre-and post-judgment interest at the maximum rate allowable by the law; and

25      i.      Any other relief which this Court may deem just and proper, including but not

26              limited to any appropriate mechanism for the oversight and continued

27              enforcement of injunctive relief against Defendants.

28

1   Dated:  August 31, 2017                       WINSTON & STRAWN LLP

2
                                                  By:   */s/ Robb C. Adkins*_____
3
                                                       Robb C. Adkins
4                                                      Lawrence M. Hill (*pro hac vice*)
                                                       Krista M. Enns
5                                                      Steffen N. Johnson (*pro hac vice*)
                                                       Lowell Jacobson (*pro hac vice*)
6                                                      Seth Weisburst
                                                       Alexa Perlman (*pro hac vice*)
7                                                      Adrianne Rosenbluth (*pro hac vice*)
                                                       WINSTON & STRAWN LLP
8
                                                       Brooke Goldstein (*pro hac vice*)
9                                                      Amanda Berman (*pro hac vice*)
                                                       THE LAWFARE PROJECT
10
                                                       Attorneys for Plaintiffs
11                                                     JACOB MANDEL, CHARLES VOLK, LIAM
                                                       KERN, MASHA MERKULOVA, AARON
12                                                     PARKER, and STEPHANIE ROSEKIND

13                              **<u>DEMAND FOR JURY TRIAL</u>**

14          Plaintiffs demand a trial by jury on all issues so triable.

15   Dated:  August 31, 2017                       WINSTON & STRAWN LLP

16
                                                  By:   */s/ Robb C. Adkins*_____
17
                                                       Robb C. Adkins
18                                                     Lawrence M. Hill (*pro hac vice*)
                                                       Krista M. Enns
19                                                     Steffen N. Johnson (*pro hac vice*)
                                                       Lowell Jacobson (*pro hac vice*)
20                                                     Seth Weisburst
                                                       Alexa Perlman (*pro hac vice*)
21                                                     Adrianne Rosenbluth (*pro hac vice*)
                                                       WINSTON & STRAWN LLP
22
                                                       Brooke Goldstein (*pro hac vice*)
23                                                     Amanda Berman (*pro hac vice*)
                                                       THE LAWFARE PROJECT
24
                                                       Attorneys for Plaintiffs
25                                                     JACOB MANDEL, CHARLES VOLK, LIAM
                                                       KERN, MASHA MERKULOVA, AARON
26                                                     PARKER, and STEPHANIE ROSEKIND

27

28

FIRST AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO