MARK ALLEN KLEIMAN (SBN 115919)
**LAW OFFICE OF MARK ALLEN KLEIMAN**
2907 STANFORD AVE
VENICE, CA 90292
TELEPHONE: (310) 306-8094
FACSIMILE: (310) 306-8491
EMAIL: mkleiman@quitam.org

BEN GHARAGOZLI (SBN 272302)
**LAW OFFICES OF BEN GHARAGOZLI**
18336 SOLEDAD CANYON RD, #2241
CANYON COUNTRY, CA 91386
TELEPHONE: (661) 607-4665
FACSIMILE: (855) 628-5517
EMAIL: ben.gharagozli@gmail.com

ALAN F. HUNTER (SBN 99805)
ELIZABETH GONG LANDESS (SBN 138353)
**GAVIN, CUNNINGHAM & HUNTER**
1530 THE ALAMEDA STE 210
SAN JOSE, CA 95126
TELEPHONE: (408) 294-8500
FACSIMILE: (408) 294-8596
EMAIL: hunter@gclitigation.com
         landess@gclitigation.com

Attorneys for RABAB ABDULHADI

ELIOT LEE GROSSMAN (SBN 76629)
530 S LAKE AVE #731
PASADENA, CA 91101
TELEPHONE: (626) 642-6279
EMAIL: innjustice@protonmail.com

Of Counsel

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB MANDEL, CHARLES VOLK, LIAM KERN, MASHA MERKULOVA, AARON PARKER, and STEPHANIE ROSEKIND;<br><br>    Plaintiffs,<br>    v.<br><br>BOARD OF TRUSTEES of the CALIFORNIA STATE UNIVERSITY, SAN FRANCISCO STATE UNIVERSITY, et al.;<br><br>    Defendants.<br><br>_____ | Case No.: 3:17-CV-03511-WHO<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT DR. RABAB ABDULHADI'S MOTION TO DISMISS; DECLARATION OF MARK KLEMAN IN SUPPORT THEREOF**<br><br>**(Filed concurrently with Motion to Dismiss and [Proposed] Order)**<br><br>Date:   November 8, 2017<br>Time:   2:00 p.m.<br>Location:  Courtroom 2 (17th floor)<br>Judge: William H. Orrick<br>Original Action Filed: June 19, 2017 |

---

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT DR. RABAB ABDULHADI'S MOTION TO DISMISS**

**REQUEST FOR JUDICIAL NOTICE**

Defendant Dr. Rabab Abdulhadi hereby requests that the Court take judicial notice of the following documents.  Exhibit A, B, and C are attached.  Exhibit D is already part of this Court's record and is therefore not attached.

| Exhibit | Description |
| --- | --- |
| A | Independent Review Regarding April Event: Summary Report of Findings San Francisco State University August 24, 2016. |
| B | Overview of Faculty/Staff/Advisor Roles & Responsibilities |
| C | Student Organization and Advisor Orientation |
| D | Dr. Abdulhadi's Motion to Dismiss Plaintiff's Original Complaint filed on August 21, 2017 - Docket No. 044 (not attached.) |

**BASIS FOR REQUESTING JUDICIAL NOTICE**

On a motion to dismiss a complaint, a court may take judicial notice of matters of public record in accordance with Federal Rule of Evidence 201 without converting the motion to dismiss to a motion for summary judgment.  Lee v. City of Los Angeles, 250 F.3d 668, 688-689 (9th Cir. 2001) (citing Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir. 1986).  Courts may take judicial notice of documents outside of the complaint that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Federal Rule of Evidence 201(d); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1117, 1109 (N.D. Cal. 2003).  Courts can take judicial notice of such matters when considering a motion to dismiss.  Wietschner, 294 F. Supp. 2d at 1109, MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986).  As explained further below, the Court may take judicial notice of Exhibits A through D.

Exhibits A through C: San Francisco State University's policies and the Independent Review it commissioned are judicially noticeable as the statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Federal

---

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT DR. RABAB ABDULHADI'S MOTION TO DISMISS**

Rules of Evidence 201(b)(2).  They are judicially noticeable because they were posted on an officially government website.  See <u>Daniels-Hall v. Nat'l Educ. Ass'n</u>. 629 F.3d 992, 998-999 (9th Cir. 2010).

     <u>Exhibit D</u>: It is well settled that a court can take judicial notice of court filed documents. See Federal Rule of Evidence 201(b) and <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 690 (9th Cir. 2001).

DATED:  September 14, 2017       RESPECTFULLY SUBMITTED

                       **LAW OFFICE OF MARK ALLEN KLEIMAN**

                       By:  /s/ Mark Allen Kleiman
                          Mark Allen Kleiman, Esq.

                       **LAW OFFICES OF BEN GHARAGOZLI**
                       Ben Gharagozli, Esq.

                       **GAVIN, CUNNINGHAM & HUNTER**
                       Alan F. Hunter, Esq.
                       Elizabeth Gong Landess, Esq.

                       Attorneys for Dr. Abdulhadi

                       **ELIOT LEE GROSSMAN, Esq.**
                       Of Counsel

---

# DECLARATION OF MARK KLEIMAN

## DECLARATION OF MARK KLEIMAN

I, Mark Kleiman, hereby declare as follows:

1.     I am an attorney duly licensed to practice law before all courts in the State of California and am admitted to practice before this Court as well.  I represent Dr. Rabab Abdulhadi.  If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge.

2.     Attached hereto as Exhibit A is a true and correct copy of the Independent Review Regarding April Event: Summary Report of Findings San Francisco State University August 24, 2016 (the Barkat protest.)  The Independent Review is o the San Francisco State University website at https://president.sfsu.edu/sites/default/files/Independent%20Review%20Regarding%20April%20Event.pdf, last accessed September 10, 2017.  This is the complete document passingly referred to by Plaintiffs at FAC 22/2-6 and FAC 23/8-19.

3.     The Court's attention is respectfully directed to pages 2, 4, 9, 13, 14, 15-19, and 21.  These  pages relate to:

        a.   the student protestors' political chants on April 6, 2016 at the Barkat event;

        b.   a finding that there was no credible threat to public safety;

        c.   a finding that the actions were directed towards the mayor, not the audience (rebutting plaintiffs' claim of antisemitism);

        d.   a finding that the protesting students included a member of two non-GUPS student organizations and at least one Jewish student protestor.

---

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT DR. RABAB ABDULHADI'S MOTION TO DISMISS**

4.    Exhibit B is a true and correct copy of the "Overview of Faculty/Staff/Advisor Roles & Responsibilities".  The Overview is on the San Francisco State University website at http://www.sfsu.edu/~sicc/advisors.html, last accessed September 10, 2017. The Court' attention is respectfully directed to the University's instruction that "[t]he advisor is a non-voting member (of the student group) and serves strictly in an advisory role."  The Overview goes on to admonish: "While the influence of the advisor is necessary and valuable, they are not responsible for the actions of the individual members or the organization as a whole."

5.    Exhibit C is a true and correct copy of the "Student Organization and Advisor Orientation."  The Advisor Orientation is available on the same San Francisco State University website as the Overview, at http://www.sfsu.edu/~sicc/advisors.html, last accessed September 10, 2017.  It may be downloaded through the top-most hyperlink on that page.

6.    The Court's attention is respectfully directed to pages: 11, 13, and  21.  These pages relate to:

a.    The limited role of the advisor;

b.    That organizations are for students; the advisor's role is to merely advise; and

c.    A statement that "[s]tudent orgs can voice whatever opinion they like following 1$^s$ amendment."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this fourteenth day of September, 2017, at Los Angeles, California.

 /s/  Mark Kleiman
Mark Kleiman

---

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT DR. RABAB ABDULHADI'S MOTION TO DISMISS**

# EXHIBIT "A"



## Independent Review Regarding April Event
# Summary Report of Findings

San Francisco State University

August 24, 2016



## TABLE OF CONTENTS

I.    Introduction ......................................................................................................... 1

II.   Brief Description Of The Event ............................................................................ 1

III.  Summary Of Key Findings ................................................................................... 2

IV.   Methodology ........................................................................................................ 3

V.    FINDING:  There Was Not Enough Lead Time To Properly Plan The Event And Key Pre-Event Planning Did Not Occur ............................................................... 5

      A.   Less Than Two Weeks' Notice Was Not Enough ............................................. 5

      B.   Too Much Time Was Spent Securing A Location ............................................. 5

      C.   There Was No Clarity About Whether The Event Would Be An Open Or A Closed Event, Or The Implications Of That Decision .................................................................. 6

      D.   The Campus Did Not Adequately Plan For Protestors ..................................... 7

VI.   FINDING:  The Protestors Disrupted The Event ................................................. 8

      A.   The Protestors' Chanting And Use Of Amplified Sound Disrupted The Event .................. 8

      B.   The Campus May Have Allowed Disruption And Amplified Sound At Past Events, Without Consequences ................................................................................ 9

VII.  FINDING:  Student Affairs' Inaction Impliedly Sanctioned The Protest ................... 10

      A.   Student Affairs Did Not Act ......................................................................... 10

      B.   The Protesting Students Did Not Understand They Were Being Directed By A University Official When The Chief Of Police Approached Them ....................................... 10

      C.   Student Affairs Staff Members Were Unclear On Their Roles And Responsibilities ......... 12

VIII. FINDING:  There Was No Credible Threat To Public Safety ................................ 13

      A.   Some SF Hillel And Other Audience Members Were Deeply Hurt By The Chants ............ 13

      B.   There Were No Direct Threats Of Imminent Violence ................................... 14

IX.   FINDING:  The Actions Were Directed Towards The Mayor, Not The Audience ............ 15

X.    FINDING:  Student Affairs Did Not Follow Clear Processes In The Aftermath Of The Event .... 17

      A.   Student Conduct Was Unclear Regarding The Process It Used In Responding To Complaints ........................................................................................ 17

      B.   Student Affairs And Student Conduct Did Not Respond To Complaints Filed By Students .. ................................................................................................. 19

SUMMARY REPORT OF FINDINGS| SAN FRANCISCO STATE UNIVERSITY

XI.   Moving Forward ................................................................................................................. 20

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

## I.   Introduction

San Francisco State University ("SFSU") retained Van Dermyden Maddux Law Corporation to conduct an independent investigation into an April 6, 2016 protest on the SFSU campus (the "Event").  The investigation commenced on May 19, 2016.

SFSU defined the scope of this investigation as follows:

> During this Event, the Mayor of Jerusalem, Nir Barkat, was meeting with SFSU students on campus and another group of students engaged in protests that impacted the Mayor's discussion. […] You are being retained to investigate what occurred during this Event, determine whether the CSU Executive Orders (and/or University policies) have been violated, and provide a report of your findings and decision.  Although the University has not received any EO 1097 complaints from individuals concerning the Event at this time, we anticipate that such complaints may be filed.  If they are, I will send you a copy of any such complaints and will ask you to incorporate any allegations contained therein into your review.[1]

This is a Summary Report ("Report") of my findings and conclusions, and is intended as just that – a summary.  The succinct nature of this Report is not meant to discount or dismiss the thoughtful, valuable, and heartfelt perspectives shared by witnesses, or the volumes of documents and background materials provided by witnesses.[2]  I have considered and incorporated all of those perspectives.

## II.   Brief Description Of The Event

*This section is meant to briefly identify the incident that is the subject of this investigation.  It is intended to be in summary form only.  The remainder of this report provides additional facts, details and perspectives regarding the Event.*

On April 6, 2016, the Mayor of Jerusalem, Nir Barkat, spoke at San Francisco State University, as part of a late-planned visit to California.  Witnesses provided varying estimates of the number of attendees.  Taking the most common estimates, and verifying with available videos, there were approximately 30 to 40 individuals who attended the Event to hear and participate in the Mayor's presentation.  An additional approximately 20 individuals attended the Event to protest the Mayor's presence on campus.

At approximately 2:05 p.m., the Assistant Director of San Francisco Hillel ("SF Hillel") kicked off the Event by introducing Mayor Barkat.  During the introduction, a group of approximately 20 student protestors entered the room.  This group included members of the General Union of Palestine Students ("GUPS"), as well as members of other campus student groups.  These students took seats.

---

[1] I received an Executive Order 1097 complaint during the pendency of this review, as discussed in Section X.

[2] I am mindful in writing this report that different terms have different meanings to different people - Jewish, Zionist, Israeli, Protestor, Palestinian, as examples.  Some of the Jewish witnesses I interviewed do not fully agree with the Mayor's politics.  One of the protestors I interviewed was Jewish.  Some of the Hillel students had mixed perspectives. In this report, I took care to use these terms as they were used by the witnesses.

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

After the introduction concluded, Mayor Barkat began his speech at 2:09 p.m.  Six minutes later, at 2:15 p.m., the student protestors stood up and began chanting. Their chants included:

- Free, free Palestine!

- From the river to the sea, Palestine will be free!

- We don't want you on our campus!

- Get the fuck off our campus!

- Israel is an apartheid state!

- Long live the intifada! Intifada, intifada!

- End the occupation now!

- End the settlement now!

- If we don't get no justice, then you don't get no peace!

- One, two, three, four, we don't want your racist war!

Several attendees used their cell phones to video and audio record the protest.  Audiotape of the first half of the Event indicates that the protestors began using a microphone and amplifier at approximately 2:30 p.m.

At about 2:30 p.m., the Assistant Director of Hillel pulled up a chair for the Mayor, then surrounded him with a circle of chairs so that if "people huddle, the Mayor could talk."  Protestors continued the chants for the entire hour that Mayor Barkat was scheduled to speak.


### III.   Summary Of Key Findings

Based on the information collected, and applying the preponderance of the evidence standard to resolve disputed facts, I make the following findings:

➢ FINDING:  There was Not Enough Lead Time to Properly Plan the Event; and, Key Pre-Event Planning Did Not Occur

Overall, less than two weeks' notice was not enough time to plan for this Event, particularly given the heightened sensitivity between student groups related to the Israel Palestine conflict.  With little time to work with, too much time was spent on what should have been a fairly simple process – securing a location.  There was no clarity on the important issue of whether the Event would be an open or closed event, or the implications of that decision.  There was no communication or planning with groups that were likely to protest.

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

> ➢   FINDING:  The Protestors Disrupted the Event

The Protestors' chanting and use of amplified sound disrupted the Event.[3]  However, several witnesses noted that the campus has tolerated similar disruptions at past events in a manner that was arguably also a violation of this same policy, yet without any ramifications to the offenders.

> ➢   FINDING:  Student Affairs' Inaction Impliedly Sanctioned the Protest

Student Affairs' inaction led the protestors to believe that their conduct was sanctioned.  It is undisputed that Student Affairs administrators did not take steps to approach, address or manage the protestors during the Event.  While the Chief of Police approached the protestors, the protesting students reasonably did not understand that he was a University official.  Student Affairs administrators who were present were unclear about their roles in managing the Event.

> ➢   FINDING:  There Was No Credible Threat to Public Safety

While some audience members were deeply hurt, even frightened, by the protest, in this specific circumstance there were no direct threats of imminent violence that would have justified police intervention, specifically arrest and removal from the area.

> ➢   FINDING:  The Actions Were Directed Towards the Mayor, Not the Audience

The protest was directed towards the Mayor of Jerusalem based on his politics, and not towards any of the audience members based on the audience members' protected characteristics.  The record tips in favor of concluding that the protestors' attention, comments and conduct were directed at the Mayor.  This finding is bolstered by the fact that the protestors left the Event shortly after the Mayor exited the room.

> ➢   FINDING:  Student Affairs Did Not Follow Clear Processes in the Aftermath of the Event

Student Affairs and the Student Conduct Office[4] lacked clarity as to which process to use in responding to student conduct complaints in the aftermath of the Event.  In the end, the process they chose to use was not implemented correctly.  Finally, Student Affairs, including the Student Conduct Office, failed to acknowledge or respond to three student complaints that were filed shortly after the Event.


## IV.   Methodology

I conducted 20 witness interviews.  Seventeen interviewed witnesses were present at the Event.  Specifically:

---

[3] The disruptive conduct violated San Francisco State University's "Time, Place and Manner" policy, which prohibits "Interference with classes in session or other scheduled academic, educational, cultural/arts programs …," and also prohibits "Employing unauthorized sound amplification."

[4] Student Conduct is an office within Student Affairs, charged with interpreting and enforcing standards of conduct in discipline proceedings against students.

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

| GROUP REPRESENTED | DESCRIPTION |
|---|---|
| Hillel Students | ███████████████████████████ |
| | Student involved in Hillel |
| | Student involved in Hillel |
| Protesting Students[5] | ████████████ |
| | Member of two Non-GUPS Student Organizations |
| | Jewish Student Protestor |
| Administration | Dean of Students |
| | Assistant Dean of Students |
| | Director of Student Conduct – *Not Present at Event* |
| | Coordinator,  Student Affairs |
| | Campus Administrator |
| Faculty Members | Endowed Chair in Jewish Studies and Social Responsibility |
| | GUPS Advisor – *Not Present at Event* |
| Police Officers | Interim Police Chief |
| | Detective |
| | Detective – *Not Present at Event* |
| Community Members/Other | Staff Attorney, Palestine Legal – *Not Present at Event* |
| | Assistant Director of SF Hillel |
| | Jewish community member |

I reviewed several hundreds of pages of documents provided by witnesses and the campus.  I also conducted an internet scan for videos and articles related to the Event.  I reviewed and considered all information that was requested, discovered or provided to me.

The information gathered was reviewed, compared and analyzed under a preponderance of the evidence standard to resolve factual or policy disputes.  "Preponderance of the evidence," for purposes of this Report, means that the evidence on one side outweighs, or is more than, the evidence on the other side.  This is a qualitative, not quantitative, standard.

SFSU and its representatives allowed me discretion to conduct the investigation as I determined to be necessary.  I was given complete access to all requested witnesses and documents.  No party interfered with, or attempted to influence, the findings in this Report.

[5] Two of the protesting students, ████████████████████████ were identified through social media, and also by the Student Conduct Office.  The protesting students were reluctant to identify additional protestors to be interviewed, knowing that this process could potentially lead to discipline or unwanted attention by non-campus organizations.  The two additional protesting students who came forward did so voluntarily.  Other protesting students identified by the Dean of Student Affairs were contacted by me, but declined to be interviewed.

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

### V.   FINDING:  There Was Not Enough Lead Time To Properly Plan The Event And Key Pre-Event Planning Did Not Occur

#### A.   Less Than Two Weeks' Notice Was Not Enough

On or around March 28, 2016, Mayor Barkat contacted SF Hillel and informed the organization that he would be in San Francisco on April 6, 2016, and was available to speak.  SF Hillel was excited about this opportunity, and began discussions with SFSU and its campus Hillel.  This left less than two weeks for the campus to prepare for the Event.

> "Knowing the difficult campus history around Israel and Palestine, we knew this would be a high profile event and appropriate steps needed to be taken." – **Campus Administrator**

> "The visit was an incredible honor, and extraordinarily exciting." – **Hillel student**

> "From that point on, we had such a short time frame to plan.  … We usually require two weeks for major events, although we are not always given the luxury. We did not have enough time, so we were trying to be as nimble as we could be, considering the timeframe." – **Police Chief**

On March 29, 2016, the Vice President of Student Affairs asked the Dean of Students to reach out to SF Hillel and request that the Event be pushed to another date so that the University could have adequate time to prepare.  The Mayor, however, was only available on April 6, 2016.

#### B.   Too Much Time Was Spent Securing A Location

Witnesses talked about the frustration and time spent attempting to secure a location for the Event.  Well over one hundred email exchanges on this topic reveal that the right hand did not know what the left hand was doing.  Student Activities and Events, Student Affairs, University Police, and SF Hillel were all involved in attempts to secure an appropriate and available location. There were many separate email threads, where some but not others were included, creating confusion.  There was no one particular point of contact.

On March 29, 2016, the Chief of Police forwarded an email from SF Hillel to the Dean of Students. In it, SF Hillel stated that the Richard Oakes Multicultural Center in Caesar Chavez Student Center ("CCSC") had been secured.[6]

Shortly thereafter, SFSU learned that SF Hillel was considering holding the Event at Rosa Parks, a different location within CCSC.  The Dean of Students did not believe this was a good venue for security purposes, and recommended Seven Hills.

On March 30, 2016, Student Affairs, Campus Police and SF Hillel continued to correspond about the Event location.  SF Hillel preferred to keep the Event at CCSC.  The Dean of Students said she would look into Jack Adams within CCSC as another potential location.

---

[6] In this same email, SF Hillel informed Campus Police that Mayor Barkat would not be bringing his own security team and SFSU should "take the lead" on Mayor Barkat's security.

By the afternoon of April 1, 2016, there was still confusion.  SF Hillel believed that they had obtained approval for Rosa Parks.  A Student Event Coordinator emailed SF Hillel stating that the Event was "approved as an authorized organization/member event."  Yet, an Associated Students Meeting and Events Coordinator indicated that Rosa Parks was not available due to a scheduling conflict.  The Assistant Director of Hillel stated they were "desperate for space" and were waiting to hear from the Dean of Students about potential availability at Seven Hills.  That evening, the Dean of Students emailed a Student Affairs Coordinator (but took the SF Hillel representatives off the email recipient list) and said Rosa Parks was not available, and that there were no other spaces available elsewhere in the CCSC.

On April 4, 2016 – two days before the Event - the Dean of Students provided SF Hillel with the contract for Seven Hills for the Event, as it was apparently the only remaining option.  She informed SF Hillel that they would have to pay for the space.  SF Hillel agreed to book the location.

The Dean of Students believes there were two "lessons" to be learned:

> One, we need a centralized scheduling system.  We had too many cooks in the kitchen.  Along with that, our processes for the number of days to plan an event were overlooked in this situation.

The Assistant Dean of Students commented on the need for a streamlined event planning process:

> This has been eye-opening.  We need to partner with campus event planners to create more of a streamlined event planning process.  Had we known about this event within our timelines, we would have worked with Hillel to let them know "If this is becoming a public event here is what you do."  And let them know they are opening the opportunity to protest and how to respond to it.  Those conversations could have happened if there had been timely notice of the proposed event.

**C.   There Was No Clarity About Whether The Event Would Be An Open Or A Closed Event, Or The Implications Of That Decision.**

SF Hillel's initial invitation seemed to indicate that the Event would be a closed and private event, by registration only.  However, subsequent factors and the manner in which the Event was eventually managed demonstrate that it was open to the public without a requirement for registration.

The Director of SF Hillel sent an email on April 5, 2016 to the organization's mailing list announcing the Event, letting the community know that the Event would take place at 2:00 p.m. at SFSU.  The email noted that admission was free, but guest registration would be required in order to attend.

The Student ▮▮▮▮▮ of Hillel described the Event as open, and noted that he spent one to two hours the day before the Event walking around campus and hanging up flyers.

The Assistant Director of SF Hillel agreed that it was SF Hillel's intent from the outset to make the Event open to students and the campus, although not necessarily to the public.  She explained

that they could have hosted the Event at Hillel, but that doing so would have made it feel less open than they intended.

The Dean of Students stated that when SF Hillel announced the Event over Facebook and other social media platforms, it did not state that those interested had to pre-register, "So that opened it up." She said:

> GUPS could have gotten tickets, but we would have had more control over it. At a private event, we would have more ability to ask them to leave. There is a big difference between a pre-registered event and an event that is open to the public. With more time we could have managed that.

The Chief of Police was told and understood that this was an open event, and his officers were told this in the briefing prior to the Event.

For the protestors' part, they believed that the Event was closed. They saw a poster in the library that said they would need to register for the Event to attend. One of the student protestors said the protestors did not attempt to register because "keeping your identity private is crucial when you are an organizer." When the protestors arrived at the Seven Hills room, she said they were surprised to get in easily:

> There were no cops, no registration, no checking IDs. Nobody said this is a private event. So we went in and thought, 'Wow, we are in.'

### D.    The Campus Did Not Adequately Plan For Protestors

Given the history of tension between Israel and Palestine, and Mayor Barkat's controversial role as the Mayor of Jerusalem, one of the most important planning aspects should have been how to provide a safe environment for competing interests at the Event. The record demonstrates that there was not adequate time or efforts spent on planning in this regard.

On April 4, 2016, the Police Chief recommended a counter protest area be established outside the Event, so that protestors would have an area where they could express their beliefs without disrupting the Event. In the same email, he clarified to Student Affairs that the police would monitor for safety issues, but in order for them to intervene if there was a disruption (as opposed to a public safety issue) they would need a citizen's arrest form provided by someone in attendance at the Event.

On April 5, 2016, an Investigator with the University Police Department followed up with the Director and Assistant Director of Hillel about security for the Event. After the discussion, the Assistant Director of SF Hillel emailed the Dean of Students confirming the conversation and asked what types of disruptions inside the facility would trigger a protestor being ejected. There was no response, as the Dean did not see this message "until moments" before the Event was set to begin.

What is *not* in the record is instructive. There was limited information demonstrating that Student Affairs was actively planning for student protests or disruption. Student Affairs did not contact GUPS, despite the likelihood the group would protest at the Event. Student Affairs did not actively

work with SF Hillel, the President's Office, or other groups to create an action plan to address how competing interests could participate without disrupting the Event.

## VI.   FINDING:  The Protestors Disrupted The Event

### A.   The Protestors' Chanting And Use Of Amplified Sound Disrupted The Event

Witness testimony, as well as video and audio of the Event, establish that the student protestors disrupted the April 6, 2016 event through loud chanting and the use of electronically amplified sound.  While the protesters did not solely consist of GUPS members, ███████████████████ ███████████████████, are shown on video leading the protest.  Witness testimony established that those two students initiated the chanting, led the chants, and employed amplified sound.

The protesting students do not feel that they disrupted the Event.  They pointed out that the Mayor was allowed to and did speak for his allotted scheduled hour.  They noted that he drew a circle of audience members closely around him and continued to dialogue with them throughout the entire hour.  In this way, they argued that his presentation was not derailed.  One of the GUPS students asserted that the protestors were practicing their First Amendment rights, just as the Mayor was practicing his First Amendment rights.  She believed the Mayor was "successful on his end" and able to finish his speech:

> He congregated with students and we were in the opposite side of the room.  He was there for a full hour.  I think it was successful on his end.  He was able to be there and engage with the community that was with him.

However, the weight of the information collected supports a finding that the presentation was, in fact, disrupted.[7]

First, the GUPS students plainly stated that their intent was to disrupt a speech by an "evil" man who was advocating for the murder of their people and the destruction of their heritage.

Second, others described the disruptive impact the chanting and amplified sound had on the Event.  The Assistant Director of Hillel agreed that the students joined the Mayor in a "huddle" after the protesting students began using amplified sound, but "it was very difficult/almost impossible for students to hear him."  One Hillel student said she hoped it would "blow over" so that the Event could continue and finish, as planned.  She was one of the students sitting close to the Mayor in the "huddle," and stated she could not hear him "because of how loud they were being."  Another Hillel student agreed that "nobody could hear anything" because of the volume of the chanting.  This student recalled asking the Mayor what he was "doing about the separation of Palestinians and Israelis, what would [he] do to create more cohesive[ness]," but the student did not hear the response because he was "so distracted [by the protest]."

---

[7] The disruption was caused by the groups' actions, not the content of their speech.  The loud chanting, including the use of amplified sound, had the effect of shutting down the Mayor's presentation and the audience's ability to participate in the Event.

The Dean of Students described the protest as "louder than [the Mayor] was, after they brought out the [portable microphone]," stating:  "No question it was difficult for him to speak and difficult for the audience to hear what he had to say."

A community member who attended the Event believes that the protestors "squandered" the opportunity to engage in a meaningful conversation with Mayor Barkat.  She explained:

> It would have been interesting to me and the community and Hillel if instead of protesting, they put together cogent and good and challenging questions for the Mayor of Jerusalem and asked him things.  Not shout him down.  Personally, they took away my opportunity to have that question and answer as an invited guest.  The University is supposed to be the place where you can have difficult conversations about difficult topics.

One witness described how the protest actually had the opposite effect of what the protestors intended:

> As a Jewish community member, I came with my little challenging questions [about the Mayor's policies towards Palestinians].  The second they were protesting they put me in my tribal stance and suddenly I was supporting the Mayor.  They shifted someone who might be a potential ally in their issue, to [me feeling] you are being rude to a Mayor of a major world city.  Now I am part of the protective group around him in the psychological sense.

**B.    The Campus May Have Allowed Disruption And Amplified Sound At Past Events, Without Consequences**

The protesting students and other witnesses pointed out that the campus has a history of emotional protests, and that amplified sound is often used in a manner that was arguably also a violation of this same policy, yet without any ramifications to the offenders.  One student protestor witness said the portable microphone has been used frequently on campus, with various student groups.  Newspaper articles confirm that in events over the past year, students have engaged in "shouting down" and the use of amplified sound, even in indoor venues.

A Jewish student who joined the protestors said he has seen a lot of protests and that "this seemed pretty normal" as far as being the type of protest tolerated by the campus.  He described a protest that occurred at Seven Hills not long before this Event, when President Wong held a town hall meeting with students regarding Ethnic Studies.  He explained that it was a similar situation, with "yelling and chanting," and was at times disruptive to President Wong's speech, though the students were allowed to speak.  The protestors were chanting in the crowd and the microphone was mostly used by the students participating in the town hall meeting.  Occasionally, a protestor would start a chant on the microphone and then step away.

A staff attorney for Palestine Legal described the protest of Mayor Barkat's appearance as "spontaneously organized" and "completely in line with the capstones of protest on this campus."

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

## VII.  FINDING:  Student Affairs' Inaction Impliedly Sanctioned The Protest

### A.    Student Affairs Did Not Act

It is undisputed that none of the Student Affairs administrators who were present at the Event approached, engaged with, or attempted to manage the protestors.

The Chief of Police described this Event as one of the most challenged:

> It seemed I did not get much support from Student Affairs.  We are usually a team and one united voice.  Where here, I was the only one saying stop.  I felt that at some point in time earlier when it started, they should have engaged the leaders of the GUPS group about civil discourse and time, place, and manner.  Some kind of engagement should have happened, instead of just waiting for me.  They never did engage.

### B.    The Protesting Students Did Not Understand They Were Being Directed By A University Official When The Chief Of Police Approached Them

Some witnesses believe that the students were directed to comply with University policy by a University official, namely the Chief of Police.  There was conflicting testimony on this point. However, the weight of the evidence demonstrates that the students did not understand the Chief of Police was a University official, and therefore they did not believe they were being given a directive by a campus authority.

Several witnesses observed the Chief of Police approaching the Protestors, some believing this occurred once, and others stating that it occurred up to three times.  Based on the Chief of Police's recollection, it is likely he approached them three times, as described next.

The Chief said on the first approach he told the two lead protestors that he was a police officer, he gave them his name, and told them they were being disruptive.  He said he flashed his badge.  He told them to stop protesting and informed them that a designated protest area was set up outside.  "One started to pay attention and the other one stopped her like, 'Do not talk to him.'  I clearly told them who I was and they heard me.  But they continued to chant."  When he approached a second time about five minutes later, "by that point, the protest was so loud that they probably did not hear me."  The Chief of Police then walked to the back of the room where Student Affairs administrators were standing.  He heard the Assistant Director of SF Hillel telling the Dean of Students that amplified sound is a policy violation.  The Chief of Police told them that he agreed.  Approximately 35 minutes into the Event, the Chief of Police walked to the podium that the Mayor was no longer using, introduced himself as the Chief of Police, and told the protestors that they were disrupting the Event and needed to stop or go outside.  The protest was loud, and he was not sure that the protestors heard him or were paying attention to him.[8]

Another campus police officer who attended the Event recalled the Chief of Police trying to make contact with the woman who was initiating the chanting.  This officer shared:

---

[8] Most witnesses did not recall the third announcement by the Chief of Police, which tends to corroborate the protesting students' perspective that his announcement was not heard.

> … It did not seem like they were involved in a conversation.  It seemed like he approached her and said whatever he said and I am pretty sure she looked past him, shook her head in a "No" fashion, but I did not see any talking going on between them.  It might be a situation where she just ignored him, but he was standing right in front of her - not for very long.

The Officer, however, did not see the Chief of Police pull out his badge.  He said, "He might have done it, he might not have.  I just saw he approached the female lead."  Later in the interview, he emphasized that he "never saw the star go out."

The Chief of Police was in plain clothes.  He explained the decision to not be in uniform:

> There is a tactical advantage in plain clothes.  I like not showing up like we anticipate a problem, and people sometimes posture for the uniform.  We had two plain clothes officer plus me.  One in plain clothes was attached to the Mayor.  Outside the venue there were six uniformed officers.[9]

The Protestors said that they did not think that the Chief of Police was speaking on behalf of the University.  They agreed that a man approached them approximately two times and asked them to be quiet.  They believed he was with the Mayor.[10]

> "He never told us who he was.  He did not flash his badge to us. He never asked us to leave.  He never said, "This is a verbal warning."  We were not really paying attention to who this guy was because he did not present himself as somebody who was tied to the University.  Had he said I am the Chief of Police and you have five minutes to leave, we would have complied.  Everybody from student services, who were just witnessing it, gave us the impression that it was okay to be there." – *Protestor*

> "But I did not know he was a police officer. [....] If he had told us he was the Chief of Police, I would have left without any resistance.  He did not make that clear and he was dressed in normal clothing.  He did not show us his badge.  Did not say his name.  Did not tell us he was a police officer.  He kept saying 'can we talk,' 'can you go outside,' 'can you keep it down.'  He eventually gave up because we were not listening to him.  He did not identify himself as a cop." – *Protestor*

The protestors plainly acknowledge that SF Hillel made attempts to talk to them, but they did not listen.  They explained that they were "in their chants."

In the end, it is plausible and consistent with the record that both perspectives are accurate.  On one side, the Chief of Police approached the group in an effort to manage the disruption.  At the same time, the protestors were taking their cue from Student Affairs officials who were not approaching them, and disregarded the Chief of Police because they were unaware of his connection to the campus.

---

[9] Those officers were called in to the room by the Chief of Police when the protestors started fanning out along the side wall, thus coming closer to the Mayor.  The uniformed officers stood between the protestors and the Mayor to ensure that there was a boundary between both groups.

[10] The Chief of Police confirmed that he has never interacted with any of the protesting students before this Event.

### C.    Student Affairs Staff Members Were Unclear On Their Roles And Responsibilities

In this process, Student Affairs officials demonstrated that they were unclear about their role in managing and responding to the protest, and unclear about the application of campus policies in this situation.  If Student Affairs leadership is unclear on the policies and practices, the students and student groups will likewise be unclear.

***Dean of Students***.  The Dean of Students noted that the members of Student Affairs Administration who were present at the protest are "all fairly new," and were "all learning."  She admitted:

> I do think we need some clarification around the First Amendment.  There is a difference of opinion about what is protected speech and what is not. … We need a training session and primer on First Amendment as one of the outcomes [of this investigation].

In a timeline written nine days after the Event, the Dean of Students concluded that the protestors had violated campus policies.  Yet, she did not take action on the day of the protest.  She explained, "We had a specific security plan if the student organization wanted someone removed from the room, they would have to fill out a citizen's arrest form."  She explained her decision to not act, sharing, "We decided we did not want to escalate any further.  That was the decision we made at the time."

***Assistant Dean of Students.***  The Assistant Dean of Students said that Student Affairs was, "not involved" in event planning for Seven Hills.  He said, "I do not know who the official sponsor was, who booked the space, or who paid for the space.  So it is kind of on Seven Hills, I would say.  My staff and my area do not coordinate events that are happening in that space.  We do not approve them.  We are not involved."  When asked why Student Affairs was present at the Event, he said that their role was to educate the students on free speech.  He explained:

> Often times we will have a political figure on campus and it is our job and responsibility to educate the student body that free speech applies, to educate students that speech is protected.  It is usually more along those conversations.

When asked why he did not approach the students at this Event, the Assistant Dean of Students said, "The Event was an outside group reserving the venue to host an Event.  Had the Event been in an area that was a little more in my area's jurisdiction, we would have talked to the students about [time, place, and manner] violations or policy violations."

The Assistant Dean of Students said that Student Affairs agreed that this was SF Hillel's event and they were waiting for SF Hillel to guide and direct what should happen at their event.

When asked whether he believed the use of amplified sound was a violation, he responded that the policy is clear on decibel levels, but it is less clear how that applies to amplification.  He said:

> For me, if you get a steel drum band in the middle of campus that is very loud, that is above decibel and it would trigger the restrictions, but that is outdoors. Indoors is a whole different story.  Amplified sound and Time, Place, and Manner

only applies to outdoor spaces and outdoor events.  We have had concerns in the Annex, for example, which exceed decibels when we have concerts.

The Assistant Dean of Students stated that with respect to this incident, he was not sure whether SFSU's Time, Place and Manner policies applied.  While these policies apply to the campus, he was not sure whether they applied at the Seven Hills location.

***Student Affairs Coordinator.***  The Student Affairs Coordinator is the position on campus responsible for facilitating the student leader orientation, which includes a discussion on SFSU's policies related to time, place, and manner.  As the person charged with educating student groups about the policy, he said in his interview, "I have not received clear answers and to this day I am still not sure how that situation [the April Event] was supposed to be handled."

The Student Affairs Coordinator understood his role at the Event was to "sit and listen."

## VIII.  FINDING:  There Was No Credible Threat To Public Safety

Several witnesses expressed dissatisfaction that the University police officers who were present failed to remove the protestors from the Event.  The record does not demonstrate that there was a safety threat that would have justified police action.[11]

### A.    Some SF Hillel And Other Audience Members Were Deeply Hurt By The Chants

We do not question that many who attended the Event were emotionally impacted by the experience.  One witness shared:

> At one point, this stuck with me, it made me choke up – the demonstrators were chanting "we don't want you on this campus" and "get the fuck off this campus" … It gave voice to us that the vitriol was not being directed just to the Mayor, but felt very personal.

The Event was also described as "a difficult place to have been."  And, "It was intimidating.  It was deeply offensive.  Unwelcoming.  Ostracizing.  Deeply hurtful."

The Student ███████ of SF Hillel was worried about the safety of the people he represents, noting that "GUPS has a history of threatening Jewish students with violence."[12]

The Assistant Director of SF Hillel noted that some students were crying and some left because they felt unsafe.  The chant "Long live the Intifada" was particularly upsetting:

---

[11] University police officers, as University officials, can intervene in the form of directing protestors to comply with University policy, such as asking them to move to an appropriate protest area or cease using amplified sound.  The Chief of Police's efforts in this regard were addressed earlier in this report.

[12] He pointed to a 2013 Event when a GUPS student posted a photo of himself with a knife with the caption, "I seriously cannot get over how much I love this blade.  It is the sharpest thing I own and cuts through everything like butter and just holding it makes me want to stab an Israeli soldier."

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

> That is jarring.  For us, it is people riding on a bus being killed by a suicide
> bomber.  They are angry and shouting Intifada, and the campus is saying, "We do
> not want this to get violent."  The space does not feel safe.

The Assistant Director of Hillel was frustrated when the Dean of Students told her that she was
concerned things would escalate if Student Affairs took action, because she felt it had already
escalated and her students did not feel safe:[13]

> [F]rom the perception of my students, it had already sort of escalated and it was
> already feeling threatening and intimidating.  And I do not think they felt
> protected.  It was a frustrating moment.  I can appreciate that nobody wants it to
> escalate further.  But we were already at a point where students were feeling
> intimidated.

A campus administrator explained that the chant, "From the river to the sea, Palestine will be
free" meant that "there should be no Israel and there is no place for Jews," and that the chant
about the Intifada called for an "armed uprising."

The protestors disagreed, stating:

> We were chanting for human rights and justice for our people.  That did not
> include killing anyone.  The interpretation was in such a horrible way that tried to
> make us violent people.

The staff attorney for Palestine legal said the chant "from the river to the sea":

> … means I want dignity and justice through the region.  People call it a one state
> solution.  It is the end of Israel in its current formation.  That is not a call for Jews
> to be pushed into the sea, it is a vision of freedom for all people who live there.

She also explained the meaning of "intifada" from the Palestinian viewpoint:

> …an Arabic word translated as struggle or shaking off.  Saying we are going to
> resist and work against our historical experience of having our land stolen and
> having to live under military rule.  It has meant violent resistance.  It means resist
> and protest.

The staff attorney asserted that the Palestinian activist students do not know how the term
"intifada" is interpreted by the Zionist community, although they have since learned because of
this process.  She commented, "This campus is where you learn."

### B.   There Were No Direct Threats Of Imminent Violence

Without discounting these feelings, the record demonstrates that the protestors did not create a
credible threat to public safety.  The protesters did not engage in any threatening physical conduct
or raise any direct threats that could be interpreted as incitement to imminent lawless action.[14]

---

[13] The Assistant Director of Hillel said she asked the Dean of Students what consequences would attach to the protesting
students following the Event.  She said she was assured that all the protester identities were known to Student Affairs,
and there would be follow-up.

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

First, the words were not directed at any particular person and were not direct threats.  While the chants have different meanings to different individuals, in context it is not reasonable to conclude that the students had the intent to physically harm participants, or even the Mayor.  The words were not accompanied by any form of threatening physical conduct.

Second, other Jewish witnesses, including one SF Hillel member who was a frustrated audience member, did not feel threatened or unsafe.  A Jewish community member said:

> The protestors were noisy and annoying, but they were in no way menacing.  I did not feel uncomfortable or unsafe.  I felt socially uncomfortable – this is a giant awkward situation.  I did not feel in any way threatened or that this was going to turn into something unsafe.

Finally and compellingly, law enforcement, who are trained to respond to threatening situations, did not perceive there was a threat.  The Chief of Police did not believe that the situation was threatening.  He reported that one or two of the protestors approached the Mayor after the Event and one asked him a question about travel recommendations.  The Mayor spoke with him.  The Chief described it as a "pleasant exchange."

Another police officer said:

> There were no threats made and there was no imminent danger.  I did not see anything.  They were loud, they kept their distance.  I did not see anyone approach the protesting group in a threatening or controversial manner. [....] I did not see any signs of threats or violence.  It was disappointing for those who went there to listen to the speaker, but I did not see any confrontations that would require law enforcement to step in.

## IX.   FINDING:  The Actions Were Directed Towards The Mayor, Not The Audience

The record supports a conclusion that the protestors' chants were directed towards the Mayor, not the audience.

As noted above, some audience members felt that the chants were directed at them, and personal.  The Assistant Director of Hillel said that at one point, the protestors chanted, "You are not welcome on this campus" and it was not clear if it was directed at the Mayor or SF Hillel generally.  Over the microphone, she replied to the protestors, "We are a part of the campus."

Most seem to acknowledge that the protest was likely directed to the Mayor during the Event.  However, witnesses in this process and commentators on social media believe that the target shifted to the Jewish students in the audience after the Mayor left the room.

---

[14] It is worth noting that the record does not demonstrate that Mayor Barkat felt threatened or unsafe at any time during this Event.  He remained in the room attempting to continue his speech for the entire hour.  While there is some disagreement on this point, the evidence tips in favor of finding that Mayor Barkat exited through the main entrance of the room, walking directly towards and past the protesting students.  Had he felt unsafe, he had an alternate exit available to him.  He stopped to engage briefly with Student Affairs.  One witness, who is Jewish, said, "I do not feel he was intimidated by them.  I did not feel intimidated by them.  That is not what was happening.  I felt irritated at them."

The Student President of SF Hillel said:

> After the Mayor and Administration left, members of the Jewish community and Jewish students were still present. At this point it was a room with 50 people still screaming at my people without the Mayor in the room "get the fuck off this campus."

The Hillel Faculty Advisor, who was present, agreed:

> After the Mayor left, the protestors turned towards the Jewish students and chanted and pointed at them. That changed it for me. … [The Mayor] walked out the door. They were celebratory and chanting after he left. I thought they would continue behind him. They did not follow him out … [they] turned and faced back to the corner where students were still standing. They chanted "get the fuck off our campus," three or four times. Those students [who heard the chants] were shocked. Then they [the Protestors] stopped and left. It did not last a long time, 20 or 30 seconds.

The Protestors disagreed, saying their focus was never the audience. They said that they filed out shortly after the Mayor left. One shared:

> I have no problems with the students on campus. They are peers to me. I do not talk to them, I do not make eye contact. We make it a thing to not talk to an Israeli student … They do not believe my people deserve basic human rights. But it was not about them.

Instead, they said the protest was directed at the Mayor based on his political views. One Palestinian protestor talked about how the Mayor's presence on campus made her feel unsafe. She described him as a person who advocates for the death of Palestinians. She said, "My school is supposed to be a safe environment. I could not believe that my school [was] bringing this guy. … As a coalition of students we had to do something." Another said, "We were there for human rights, justice and the end of the occupation of our people."

The Faculty Advisor to GUPS questioned why SFSU would host the Mayor when, "Ethnic cleansing is happening under his watch."

In the end, the record demonstrates that the protest was directed towards the Mayor of Jerusalem based on his politics, and not towards any of the audience members.

First, some of the Jewish witnesses corroborated that the chanting was directed to the Mayor based upon his politics, and not directed at them. A Jewish community member who was present described the protest as "chanting for chanting…the ritual of it." She stated that the chanting was not directed at the Event participants, but rather were "political statements" and more "this is what we want."

Second, the record supports a finding that the protestors left shortly after the Mayor. This corroborates their statement that the focus was the Mayor, not the audience. Even those who assert that the chanting was "targeted" acknowledge that the protestors left shortly after the Mayor. One SF Hillel student said that the protestors "filed out pretty quickly after he left,

cheering and chanting."  A Campus Administrator who believed the protestors were "antagonizing" the crowd, nonetheless acknowledged that they left "shortly after" the Mayor.

Finally, Student Affairs officials who were monitoring the Event corroborated that the focus was the Mayor.  A Student Affairs Coordinator who was present wrote the following shortly after the Event:

> When the Mayor finally left the room, some of the protestor crowd appeared to track to the [entrance] door with the Mayor.  Nothing happened aside from them yelling at him and seemingly applauded each other and [they] stopped yelling once he was physically out of the room.

The Assistant Dean of Students wrote the following shortly after the Event:

> The Mayor continued his talk with the huddled group, until roughly 3 p.m. when the Event was concluding. The students disrupting the Event remained on site until the Mayor left the facility. They followed him out of the facility, and remained chanting outside for a few minutes as he proceeded to leave.

A Student Affairs Coordinator who was not interviewed, provided a summary of the protest, and noted:

> When the Mayor concluded, the protesters concluded and left.

## X.  FINDING:  Student Affairs Did Not Follow Clear Processes In The Aftermath Of The Event

The record demonstrates that Student Affairs did not follow a clear process in the aftermath of the Event.  Student Conduct was not clear what process to apply, and then did not follow the process that was cited.  Student Affairs and Student Conduct did not process or respond to three student complaints that were raised.

### A.  Student Conduct Was Unclear Regarding The Process It Used In Responding To Complaints

On April 15, 2016, the Dean of Students filed a complaint with Student Conduct regarding the Event.  On April 26, 2016, at the urging of the Dean of Students, three additional Student Affairs officials who were present at the Event sent complaints to Student Conduct.

Both the Dean of Students and the Director of Student Conduct believed that Student Conduct would proceed against GUPS, as a student organization, rather than against any particular protestor.  The record demonstrates that there were communications regarding exactly what the process should look like, but no clear policy was identified.

The Dean of Students agreed that Student Conduct did not follow their "usual procedure" in that, unbeknownst to her, the Director "used the individual student conduct process" rather than the

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

"student organization conduct process."  She explained that the sanctions of the two processes do not "line up."

Ultimately, the Director of Student Conduct believed he was processing the complaints under CSU Executive Order 1098, and said:

> …. I had already sent out appointment letters under 1098, so I was comfortable proceeding.

However, Executive Order 1098 is a process related to complaints against students, not student organizations.  Importantly, the policy is clear that an investigation is required, and reads:

> Complaints by Students against Students shall be investigated according to the procedures set forth in Executive Order 1097.

> Complaints by CSU employees … against students shall be investigated according to the procedures set forth in Executive Order 1096.

Student Conduct took a different route.

On April 26, 2016, Student Conduct separately notified two lead GUPS protestors that they were under investigation for potential violations of the Student Conduct Code.[15]  The letters did not state that GUPS, as an organization, was the subject of the investigation.

On May 9, 2016, Student Conduct convened a meeting with the two students.  The GUPS advisor was present.  After a two-and-one-half-hour discussion with the two students, the allegations were dismissed.  Student Conduct did not interview any other witnesses present at the Event, including members of Hillel.  The Director said his decision was based on the following factors: The students admitted to the chanting, but explained that they had not been asked to leave; they admitted to using amplified sound, but noted that amplified sound was used at other events on campus; they indicated that they were not aware of the Time, Place and Manner policies; and, they stated that they had learned from their mistakes.

The Director of Student Conduct explained that, in his view, the process was meant to be educational.  He told the students:

> […] what ended up happening is you came out looking like the bad guys and he [the Mayor] looks like the victim and now you are here in front of me answering for your actions.

He felt comfortable that the process had met its goal of educating the students, and felt that they would not repeat the conduct again in the future.

---

[15] The two students felt that they were singled out because they are Palestinian, given that students from other student groups participated in the protest and were not summoned to Student Conduct.  I find it more likely that these two students were contacted because the video footage of the Event shows that they were the leaders of the protest.

Ultimately, I reach some of the same conclusions as the Director of Student Conduct.  However, the lack of rigor in the process left many feeling that the campus did not take the allegations seriously.

### B.    Student Affairs And Student Conduct Did Not Respond To Complaints Filed By Students

The record demonstrates that three Hillel students filed complaints that were not acknowledged or responded to by Student Affairs or Student Conduct.[16]

On Friday, April 8, 2016, the Assistant Director of Hillel sent an email to the SF Hillel community inviting Hillel members, students and non-students, to submit conduct complaints.  Three Students submitted complaints.

*First Complaint.*  On April 9, 2016, a student sent an email to Student Conduct and Student Affairs.  In it, he alleged that the protestors had violated the Student Code of Conduct.  He wrote, in part:

> So, let's get this straight. I am not opposed to protest. The GUPS group has every right in the world to protest for their cause. I would support if they approached in a deeper meaningful way, for understanding and learning, which can lead to action. Their screeches and loud voices are not filled with knowledge or a call for action. It is just a disruption. No actions will be taken from their calls to protest neither here nor in the Middle East.
>
> […] This was a missed chance for their organization to take a different and thoughtful approach to the Event by actually asking pressing and critical questions for the speaker. […]

He did not receive any response from Student Conduct or Student Affairs.

*Second Complaint.*  On April 11, 2016, a student submitted an email to Student Conduct and Student Affairs.  She wrote, in part:

> During this, the protestors continued to yell phrases such as "Get the fuck off this campus", and "long live the intifada" both of which took the protest from a peaceful representation of freedom of speech, to a place that brought me to tears. I feel that I deserved the right to be able to listen to the lecture in a safe environment.
>
> […]
>
> I look forward to the day that I can feel safe at SFSU, and where the campus can allow diverse viewpoints from an academic and respectful place.

She did not receive any response from Student Conduct or Student Affairs.

---

[16] Those complaints were not provided to me in my initial interviews with either the Director of Student Conduct or the Dean of Students.  I had to make several requests for copies, and finally received them on July 9, 2016, well over a month after the initial interviews.  I do not attribute bad faith to this delay, but believe it further exhibits the lack of attention given to the three students and their concerns.

***Third Complaint***.  On April 12, 2016, a third student sent an email to Student Conduct.  In it, he wrote, in part:

> […] I was utterly offended by lack of civil discourse by GUPS members. They violated multiple student conduct codes, and I'd like to be sure that the University will take action.

He did not receive any response from Student Conduct.

On May 10, 2016, this student sent an email to the Administration complaining about an event following the Mayor's speech that made him feel unsafe on campus.  Specifically, he alleged that he was physically targeted on campus by a GUPS student in the month following the Mayor's appearance on campus.  The complainant student wrote, "He was either trying to provoke a physical confrontation or just flat-out intimidate me.  He did not say anything.  I decided to walk away, but I feared for my safety at the time and afterwards, and have filed a police report."  In response, the complainant student was informed that he could initiate a formal Executive Order 1097 process, and was invited to submit the required form, which he did.[17]

The student then expressed his desire that the campus investigate the protestors' conduct at the Mayor's Event under the EO 1097 process.  On June 10, 2016, the campus conducted an intake meeting with the student regarding his complaint related to the Mayor's speech.  The findings in this report will inform that process.

## XI.   Moving Forward

The campus climate will need to be monitored in the wake of the Mayor's appearance and the heightened tension among students.  As noted above, one Hillel student has alleged targeting by a GUPS student after the Mayor's Event.  Another Hillel student witness said that several students, both those who had attended the Event and those who had not, spoke with her after the Event, and told her they were "concerned about being visible on campus and being active [in the Jewish community]."

The GUPS students likewise feel unsafe.  One reported that she was followed twice from the bus station, and that individuals are roaming around and taking photos of the GUPS office in a manner that feels threatening.

---

[17] Executive Order 1097 defines harassment as "unwelcome conduct, based on the Complainant's Protected Status [Nationality, Race or Ethnicity, Religion] that is sufficiently severe, persistent or pervasive that its effect, whether or not intended, could be considered by a reasonable person in the shoes of the Complainant, and is in fact considered by the Complainant, as limiting her/his ability to participate in or benefit from the services, activities or opportunities offered by the University."  As noted earlier in this report, the record demonstrates that the protestors' conduct was not directed towards the audience members, but instead directed towards the Mayor for his political views.  Even if one concluded that the conduct was based on the protected status of the audience members, I question whether this single protest would be sufficiently severe, persistent or pervasive – *standing alone* - to trigger a policy violation.  However, conduct that is repeated or cumulative can become conduct that meets this standard.  This underscores the need for the university to respond to each student complaint in a prompt, thorough and impartial manner, following applicable policies and procedures.

SUMMARY REPORT OF FINDINGS | SAN FRANCISCO STATE UNIVERSITY

Moving forward, it will be important for the campus to respond to student concerns in a timely and consistent fashion in order to ensure that all students feel safe on campus.  Policies and procedures should be clarified, and augmented, if needed.  Campus officials and students must be educated on the standards of conduct.  Finally, allegations of misconduct should be investigated and responded to following the applicable procedures, which must be applied in a consistent and even-handed manner.

♦♦♦  ♦♦♦  ♦♦♦  ♦♦♦

This concludes the investigation.

Respectfully Submitted,

Deborah Maddux

# EXHIBIT "B"

**San Francisco State University** | Home | Login | Calendar | A–Z Index | Search Tools | [        ] **Search**

# Student Activities & Events

**Site Home**

**Student Organizations**

Organization Directory
Orientation Dates
Constitution
Guideline
Organization Registration
Web/Email Accounts
Fundraising
Event Planning
Advisors

**Greek Life**

**Events & Programs**

**Student Life Events Center**

**Vendor Program**

**Faculty & Staff**

**Conduct & Policies**

**About Us**

## Faculty & Staff Advisors Of Recognized Student Organizations

### Advisor Orientation Document

Faculty/staff advisors are required by CSU policy to complete a mandatory orientation. Until the advisor completes the orientation, the student organization will not be recognized/registered. In order to best accommodate your schedule and provide information throughout the year, SAE has developed an online orientation for all faculty/staff advisors. Please click the link below to download the Student Organization Advisor Orientation.

📕 Download the Student Organization Advisor Orientation (PDF Version, 224 KB)
Download free Adobe Reader

### Overview of Faculty/Staff Advisor Roles & Responsibilities

The SAE staff welcomes all faculty/staff advisors. You were selected by your student leaders to serve them and the organization as a mentor and guide. This is a great honor and an experience we hope that you will enjoy. SAE staff and the University appreciate the work you do to support student leadership on campus and are available to you throughout the year. This website was designed to assist you in your role. It is currently in development and new resources will continue to be added throughout the year, so please check back.

The faculty/staff advisor is selected by the student organization. This individual serves as an integral component in establishing a partnership and building a positive relationship with the student organizations at San Francisco State University.

The role of an advisor varies, but it is always an important one. The advisor is a non-voting member and serves strictly in an advisory role. The scope of the student organization's activities, the effectiveness of officers, the time commitments of the advisor and several other factors determine the level of involvement the advisor will have with the student organization. There may be some concerns regarding liability and your role as the advisor to a student organization. As an advisor and employee, one is not to act outside of the scope of his/her employment. At no time should actions occur that would be considered as behavior that is inconsistent with your role as an official representative of the university. While the influence of the advisor is necessary and valuable, they are not responsible for the actions of the individual members or the organization as a whole.

Considering their expertise and experience, the faculty/staff advisor can often provide significant insights regarding student organization issues. For example, goal setting, program ideas, conflict resolution, feedback, continuity and student organization advocacy. Their most important contribution is advising about organizational and interpersonal effectiveness, communication, and personal growth. It is through the aid of the advisors that individual students develop their true potential as leaders.

The advisor should assist the student organization to adhere to all University policies, as well as federal and state law. Furthermore, the student officers are to know where policies are listed, what the policies are, why they exist, and the channels to be followed for changes, revisions or exceptions. Student organization programming/events may require liability insurance, safety and security cost for event planning. The policies are listed throughout the SAE website. Student

**Quick Links**

 GatorJOBS for Students

 GatorJOBS for Employers

● OrgSync Login

f SICC Facebook

🐦 SICC Twitter

✖ Student Life Calendar

**Additional Resources**
links to helpful websites.

Select a Link
**Go**

**Search Student Activities & Events**
[        ]
**Go**

**Contact**

**Hours:** Monday through Friday, 8 a.m. - 5 p.m.

**Phone:** (415) 338-1761

**Fax:** (415) 338-6150

**Email:** sicc@sfsu.edu

**Address:** 1600 Holloway Avenue, San Francisco, CA 94132, Student Services Building, Room 206

*Last Update: January 10, 2017_cp*

Activities and Events and the Dean of Students Office are the designees who can respond to questions concerning the interpretation or application of policies and regulations.

**Advisor Support**

SAE and the University are grateful for the work faculty/staff advisors do for student organizations at SFSU. The faculty/staff advisor is encouraged to contact us with any questions or concerns. SAE staff are happy to assist any way possible.



SF State Home | Contact | 1600 Holloway Avenue . San Francisco . CA 94132 . Tel (415) 338-1111

# EXHIBIT "C"

# STUDENT ORGANIZATION ADVISOR ORIENTATION

**Student Activities & Events (SAE)**



SF State

# OVERVIEW OF ADVISOR ORIENTATION

1. SAE contact information for any questions/answers

2. Advisor requirements, roles, benefits & tips

3. Organization/Advisor registration process

4. Major Policies and the SAE processes

5. Student organization benefits, rights, and responsibilities

6. Event planning

7. Funding & fundraising

8. Resources



SF State

# TO CONTACT SAE

- In the Student Services Building (SSB), room 206

- Phone: (415) 338-1761

- Fax: (415) 338-6150

- sicc@sfsu.edu

- **http://www.sfsu.edu/~sicc**

- Located on Facebook as well



SF STATE

# ADVISOR REQUIREMENTS

- Be a University employee (employees of campus <u>auxiliary</u> entities may not serve as advisors)

- **Complete the Advisor Orientation by reading this document in its entirety**

- Complete the Advisor Registration process (next slides)

- Be on campus: advisors on sabbatical or extended leaves of absences should identify an alternate advisor during their absence from campus

- Be familiar with the organization's constitution and bylaws and, if applicable, the constitution and bylaws of the organization's inter/national affiliate

- Assist SAE and the University in upholding University policy



SF STATE

# ADVISOR REGISTRATION PROCESS

- Log on to Orgsync.com, you'll find the login link in the upper right corner, then look for the SF State "community"

- **IF YOU HAVE NOT CREATED AN ACCOUNT YET** → create your profile/log-in using the WHITE BUTTON only (Sign in with Campus ID), through https://orgsync.com/login/san-francisco-state-university

- Once logged in, if you just created an account, you'll need to join an organization. There will be an option to join an organization or see your memberships in the upper right corner of the page, next to where your profile name appears.

- Click on the image/name of the organization of which you'd like to become a "member" (See Next Slide)

5



SF STATE

# ADVISOR REGISTRATION PROCESS





# ADVISOR REGISTRATION PROCESS

Now, simply click on the "Join Now" box that will pop down after you hover on the "settings" menu option on the right side.





# ADVISOR REGISTRATION PROCESS

- Once you are a "member" of the portal you will need to check your email; you'll have a registration email assuming the Students have done their part and submitted the organization registration request.
- Only once the organization has submitted the registration request will you receive an email from OrgSync (not the person who submitted the request), with the subject heading, "Review Requested by (insert name of student who submitted the form)." When you open that email, click on the Green button in the middle of the page which reads, "Review Now."
- That link will take you back into OrgSync where you may or may not need to log in again.
- The page you'll immediately see will be the profile for the organization which you will advise. Your only role is to click on the green button on the right side of that page which reads, "Submit Review Form."



8

SF STATE

# ADVISOR REGISTRATION PROCESS

- Make sure you fill out all the fields and press the green button at the bottom which reads, "Continue."
- The subsequent page is your final task, press the green button which reads, "Finish."
- If the, "Finish" button is not pressed and you close the browser page, it will be as if you hadn't done anything and the form will not be submitted.
- Once you submit that form, you'll be formally recognized as the Advisor for the group. The group will still need to do other items to complete the registration process, but from that point forward, you're done with your part.

9



SF STATE

# EXTENDED ABSENCES & RESIGNATION

- Extended absences: when advisors will be on extended absences from campus (sabbatical, leave of absence, emergency leave of absence, etc.), an alternate advisor must be identified. This change should be reported to SAE as soon as possible at sicc@sfsu.edu.

- Resignation: due to a number of factors (retirement, time constraints, difference of ideology, etc.), there may come a time when advisors, organizations, or both parties determine that another advisor would better serve the organization. Once this decision has been made, it is important to have a discussion with the leadership of the organization regarding any change. Both the organization and advisor are required to notify SAE of any changes at sicc@sfsu.edu.



SF STATE

# OTHER POSSIBLE ROLES OF THE ADVISOR

- In addition to the requirements on the previous slides, the advisor may also serve in the following capacities should the students from the organization approve/permit:
  - Attending organization meetings and/or events
  - Teaching and coaching student leaders when issues or conflicts arise
  - Serving as a resource for networking on and off campus
  - Mentoring students in the organization
  - Assisting the organization with goal-setting
  - Keeping historical information and documents

11



SF STATE

# BENEFITS OF BEING AN ADVISOR

- Developing a mentoring/teaching relationship with students
- Recognition from the University community
- Facilitating the growth and development of student leaders
- Continued historical growth related to cultural, social, religious, educational, and political changes of student organizations
- Establishing networks with peers/colleagues serving in similar capacities
- Working with student organizations of varied interests
- Assist in the review of Retention, Tenure, and Promotions (RTP)



SF State

# A FEW TIPS FOR SUCCESS

- Set expectations: meet with leaders from the organization early in the academic year and discuss mutual expectations that the leaders would like from the advisor and vice versa. <u>Remember that organizations are for the students, the role of the advisor is to advise in their decisions and assist them in their organizational development.</u>
- Quality vs. Quantity: It is very important to have a presence with students, but it is more valuable to have meaningful interactions and relationships with students.
- Motivation: sometimes students will burn out and lack the motivation to continue to work for the organization's success. Advisors can help determine what will motivate the students (i.e., recognition, achievement, empowerment).

13



SF STATE

# THE REGISTRATION PROCESS: Overview

- All student organizations are required to (re)register with the University each fall semester by September **30th** in order to be recognized as a student organization at SF State. Meeting the deadline allows organizations to also meet the Associated Students Incorporated (ASI) funding schedule. Student Organizations' registration is valid for one calendar year, ending on September **30th** of the following year. Registration is an extensive process and may require some time for forms to be processed, so please plan accordingly.

- Registration information, including deadlines and materials, is available at http://www.sfsu.edu/~sicc/organizationregistration.html

14



SF STATE

# THE REGISTRATION PROCESS: Details

http://www.sfsu.edu/~sicc/organizationregistration.html

- The following is a list of all requirements that must be met in order for an organization to obtain University recognition:
  - o Complete the steps to register via OrgSync – these steps are available at http://www.sfsu.edu/~sicc/organizationregistration.html
  - o Membership: all organizations must have a minimum of 5 S.F. State students. One of these must be a president and another must be a financial officer/treasurer. The other 3 students can be general members and/or additional officers decided upon by the organization. The president must specify the 4 other organization members on their OrgSync registration page.
  - o GPA and unit load: all officers must have a minimum 2.0 cumulative S.F. State GPA and be enrolled in a minimum of 6 units for undergraduate students or 3 units for graduate students.
  - o Advisor: each organization must have an advisor that is a current S.F. State employee. The advisor creates their own OrgSync account and joins the respective organization(s) necessary.
  - o Constitution/bylaws: all student organizations must keep their most recent constitution and/or bylaws on file with SAE in electronic format. In addition, all constitutions and/or bylaws must meet the requirements outlined in the constitution guideline. http://www.sfsu.edu/~sicc/constitutionguideline.html
  - o Roster: template is hosted in your OrgSync portal under the "files" menu option.
  - o The president and financial officer/treasurer must attend a Student Leader Orientation session. In addition, any members/officers wishing to conduct business on behalf of the organization (reserve space on campus, get a tabling permit, complete an event application, etc.) must also attend a Student Leader Orientation session. Students only have to attend one of these sessions once during their time at S.F. State. http://www.sfsu.edu/~sicc/leaderorientation.html
  - o Leadership Symposium: each organization must send at least one representative to the annual Leadership Symposium held in September. It is recommended that the president and financial officer attend, but any officer or member can attend to meet the requirement. Please note: this is an annual event held at the beginning of the fall semester and is an annual requirement that each student organization seeking University recognition be represented at the Symposium. http://www.sfsu.edu/~sicc/symposium.html

15



SF STATE

# THE RE-REGISTRATION PROCESS

- Registration is an academic yearly process: Every Fall semester, it begins in July and closes at the end of September. (deadline is September 30th)

- The President SHOULD be the person who re-registers a group by clicking on the link analogous to the one below…



16



SF STATE

# THE RE-REGISTRATION PROCESS

- Subsequent Officer/Member agreement forms sent via email after president hits the "finish" button. All 6 must be completed before the audit of the registration request begins.

- IF the organization deals with cash money, the President, Financial Officer/Treasurer, and Advisor must complete the "Student Organization Account Application and Agreement" form any time there is a president or treasurer change. This form can be found at asi.sfsu.edu. For student organizations that have received an exemption (MUST be 501c3, AKA Tax exempt, with confirmation/approval by SAE as per http://www.sfsu.edu/~sicc/conduct.html#banking) from the banking policy and do not bank with ASI, an exemption request must be submitted for annual review in lieu of the ASI banking form. This is a required PART of registration.

- Registration from previous academic year remains current until the Fall deadline of the following academic year or until the organization re-submits registration materials

- Instructions for registering using OrgSync are available at http://www.sfsu.edu/~sicc/organizationregistration.html#process

- Once approved, president must inform SAE of any changes in membership, officers, advisor and constitution

17



SF STATE

# BENEFITS OF RECOGNIZED STUDENT ORGS.

- Recognized student organizations have the following rights and privileges on campus:
  - General use of facilities (classrooms, Student Center, Malcolm X Plaza, lawn areas) at little or no cost. Some specialized venues such as the Gym, Creative Arts facilities and the Seven Hills Conference Center do have costs associated with them
  - The right to request financial subsidy and other services from the Associated Students Incorporated (http://asi.sfsu.edu)
  - The right to use the University as a mailing address for the organization (mailboxes provided & maintained by SAE)
  - SF State email (@mail.sfsu.edu) and OrgSync website account
  - Banking with ASI while using OrgSync Treasurer module for transparency
  - Leadership development workshops and event planning resources provided by SAE



SF STATE

# RESPONSIBILITIES OF RECOGNIZED ORGANIZATIONS

- Manages itself according to University policies and the organization's constitution/bylaws

- Conducts its fiscal operations in accordance with proper standards of business management set forth by the CSU, Auxiliary Accounting Office, and SAE

- Works with its selected advisor, SAE and the Associated Students Incorporated to enhance the purposes and plans of the organization for the benefit of its members and the University

- Ensures that its members, guests, speakers and performers conduct is also in accordance with University policies

- Pays for damages to University facility/facilities that may occur during its event.  The organization is required to monitor guests and give due warning for risks.

- Use of University name, images, and copyright/trademark (the org is NOT a part of SF State)

- Organizations are responsible for all the information on the SAE website (http://www.sfsu.edu/~sicc/)



SF STATE

# MAJOR POLICIES: STUDENT CONDUCT

- **Student Code of Conduct**:
  http://www.sfsu.edu/~bulletin/current/supp-reg.htm#ppg339

- "The University is committed to maintaining a safe and healthy
  living and learning environment for students, faculty, and staff.
  Each member of the campus community should choose
  behaviors that contribute toward this end. Students are expected
  to be good citizens and to engage in responsible behaviors that
  reflect well upon their university, to be civil to one another and
  to others in the campus community, and contribute positively to
  student and university life."



SF STATE

# MAJOR POLICIES (CONTINUED)

- **Non-Discrimination Policy**: "No campus shall recognize any fraternity, sorority, living group, honor society, or other student organization that discriminates on the basis of race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation, or disability. The prohibition on membership policies that discriminate on the basis of gender does not apply to social fraternities or sororities or other university living groups." (CSU Executive Order 1068)

- Open membership: "*No campus shall recognize any fraternity, sorority, living group, honor society, or other student organization unless its membership and leadership are open to all currently enrolled students at that campus, except that a social fraternity or sorority or other university living group may impose a gender limitation as permitted by Title 5, California Code of Regulations, Section 41500. Student organizations may require applicants for leadership positions to have been members for a specified period of time, and may require officers to compete for those positions in elections of the membership*." (CSU Executive Order 1068)

- **Time, Place and Manner (University Executive Directive 89-13)**: All use of University properties and services by registered student organizations must comply with applicable campus time, place and manner regulations.  The entire policy is available at http://www.sfsu.edu/~sicc/conduct.html#time
  1. Music/Band Example – No amplified sound unless registered with an event
  2. Freedom of Speech – student orgs CAN voice whatever opinion they like following 1st amendment.

21



SF STATE

# MAJOR POLICIES: HAZING

- The State of California and San Francisco State University have expressly and repeatedly asserted their opposition to hazing and pre–initiation activities which do not contribute to the positive development and welfare of new members. Whether on or off campus, planned or spontaneous, California law makes it a criminal offense for anyone to participate in hazing. Students are entitled to be treated with consideration and respect. No individual shall perform an act that is likely to cause physical, psychological or social harm to any other person within the University community on or off campus.

- Additional information about definitions, policies and procedures related to hazing can be found at http://www.sfsu.edu/~sicc/conduct.html#hazing

22



SF STATE

# MAJOR POLICIES: HAZING (CONTINUED)

**Matt's Law Sec 3.245.6: Defining Hazing and Consequences**

- As used in this section "hazing" or "haze" is conduct which causes, or is likely to cause, bodily danger, physical harm, or personal degradation or disgrace resulting in physical or mental harm to another person in the course of the other person's pre-initiation into, initiation into, affiliation with, holding office in, or maintaining membership in any organization. The terms "hazing" or "haze" do not include customary athletic, fire department, police department, military, or quasi-military training, conditioning, or similar events or activities.

- Any person who hazes or conspires to participate in hazing is guilty of a misdemeanor punishable by a fine of not less than one hundred dollars ($100), nor more than five thousand dollars ($5,000), or imprisonment in the county jail not to exceed one year, or by both fine and imprisonment.

- Any person who hazes or conspires to participate in hazing which results in death, great bodily injury, or great psychological injury is guilty of a felony punishable by imprisonment in the state prison.

23



SF STATE

# MAJOR POLICIES: ALCOHOL & ILLEGAL DRUGS

- San Francisco State University expects the campus community as well as external groups to be aware of all state and local laws with reference to possession, serving and consuming of alcohol; to inform decisions about alcohol and drug use; and to be responsible for the consequences of those decisions.

- **Alcohol service is not permitted at student organization sponsored events <u>on</u> the SF State campus or any related properties.**

- Student organizations ***should not*** serve alcohol at events off campus.

- Additional information regarding alcohol and illegal drugs can be found at http://www.sfsu.edu/~sicc/conduct.html#alcohol

24



SF STATE

# CONDUCT PROCESS FOR STUDENT ORGS.

- A complaint alleging non-academic misconduct by a student organization may be filed by anyone, but must be in writing, signed, dated and submitted to the Director of SAE. These complaints must be submitted within seven working days of the alleged violation, and include any supporting evidence, documentation and names of witnesses

- A complete description of the conduct process and procedures is available at http://www.sfsu.edu/~sicc/socb.html

25



SF STATE

# EVENT PLANNING

- Recognized student organizations are able to use University facilities generally at no cost. Some specialized venues such as the Gym, Creative Arts facilities and the Seven Hills Conference Center do have costs associated with them.

- Timelines/Outlines
  - Event Proposal for large events may be required
  - Give at least 3 months notice for planning large events

- Cancellations/rained out events
  - Due to limited resources, the University cannot hold rain locations
  - If an event is cancelled, it does not automatically guarantee another date for the venue

- **<u>SPACE</u> is reserved by venues on campus, <u>EVENTS</u> are approved by SAE**

- The process for reserving space on campus depends on the venue. Below is a list of venues and instructions for how to reserve space in them:
  - Cesar Chavez Student Center: done electronically – information about the procedure is available at http://asi.sfsu.edu
  - Classrooms: requests are accepted online at http://www.orgsync.com
  - Outdoor Venues (Malcolm X Plaza, Centennial Walkway & lawn areas):  reservations can be made online at http://www.sfsu.edu/~sicc/outdoor.html
  - All other venues: a guide for reserving all other possible venues on campus is available at http://www.sfsu.edu/~sicc/facilities.html



SF STATE

# PUBLICITY & POSTING

- Ideas for publicity are available at
  http://www.sfsu.edu/~sicc/eventplanning.html

- Banners: indoor and outdoor

- Chalking – "Chalk Where You Walk"

- Posting
  - No publicity may be posted on walls, doors, windows, lamp posts, plants, garbage cans, phone booths, vehicles, etc.
  - Printed publicity must be written in English. Translation is required on postings/flyers that are written in a language other than English.
  - The name(s) of the sponsoring student organization(s) is/are required on all postings/flyers.
  - Unapproved postings/flyers will be removed.

- **Publicity & posting in the Residential Community, follow Housing policies**



SF STATE

# FUNDING, FUNDRAISING, and CASH

- ASI: http://asi.sfsu.edu

- Vendor Sponsorship Program (coordinated by SAE, not available to Club Sports):

http://www.sfsu.edu/~sicc/vendor.html

- Tabling: Tabling Permits are good for one week at a time and are available starting on Thursday the week prior to the desired tabling week. Must follow the Banking/Cash handling policies
  - http://www.sfsu.edu/~sicc/conduct.html#banking
  - http://www.sfsu.edu/~sicc/eventplanning.html#cash



SF STATE

# RESOURCES

- SAE's web site has a variety of resources that can be accessed by visiting http://www.sfsu.edu/~sicc

- Staff in SAE are happy to provide individual consultation to advisors and students; a complete listing of SAE staff is available at http://www.sfsu.edu/~sicc/staffdirectory.html

- Feedback from advisors, students and the University community is welcome and can be provided via email through sicc@sfsu.edu

- Please feel free to contact SAE with any ideas for additional resources that would be helpful

29



SF STATE

# WE LOOK FORWARD TO WORKING WITH YOU.

Student Activities and Events (SAE)

SSB 206 | www.sfsu.edu/~sicc | 415.338.1761 | sicc@sfsu.edu



SF STATE

# EXHIBIT "D"

## <u>NOT ATTACHED</u>

## <u>SEE DOCKET NO. 044</u>

## DR. ABDULHADI'S MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT FILED ON AUGUST 21, 2017