Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
JACOB MANDEL, ET AL.,          )
                               )
          Plaintiffs,          )
                               )
  VS.                          )     NO. CV 17-03511-WHO
                               )
BOARD OF TRUSTEES OF THE       )
CALIFORNIA STATE UNIVERSITY,   )
SAN FRANCISCO STATE UNIVERSITY,)
ET AL.,                        )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Wednesday, November 8, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111
BY:  **SETH WEISBURST, ESQUIRE**
     **KRISTA M. ENNS, ESQUIRE**

WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601
BY:  **LOWELL D. JACKSON, ESQUIRE**

THE LAWFARE PROJECT
633 Third Avenue - 21st Floor
New York, NY  10017
BY:  **AMANDA BERMAN, ESQUIRE**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

APPEARANCES CONTINUED:

For Defendants Board of Trustees of the California State
University, San Francisco State University, Leslie Wong, Mary
Ann Begley, Luoluo Hong, Lawrence Birello, Reginald Parson,
Osvaldo Del Valle, Kenneth Monteiro, Brian Stuart, Robert Nava,
Mark Jaramilla, Vernon Piccinotti, and Shimina Harris:

                    MUNGER, TOLLES & OLSON LLP
                    350 South Grand Avenue - 50th Floor
                    Los Angeles, CA  90071
            BY:  **BRADLEY S. PHILLIPS, ESQUIRE**

                    MUNGER, TOLLES & OLSON LLP
                    1155 F Street, NW - 7th Floor
                    Washington, DC  20004
            BY:  **ADELE M. EL-KHOURI, ESQUIRE**

For Defendant Rabab Abdulhadi:

                    GAVIN, CUNNINGHAM & HUNTER
                    1530 The Alameda - Suite 210
                    San Jose, CA  95126
            BY:  **ALAN F. HUNTER, ESQUIRE**

                    MARK ALLEN KLEIMAN
                    2907 Stanford Avenue
                    Venice, CA  90292
            BY:  **MARK ALLEN KLEIMAN, ESQUIRE**

                    LAW OFFICES OF BEN GHARAGOZLI
                    18336 Soledad Canyon Road - Suite 2241
                    Canyon Country, CA  91387
            BY:  **BEN GHARAGOZLI, ESQUIRE**

| | |
|---|---|
| 1 | **Wednesday - November 8, 2017**                    **2:12 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling CV 17-3511, Mandel, et al., vs. |
| 5 | Board of Trustees of the California State University, et al. |
| 6 | Counsel, please come forward and state your appearance. |
| 7 | **MR. PHILLIPS:**  Good morning, Your Honor.  Brad |
| 8 | Phillips of Munger, Tolles & Olson on behalf of all defendants |
| 9 | except Professor Abdulhadi, and with me at counsel table is my |
| 10 | colleague, Adele El-Khouri. |
| 11 | **THE COURT:**  Good afternoon. |
| 12 | **MR. HUNTER:**  Good afternoon, Your Honor.  Alan Hunter |
| 13 | for Defendant Abdulhadi.  I have two colleagues with me. |
| 14 | **MR. KLEINMAN:**  Good afternoon, Your Honor.  Mark |
| 15 | Kleinman, also for Defendant Abdulhadi. |
| 16 | Mr. Hunter will be arguing the motion to dismiss.  I'll be |
| 17 | addressing matters of the case management conference. |
| 18 | **MR. GHARAGOZLI:**  Good afternoon, Your Honor.  Ben |
| 19 | Gharagozli, G-H-A-R-A-G-L-O-Z-I, for Dr. Abdulhadi.  I will be |
| 20 | handling the motion to strike and the request for judicial |
| 21 | notice, if it please the Court. |
| 22 | **MR. WEISBURST:**  Good afternoon.  Seth Weisburst, |
| 23 | Winston & Strawn, appearing pro bono, along with my colleagues |
| 24 | Lowell Jackson, Krista Enns, and from The Lawfare Project, |
| 25 | Amanda Berman. |

1          **THE COURT:**  Welcome to you all.

2      So let me tell you what I understand about this case and

3  the motion to dismiss, and then I look forward to hearing from

4  you.

5      So I understand that the plaintiff agrees that CSU and

6  SFSU can't be defendants on the constitutional claims and the

7  individual defendants can't be liable for damages on those

8  claims in their individual capacity.  And the claims that I'm

9  looking at arise from Mayor Barkat's visit and the KYR Fair.

10     And the way that I read the Complaint is that all these

11 allegations -- the allegations harming Jewish students because

12 of their religion, ethnicity, or perceived pro-Israeli

13 beliefs -- are invidious discrimination claims, and so my

14 understanding of the law and of -- particularly of the *OSU*

15 *Student Alliance* case is that the plaintiffs must allege

16 specific intent to discriminate, not just knowledge.  And so my

17 analysis of the case flows from that.

18     So with respect to the First Amendment and with respect to

19 the Barkat event, merely because the event space was moved

20 doesn't mean that there is a denial of the right to assembly.

21 The expressed concern of the institution was the expected

22 protest and student disruption rather than the content of his

23 speech.  The payment of the fee didn't impinge on First

24 Amendment rights.  And it was the protests of third parties and

25 not the acts of the defendants that frustrated the plaintiffs

1    in their ability to enjoy the speech.

2         So those are, I think, problems with the First Amendment

3    claim there.

4         With the KYR Fair, the specific allegations blame the

5    mistaken invitation and the exclusion on the organizers but not

6    the administration defendants.  The allegations against Begley,

7    Harris, and Monteiro are a failure to act, and there again,

8    allegations of invidious viewpoint discrimination.  And so

9    failing to act is not enough.

10        With respect to equal protection, there's no showing that

11   similar groups in similar circumstances weren't treated the

12   same way with respect to the Barkat event, and with Jews for

13   Peace apparently included at the KYR Fair, equal protection is

14   not -- would not seem to be a claim that would work.  And

15   again, with Defendants Stuart, Harris, Piccinotti, there aren't

16   any allegations of affirmative acts there.

17        With respect to Title VI, there aren't allegations of

18   direct discrimination, which I've just been discussing.  I

19   think more needs to be alleged than simply the events that have

20   been described regarding Mayor Barkat and the KYR Fair to

21   allege a hostile environment today.  You can't rely on what

22   happened between 1973 and, pick a year, 2009.  That claim, I

23   think, lacks specificity, nor does it show deliberate

24   indifference.

25        The plaintiffs concede that SFSU investigated the

1   incidents, prepared reports, took steps to address the

2   incidents, and I don't see an actionable denial of educational

3   benefits.

4        So those are the problems with all the defendants, except

5   for the separate motion from Ms. Abdulhadi, and she's not an

6   official actor.  She didn't create or apply a policy.  There

7   aren't allegations that she acted with specific intent to

8   discriminate against the plaintiffs, and her role, as alleged,

9   seems speculative.

10        So those are my primary concerns.  So let's hear from the

11   plaintiffs.

12        **MR. WEISBURST:**  Good afternoon, Your Honor.

13        The question before the Court today is whether accepting

14   all the plaintiffs' facts as true, plausible claims for relief,

15   have been stated in the First Amended Complaint.

16        **THE COURT:**  Could you start with my primary question,

17   which is invidious discrimination, specific intent.  Tell me

18   what the standard is that you think I should be applying, and

19   if I'm misreading the *OSU* case, tell me why.

20        **MR. WEISBURST:**  Sure.

21        Plaintiffs' position is that defendants' claims are not

22   based on third-party conduct, but that we've alleged specific

23   conduct by the defendants themselves.

24        We agree with Your Honor that the *OSU* case applies here,

25   and it appears that defendants don't agree or haven't applied

1    the case.   According to *OSU*, the conduct the plaintiff must

2    allege to state a Section 1983 claim can be colorable action or

3    inaction, is the first point I would note.

4         Part of the inquiry --

5         **THE COURT:**  So my -- the way that I read your

6    Complaint and its -- the allegations are rife throughout it --

7    is that it's an invidious discrimination case, that you are

8    complaining that the Jewish students, because of the fact that

9    they're Jewish, because of their religion, are being treated

10   differently than everybody else.   That's invidious

11   discrimination.

12        **MR. WEISBURST:**  That's correct.  We do allege specific

13   intent, although the *OSU* case, my understanding is that

14   knowledge suffices -- this is from *OSU*.  Knowledge suffices for

15   free speech violations under the First and Fourteenth

16   Amendments.

17        So we do allege specific intent, but knowledge alone,

18   according to *OSU*, of the deprivation of plaintiffs' rights is

19   sufficient to state a claim, and per *OSU*, because knowledge

20   suffices, allegations that defendant knew about the violation

21   of the rights and acquiesced in that violation also suffices to

22   state a claim from -- for First and Fourteenth Amendment

23   violations.

24        **THE COURT:**  So my problem is that -- yes.  You're

25   quoting from part of the case.

1    There's another part of the case that discusses invidious

2    discrimination and the standards that apply, and your case --

3    it's not saying that there is a -- there's some written policy

4    that discriminates against the Jewish students, and the rights

5    that you're complaining about come as a result of invidious

6    discrimination, and that means that you have to allege specific

7    intent, as I understand that case.

8        **MR. WEISBURST:**  We believe we have alleged specific

9    intent.  I understand Your Honor's point about the historical

10   allegations which are there for, we believe, important

11   background, but I will concede those allegations are not part

12   of the current hostile environment.

13       This is a problem, anti-Semitism at SF State, that's been

14   woven into the culture, and this is decades long, but we

15   certainly do allege that this is a current pervasively hostile

16   environment for Jewish students at SF State, and the specific

17   named defendants are directly involved with this, both

18   regarding the events that are the subject of the 1983 claims,

19   and we do allege -- I can run through them for you, but

20   defendants have tried to cast our Complaint as only focused on

21   those two events, and that certainly isn't the case as far as

22   Title VI.

23       But we do allege specific intent, so our position would be

24   that we have stated a claim.  We certainly have provided

25   sufficient factual allegations that reasonable inferences drawn

1  from those allegations would suffice to state a claim,

2  including for invidious discrimination.

3       THE COURT:  What are your -- give me the top three

4  acts of specific intent that you've alleged.

5       MR. WEISBURST:  As to the Title VI claim?

6       THE COURT:  Pick a claim.  I'm really looking sort of

7  for the factual guts of the specific intent allegations and

8  what -- and the reason I'm asking is that what I see mostly is

9  what you've alleged as failures to act, failures to do

10 different things, and not a policy, not a specific thing,

11 besides moving the Barkat event.  So that's --

12      MR. WEISBURST:  I understand.

13      THE COURT:  I'm looking for the heart of your case.

14      MR. WEISBURST:  As to the Claims 3 and 4, which are

15 the Know Your Rights Fair, it's not accurate that defendants

16 were not involved in the intentional exclusion of Hillel from

17 this Know Your Rights Fair, which was motivated because it was

18 going to affect Jewish students, as we allege, and it denied

19 Jewish students the opportunity to go ironically to this fair

20 which was set up to provide information about rights for

21 vulnerable populations in the wake of the new political climate

22 after the presidential election.

23      So this fair was set up, and for some reason, it was

24 decided that Jewish students weren't entitled to have a table

25 they could go to for their group.  You mentioned the JVP group,

1    so I'll address that.

2          First of all, that group is not alleged in our Complaint,

3    and bringing up additional facts such as that we believe is not

4    appropriate at the Rule 12 motion stage.   However, to use an

5    analogy, if a group -- if a Chinese group -- a group of Chinese

6    students were excluded because certain people disagreed with

7    policies that the Chinese government was taking, human rights

8    violations, for example, that's obviously invidious

9    discrimination.   There is no justification for it.   And having

10   a table of some cherry-picked people who will support your

11   point of view and being able to point to them cannot be a way

12   to avoid liability.   That's --

13          **THE COURT:**   Who's event was it?   Wasn't --

14          **MR. WEISBURST:**   As we allege, this is a

15   school-sponsored event in the center of campus in the very

16   building that the Barkat event was not allowed to be hosted at,

17   which we do, also on that point, believe that that is a burden,

18   even if it didn't shut down the event entirely in that moment.

19   We believe this is an orchestrated -- and this is what we've

20   alleged -- an orchestrated series of events.

21          First they didn't want to have the event happen in the

22   first place as far as the Barkat event.   Then they discussed

23   how to handle it.   They decided to move it to a room that far

24   fewer people would attend.   People hadn't heard of this space.

25          We do believe the burden of forcing them to pay -- a

1    student group to pay money for an event that otherwise would

2    have been free in the Student Center was a burden, and that was

3    before the standdown order by the school which -- the police,

4    as we allege, were set to act and allow this event to continue.

5    They would have either removed the disrupting students or they

6    could have removed their amplification or their sound.  They

7    could have done -- they were in the process of getting ready to

8    do -- to take steps that would have allowed this event to

9    continue, the Barkat speech, and they were ordered by the Dean

10   of Students to tell the police to stand down and take no

11   action, and that had the effect of the entire hour, this speech

12   being shut down using amplifying sound in violation of

13   reasonable time, place, manner restrictions and the school's

14   actual policy until the event ended and nobody could hear from

15   this speech.  And everybody who was there was deprived their

16   First Amendment right to hear that speech.

17        And as we allege, which should be taken as true for

18   purposes of this stage of the process, that was done with the

19   intent of discriminating against people because they were

20   Jewish.  They were invited by the Jewish group Hillel, and

21   that's the equal protection side of it.

22        As to the Know Your Rights Fair, the school did its own

23   report, as we've alleged, and determined -- we've asked for

24   this report in discovery.  We haven't received it yet, but we

25   allege and know that this report finds that Hillel was

1    intentionally excluded, intentionally discriminated against,

2    and --

3             THE COURT:  By whom?

4             MR. WEISBURST:  And this was an act of retaliation.

5        This organizing committee, we allege, includes

6    Dr. Abdulhadi.  We allege that Dean Begley was involved in this

7    and that these actions were ratified by all the administration

8    defendants, both before and after.

9        Dean Monteiro was aware of it, as we allege, and this

10   can't be just considered something done by students or done by

11   this amorphous committee.  We allege the involvement.  They

12   were involved.

13       And so given such a clear, both motivation and result, we

14   feel like we've done more than enough to state a plausible

15   claim under the *Iqbal* and *Twombly* cases as far as those two

16   causes of action.

17       As to Title VI, there's so much that we almost -- I'm not

18   sure where to start.  We -- we -- I understand the criticism

19   that they've made about the length of our Complaint.  In one

20   respect, there's so many unfortunate facts here that we didn't

21   know how to limit it.

22            THE COURT:  Well, my suggestion is that next time

23   around, you at least get rid of 1973 to 2009.  You don't -- you

24   don't --

25            MR. WEISBURST:  I understand --

1          **THE COURT:**  You could say that in a paragraph.

2      The Complaint has some of the read of -- and I understand,

3  but there's -- but it would be more helpful if the Complaint

4  focused on these are the claims and the specific evidence

5  that's going to get me over the hurdle so that I can get the

6  case going.

7      So that is my over-arching suggestion if I stick with my

8  tentative.

9          **MR. WEISBURST:**  I understand that.  And we -- I won't

10  fight you on that point.  We labeled them as background.

11      I can explain just very briefly that this is a systemic

12  institutionalized problem and that those involved have -- there

13  is no way they weren't on notice and aware of these situations,

14  and that makes it all the more problematic that they have taken

15  no steps, and I wanted to point that out.

16      In the beginning, you said that there were investigations

17  done and steps taken.  Our position and what we've alleged in

18  the Complaint is that no actual steps have been taken at all

19  that would in any way qualify as a reason why this case

20  shouldn't continue.

21      But I take your point about the historical allegations.

22  We were trying to establish the systemic nature of this issue,

23  but we're more than happy to amend the Complaint and remove

24  those.  We're not claiming that that is the precise reason that

25  we're here today.  It's about the current pervasively hostile

1    environment for Jewish students on campus where Jews are

2    literally afraid to walk from Point A to Point B on campus.

3    They hide their identity.  They can't have a Star of David

4    exposed because they don't know what's going to happen to them.

5        And that takes the form both of physical threats, of

6    statements from the president of the university who has said

7    that physical safety -- he can't agree to the proposition that

8    physical safety of Jewish students is not a political issue and

9    he wouldn't agree to unequivocally welcome Jews on campus who

10   want to be Jews.

11       This is not just a situation of students mistreating each

12   other and an expectation that the administration should police

13   and know of every problem that's happening on campus.  This is

14   directly interwoven with the school itself and defendants, and

15   they were involved in not only those events that are the source

16   of our 1983 claims directly and we think it's more than

17   sufficient under *OSU*, but all kinds of other things.

18       Routinely, tabling permits are denied to Jewish students

19   at other events that are lower profile.  The Jews wanted to

20   have a mural.  There's -- I don't know how many -- 12 or 15

21   other different cultures have a mural represented as part of

22   the Student Center.  One of our plaintiffs was part of the

23   Jewish Mural Project that was trying to set up a mural, and the

24   school shut that effort down.  That's in our Complaint.

25       Jews are treated like second-class citizens on this

1    campus.  It's not just from students.  It's from the

2    administration.  It's from the defendants.  And we feel like

3    we've alleged more than enough as far as the Title VI claim

4    beyond those events, and there's been an effort to try and

5    strike much of this for what we believe doesn't come close to

6    meeting the standard of disfavored motions to strike in the

7    first place.

8         None of this is immaterial or impertinent.  The scandalous

9    comments that they're criticizing about coming from Dr. Wong

10   are actual comments and they're scandalous because of their

11   nature.  They're not scandalous to include in the Complaint.

12        And we believe that the motions to strike are, whether

13   intentional or not, trying to limit the Complaint so that it is

14   only about these two events.

15        But the fact is it's not, and there is no justification

16   legally to strike the material that they're seeking to strike

17   as far as the motions to strike go.

18        **THE COURT:**  All right.  And do you want to say

19   anything with respect to Ms. Abdulhadi's motion to dismiss

20   that's different than what you've already said?

21        **MR. WEISBURST:**  Yes.  Well, we -- let me start here.

22        There's been repeated statements from all corners that

23   this is an effort to silence speech, suppress speech, whether

24   it's Professor Abdulhadi's or anyone else.  And we have said it

25   in the Complaint and we mean it and I can say it here today,

1    for what that's worth.  This case is not about suppressing

2    other's speech or suppressing academic freedom.

3         It was the speech that the Jewish students and the Jewish

4    plaintiffs showed up to attend.  That was the one that was

5    suppressed.  That was the speech that didn't get to happen.

6    We're not saying other people's speeches should be shut down.

7    We're saying if Jewish students want to host and attend a

8    speech, then they have a First Amendment right to hear it.

9         And they -- we're just asking for equal treatment from

10   everyone.  Dr. Abdulhadi -- all of her motions have over and

11   over again made these accusations that we're trying to silence

12   her speech.  Her speech and her opinions are what they are, but

13   they're no more protected by the law than a speech from Jewish

14   students, and there's an established right to hear and receive

15   information that was violated by -- deprived from all the

16   plaintiffs at the Barkat event.

17        And their right to assemble and have -- share information

18   at the Know Your Rights Fair was also taken away from them.

19   Dr. Abdulhadi, we allege, was an organizer of the Know Your

20   Rights Fair.  She was involved at all stages of excluding

21   Hillel.  It was done with an intentional motivation because it

22   was going to affect Jewish students.  That's what we allege.

23   That has to be taken as true for these purposes.

24        Dr. Abdulhadi is more than able at the time -- the right

25   time to deny that, present evidence, answer the claims, but

1     that's not what we're supposed to be deciding here today.

2          She also ratified the conduct.  She encouraged the conduct

3     both -- in both events beforehand, ratified it afterwards,

4     staged a hunger strike which extracted a promise from the

5     University to not punish herself, any other faculty, any

6     administrators, any students for their conduct in the

7     unconstitutional deprivation of rights at the Barkat event, and

8     she has come forward in her own written statements and

9     confirmed that this was an intentional exclusion of Hillel to

10    the deprivation of plaintiffs' rights at the Know Your Rights

11    Fair, calling them a privileged white group that didn't belong.

12         And her opinion about whether they belong at a public

13    school's event that ironically is supposed to be informing them

14    of their rights is not something that she can act on as a state

15    actor.

16         She subscribes, as we've alleged --

17              **THE COURT:**  Is she a state actor?

18         **MR. WEISBURST:**  She is a state actor.  She's employed

19    and has authority based on her position, employed by the

20    California State University system.  And she has exactly that

21    authority to the harm of plaintiffs.

22              **THE COURT:**  All right.

23         **MR. WEISBURST:**  I'll just add that as to the Know Your

24    Rights Fair, her own statements confirm what the report also

25    says, which is that this was a purposeful exclusion of

1    plaintiffs' registered student group, unlike the JVP, Jewish

2    Voice for Peace.  That is not a registered student

3    organization.  That is an outside organization that was allowed

4    to be at this room because they have a litmus test of a

5    position at Bet Israel.

6         Hillel is not an Israeli group.  It's a group for Jewish

7    students to unite and be with other Jews and have cultural

8    events on campus, and they were particularly alarmed, as I

9    think it's understandable, anybody following the news in the

10   wake of the presidential election to -- there's been a wave of

11   anti-Semitism in the campaign.  There has been a 67 percent

12   increase in anti-Semitic events based on the ADL audit that

13   came out last week.

14        And these students wanted to be able to go to the Cesar

15   Chavez Student Center, like other groups, and hear about -- air

16   their concerns, hear information that would benefit them, and

17   Dr. Abdulhadi and the other defendants were integrally involved

18   in making sure that that didn't happen.  And on a public school

19   campus, that is certainly not okay.

20        We do believe she is a state actor, and we've alleged that

21   she is one.

22             **THE COURT:**  Thank you very much.

23             **MR. WEISBURST:**  You're welcome.

24             **THE COURT:**  Mr. Phillips.

25             **MR. PHILLIPS:**  Thank you, Your Honor.  Brad Phillips

on behalf of defendants other than Professor Abdulhadi.

Your Honor, I think you focused on exactly the right issues.

**THE COURT:** Why didn't you cite *OSU*? There is nothing in -- so I'm just interested in whether I've gone off on a frolic of my own or whether I've got the law right.

**MR. PHILLIPS:** No, Your Honor, you haven't gone off on a frolic of your own at all. You're absolutely right. *OSU* requires specific intent with respect -- to the equal protection claim, it requires specific intent by these individual defendants, which is clearly not shown here.

With respect to the First Amendment, Your Honor, it doesn't require specific intent there of the individual who was a defendant. It said knowledge by him was sufficient. But you need specific intent in order to have any violation. In other words, you need specific intent by some state actor, some University official of which this other person had knowledge. And they haven't alleged that here either.

I think they're right under *OSU* for the First Amendment claim. An individual defendant can be sued for having knowledge of some other official's discrimination under the First Amendment.

Under the Equal Protection Clause, the defendant himself or herself has to have that specific intent. But here they haven't alleged either, Your Honor. And I'm happy to go

1    through and detail why we think that's the case.

2         Before I do that, just so I don't forget, I'd like to call

3    Your Honor or command to Your Honor's attention a case that we

4    did not cite in our briefs but which we alerted the other side

5    that we intended to rely on by email on Monday.  And that case

6    is *Hernandez vs. City of San Jose*.  It's at 241 F.Supp.3d.  My

7    original email mistakenly said *second* and counsel nicely

8    corrected me.  F.Supp.3d 959.  It's Northern District of

9    California, Judge Koh, earlier this year in 2017.

10        The case is pretty much directly on point with respect to

11   the fact that the University did not have an obligation to

12   prevent the protestors from interfering with Mayor Barkat's

13   speech.  The case arose out of a Trump demonstration in

14   San Jose during the election campaign, and the protest -- there

15   was a -- they expected protests.  The police plan was to direct

16   the protestors in a particular -- direct the demonstrators, the

17   pro-Trump people, in a particular direction.

18        It turned out there was a disruption and some violence and

19   the court clearly held that the University -- that the city did

20   not have any obligation to have stopped that.  And the key

21   language, really, is there that Judge Koh says, "Ordinarily

22   members of the public have no constitutional right to sue state

23   actors who fail to protect them from harm inflicted by third

24   parties," and she cites there a Ninth Circuit decision, and

25   then she addresses the exception that was relied on.  There are

1  two.

2       State-created danger.  And there she said, "To state a

3  claim under the state created danger doctrine, a plaintiff must

4  first allege that the state action affirmatively placed the

5  plaintiff in a position of danger; that is, state action

6  created or exposed an individual to a danger which he or she

7  would not have otherwise faced."  Must show that the -- in that

8  case, the police -- here it would be the University and -- put

9  the plaintiff in a worse position than that in which he would

10  have been had the police not acted at all.

11       Those are clearly not the allegations here, Your Honor.

12  And so we think that exception, even if it were advanced, would

13  not apply.  I do commend that to your attention, and I

14  apologize for not having cited it in our papers, Your Honor.

15       With respect to the Mayor Barkat event, Your Honor, with

16  respect to the First Amendment claim, it needs to be dismissed

17  for several reasons.

18       First, they haven't alleged sufficiently any significant

19  burden on speech, association, or assembly.  The $300 fee is

20  not a significant burden on their assembly.  It was paid.

21       And they don't allege facts that support their conclusory

22  allegation, totally on information and belief, that fewer

23  students attended the event due to the defendants' decision to

24  have it held elsewhere.  In fact, they don't identify a single

25  person who didn't attend for that reason, notwithstanding the

1    fact that they affirmatively allege that Plaintiff Mandel spoke

2    with lots of San Francisco State University students about it.

3    They don't identify anyone who claims not to have attended

4    because of that.

5        Your Honor, the allegations of the Complaint themselves

6    establish that it wasn't moved for a discriminatory purpose.  I

7    think as Your Honor alluded, they allege that -- they notified

8    the University of it nine days before the event was supposed to

9    take place.  And they affirmatively allege at page 62 that the

10   University knew that a protest and likely an unlawful one was a

11   near certain eventuality.

12       And then they allege that Hillel expressly warned the

13   administration of an extreme likelihood of a raucous and

14   potentially violent disruption.  That's in paragraph 115.

15       Your Honor, those -- and there are no allegations, no --

16   other than a conclusory allegation, there are no allegations

17   whatsoever of anything any University person said or did that

18   indicated that it was moved for some reason other than the

19   reason explained in the Complaint.  The Dean of Students

20   expressed concern about the use of classroom space.  Defendant

21   Birello is expressly alleged to have said, "Good luck.  We hope

22   there is a great turnout."

23       Defendants communicated, paragraph 67, that they didn't

24   want the Barkat event to occur on the main campus, and

25   Defendant Hong, the Vice-President for Student Affairs, is

quoted in the Complaint as being worried about the fact that
there were powder kegs all over campus in search of a lit fuse.

Defendant Begley is quoted as saying, "If this may draw
protest activity, I'm concerned about reserving classroom
space.  During the middle of the day, we may direct them to
Seven Hills or another location that would have less impact on
classes in that area."

Those are the allegations of the Complaint, Your Honor.
The law is clear under the *Pinard* case that is cited in the
papers that schools have a right and ability to take action
with respect even to protected speech if it will substantially
interfere with the work of the school.

I acknowledge that colleagues and universities probably
have somewhat less leeway in that regard than K through 12
schools do, but here you have the plaintiffs telling the
University of an extreme likelihood of a violent disruption,
and that in that circumstance, clearly the University, on the
face of the Complaint, had the discretion to have it moved on
campus but at a site father from the center of campus.

I have addressed their argument, Your Honor.  So that goes
to why it was moved.

With respect to the fact that the University didn't
intervene during the protest, I've addressed that.  I think the
*Hernandez* case is pretty much squarely on point.  The fact that
somebody may have violated University policies or the like is

1    irrelevant to the First Amendment claim.  You can't make a

2    First Amendment claim based on the fact that somebody may have

3    violated a campus policy or a university policy, Your Honor.

4         And they also -- they make reference to a heckler's veto,

5    sort of a passing reference to a heckler's veto, but as I

6    expect Your Honor knows, a heckler's veto is where the

7    government removes the speaker, not where there is a protest

8    that the heckler's shouting down.  It's where the government

9    decides that instead of doing anything about the protestors,

10   they remove the speaker and keep him from speaking, which is

11   not what happened here.

12        On the equal protection claim, clearly they need to show

13   both that others in similar circumstances were treated

14   differently.  There is not even an allegation of any --

15              THE COURT:  I don't need to hear argument on this.

16          MR. PHILLIPS:  Thank you, Your Honor.

17        With respect to the Know Your Rights Fair, Your Honor, the

18   Complaint does not allege that these defendants were involved

19   in the decision to move the fair, Your Honor, other than in a

20   totally conclusory fashion.

21        They allege that the organizing committee, which is later

22   alleged in a quotation from *J Weekly*, but nevertheless, in the

23   Complaint alleged to be the self-organized and self-appointed

24   planning committee -- that that committee cut off registration

25   at a particular time, excluding the other groups, as well as

1   Hillel.  But that they cut off registration.

2        And it expressly alleges that Monteiro, learning of that

3   decision, decided he wouldn't speak -- be the keynote speaker

4   for the event.

5        And the Dean of Students, Begley, told them that he

6   thought excluding Hillel was a problem.  And some allegation

7   that any of the other administrator defendants even knew about

8   it.

9        So there is clearly no showing that the administrator

10  defendants made the decision or ratified the decision not to

11  include them, in addition to the fact, Your Honor, that it's

12  not shown that Hillel was excluded because of race, religion,

13  or viewpoint.

14       And they try and say well, it doesn't matter that another

15  Jewish group had a table.  And I don't know much about the

16  other group, Your Honor, so I can't address counsel's

17  representations in that regard with respect to viewpoint.

18       And they suggest that this is -- in their papers --

19  frankly, I think somewhat offensively suggest that it's -- some

20  of my friends are -- some of my friends are Jewish defense,

21  citing *People vs. Johnson*, the California Supreme Court's

22  peremptory challenge case, Your Honor.

23       It's not that at all, Your Honor.  In *People vs. Johnson*,

24  the prosecutor struck all the Jewish prospective jurors and

25  said he had friends that were Jewish, and not surprisingly, the

1     court didn't think that was a good enough explanation.

2          The analogy to here, Your Honor, there would be if there

3     were two prospective Jewish jurors and the prosecutor struck

4     one and left the other one on the jury, that would be a decent

5     argument by a prosecutor defending his decision as to why he

6     struck that juror, and that's the situation here, Your Honor.

7          With respect to the Title VI claim, Your Honor, I do

8     disavow all the historical allegations.

9          All of the other stuff, other than the Mayor Barkat event

10    and the Know Your Rights Fair, Your Honor, is all just sort of

11    thrown up against the wall.  There is no allegations, specific

12    allegations, about when it was reported, to whom it was

13    reported, was that a person with authority to deal with the

14    situation, what did the University do after that and so on.

15    None of that.  It's all just throwing up a bunch of general

16    allegations and saying that it's a hostile environment, and

17    that's not how Title VI cases needed -- need to be pleaded, as

18    with Title IX cases with which I know that Your Honor is also

19    very familiar with.

20         And the perhaps most fundamental, Your Honor, there's

21    absolutely no showing of deliberate indifference.  The

22    Complaint on its face refutes a deliberate indifference claim.

23         It may well be the case, I think it is the case, that the

24    University hasn't done everything that the plaintiffs and some

25    others would like them to do.  And I will say, as the Complaint

1    itself alleges, the University is working on the problem.

2        But under the law, Your Honor, the fact that the

3    University conducted investigations, concluded the violations

4    occurred, condemned some of those, talked about them with the

5    alleged perpetrators, all of those allegations, Your Honor, are

6    crystal clear that they refute any showing of deliberate

7    indifference under the law which requires a conscious decision

8    by the University simply not to address the problem, which is

9    totally refuted by the Complaint itself.

10       And I will say as an aside, I think some of the

11   characterizations about -- by counsel today about the

12   University's conduct are inaccurate, but I don't think they're

13   really relevant to the motions before them.

14       And, Your Honor, with respect to the -- whether there's a

15   showing of discrimination that was severe, pervasive, and

16   objectively offensive, Your Honor, the statements of the

17   protestors are not -- those -- those statements may have

18   been -- some of them may have been offensive, but that's not --

19   first of all, most of them, if not all of them -- probably all

20   of them, Your Honor -- the ones that are quoted in paragraph

21   72, which I will agree some of which are offensive, highly

22   offensive, are all protected under the First Amendment.

23       And I would note, Your Honor, that they say that the --

24   the "get the F off campus" is directed at the students there.

25   I would submit that a better inference is probably that it was

1   directed at the Mayor of Jerusalem whose speech they were --
2   presence on campus they were protesting.

3       But I think those statements are all directed at Israel
4   and Israeli policy and the mayor's policy and so on.  They are
5   not directed at people because they're Jewish.  There is a
6   difference between those two things, as the amicus brief that
7   was submitted suggests.

8       With respect to the Know Your Rights Fair, clearly being
9   excluded from one fair on campus organized by groups with which
10  Hillel is clearly hostile, I think it goes both ways, I expect.
11  Clearly not a severe form of violation of their rights, a
12  single fair, a table.

13      So, Your Honor unless Your Honor has other questions, I
14  will submit it.

15          **THE COURT:**  Thank you, Mr. Phillips.

16      Let's hear from Professor Abdulhadi.

17          **MR. HUNTER:**  Alan Hunter for Defendant Abdulhadi.  I
18  will try and be brief and non-repetitive of Mr. Phillips,
19  Your Honor.

20      What I would actually like to start with is focusing on
21  what really are the charging allegations relative to Professor
22  Abdulhadi.

23      We heard from plaintiffs' counsel some statement to the
24  effect that she was an organizer relative to a particular
25  event.  That doesn't appear on the face of the First Amended

1   Complaint.

2        When we get right down to the heart of it, their charging

3   allegations against Professor Abdulhadi is that in her role as

4   a faculty adviser, she failed to assist GUPS, which is -- or

5   GUPS, which is a non-state acting members group relative to

6   compliance with University nondiscrimination policy.

7        So that brings us right to the question of whether or not

8   there's a constitutional violation relative to the professor.

9   And with respect to the *Citizens* case, we know that merely any

10  action taken to avoid a third-party non-state actor from

11  violating plaintiffs' constitutional rights is not actionable.

12       The cases the plaintiffs cite on that point are all

13  employment-related cases where it's a supervisor, not -- and

14  Professor Abdulhadi is not a supervisor.  But it's a supervisor

15  supervising another state actor.  That's not the situation we

16  have here.

17       With respect to the *Hernandez* case that Mr. Phillips

18  addressed, that is important.  The state-created danger

19  exception rule is of no application here.  And in particular,

20  I'll just point out that, one, there is no facts that show that

21  Defendant Abdulhadi -- Abdulhadi's part in this case put

22  plaintiffs in a worse position than they would have been

23  otherwise.

24       There's no facts of deliberate indifference on the

25  professor's part, in particular with respect to no facts of

1   deliberate indifference as to any state-created danger that was

2   obvious or known to the professor.  And there's no alleged

3   facts regarding intent on the part of the professor.

4        That brings us to qualified immunity with respect to the

5   professor, the first element of which is is there is a

6   constitutional violation.  I've already gone over that, but if

7   we go to the next element, which is is there a -- is it

8   sufficiently clear that a reasonable official would understand

9   what he or she is doing violates a constitutional right.

10       What we're dealing with here is -- and what that

11  translates to -- is a reasonable position -- is a reasonable

12  person in the position of a faculty adviser who has the

13  obligation to assist, not to control, but to assist a

14  third-party student group, can they be fairly expected to have

15  a sufficiently clear understanding that if they fail to assist,

16  as alleged, that that somehow constitutes a constitutional

17  violation.  So our position is that it does not, and the

18  professor is entitled to qualified immunity.

19       On the immunity spectrum, there is also the Eleventh

20  Amendment, and what we've heard -- and Mr. Phillips actually

21  stressed it in part -- we're dealing with past events, two

22  distinct events with respect to the professor of failure to

23  assist relative to two particular events.

24       There's no allegation of ongoing continuous misconduct on

25  the part of the professor.  So in the context of official

1    capacity claims, there is -- the Eleventh Amendment defense

2    does apply.

3         Of interest -- and I would draw the Court's attention to

4    the First Amended Complaint at page 17, lines 18 through 27.

5    The plaintiffs in that -- in that part of the Complaint are

6    conceding that the lead charging allegations against the

7    professor are official capacity claims, not individual capacity

8    claims, and therefore nothing survives the Eleventh Amendment.

9         And on the dec relief claim, I would simply point out that

10   there are no factual allegations that establish any real link

11   between the professor and any damage suffered by the

12   plaintiffs, let alone any damage that's not speculative.

13        And then in closing, I would simply note in reference to

14   one of Your Honor's comments, is the professor a state actor or

15   not?  For some purposes, maybe yes; for other purposes, maybe

16   not.  And as an example of that, plaintiffs' counsel indicated

17   that the professor was quoted in an after-the-fact article

18   about one of the events.  That doesn't necessarily put her in a

19   state actor role in that context.

20        So with that, if you have -- with respect to the motion to

21   strike, I'll defer to Mr. Gharagozli.

22             **THE COURT:**  All right.  Thank you.

23        Any last words?

24        **MR. WEISBURST:**  Yes, please.  Thank you, Your Honor.

25   There's quite a bit to respond to.  I will try and be brief.

1              THE COURT:  You don't need to repeat anything that

2      you've said before.

3              MR. WEISBURST:  I understand.

4              THE COURT:  Be very targeted.

5              MR. WEISBURST:  We've argued these points in our

6      brief, and I will refer you to them.

7          I want to stress that, as you know, as the Court knows,

8      what we allege matters, so to the extent -- there's all kinds

9      of things in counsel's argument about -- that was just

10     disputing facts, and what the Complaint alleges must be taken

11     as true.

12         Specifically as one example, Dr. Abdulhadi's counsel said

13     that we don't allege that Dr. Abdulhadi is an organizer of the

14     Know Your Rights Fair.  Paragraph 160 says, "Abdulhadi wrote

15     that because the organizers there challenged the status quo,

16     student and faculty organizers, including on information and

17     belief herself, had been subjected to systematic interrogation,

18     harassment and administrative retaliation by the University."

19     That is not Abdulhadi being quoted in an article, as counsel

20     said.  That's an article that she herself wrote.  So that

21     allegation is in there.

22         And also as far as the several things that the

23     administration defendants' counsel said, he's disputing facts

24     and making several statements about things that we haven't

25     alleged that actually are in the Complaint, so I guess -- I

1   have a chart that -- if it would be helpful for the Court that

2   tracks the allegations by defendant.  Maybe that would be a

3   helpful submission.

4         **THE COURT:**  No, that wouldn't.  A shorter, plainer

5   statement of the claim would be a helpful submission, actually.

6         There used to be a rule, which is now honored in the

7   breach, of requiring a short and plain statement, and now you

8   can't because of *Iqbal*, and I'm not suggesting that you leave

9   out things that are important to your case, but I am suggesting

10  that you'll want to focus on those.

11        And rest assured that before the -- my order on the motion

12  comes out, it will be cited to the allegations in the Complaint

13  so you don't have to go through all the things that -- where

14  you disagree with a fact that one of the counsel said.

15        **MR. WEISBURST:**  I understand.  Thank you, Your Honor.

16  And we haven't yet raised leave to amend, but --

17        **THE COURT:**  I'm going to give you leave to amend.

18        **MR. WEISBURST:**  Okay.  Thank you, Your Honor.

19        I won't repeat anything more than necessary.

20        We agree with Your Honor that *OSU* and the *Dubner* case

21  apply here.  The *Hernandez* case that counsel cited and which is

22  a progeny of *DeShaney* do not apply here.  Those are substantive

23  due process claim cases.  This is not a substantive due process

24  case.

25        While we do allege it was dangerous in that room, the 1983

1    claims are about First and Fourteenth Amendment rights.

2    *DeShaney*, *Hernandez*, those are not about the First Amendment.

3    They're about a substantive due process claim related to bodily

4    integrity and physical danger.  So those cases simply do not

5    apply here.

6          And *OSU* and *Dubner* do, which is another Ninth Circuit case

7    that said that to address the point about supervisors having --

8    trying to get out of the realm of *OSU* because people might not

9    have control over the others, the *Dubner* case, cited in our

10   opposition, holds that a Section 1983 defendant can, quote, "be

11   held liable in his individual capacity if he knowingly refused

12   to terminate a series of acts by others which he knew or

13   reasonably should have known would cause others to inflict a

14   constitutional injury."  That's not restricted by one state

15   actor to another, supervisor or otherwise.  That squarely

16   applies to Dr. Abdulhadi and every other defendant that had

17   control of another defendant.

18         So to the extent that President Wong has control over Dean

19   Begley, who is giving the standdown order, that applies all the

20   way down to the people that are managing these events.

21         So we have alleged the conduct that would be -- that would

22   fall under that that in the very least, people knowingly

23   refused to terminate a series of acts by others and then

24   ratified them after the fact.

25         There was a statement made about -- this is just an

important one with Title VI that reports that complaints

weren't made.  We haven't alleged that.  We allege that reports

under an Executive Order 1097 were specifically ignored,

including by plaintiff Jake Mandel, who is in the courtroom

here today.  He filed one related to the Barkat event and he

filed one after when he was physically threatened on campus.

Those were ignored.  This is all in the Complaint.

We allege that the investigator of the Barkat event

specifically cited that she thought it was strange and a

problem that nobody had given her these reports that had not

been followed up on, and she had to repeatedly follow up and

eventually she found out about them.

So part of our Title VI claim is the framework for

complaints about harassment and mistreatment on campus, but

when somebody actually fills out the complaint, nothing is done

about it, and that's in our Complaint.  That a hundred percent

supports a hostile environment claim under Title VI and

deliberate indifference.

I mean, the idea that we haven't alleged deliberate

indifference when we talk about the specific comments and

conduct of the defendants and the administrators at the school

in light of everything that's happened, it's absolutely the

definition of deliberate indifference, what's happening on this

campus.

Again, counsel was alleging that the Complaint somehow

1    concedes something has been done, that actions have been taken.

2    Nothing could be further from the truth.  No meaningful actions

3    in any way have addressed any of these issues.

4        Qualified immunity, it's usually not handled at this stage

5    on Rule 12, as Your Honor knows.  Where there is a

6    clearly-established right that somebody reasonably should have

7    been aware that's it's being violated, you're not entitled to

8    qualified immunity.  That's clear in the case law.

9        These are First Amendment rights here.  The right to

10   listen and receive information is an established part, just

11   like the right to speech and to assemble and associate.  There

12   can be no possible claim that these -- the conduct, as we've

13   alleged it, which is what matters here, is something that isn't

14   clearly established or that somebody wouldn't have been on

15   notice would have been a violation of a clearly-established

16   right.

17       I think this is the last thing.  The Eleventh Amendment,

18   something Your Honor said at the beginning -- I just want to

19   make sure we're all on the same page.  We seek damages from

20   defendants in their personal capacity and injunctive relief in

21   their official capacity.  We do allege this is an ongoing

22   problem.  We do allege that injunctive relief is absolutely

23   necessary.  We have not conceded in any way this is limited to

24   one person's official or personal capacity, and for each

25   defendant we do explain their own personal conduct that goes to

1   these claims, so I just wanted to respond to that point from

2   counsel as well.

3          THE COURT:  All right.  Thank you.  And I really

4   don't --

5          MR. PHILLIPS:  Two, quickly.

6          THE COURT:  If it takes less than a minute,

7   Mr. Phillips.

8          MR. PHILLIPS:  Your Honor, I know you're going to give

9   them leave to amend, but if he says what they allege matters,

10  then the Complaint should be dismissed with prejudice --

11         THE COURT:  I don't need to hear anything more.  Thank

12  you.

13         MR. PHILLIPS:  The other point --

14         THE COURT:  Thank you, Mr. Phillips.  You used up your

15  points.

16      All right.  So what I'm going to do is almost undoubtedly

17  I'm going to dismiss the Complaint with leave to amend, and I

18  would start honing the Complaint so that it is really a lean

19  and clear piece of advocacy.  And so the motion to strike is

20  moot.

21      And with respect to the CMC, I'm going to put that over to

22  the next hearing on the motion to dismiss.  And I saw the

23  plaintiffs' schedule and the concern that the trial occur by

24  February of 2019 because of the fear of the -- I guess the

25  statute running with respect to some of the acts, at least with

1   respect to Title VI, and I will keep that in mind.  I assume

2   that that means sometime before the graduation in the spring of

3   2019, and I will keep that in mind when we come to setting the

4   schedule.  But I want to see what claims are there after a

5   well-honed Complaint.  So that's that.

6          And I'll look forward to seeing you again.  Thank you.

7                  (Proceedings adjourned at 3:08 p.m.)

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:   Thursday, November 9, 2017

8

9  *Pamela A. Batalo*

10 _____
   Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11 U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25