UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB MANDEL, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, et al.,<br><br>    Defendants. | Case No. 17-cv-03511-WHO<br><br>**ORDER GRANTING MOTIONS TO DISMISS; DENYING MOTIONS TO STRIKE**<br><br>Re: Dkt. Nos. 79, 81, 82, 100, 123 |

Plaintiffs, three Jewish current or former students of San Francisco State University and three Jewish community members,[1] filed suit alleging that defendants have tolerated and in some instances fostered or encouraged anti-Semitic conduct on the SFSU campus.[2]  While the First

---

[1] Plaintiff Jacob Mandel is the former student President of Hillel at SFSU and graduated in January 2017.  First Amended Complaint (FAC) ¶ 22.  Plaintiffs Charles Volk and Liam Kern are current SFSU students.  FAC ¶¶ 23, 24.  These plaintiffs are referred to collectively as "Student Plaintiffs."  Plaintiffs Masha Merkulova, Aaron Parker, and Stephanie Rosekind are members of the community who, as discussed below, allege they were deprived of the opportunity to hear a speech on SFSU's campus.  FAC ¶¶ 25-26.  These plaintiffs are referred to collectively as "Community Plaintiffs."

[2] Defendants the Board of Trustees of the California State University (CSU) and SFSU are referred to as the "Entity Defendants."  Defendants Leslie Wong, President of SFSU; Mary Ann Begley, SFSU's Interim Associate Vice President and Dean of Students; Luoluo Hong, SFSU's Vice President for Student Affairs & Enrollment Management, Title IX Coordinator & DHR Administrator; Lawrence Birello, SFSU's Student Organization Coordinator; Reginald Parson, SFSU's Deputy Chief of Police and former Chief of Police; Osvaldo del Valle, SFSU's former Assistant Dean of Students & Director of Student Conduct; Kenneth Monteiro, SFSU's Dean of the College of Ethnic Studies (COES); Brian Stuart, SFSU's Assistant Dean of Students & Director New Student Programs; Robert Nava, SFSU's Vice President of University Advancement; Mark Jaramila, SFSU's Coordinator of Meeting & Event Services; Vernon Piccinotti, SFSU's Event & Technical Services Manager; and Shimina Harris, SFSU's current Assistant Dean of Students & Director of Student Conduct, are referred to as the "Administration Defendants."  Also named as a defendant, and separately represented, is Professor Rabab Abdulhadi, a professor within COES, the faculty advisor to the student group General Union of Palestine Students (GUPS), and a senior scholar of the Arab and Muslim Ethnicities and Diasporas Initiative (AMED).  FAC ¶ 37.  AMED is an SFSU-funded program under the umbrella of COES.

Amended Complaint (FAC) alleges a rise in anti-Semitism in general, and a long history of toleration of anti-Semitism at SFSU in particular, the central allegations surround two events: (i) a speech by the Mayor of Jerusalem, Nir Barkat, that was assigned to a location far from the center of campus and interrupted by protestors; and (ii) the exclusion of a Jewish student group from a "Know Your Rights" fair.  Plaintiffs allege that SFSU, officials in the administration, and a professor that supervises a student group violated their First Amendment rights, rights to equal protection, and Title VI of the Civil Rights Act of 1964 by discriminating against them based on their Jewish identity.

The FAC is at once far too long, repetitive and full of barely relevant material, and yet so conclusory regarding the causes of action asserted that it does not state a plausible claim for relief against any defendant at this juncture.  For the reasons discussed below, I GRANT the motions to dismiss with leave to amend and DENY the motions to strike.  I will give plaintiffs leave to amend the entire FAC against all defendants in light of the liberal rules allowing amendment.

**BACKGROUND**

## I.   MAYOR BARKAT EVENT

On March 28, 2016, the Hillel student group arranged for the Mayor of Jerusalem, Nir Barkat, to speak on SFSU's campus.  The event was to take place on April 6, 2016 from 2:00 p.m. – 3:00 p.m. and was titled "Jerusalem Mayor Nir Barkat:  How is a Visionary from the High-Tech Sector Leading a Diverse and Scrutinized City?"  FAC ¶ 61.

### A.   Pre-Event Conduct.

Hillel gave SFSU administrators nine days' notice in advance of the event.  *Id*.  On March 29, 2016, Hillel's director emailed defendants Parson, Hong, and Begley, recommending that the Dean of Students and campus police have a protocol in place in case protestors, particularly GUPS, attempted to disrupt the event.  *Id*. ¶ 62.  Plaintiff Mandel attempted to secure the permits and a room for the event.  *Id*. ¶ 63.  Hillel received confirmation from defendant Birello – whose

---

FAC ¶ 53.  The individually-named Administration Defendants plus Abdulhadi will be collectively referred to as "Individual Defendants."

United States District Court
Northern District of California

job is alleged to include managing student organization events, including assigning space and approving permits for student-sponsored events – that the event was assigned to a room in the Cesar Chavez Student Center (CCSC) in the heart of campus. *Id.*

Defendant Jaramilla (who is alleged to be responsible for coordinating and managing events at SFSU) and defendant Piccinotti (who is alleged to also be responsible for scheduling events and involved in event planning for on-campus events) along with defendants Begley, Hong, Stuart, and Birello, "collectively executed" SFSU's "efforts to move the Barkat event away from CCSC to a remote location, and require Hillel to pay a fee to reserve that more-distant space. *Id.* ¶ 64. Plaintiffs allege that defendants sent them and the other organizers of the Barkat event various, conflicting emails over the course of the week between the initial notice and the event, expressing concern over the location and identifying "Seven Hills" as a preferred location. The event was eventually assigned to a room in Seven Hills, which is not centrally located, and required Hillel to pay a fee of $356.50. FAC ¶¶ 65, 68.

Hillel continued to ask for a different, more centrally located room. *Id.* ¶ 66. But because of administrator concerns that the event might draw protestors in classroom space during the middle of the day, voiced particularly by defendants Hong and Begley, the event remained set for Seven Hills. *Id.* ¶ 67.

Plaintiffs contend that the Administration Defendants acted discriminatorily by consigning the event to a distant and fee-based event space far from the center of campus, when a centrally located and free room was available. FAC ¶¶ 5, 67. Plaintiffs contend that "Defendants' communications confirm that they [preferred] to suppress speech by a visiting foreign dignitary prepared to engage the campus community in productive dialogue, rather than confront the hostile forces operating to silence debate and shut down dissent on SFSU's campus." *Id.* ¶ 67. Plaintiffs assert that assigning the event to Seven Hills had the effect of decreasing the number of students who could attend, as the location was not only far from central campus but not familiar to students, and that the delays in confirming the event location significantly impacted Hillel's efforts to publicize the event. *Id.* ¶ 68. On information and belief, plaintiffs assert there were other open, non-fee rooms more centrally-located available. *Id.*

United States District Court
Northern District of California

1    SF Hillel Deputy Director Rachel Nilson communicated with a representative of SFSU

2    Police Department, Dave Rodriguez, in the days leading up to the event.  Rodriguez informed

3    Nilson that the police expected protesters and intended to erect barriers and have a designated

4    protest area outside the event.  *Id.* ¶ 68.  Organizers also emailed the Dean of Students seeking

5    information about what types and levels of disruption at the event would trigger ejections, but the

6    Dean did not see the message in time to respond.  *Id.* ¶ 69.  Defendant Parson, then-Chief of

7    Police, informed defendants Hong and Begley that in order to remove protestors from the event,

8    someone from SF Hillel would need to sign a Citizen's Arrest form; that information was never

9    communicated to SF Hillel.  *Id.* ¶ 70.

10         **B.     Conduct During and After the Event.**

11    Plaintiffs allege that a group of protestors, including many members of the General Union

12    of Palestine Students (GUPS) student group, "commandeered" the event shortly after Barkat

13    started speaking.  The protestors used amplified sound, prohibited under the Student Code of

14    Conduct and SFSU's Time, Place and Manner policies, to disrupt the speech and chanted

15    "menacing" threats like "Get the fuck off our campus" and "Intifada."  FAC ¶¶ 6, 7, 9, 72, 76, 80.

16    The protestors' conduct disrupted the event and physically intimidated the Student and

17    Community Plaintiffs to such an extent that Barkat had to stop his speech.  FAC ¶¶ 6, 7, 9, 74.

18    Plaintiffs expected that the police or administrators in attendance (including defendants

19    Parsons and Begley) would take action to stop the protestors' disruption of the event to allow the

20    speech to continue – for example, by asking them to leave, warning them they were violating the

21    Student Conduct Code, or removing them – but the SFSU Administrators instead ordered the

22    SFSU police in attendance to "stand down." FAC  ¶¶ 6, 7, 9, 74-75, 79.  Community Plaintiff

23    Aaron Parker told defendant Parsons that he would complete a Citizens' Arrest form, but no form

24    was provided to him.  FAC ¶¶ 70, 88.  Parsons asked the protestors to leave but was ignored.

25    Parsons told Mandel that he wanted to remove the protestors but was told by defendants Begley,

26    Birello, and other administrators to have the police "stand down."  *Id.* ¶¶ 84, 89, 97, 191.  After

27    telling Mandel that the situation was "being dealt with," the administrators left the event without

28    taking any steps to remove the disruptive group or otherwise enable the event to proceed.  *Id.* ¶ 92.

The protestors' conduct allegedly violated numerous provisions of the Student Conduct Code, including use of a sound amplifier (FAC ¶ 80), willful disruption of an event (¶ 81), disorderly conduct (*id.*), and failure to comply with directions of university officials. *Id.* Yet defendant Begley later informed GUPS that she and the administration had no issue with the threatening "content" of GUPS's protest. *Id.* ¶ 106.

SFSU commissioned an Independent Review Report of the events leading up to and occurring during and after the Barkat speech.[3] FAC ¶¶ 73, 94. That Report faulted defendant Hong for failing to adequately prepare for the event and faulted Student Affairs both for failing to contact and advise GUPS of the conduct allowed and prohibited at the event and for failing to actively work with Hillel to address how protests could be accommodated. *Id.* ¶ 94. The Report concluded SFSU officials "impliedly sanctioned" the disruptive conduct given their failure to engage with or attempt to manage the protestors. *Id.* ¶ 95.

The Report, as well as student conduct review processes conducted first by defendant Del Valle and then overseen by defendant Harris, confirmed that violations of the Student Conduct Code had occurred. Yet no actions were taken by SFSU against the disruptive students or the GUPS student group, other than verbal warnings. FAC ¶¶ 81, 96, 106-110. Plaintiffs note that the three complaints filed by Jewish students over the event were never acknowledged or responded to by the Administration. *Id.* ¶ 113. They allege that the failure of the defendants to impose discipline on the protestors and/or GUPS was related to the resolution of a hunger strike organized by the College of Ethnic Studies (COES), because one of the demands of the hunger strikers was

---

[3] Various findings of fact from the Independent Review Report are cited in the FAC. *See e.g.*, ¶¶ 73, 94, 106. Defendant Abdulhadi attaches a copy of the Independent Review Report to her Request for Judicial Notice [Dkt. No. 80], asking the Court to take notice of the Report under the doctrine of incorporation. Plaintiffs oppose, arguing that I cannot take judicial notice of the disputed facts in that Report. Dkt. No. 88. Abdulhadi's request is GRANTED and judicial notice will be taken of the Report, but only for the limited purpose of the fact of SFSU's investigation and conclusions and not as to the truth of any disputed facts. Abdulhadi also requests judicial notice of two SFSU policy documents: an Overview of Faculty/Staff/Advisor Roles & Responsibilities and the Student Organization and Advisor Orientation. Plaintiffs oppose, arguing that whether Abdulhadi complied with the policies is in dispute. Dkt. No. 88. The request is GRANTED as to the existence and provisions of the policies. Plaintiffs do not dispute that they themselves rely on parts of those policies in their FAC. Finally, Abdulhadi requests judicial notice of her original motion to dismiss. As that is a record in the docket of this case, there is no need to request judicial notice of it.

"protection" of COES students facing sanctions related to the disruption of the Barkat event. *Id.* ¶ 81.

Defendant Wong affirmed that SFSU did not intend to take "disciplinary action against any student, staff, faculty or administrators who have taken part in protest and advocacy efforts." *Id.* ¶ 81. Plaintiffs criticize Wong for that, his failure to make a public statement for three weeks after the event, and his issuance of an "empty letter" about the event, all of which demonstrate his "deliberate indifference to the struggles that Jewish individuals face at SFSU." *Id.* ¶ 112. They assert that Wong attempted to distance himself from Jewish students and the serious issues they face at SFSU by (i) invoking anti-Semitic stereotypes in his communications following the event, (ii) failing to condemn anti-Semitic conduct on the campus as strongly and swiftly as he condemned hostile conduct aimed at other groups, and (iii) continually dismissing the dangers to the physical safety of Jewish students on campus as a "political issue." *Id.* ¶¶ 112, 116, 117, 119, 120, 126, 130-132.

Plaintiffs contrast SFSU's alleged mishandling of the Barkat event with a "long history" of SFSU hosting and facilitating anti-Semitic speakers and events. They contend that this demonstrates SFSU's denial of equal protection to Jewish students as it relates to free speech. FAC ¶¶ 123-124, 126.

In addition, plaintiffs allege that SFSU's Advisor Requirements require faculty advisors of student groups to "assist" the student groups they supervise in upholding University policies, including the Student Code of Conduct, the Non-Discrimination Policy, and Time, Place and Manner policies for protests. *Id.* ¶ 82. On information and belief, plaintiffs allege that defendant Abdulhadi (GUPS's faculty advisor) "chose to disregard these advisor requirements as they applied to GUPS's conduct surrounding the Barkat event, in violation of Plaintiffs' civil rights." *Id.*

## II.    FEBRUARY 2017 KNOW YOUR RIGHTS FAIR.

Student Plaintiffs allege that in February 2017, Hillel was surreptitiously and intentionally barred from a Know Your Rights fair (KYR Fair), contrary to SFSU's non-discrimination policy and with full knowledge and involvement by SFSU Administrators, including defendants Birello,

Jaramilla, and Piccinotti.  FAC ¶¶ 13, 142, 143.  The KYR Fair was sponsored by COES, GUPS, and other organizations for "vulnerable populations who may be feeling targeted in the new political climate" since the 2016 presidential election.  FAC ¶¶ 144, 145.

Plaintiffs assert that Hillel was invited to the KRY Fair by accident, but when the accidental invitation came to light, other student groups like GUPS threatened to pull out if Hillel was included.  *Id*. ¶¶ 149, 150.  Hillel, through representative Jason Steckler, expressed interest in attending; after responding to a "viewpoint-based" test from the organizers about an allegedly anti-Muslim poster event not connected with Hillel, it was invited.  *Id*. ¶ 150.  But the student organizing committee, with SFSU's knowledge, then surreptitiously changed the cut-off date for registration with the goal of excluding Hillel and Jewish students from the event.  *Id*.

Defendant Begley was informed of Hillel's exclusion 13 days prior to the event.  He told organizers that excluding Hillel would be a problem.  *Id*.  Two days before the event, Hillel's director contacted Begley to express his concern that holding this type of an event "without sufficient space" to include Hillel was regretful.  *Id*.  Begley, however, decided to let the event proceed.  Defendant Monteiro became aware of Hillel's exclusion and declined an offer to give a keynote address at the event; however, he too allowed the event to proceed.  *Id*.  Hillel's exclusion was allegedly intentional and sanctioned by SFSU and its officials.  *Id*. ¶¶ 155, 156.

SFSU commissioned a separate report on Hillel's exclusion from the KYR Fair.  To date, that report has not been released to the public, but it has been released to some individuals.  It concludes that Hillel was intentionally excluded.  *Id*. ¶¶ 157, 158.  Defendant Abdulhadi wrote an article admitting that Hillel was intentionally excluded from the KYR Fair, and characterized SFSU's follow up investigation as an attempt to interrogate and harass students and faculty.  *Id*. ¶ 160.  Another student organizer of the Fair, a GUPS member and COES graduate student, likewise admitted that Hillel was excluded because of an "ill fit" with the mission of the Fair and in light of the threat of other organizations' withdrawal if Hillel were allowed.  *Id*. ¶ 161.

On information and belief, plaintiffs allege that defendant Abdulhadi chose to disregard her advisor duties – to assist GUPS in adhering to SFSU's non-discrimination policies – and allowed Hillel to be excluded in violation of the Plaintiff Students' civil rights.  *Id*. ¶ 162.  They

United States District Court
Northern District of California

7

1    also assert that defendant Harris, as Dean of Student Conduct, is liable for her failure to reprimand

2    the students involved in this intentional discrimination in violation of SFSU policy.  *Id.* ¶ 163.

3    **III.    ADDITIONAL ALLEGATIONS**

4            There are a number of additional conclusory allegations that lack the date they occurred,

5    how frequently they occurred, and who was involved.  For example, there are repeated allegations

6    in the FAC that the Student Plaintiffs were denied tabling permits (and often received

7    "inadequately explained denials") for Hillel and the Jewish fraternity AEPi at campus events.

8    FAC ¶¶ 22, 23, 24, 60.  There are few details regarding these alleged denials.  The FAC also

9    alleges: (i) that "Jewish students who publicly display their Jewish identities or support the

10   existence of a Jewish national homeland are made to feel unwelcome in a host of classes offered

11   under the umbrella of COES;" (ii) "[w]hile murals exist representing a wide and diverse array of

12   various university minority constituencies," no Jewish mural has been allowed or approved,

13   despite repeated requests and personal efforts by plaintiff Volk; (iii) "Jewish events—including

14   those that have no Israel-related purpose or messaging—are systematically shut down by raucous

15   mobs, with the imprimatur of the university;" (iv) Jewish community members are faced with

16   verbal assaults including genocidal chants and expletives, and are forced to watch as the very state

17   actors under whose protection they remain, embolden the attacks in a number of ways, while

18   ignoring the civil rights and the right to safety of the Jewish members of the SFSU community;"

19   (v) "Jews are often afraid to wear Stars of David or yarmulkes on campus, and regularly text their

20   friends to describe potential safety issues;" and (vi) "Jewish students are not treated or accepted as

21   equals, and their rights are not protected, in the hostile environment for them that is SFSU."  FAC

22   ¶ 60.  Again, there are no details as to time, frequency, or individuals involved in these

23   occurrences.

24           The FAC also contains numerous general allegations about violent and threatening social

25   media postings by a former student and former President of GUPS at SFSU.  It asserts that those

26   postings and other anti-Semitic on-campus graffiti and hostile events were tolerated by SFSU

27   officials.  FAC ¶¶ 127-136.

28           Plaintiffs admit that SFSU has taken steps to address the two specific events – the Barkat

8

United States District Court
Northern District of California

event and Hillel's exclusion from the KYR Fair – as well as anti-Semitism at SFSU.  But they assert those steps are "disingenuous" in light of the ongoing failures to acknowledge the threats to Jewish students' civil rights and physical safety at SFSU by Wong and other SFSU officials.  FAC ¶¶ 164-169.

In addition to defendant Abdulhadi's alleged failures to adequately advise GUPS, plaintiffs contend that Abdulhadi "conscripted" ethnic studies students to participate in a hunger strike that resulted in no charges of discipline being brought by SFSU against the Barkat event demonstrators.  FAC ¶ 126.  Plaintiffs also assert that Abdulhadi received SFSU funds to travel to the Middle East to meet with representatives of designated terrorist organizations as "research," and spearheaded a formal collaboration and student exchange between SFSU and An-Najah National University, which according to plaintiffs is a "known recruitment facility" for Hamas.  FAC ¶¶ 137, 139.  Finally, they state that students have to pass a "political litmus test," a commitment to anti-Zionism, to succeed in Abdulhadi's classes or "nearly any other class in the Ethnic Studies Department." *Id.* ¶ 141.

## IV.    CAUSES OF ACTION

The Student Plaintiffs allege that as result of SFSU's conduct before and during the Mayor Barkat event and in excluding Hillel from the KYR Fair, they were denied the opportunity to equally participate in the events.  FAC ¶¶ 22-24, 85-87.  They repeat general, non-specific allegations that they have been verbally assaulted and physically threatened on SFSU's campus as a result of their Jewish identity.  As a result, they assert that they personally experienced SFSU officials' "intentional discrimination and deliberate indifference" to SFSU's "pervasively hostile anti-Jewish environment."  FAC ¶¶ 22-24, 85-87.

Student Plaintiffs characterize the SFSU officials' actions and failure to act at the Barkat event as (i) "aiding and abetting" the protestors' and GUPS' violation of the Student Code of Conduct and SFSU's Time, Place and Manner policy, (ii) violating the plaintiffs' free speech and assembly rights, and (iii) fostering a hostile environment for Jewish students  *Id.* ¶¶ 95-99.  These and other experiences have allegedly caused the Student Plaintiffs to miss classes, avoid enrolling in classes offered through COES, and deprived them of "equal access to the educational

opportunities or benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who choose not to be open about their Jewish identity." *Id*. ¶¶ 85-87, 99. The Student Plaintiffs also allege that Hillel's exclusion from the KYR Fair denied them their First Amendment speech and assembly rights and rights to equal protection, and is a further example of SFSU providing inferior and unequal accommodation to Jewish students because of their beliefs and Jewish identities. *Id*. ¶¶ 144, 152, 153, 154.

The Community Plaintiffs allege that they were denied the right to meaningfully participate in the Mayor Barkat event and express their views regarding the same. FAC ¶¶ 25-27. They also assert that they felt threatened and unsafe during the event, and reported the same to police officers on site. *Id*. ¶¶ 88-91.

Based on these allegations, the following causes of action are asserted:

1. Violation of 42 U.S.C. § 1983, asserted by all plaintiffs against the Individual Defendants (Wong, Begley, Hong, Birello, Parson, del Valle, Monteiro, Abdulhadi, Stuart, Nava, Jaramilla, Piccinotti, Harris), based on the violation of the plaintiffs' rights to free speech and assembly under the First Amendment related to the Barkat event, FAC ¶¶ 170-181;

2. Violation of 42 U.S.C. § 1983 (asserted by all plaintiffs against the Individual Defendants) for denial of equal protection guaranteed by the Fourteenth Amendment, related to the Barkat event;

3. Violation of 42 U.S.C. § 1983 (asserted by Student Plaintiffs against defendants Wong, Begley, Hong, Birello, Monteiro, Abdulhadi, Stuart, Nava, Jaramillo, Piccinotti, and Harris), based on violations of the plaintiffs' rights to free speech and assembly related to the exclusion from the KYR Fair;

4. Violation of 42 U.S.C. § 1983 (asserted by Student Plaintiffs against the individuals identified in the prior cause), based on denial of equal protection guaranteed by the Fourteenth Amendment, related to the KYR Fair;

5. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. (asserted by Student Plaintiffs against defendants CSU and SFSU), related to SFSU's discrimination against and exclusion of plaintiffs from the benefits of education at SFSU; and

1    6.   A claim for Declaratory Relief under 28 U.S.C. §§ 2201, 2202 (asserted by Student

2         Plaintiffs against all defendants).

3         The defendants first move to strike the FAC in full, arguing that it is overly-long,

4   confusing, opaque, and poorly organized.  Dkt. No. 81.  More narrowly, the defendants move to

5   strike large portions of the FAC because it is full of redundant, immaterial, impertinent, and

6   scandalous material irrelevant to the current allegations.  *Id.*  Separately, defendant Abdulhadi

7   moves to strike paragraph 43, arguing that plaintiffs have cited a "distorted" definition of the U.S.

8   State Department's definition of anti-Semitism.  Dkt. No. 44.[4]

9         The Entity and Administration defendants, and separately, defendant Abdulhadi, also move

10  to dismiss all of the claims asserted in the FAC.  A group of Jewish Studies Scholars have filed a

11  motion for leave to appear as Amicus Curiae, which is opposed by plaintiffs.[5]

**LEGAL STANDARD**

13        Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

14  if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

15  dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

16  face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is facially plausible when

17  the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

18  is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

19  omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

20  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts

21  sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

United States District Court
Northern District of California

---

[4] Defendant Abdulhadi originally moved to strike the "distorted" State Department quote as
contained in paragraph 42 of the original complaint, but pursuant to stipulation, Abdulhadi's
motion to strike is now asserted against paragraph 43 of the FAC.

[5] Five Jewish scholars seek leave to file an amicus brief in support of Abdulhadi and to
demonstrate the "unacceptability of the so-called 'State Department Definition of Antisemitism'
that plaintiffs seek to employ in establishing the viability of their complaint."  Dkt. No. 100.
Plaintiffs oppose that motion, arguing that the proposed Amici's filing does not comply with the
Northern District's rules and the brief would not add anything not argued by the parties.  Dkt.
No. 106.  As I do not reach and do not rely on the State Department's definition of anti-Semitism in
this ruling, there is no need to grant the motion and it is DENIED without prejudice to proposed
Amici renewing the motion with respect to any future motions.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The function of a motion to strike under Rule 12(f) is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing of those issues before trial. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (citation omitted). Motions to strike "are generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice." *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001).

**DISCUSSION**

**I.      MOTIONS TO STRIKE**

Defendants move to strike the FAC in whole, arguing that the 77 page, 248 paragraph FAC is over-long, redundant, disorganized, and full of irrelevant material, violating Rule 8's short plain statement requirement. Dkt. No. 81. I agree with their concerns. Complaints of this length, particularly given the redundant and non-specific allegations included in the FAC, do no one any good. Potentially relevant facts are buried by the irrelevant ones. Allegations in one section of the FAC are alleged slightly differently, with attendant legal consequences, in other sections of the FAC. Short, plain, necessary allegations – targeted to the claims alleged – are in everyone's best interests. That is not what plaintiffs have presented.

Nevertheless, motions to strike are disfavored. The allegations underlying the six causes of action at paragraphs 170 – 248 of the FAC are clearly stated. Defendants are on fair notice of the claims asserted and the facts connected to each of the causes of action. While the FAC violates the spirit of Rule 8 and does plaintiffs no favors, given its length and repetitiveness,

United States District Court
Northern District of California

1    defendants have fair notice of the allegations against them.  I will not strike the FAC in full or

2    separately parse through the redundant assertions.  Plaintiffs should take heed of the criticisms in

3    this Order when they amend.

4         Defendants identify irrelevant legal arguments and irrelevant allegations of anti-Semitism

5    that occurred in the past (before the complained-of events) or occurred on other campuses.  *See*

6    FAC ¶¶ 1, 10-11, 60, 80-82, 162-163 (vague and generalized allegations regarding a rise of anti-

7    Semitism, assaults on the First Amendment on campuses, alleged violations of student code and

8    criminal code conduct).  While of little to no relevance to the claims *actually asserted* in the FAC,

9    I will not strike these allegations.  I will determine their significance at the appropriate time to act

10    as a gatekeeper so the jury considers only relevant facts.  At this juncture, factual allegations that

11    are irrelevant cause no harm to my ability to adjudicate the pending motions.

12         Defendants argue that allegations about anti-Semitic speech or events at SFSU over the last

13    few decades, and allegations regarding the funding and status of the Jewish Studies department in

14    comparison to other departments, are irrelevant to the claims asserted in this case and should be

15    struck.  FAC ¶¶ 4, 46-49, 51-59, 100, 118-119, 123, 125-126, 133-136.  Plaintiffs respond that

16    these allegations are relevant, at least, to their Title VI claims that rest in part on the alleged

17    fostering and toleration of a hostile and discriminatory environment by SFSU officials.  Under

18    Title VI, past events are only relevant to extent plaintiffs are aware of them and the prior events

19    are "similar" to the ones underlying the current Title VI action, so I question the need for much of

20    the background discussion in FAC paragraphs 44 – 69.  While their ultimate relevance is

21    questionable, I will not strike these allegations at this juncture.[6]

22         With respect to the allegedly scandalous characterization of defendant Wong's statements

23    as invoking anti-Semitic stereotypes, the allegations are not scandalous on their face and their anti-

24    Semitic interpretation (by some members of the SFSU community) are substantiated  in the FAC.

25    FAC ¶¶ 116, 117; SFSU MTS at 10.  Wong's alleged comments are, obviously, subject to

26

27    ───────────────

28    [6] I note that the extensive allegations regarding social media and on-campus threats allegedly made by a student member of GPUS against Israelis and Israeli soldiers, FAC ¶¶ 100, 133-136, but not against students or Jews in general, rest on a particularly thin reed of relevance.

different interpretations by plaintiffs and defendants.  Plaintiffs' characterizations of them will not be struck from the FAC.

Defendant Abdulhadi joins the other defendants' motion to strike.   Dkt. Nos. 44, 74.  She also independently moves to strike the FAC's citation in paragraph 43 to the U.S. State Department's definition of anti-Semitism, an argument also raised in the defendants' motion to strike.  Defendants argue that this paragraph should be struck because the State Department's definition of anti-Semitism is immaterial and not-binding on this Court, and also because plaintiffs' purported quoting of that definition conflates examples that *are* in the State Department's view anti-Semitic with examples that "could," depending on context, be anti-Semitic, without noting that distinction.  Plaintiffs oppose the motions to strike, arguing that defendants have not shown that the State Department's definition and examples have no bearing or relevance to this case.

I have noted the qualifying language identified by defendants that plaintiffs omitted from their citation to the State Department's definition.  And I agree the definition is not binding on me. But while its primary author may have expressed concerns about its application in a university environment, it is – when viewed in its full context – a potentially relevant definition.

Finally, defendants move to strike the few mentions of defendants Stuart, Piccinotti, and Harris or, in the alternative, move for a more definitive statement regarding them.  SFSU MTS at 12-15.  Similarly, defendants move to strike the allegations regarding Abdulhadi or, in the alternative, for a more definitive statement regarding her role in and potential liability for the causes of action alleged.  *Id*.  The grounds argued in support of the motion to strike regarding these individuals essentially repeat arguments made on the motions to dismiss, which will be addressed below.

Defendants' motions to strike are DENIED.

## II.   MOTIONS TO DISMISS

Defendants move to dismiss on numerous grounds.  They argue that CSU and SFSU as entities cannot be defendants on the constitutional claims and the Individual Defendants cannot be held liable for damages on the constitutional claims in their official capacities (SFSU MTD at 7-

8).  Plaintiffs admit that those points are not in not dispute.  The parties differ over whether plaintiffs have adequately and can adequately allege constitutional claims for injunctive relief against the Individual Defendants in their official capacities and for damages against the Individual Defendants in their personal capacities under the first four causes of action.  Defendants also contend that plaintiffs cannot state a claim under Title VI because there are no allegations either that SFSU officials intentionally discriminated against any of the plaintiffs or of deliberate indifference to peer-to-peer harassment.

Defendant Abdulhadi separately argues that she cannot be held liable under the constitutional claims as plaintiffs cannot allege that she engaged in any of the conduct that caused plaintiffs harm.  Also, she asserts that she cannot be punished – consistent with her own First Amendment rights and rights to academic freedom – for her political views and academic activities.

### A.    SFSU and Administration Defendants' Motion to Dismiss

Defendants contend that each of plaintiffs' claims fails because plaintiffs have not alleged sufficient burdens on their rights to free speech and association or violations of equal protection. In Opposition, plaintiffs confirm that the heart of plaintiffs' FAC are allegations of discrimination against plaintiffs based on their race, ethnicity, and religion.[7]  Plaintiffs' Opposition to Administration Defendants' Motion to Dismiss (Pls. Oppo. SFSU, Dkt. No. 84) at 2.

#### 1.    First Amendment Claims

Defendants argue that the FAC fails to adequately allege a deprivation of First Amendment rights by any of the Individual Defendants.  All that is alleged is the failure of some of those individuals to stop *others* from infringing plaintiffs' First Amendment rights.  That is not enough.

---

[7] A few clarifications bear emphasis.  First, plaintiffs confirm in their Opposition that they are not asserting "free exercise" of religion claims.  Pls. Oppo. SFSU at 2.  Second, there are no constitutional claims asserted against CSU or SFSU, and no Eleventh Amendment immunity issue with respect to the Title VI claim asserted against CSU/SFSU.  Third, plaintiffs clarify that they are not seeking damages for any of their claims of constitutional violations asserted against the Administration Defendants in their "official capacities."  *Id.* at 5-6.  The FAC, as discussed below, does not clearly allege that any Administration Defendants committed constitutional violations in their official capacity as a result of promulgating or enforcing an unconstitutional policy or practice of CSU/SFSU.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a.     In general

To state a First Amendment infringement of freedom of association claim – the Student and Community Plaintiffs' inability to benefit from the Barkat event – plaintiffs must plead that the individuals actions imposed a "serious burden upon, affect[ed] in a[] significant way, or substantially restrain[ed]" the plaintiffs' ability to associate.  *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1033 (9th Cir. 2004).  To state a First Amendment claim for infringement of free speech – the Student Plaintiffs' exclusion from the KYR Fair – a plaintiff must allege facts showing that "by his actions the defendant deterred or chilled the plaintiff's [] speech and such deterrence was a substantial motivating factor in the defendant's conduct." *Mendocino Envt'l Center v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal citation and alterations omitted).  A plaintiff need not show that his or her speech was actually inhibited or suppressed, but that "an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (citing *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996)).

While plaintiffs may bring claims against the Individual Defendants in both their official and individual capacities, there are significant distinctions between those two claims (in addition to the distinction in available relief).  In an official-capacity suit, the plaintiff must demonstrate that a policy or custom of the governmental entity of which the official is an agent was the "moving force" behind the violation.  Absent allegations of a "policy or custom" that led to the injury, there can be no individual "official capacity" liability.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (because "the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a part in the violation  of federal law.'" (quoting *Kentucky v. Graham*, 473 U.S. 159 (1985)); *see also Papasan v. Allain*, 478 U.S. 265, 277–78 (1986) (The *ex parte Young* exception "has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation.").

United States District Court
Northern District of California

1    For all of the First Amendment claims (which are expressly tied to the Barkat and KYR Fair

2    events), the underlying allegations are that defendants took specific actions or refused to take specific

3    actions that harmed plaintiffs *because of* plaintiffs' Jewish religion, ethnicity, or perceived pro-Israeli

4    beliefs.  The First Amendment claims, therefore, are invidious discrimination claims.  Plaintiffs have

5    to allege defendants' *specific intent* to discriminate to state an official capacity claim; knowledge and

6    mere supervisory responsibility will not suffice.  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1070

7    (9th Cir. 2012) ("Invidious discrimination claims require specific intent," whereas attacks on facially

8    neutral policies (or deliberate indifference claims) do not require specific intent to establish

9    "knowledge but failure to act" supervisory liability).

10    For personal capacity allegations for damages stemming from a constitutional violation,

11    plaintiffs must plead specific facts showing that each named defendant directly engaged in culpable

12    conduct.

### b.  Barkat Event

13    The key factual allegations regarding the right of association claim are that the

14    Administration Defendants violated the Student and Community Plaintiffs' rights of association

15    by consigning the Barkat event to a space far from the center of campus, charging Hillel a fee for

16    that space, and then failing to enforce SFSU Student Code of Conduct policies – namely no

17    disruption of events and no use of amplified sound – and instructing the police to "stand down"

18    and not remove the protestors.  This does not add up to a cognizable claim.

### i.  Provision of Space

19    The mere fact that plaintiffs were not given access to their preferred space does not constitute a

20    violation of the First Amendment.  "[T]he fact that [an organizations' members] cannot assemble at

21    that precise location does not equate to a denial of assembly altogether."  *San Jose Christian College v.*

22    *City of Morgan Hill*, 360 F.3d at 1033.  Plaintiffs allege that the Seven Hills space was not centrally

23    located, that many students "had no idea where Seven Hills was located," and that "[o]n information

24    and belief, fewer students and community members attended the Barkat event due to its out-of-the-way

25    location and because Hillel's opportunity to publicize the event was significantly impacted by the

26    University's delay in confirming the location."  FAC ¶ 68.  That the location was out of the way and

the delay in confirming the location might have decreased attendance are not a denial of a right to assembly.  After all, each of the Student and Community Plaintiffs *was able* to assemble, even if, as discussed below, they were not able to benefit from the purpose of the event because it was shut down by protestors.

Significantly, plaintiffs are *not* alleging that the denial of a centrally located space for the Barkat event was pursuant to a policy or practice of SFSU to deny Jewish students and community members access to centrally-located space for events.  Instead, plaintiffs allege that SFSU officials intentionally discriminated against them by denying them a central space for this particular event. Therefore, cases discussing facial or as applied challenges to statutes, permit processes, and other policies that could "reduce[] the size of a speaker's audience can constitute an invasion of a legally protected interest," are inapposite.  *See, e.g.*, *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 130 (4th Cir. 2011); *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 461 (4th Cir. 2005).

Moreover, there are no allegations that the "mysterious" change of space for the event was caused by defendants' concern over the *content* of the Barkat speech, that Barkat is Jewish, or that many members of the audience might be Jewish.  Instead, plaintiffs contend that Administration Defendants expressed concerns over what space would be best because of a non-discriminatory reason – the expected protests and the impact of the protests on classes given the planned time of the event. FAC ¶¶ 65, 67.[8]

### ii.      Fee Charged for Space

With respect to plaintiffs' complaint that Seven Hills room required a fee, it is questionable whether that standing alone can constitute a violation of plaintiffs' First Amendment rights where there are no allegations that any of the *plaintiffs* paid the fee.  The fact a fee was required (and paid by a third-party, Hillel, FAC ¶ 68) does not support an infringement of plaintiffs' First Amendment rights. There are no allegations that the fee imposed a serious burden, affected in a significant way, or substantially restrained the ability of plaintiffs to associate.  *See San Jose Christian College v. City of*

---

[8] The "lit fuse" remarks relied on by plaintiffs as support for their contention that the Administration Defendants intentionally consigned the Barkat event to a distant space show that the concern of at least one Administration Defendant was over the potential for protestors and disruption, not disagreement with the content of the speech.  FAC ¶ 67; Pls. Oppo. to SFSU at 9.

*Morgan Hill*, 360 F.3d 1024 at 1033.  Indeed, the check was delivered by the third party and the event proceeded despite the fee.

### iii.   Failure to Enforce Policies/Remove Protectors/Stand Down

The heart of the allegations against the Administration Defendants related to the Barkat event is that defendants failed to enforce student code violations, stop the protests, or remove the protestors.  Defendants argue they cannot be liable because it was the protests by the third-parties that frustrated plaintiffs' ability to benefit from the Barkat event, not affirmative acts by any defendant.  *Felber v. Yudof*, 851 F.Supp.2d 1182, 1186 (N.D. Cal. 2011) ("[E]ven assuming that plaintiffs have alleged, or could amend to allege, sufficient acts of harassment and intimidation directed against them based on their religion to be deemed as an interference with their free exercise of that religion, they simply have no basis for pursuing such constitutional claims against defendants. With exceptions not implicated here, state actors have no constitutional obligation to prevent private actors from interfering with the constitutional rights of others.").

Plaintiffs respond that they are alleging that specific Administration Defendants intentionally failed to enforce the Codes of Student Conduct and issued a "stand down" order to the police.  What is lacking from the FAC are plausible allegations that the Administrative Defendants took those intentional acts or intentionally failed to act *because* of the content of the event's speech, the preferential content for the protectors' speech, or the views or religious beliefs of the attendees or organizers of the event.  And even if discriminatory intent could be alleged, it is questionable whether a denial of association claim can be made based on the interruption and failure of the Administration Defendants to handle the protestors in plaintiffs' preferred way (or even in a required way) for *one event*.

The plaintiffs have failed to allege a claim for violation of their First Amendment rights of association based on the allegations regarding the Administration Defendants' handling of the Barkat event.  This claim is DISMISSED.[9]

---

[9] It is not clear given the allegations and thrust of the FAC that any of the plaintiffs will be able to allege a First Amendment freedom of association claim with respect to the Barkat event.  In addition, plaintiffs appear to assert an ongoing burden on their freedom of association rights

United States District Court
Northern District of California

### c.    KYR Fair

There are no facts alleged to support the assertion that the Administration Defendants *played any role* in the denial of Hillel's ability to participate in the KYR Fair.  The FAC simply assumes that Administration Defendants must have played some role in light of their job titles and responsibilities.  *See, e.g.*, FAC ¶ 13 ("For example, in February of 2017, Hillel was intentionally and surreptitiously barred from a 'Know Your Rights' Fair based on its members' religion and ethnicity, with the full knowledge and involvement of SFSU administrators, in clear violation of Plaintiffs' civil rights under the First and Fourteenth Amendments."); FAC ¶ 143 ("On information and belief" defendants Birello, Jaramilla, and Piccinotti (given their job titles) "are each responsible for coordinating and managing student organization events such as the 'Know Your Rights' Fair, including ensuring that no registered student organization is intentionally discriminated against, improperly excluded, or otherwise subject to violations of established SFSU policies (including the Non-Discrimination Policy) or state or federal law" and these defendants "allowed the admitted intentional discrimination and exclusion of Hillel to occur, choosing not to address Hillel's intentional exclusion in any way"); FAC ¶ 144 ("The fair was an official SFSU event, sponsored by the SF State California Faculty Association, the Cesar E. Chavez Institute, the College of Ethnic Studies, the Dream Resource Center, the Ethnic Studies Student Organization, General Union of Palestine Students, Improving Dreams, Equity, Access and Success (IDEAS), and the Muslim Student Association."); FAC ¶ 150 ("The organizing committee for the fair, including COES and GUPS, with SFSU's knowledge and approval, cut off registration to purposefully exclude this recognized Jewish student group, excluding other groups in the process in an effort to cover up this active discrimination."); FAC ¶ 153 ("Defendants are responsible for these violations of Plaintiffs' rights because of their direct active involvement in the intentional and deceptive exclusion of Hillel from the "Know Your Rights" Fair."); FAC ¶ 156 ("The

---

because some unidentified defendants are "improperly instructing faculty, administrators, SFSU police, and other student organizations as to the appropriate way to handle disruption of campus speakers, even after committing to a training program and the implementation of new and adequate university policies following the culmination of the university-commissioned investigation into the Mayor Barkat disruption."  FAC ¶ 176.  There are *no facts* in the FAC regarding that claim.  If plaintiffs choose to amend their First Amendment right of association cause of action, the amended claim must be based on facts, not rhetoric.

United States District Court
Northern District of California

decision to exclude Hillel from the event was made and then sanctioned by highranking university officials.").

The more *specific* allegations of the FAC repeatedly place responsibility for both the "mistaken" invitation and Hillel's ultimate exclusion on the "organizers" of the event who do not include any of the Administration Defendants.  FAC ¶ 150 ("Hillel was invited to the fair by accident, and once the invitation had been extended, the event's organizers (including COES, GUPS and MSA [Muslim Students Association]) worked to find a way to rescind it."); FAC ¶ 157 ("the Fair's organizers were responsible for retaliation and intentional discrimination against Hillel and Jewish students at SFSU"); FAC ¶ 158 (according to a SFSU communications officer, "San Francisco Hillel was improperly excluded from the Know Your Rights Fair by the self-organized and self-appointed planning committee.").

Indeed, only two Administration Defendants are identified by name as having violated the Student Plaintiffs' rights because of their alleged failure to force the KYR Fair's organizers to include Hillel or by their failure to shut the event down upon notice that Hillel had been or might be excluded.  Defendant Begley, Dean of Students, is alleged to have known about the exclusion of Hillel in advance:

> Defendant Begley was made aware of the fair organizers' intention to exclude Hillel thirteen days in advance of the event, having been informed by the director of the Dream Center, an on-campus group dedicated to immigrants' rights.  Defendant Begley told the organizers, including several members of the SFSU faculty, that excluding Hillel would be a problem. Two days before the event, Hillel Director Oliver Benn contacted Defendant Begley to express his regret that SFSU was hosting a campus-wide event such as this one without ensuring sufficient space for the recognized Jewish group to participate. With full awareness of the premeditated nature of Hillel's segregation, and with full authority as the Dean of Students to force inclusion, Begley decided to allow the organizers to proceed with impunity.

FAC ¶ 150.  The allegations against Begley concern not her own affirmative decisions but her failure to force Hillel's participation or failure to cancel the event.  Similarly, as to defendant Monteiro, the Dean of COES, the FAC alleges:

> Defendant Monteiro became aware that a problem was unfolding and declared that he would be reversing his previous acceptance of

> an invitation to deliver a keynote address at the event.  However, as the Dean of COES, with apparent awareness of a problem so substantial that he would refuse to deliver his remarks, he was empowered to compel the event's organizers to include all interested student groups—including those who were innocent bystanders, denied access only to cover up a proactive undertaking meant to exclude one group and one group only—or else to shut the event down.

*Id.*

The problem with these allegations against Begley and Monteiro is that while they allege knowledge of the potential or actual intended exclusion of Hillel *by others* in advance of that exclusion, these allegations do not establish *their* potential liability.  The allegations, as repeatedly characterized by plaintiffs, are based on invidious view-point discrimination.   Given the way this case has been framed by plaintiffs, simply having knowledge and failing to act will not suffice to impose personal liability on defendants in either an official capacity (absent clear allegations that SFSU had or has a *policy* to engage in view-point discrimination) or in a personal capacity.  Invidious discrimination requires evidence of specific intent by each defendant, not just knowledge about someone else's actions.

Plaintiffs rely on *OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012) where the court allowed imposition of supervisory liability on a university official who knew of but failed to stop enactment of an unconstitutional policy regarding placement of newspaper bins on the public-forum campus.  699 F.3d at 1075.  In reaching that conclusion, however, the court focused on the nature of the constitutional violation alleged.  As relevant here, the *OSU* court distinguished claims based on "the right not to be singled out because of some protected characteristic, like race or religion" from claims based on the application of a law that was alleged to violate the Free Speech Clause, *e.g.*, content-based or content-neutral laws, regulations, and policies.  *Id.* at 1074-1075.  While plaintiffs here are asserting a First Amendment claim based on rights to free speech and assembly, their claims are based not on allegations of the application of any *policy* by SFSU, but instead are based on allegations of invidious discrimination.  In these circumstances, as confirmed by the *OSU* decision, *specific intent* to discriminate is required; supervisors cannot be

held liable simply because they knew of and failed to stop the invidious discrimination alleged.[10]

*Id*. at 1074 ("As for invidious discrimination claims, the substance of the constitutional right to which the claims correspond—the right not to be singled out because of some protected characteristic, like race or religion—calls for a specific intent requirement.").

Finally, defendant Harris is alleged to somehow have violated the Student Plaintiffs' free speech rights by "her failure reprimand or discipline in any way the students involved in the intentional discrimination against Hillel vis-à-vis the 'Know Your Rights' Fair." FAC ¶ 163. However, plaintiffs cite no authority that would allow them to hold defendant Harris liable for others' actions in violating plaintiffs' constitutional rights where her only role was a post-hoc failure to punish.[11]

Plaintiffs have failed to allege facts plausibly showing that any of the Administration Defendants took acts *because* of the content of plaintiffs' speech or views (or in preference for others') that impinged on the free speech and right to assembly claims of plaintiffs. Plaintiffs' First Amendment claims are DISMISSED.

### 2. Equal Protection Claims

To state an equal protection claim under Section 1983, a plaintiff must allege facts sufficient to show that a defendant acted "with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013). This generally requires a plaintiff to show that she was treated differently than

---

[10] While the *OSU* decision used broad language that "free speech violations do not require specific intent," that discussion was tethered to the discussion of Free Speech Clause cases addressing express government regulations (*e.g.*, *United States v. O'Brien*, 391 U.S. 367 (1968)), and not Free Exercise Clause cases or other claims that turn on invidious discrimination like the claims alleged here. *Id*. at 1074-75.

[11] Similar to the First Amendment claim with respect to the Barkat event, in the FAC plaintiffs allege that the "KYR Defendant Individuals . . . continue to deprive Plaintiffs of their rights as secured by the First Amendment to the United States Constitution, by inadequately training faculty, administrators, and other student organizations as to the appropriate way to administer university events." FAC ¶ 204. Plaintiffs also allege that "[d]espite multiple complaints in writing to SFSU, including to certain KYR Defendant Individuals, the KYR Defendant Individuals continue to fail to ensure that Plaintiffs, as Jewish students, are treated equally and that their civil rights on campus are protected." *Id*. ¶ 206. There are no facts in the FAC regarding these subjects.

similarly situated individuals because of some protected classification. *Id.* Defendants argue that

plaintiffs' equal protection claims fail because Student Plaintiffs have not alleged they were

treated materially differently than other groups by the Administration Defendants *because of* their

race, ethnicity, or religion.

### a.      Mayor Barkat Event

There are a number of problems with plaintiffs' equal protection allegations claim based

on the Barkat event. First, Student and Community Plaintiffs fail to allege any facts showing that

in materially similar circumstances – *i.e.*, events where speakers would likely draw protests and

scheduled when classes are ongoing – other groups who are not identified as Jewish (by race,

ethnicity, or religion) were offered more centrally located or fee-free rooms. Second, plaintiffs

fail to allege any facts that in materially similar circumstances – an open event where protestors

had access, protestors started to disrupt the event, and protestors used prohibited amplification –

the Administration Defendants present at the event acted differently. In other words, plaintiffs

need to allege that these same defendants have acted in similar circumstances to remove student

protestors or instructed the police to do so, in order for a plausible inference to arise that the

Administrator Defendants acted the way they did *because of* Plaintiffs' Jewish identify.

### b.      KYR Fair

The Administration Defendants make several arguments against imposing equal protection

liability on them, some of which lack merit. For example, they argue that the KYR Fair claim is

blocked by plaintiffs' allegation that Hillel's exclusion was secured by the "surreptitious"

changing of the registration deadline that excluded numerous other participants, not just Hillel.

However, "[a] willingness to inflict collateral damage by harming some, or even all, individuals

from a favored group in order to successfully harm members of a disfavored class does not cleanse

the taint of discrimination; it simply underscores the depth of the defendant's animus." *Pacific

Shores Properties, LLC v. City of Newport Beac*h, 730 F.3d 1142, 1159 (9th Cir. 2013).

Defendants argue with more promise that because another Jewish-identified group

participated in the KYR Fair, there is no plausible basis to allege a denial of equal protection based

on Jewish identity. They ask me to incorporate by reference the full content of a post-KYR Fair

24

United States District Court
Northern District of California

1    statement made by defendant Abdulhadi.  In that statement, which plaintiffs rely on for evidence

2    that Hillel *was intentionally* excluded by the organizers, Abdulhadi notes that another Jewish

3    group ("Jews for Peace") was included in the Fair.  SFSU Mot. at 11; FAC ¶ 160.

4         Plaintiffs object to the incorporation of the full Abdulhadi blog post, arguing that their

5    claims do not depend on it.  They neglect to note that they themselves rely on it as evidence that

6    Hillel *was* intentionally excluded from the KYR Fair.  However, the full blog post was not

7    attached to either of the motions to dismiss or as part of Abdulhadi's request for judicial notice;

8    therefore, I cannot rely on the portions not cited by plaintiffs in ruling on the motions to dismiss.

9    *See, e.g., Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation by reference

10   appropriate where "plaintiff's claim depends on the contents of a document, the defendant attaches

11   the document to its motion to dismiss, and the parties do not dispute the authenticity of the

12   document, even though the plaintiff does not explicitly allege the contents of that document in the

13   complaint.").

14        Accordingly, I will not dismiss the equal protection claim regarding the KYR Fair on this

15   ground now.  However, if there *was* another Jewish-identified group participating at the Fair,

16   plaintiffs would face a potentially insurmountable burden to show that Hillel was excluded

17   *because of* Jewish race, ethnicity, or religion.  In that event, perhaps plaintiffs could allege a

18   different equal protection theory regarding Hillel's exclusion, but those facts and that theory are

19   not included in the FAC.

20        More problematic is that the claims in this case are all grounded in invidious

21   discrimination (that the Student Plaintiffs' were denied equal participation in the KYR Fair

22   because of their Jewish identity).  While there are general allegations that certain Administration

23   Defendants had responsibility for "student events," the more specific allegations admit that it was

24   the student organizers who accidentally invited and then prevented Hillel from participating.  The

25   only Administration Defendants who are specifically identified as having some responsibility for

26   preventing Hillel's exclusion or failing to shut down the KYR Fair are defendants Begley and

27   Monteiro.  Yet there are no facts alleged that these individuals had the power to do what plaintiffs

28   seek (require the students to admit Hillel or force the student organizers to cancel the Fair), nor

United States District Court
Northern District of California

1  that they acted with the specific intent to deprive the Student Plaintiffs of their equal protection

2  rights because of their Jewish identity.

3      The equal protection claim suffers from a number of deficiencies identified above with

4  respect to the Barkat event and the KYR Fair and is DISMISSED.

5         **3.**        **Piccinotti, Harris, and Stuart**

6      Defendants move to dismiss claims against defendants Piccinotti and Harris because there

7  are no facts alleged that they took any affirmative acts (or failures to act) with respect to any of the

8  alleged violations of plaintiffs' First and Fourteenth Amendment rights.  Harris allegedly failed to

9  hold student protestors or student KYR Fair organizers liable for violations of student conduct

10  codes.  FAC ¶¶ 110, 163.  Those omissions *followed* the alleged constitutional violations.  The

11  claims against Harris, therefore, are DISMISSED.[12]

12      As to Piccinotti, his only alleged offense was receiving an email regarding Hillel's attempt

13  to secure a room in CCSC for the Barkat event.  FAC ¶ 65.[13]  He is not alleged to have played any

14  *direct* role in either of the events, have knowledge of the alleged discriminatory conduct against

15  plaintiffs, or have the authority to do anything about it.  This is insufficient, and the claims against

16  him are DISMISSED.  *See OSU*, 699 F.3d at 1075.

17      Defendants also move to strike the claims against defendant Brian Stuart because no facts

18  are alleged that he took any affirmative acts.  Stuart is only mentioned in the FAC as a defendant

19  who is "SFSU's Assistant Dean of Students & Director, New Student Programs;" as part of the

20  collective who "executed the University's effort to move the Barkat event away from CCSC and

---

[12] As noted above, while the FAC appears to argue that there is some continuing equal protection injury (*e.g.*, injuries following the KYR Fair), the FAC is devoid of facts to support any such claim.

[13] The only other allegations against Piccinotti are that "as Event & Technical Services Manager," he is "responsible for properly coordinating and managing events at SFSU, including those sponsored by student organizations"; Piccinotti was part of a collective of administrators who "executed the University's effort to move the Barkat event away from CCSC and to require Hillel's payment to host the event"; and Piccinotti "(as Event & Technical Services Manager) [was] responsible for coordinating and managing student organization events such as the "Know Your Rights" Fair, including ensuring that no registered student organization is intentionally discriminated against, improperly excluded, or otherwise subject to violations of established SFSU policies."  FAC ¶¶ 63, 64, 143.

to require Hillel's payment to host the event;" as receiving the same email as Piccinotti about Hillel's attempt to secure a room at CCSC; as receiving an email from Begley (also sent to defendants Hong, Stuart, and Parsons) notifying them that Begley had just learned Hillel was trying to secure the CCSC room and of Begley's concerns about disruption to classes; and as "acknowledging" post-event that the use of amplified sound at the Barkat event violated SFSU's code of student conduct and the protectors violated other student code provisions.  FAC ¶¶ 38, 64, 65, 67, 80, 81.  Plaintiffs fail to allege that Stuart had any direct role with respect to the Barkat event acts.  He is DISMISSED.

### 4.    Title VI Claim

Defendants argue that the Student Plaintiffs have not alleged intentional discrimination by SFSU or its officials and that a Title VI claim cannot be asserted based on SFSU's failure to prohibit other students (*e.g.*, the protestors) from engaging in their First Amendment activities. Defendants also assert that the Student Plaintiffs fail to allege facts to establish SFSU was deliberately indifferent to peer-to-peer harassment of the Jewish students.

### a.    In general

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.  To state a prima facie claim of discrimination under Title VI a plaintiff must allege facts sufficient to "give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Generally, this requires plaintiffs to plead facts demonstrating that (1) they are part of a protected class, (2) they were treated differently from similarly situated individuals, and (3) this treatment was motivated by their protected status.  *See Rashan v. Geissberger*, 764 F.3d 1179, 1182 (9th Cir. 2014); *see also TC v. Valley Cent. School Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011) ("[A] claim of discrimination under Title VI must plead (1) that defendants discriminated against them on the basis of race, (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for defendants' actions.").

The Ninth Circuit has held that to plead a Title VI claim for a hostile school environment a

plaintiff must allege that (1) there is a racially or otherwise hostile environment; (2) the district had notice of the problem; and (3) it failed to respond adequately to redress the problem. *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1033 (1998). A hostile environment is one that is "so severe, pervasive, and objectively offensive, and that so detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999) (discussing the standard for harassment claims under the analogous Title IX framework); *see also Monteiro*, 158 F.3d at 1033 (a "hostile environment" adequately alleged "if it is sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim").

### i.     Direct Discrimination

Student Plaintiffs initially argue they have stated a Title VI claim based on allegations of direct discrimination (i) that SFSU consigned the Barkat event to a distant and fee-based room and the Administration Defendants failed to stop the protestors so the event could proceed; and (ii) the exclusion from Hillel from the KYR Fair.

The Student Plaintiffs' Title VI claim based on direct discrimination suffers from the same defects described above because the constitutional claims have not been adequately alleged.[14] There are, in addition, other deficiencies with the Title VI claim that require its dismissal.

### ii.     Hostile Environment

Student Plaintiffs confirm in their Opposition that they are alleging a hostile environment claim under Title VI. As framed by the FAC, the only specific *current* allegations of peer-to-peer harassment that might support a hostile environment claim are the conduct of GUPS and other protestors at the Barkat event and the exclusion of Hillel from the KYR Fair. Those two claims – standing alone – do not show that Jewish students at SFSU suffered such severe, pervasive, and

---

[14] I recognize that under Title VI, the Ninth Circuit has held that although "a showing of intent is required at trial," for pleadings, the complaint only needs to allege "that the defendant is engaging in discrimination." *Monteiro*, 158 F.3d at 1026. Given the multiple levels of problems with the current allegations of discrimination discussed above, even if intent by defendants is not required for the Title VI claim, it is not clear that plaintiffs will be able to otherwise allege sufficient acts of intentional discrimination.

United States District Court
Northern District of California

objectively offensive discrimination to be actionable under Title VI, especially when, as discussed above, the alleged incidents of discrimination have not been shown to have emanated from affirmative acts by the Administration Defendants.  *See, e.g., Davis*, 526 U.S. at 631 ("A single instance of severe one-on-one peer harassment could, in theory, be said to have such a systemic effect, but it is unlikely that Congress would have thought so.").

The "background" allegations assert a variety of anti-Semitic conduct starting in 1973 and continuing through 2009 (FAC ¶¶ 46-59).  That conduct is not close enough in time nor substantially similar to the two events actually identified and complained of to bolster the claim. *See, e.g., Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 337 (6th Cir. 2008) (in Title VII case, "[w]hen determining the relative weight to assign similar past acts of harassment, the factfinder may consider factors such as the severity and prevalence of the similar acts of harassment, whether the similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff . . . . In general, however, the appropriate weight to be given a prior act will be directly proportional to the act's proximity in time to the harassment at issue in the plaintiff's case.  The further back in time the prior act occurred, in other words, the weaker the inference that the act bears a relationship to the current working environment."); *see also Felber v. Yudof*, 851 F.Supp.2d 1182, 1188 (N.D. Cal. 2011) ("[A]cts occurring years before plaintiffs ever enrolled at UC Berkeley, and/or on different campuses entirely, does little to demonstrate that plaintiffs suffered severe and pervasive harassment.").

The FAC also alludes to other current events that in plaintiffs' view set a tone that SFSU tolerates, if not promotes, anti-Semitism, but those allegations are vague and conclusory. There are no details with respect to time, frequency of occurrence, who was involved, and in some instances whether the acts were aimed at the Student Plaintiffs or otherwise known to the Student Plaintiffs. FAC ¶¶ 22-24, 133-136, 141, 155.  For example, with respect to the vague allegations of having tabling permits denied or that the denials were "inadequately explained," there are no allegations of when these incidents happened, how often they happened, and who (other than in some instances, Mandel) was involved.  Similarly, with respect to the "rumors" of a litmus test for COES and Abdulhadi classes, there are no facts substantiating the existence of that litmus test, and

29

only one vague allegation that plaintiff Kern was reluctant, but not prohibited, from taking a COES course.  The same is true of the allegations that "students" had to take alternative routes to class and hide their Jewish identity to avoid being threatened.  In general, these vaguely identified events and assertions, without more factual support, cannot prop up the Student Plaintiffs' hostile environment claim.

### iii.      Deliberate Indifference

Even if adequately alleged, the Student Plaintiffs are also required to show that defendants had knowledge of the incidents of harassment creating the hostile environment and were deliberately indifferent to them.  *See, e.g., Doe v. Willits Unified School Dist.*, 473 Fed. Appx. 775 (9th Cir. 2012) ("Damages under Title IX are available only if an official with authority to address the alleged discrimination and institute corrective measures has actual knowledge of the discrimination and fails to adequately respond—*i.e.*, acts with deliberate indifference." (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

The test for deliberate indifference is "whether a reasonable fact-finder could conclude that the College's response was 'clearly unreasonable in light of the known circumstances.' . . .  In other words, we must decide whether, on this record, one could find that the College made 'an official decision . . . not to remedy the violation.'"  *Oden v. Northern Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999) and *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998)).

To "meet this high standard there must, in essence, be an official decision not to remedy the violation and this decision must be clearly unreasonable." *Doe v. Willits Unified School Dist.*, 473 Fed. Appx. at 775–76; *see also Monteiro*, 158 F.3d at 1034 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–92 (1989)) ("[T]he district is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that 'it can be said to have been deliberately indifferent to the need.'").

The Entity Defendants initially rely on *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ,*. 526 U.S. 629 (1999), where the Supreme Court explained in the analogous Title IX context that "[d]eliberate indifference makes sense as a direct liability theory only where the

United States District Court
Northern District of California

1  recipient has the authority to take remedial action." *Id*. at 630.  Defendants contend, at least with

2  respect to the Barkat event, that they did not have the authority to prevent or stop the protestors'

3  free speech rights to protest.  Defendants' point is well taken.

4        Even more problematic for the Title VI claim are plaintiffs' own admissions that SFSU *has*

5  taken steps in response to both the Barkat and KRY Fair events.  Specifically, SFSU investigated

6  both incidents and prepared reports, although only the Barkat Report has been publicly released.

7  Plaintiffs also admit SFSU has taken broader steps to address the shutdown of Barkat event and

8  anti-Semitism at SFSU in general, although they characterize them as "disingenuous."  FAC ¶¶

9  164-169.

10       Plaintiffs fail to allege facts that plausibly show SFSU's responses are clearly

11  unreasonable.  For example, there are no allegations that the investigations were conducted in a

12  way that caused the Student Plaintiffs specific prejudice, *e.g*., with unreasonable delays or

13  inadequate efforts.  *See Oden*, 440 F.3d at 1089 ("[T]his record does not permit an inference that

14  the delay was a deliberate attempt to sabotage Plaintiff's complaint or its orderly resolution.").

15  Although no student groups or individual students were disciplined with respect to the Barkat

16  investigation or the KYR Fair, according to plaintiffs, there are no facts alleged that that these

17  discrete "failures" to impose discipline amount to deliberate indifference.  *See, e.g., id*. at 1089

18  ("An aggrieved party is not entitled to the precise remedy that he or she would prefer.").  For

19  example, the Student Plaintiffs do not allege that multiple events sponsored by plaintiffs or Jewish

20  students or community members were impermissibly shut down by these same protestors or that

21  these same protestors have repeatedly aimed threats and violent taunts at Jewish students or

22  otherwise repeatedly violated the Student Conduct Code *such that* the failure to discipline one or

23  more of them amounts to deliberate indifference.

24       Finally, as to the efforts by defendant Wong and others to address anti-Semitism more

25  generally, while the Student Plaintiffs claim comments by Wong were themselves anti-Semitic

26  and have further hurt and alienated Jewish students, there are no facts alleged showing that the

27  efforts of SFSU are clearly unreasonable.  *See, e.g., Felber*, 851 F.Supp.2d at 1188 (no deliberate

28  indifference where plaintiffs alleged "that the administration has engaged in an ongoing dialogue

with the opposing parties in an attempt to ensure that the rights of all persons are respected, and to minimize the potential for violence and unsafe conditions. That the University may not have acted as plaintiffs would prefer does not rise to 'deliberate indifference.'").  Plaintiffs have not alleged *facts* to plausibly show deliberate indifference; indeed, the facts actually alleged appear to show the Entity Defendants' responses were objectively reasonable.

### iv.     Deprivation of Educational Benefits

The Student Plaintiffs also fail to allege facts showing that they were denied educational benefits.  The two discrete instances of "deprivation" specifically identified in the FAC, the frustration of the Student Plaintiffs' asserted rights to hear Mayor Barkat and right to represent Hillel at the KYR Fair, do not, standing alone, equate to an actionable deprivation of educational opportunities.  *See, e.g., Fennell v. Marion Independent School Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (plaintiffs must show "concrete, negative effect" on the victims' education, for example creating "disparately hostile educational environment" relative to a peer, "forcing the student to change his or her study habits or to move to another district," or "lowering the student's grades," or causing anxiety sufficient to require "alternative study arrangements"); *Gabrielle M. v. Park Forest-Chicago Heights, IL. School Dist.* 163, 315 F.3d 817, 823 (7th Cir. 2003) ("negative impact on access to education may include dropping grades . . . becoming homebound or hospitalized due to harassment . . . or physical violence"; in that case there was no evidence that plaintiff was denied access to an education where although "she was diagnosed with some psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase."); *see also Felber*, 851 F. Supp. 2d at 1188 (noting "it was not clear that activities on Sproul Plaza or at Sather Gate necessarily would significantly impede any student's access to the educational services offered by the University" when the incidents alleged "did not occur in the context of her educational pursuits" but when plaintiff was attempting to exercise free speech).

In addition to those two events, the Student Plaintiffs describe their own experience:

> Mr. Mandel has been verbally and physically threatened and targeted on SFSU's campus based on his Jewish identity, and has personally experienced the University's intentional discrimination

1

2

3

> and deliberate indifference to SFSU's pervasively hostile anti-Jewish environment. These experiences have caused Mr. Mandel to miss class at SFSU and have deprived Mr. Mandel of equal access to the educational opportunities or benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who choose to not be open about their Jewish identity.

4  FAC ¶ 22.  Mandel does not provide sufficient details to plausibly show a concrete, negative effect

5  on his education, consistent with the case law identified above.

6

7

8

9

10

> Mr. Volk has been verbally and physically threatened on SFSU campus based on his Jewish identity, and has personally experienced the University's intentional discrimination and deliberate indifference to SFSU's pervasively hostile and discriminatory environment. These experiences have forced Mr. Volk to miss class at SFSU and have deprived Mr. Volk of equal access to the educational opportunities or benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who choose to not be open about their Jewish identity.

11  FAC ¶ 23.  Similarly, Volk does not plead sufficient details to plausibly show a concrete, negative

12  effect on his education as required.

13

14

15

16

17

18

19

20

21

> [Plaintiff] Kern has been verbally assaulted on SFSU's campus based on his Jewish identity, and has personally experienced the University's intentional discrimination and deliberate indifference to SFSU's pervasively hostile anti-Jewish environment. These experiences have forced Mr. Kern to avoid enrolling in classes at SFSU that otherwise interested him and/or filled requirements toward the completion of his degree, where his Jewishness would make him a target of harassment and subject him to personal attack and unfair and prejudicial treatment. For example, when he wanted to take an International Relations class, he signed up for an online class instead of one offered through COES for these reasons. As a result, he could not benefit from the many advantages of a live class where students and faculty engage in debate and a free exchange of ideas. Mr. Kern has been deprived of equal access to the educational opportunities or benefits provided by SFSU and CSU to similarly situated students who are non-Jewish or who choose to not be open about their Jewish identity

22  FAC ¶ 24.  Kern does not allege facts about the assaults (for example, the dates of the assaults, the

23  frequency of the assaults) and what impact they had on his educational access other than a

24  "reluctance" but not inability to enroll in one COES class.  These allegations are likewise not

25  specific enough to plausibly show a concrete, negative effect on Kern's education.

26  In sum, there are numerous problems with the Title VI claim as alleged.  It is

27

28

United States District Court
Northern District of California

1  DISMISSED.[15]

2  **B.    Abdulhadi Motion to Dismiss**

3  Defendant Abdulhadi separately moves to dismiss on the grounds that: (i) the allegations

4  against her concern the activities of others; (ii) she cannot be held responsible for her political or

5  academic affiliations; (iii) plaintiffs have no standing to sue; and (iv) any alleged claims are barred

6  by Eleventh Amendment or qualified immunity.

7  The bulk of plaintiffs' allegations regarding Abdulhadi are about things Professor

8  Abdulhadi has done or appointments she secured *in the past*.  For example: that she became a

9  director and senior scholar at AMED (in 2006); she co-founded a group that advocates for the

10  social, political, and economic boycott of Israel (in 2006); she drafted a brochure celebrating a

11  mural that, initially but not in the final version, contained explicit anti-Semitic image; and as Dean

12  of COES and director of AMED, she was integrally involved in on-campus conferences in 2009

13  that advocated discriminatory, racist, and anti-Semitic positions, including attacking the

14  legitimacy and right of Israel to exist. FAC ¶¶ 56, 57, 58, 59.  Those allegations are irrelevant to

15  the constitutional claims asserted against Abdulhadi and have little or no apparent connection to

16  the Title VI claims against the Entity Defendants.

17  The allegations about Abdulhadi's actions during the times the Students Plaintiffs have

18  been at SFSU that are the basis of the claimed constitutional violations are:

19
20  - Her "Academia.edu" profile page features an image calling for a "Third Intifada," "a
     terrorist mutiny by Palestinians against Jews in Israel," FAC ¶ 78;

21
22  - "On information and belief, Defendant Abdulhadi, as GUPS's faculty advisor, chose to
     disregard" the "advisor requirements" that require her to "assist" GUPS as their faculty
     advisor including SFSU's non-discrimination policy and the time, place, and manner
23     policy "as they applied to GUPS's conduct surrounding the Barkat event, in violation of
     Plaintiffs' civil rights," FAC ¶ 82;

24
25  - "Defendant Abdulhadi effectively conscripted Ethnic Studies students—most of which are
     also members of GUPS—to demand increased funding for COES by staging a hunger

26

27  [15] Having dismissed plaintiffs' claims against the Entity and Administration Defendants with leave
to amend, I will not at this juncture address whether plaintiffs have appropriately pleaded a
28  declaratory relief claim, as that cause of action depends on plaintiffs stating viable claims.  I will
address that issue, if and as necessary, on the next round of briefing.

United States District Court
Northern District of California

strike in the middle of SFSU's campus" and in the successful negotiation secured a commitment from Wong "not to investigate GUPS students for disruption of the Barkat incident," FAC ¶ 126;

- In 2014, "Defendant Abdulhadi faced harsh criticism after taking a publicly-financed trip to Palestinian territories in order to meet with notorious members of U.S.-, E.U.-, U.K.-, and Canadian-designated foreign terrorist organizations," FAC ¶¶ 127, 137, 138;

- In or around 2014, Abdulhadi "spearheaded the establishment of a formal collaboration with a written Memorandum of Understanding between SFSU and An-Najah National University in the West Bank, a known recruitment facility for Hamas, a designated foreign terrorist group," FAC ¶ 139;

- "[O]n information and belief, in order to succeed in Dr. Abdulhadi's class, or nearly any other class in the Ethnic Studies Department, students must pass a political litmus test, a central feature of which is a commitment to anti-Zionism. For example, papers that do not espouse anti-Zionism, or merely argue in favor of Israel's right to exist, will not be respected or well-graded by the professor, no matter their academic merit. . . . Both faculty and many Jewish students, including Plaintiffs, believe that Jewish students would be unfairly targeted if they were to enroll in courses in COES, especially those taught by Dr. Abdulhadi," FAC ¶ 141;

- "Abdulhadi also acknowledged that Hillel was intentionally excluded from the 'Know Your Rights' Fair, publishing her thoughts regarding the Fair in the online publication Mondoweiss: '[T]he organizers [of the 'Know Your Rights' Fair] refused to allow a member of a privileged white group [referring to Hillel] whose members feel entitled to be represented everywhere and anywhere they deem the event to be of interest irrespective of the event's goals.' Abdulhadi wrote that '[b]ecause the organizers dared challenge the status quo, student and faculty organizers,' including, on information and belief, herself, 'have been subjected to systematic interrogation, harassment and administrative retaliation by the university.' . . . . Abdulhadi also wrote that '[t]he university frame[d] the fact that Hillel did not have a table at the KYR Fair as anti-Semitic.'" FAC ¶ 160,

- "On information and belief, Defendant Abdulhadi chose to disregard [her] advisor requirements [including compliance with SFSU's non-discrimination policy] as they applied to GUPS's conduct surrounding the 'Know Your Rights' Fair, in violation of Plaintiffs' civil rights," FAC ¶ 162.

As an initial matter, while Abdulhadi has been sued in both her official and personal capacity, there is no SFSU "policy" that Abdulhadi is alleged to have created, applied, or otherwise could be liable for as an official actor. Likewise, there are no allegations about ongoing constitutional deprivations, as opposed to deprivations in the past related to Abdulhadi's conduct. *See supra*. Therefore, no claim can be asserted against her for injunctive relief on the basis of her "official" capacity.

Abdulhadi could theoretically be liable in her personal capacity for damages related to the two incidents of invidious discrimination alleged in the FAC (the shutdown of the Barkat event and the exclusion of Hillel from the KYR Fair). However, there are no allegations that Abdulhadi herself took any affirmative actions against plaintiffs or otherwise acted with specific intent to discriminate against plaintiffs. Instead, there is only speculation that, because of her role as an advisor to GUPS and as a faculty of COES, she had advance knowledge of GUPS's plan to disrupt the Barkat event and failed to prevent it and also failed to prevent the organizers of KYR Fair from excluding Hillel.[16] As discussed above, because the constitutional claims are based on assertions of invidious discrimination, facts showing that Abdulhadi had the specific intent to discriminate against plaintiffs and that she took actions against plaintiffs causing harm to their constitutional rights need to be alleged.

Plaintiffs attempt to avoid alleging facts showing specific intent to discriminate by relying on cases arising under the Eighth and Fourteenth Amendments that discuss "deliberate indifference" when conditions of confinement are involved. Those cases are inapposite. Following *Iqbal*, the prison condition cases continue to recognize that "deliberate indifference" can be a basis for supervisory liability under § 1983 for claims of "unconstitutional conditions of confinement, *unlike* a claim of unconstitutional discrimination." *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011) (emphasis added); *see also OSU*, 699 F.3d at 1071 ("[B]ecause Eighth Amendment claims for cruel and unusual punishment generally require only deliberate indifference (not specific intent), a Sheriff is liable for prisoner abuse perpetrated by his subordinates if he knowingly turns a blind eye to the abuse."). As noted above, because plaintiffs' claims rest on intentional invidious discrimination, specific intent needs to be alleged.

As to any affirmative acts by Abdulhadi that caused plaintiffs harm to their constitutional rights, the FAC is silent. Plaintiffs, at most, attempt to build a bridge between Abdulhadi's

---

[16] In their Opposition to Abdulhadi's motion to dismiss, plaintiffs claim they have pleaded facts showing that Abdulhadi was "aiding, encouraging, organizing, and condoning" the shutdown of the Barkat event and the exclusion of Hillel from the KYR Fair, citing generally to "FAC ¶¶ 61-113, 170-81" "182-96" "FAC ¶¶ 142-62, 197-211" and "212-27." Pls. Abdulhadi Oppo. at 2. However, the vast majority of the paragraphs cited contain *no mention* of Abdulhadi.

United States District Court
Northern District of California

alleged anti-Zionist and anti-Israel stances, her pro-Palestinian resistance support, and her academic pursuits to support an inference that she must have encouraged GUPS or others to engage in the acts of discrimination complained of.[17]  That bridge supports no weight.  Plaintiffs offer only rank speculation that Abdulhadi took any actions or failed to take required action *before* the alleged constitutional violations.  The allegations regarding Abdulhadi's post-events comments do not show that she took any pre-event acts that led to the alleged constitutional deprivations.

Given the total lack of facts alleged showing that Abdulhadi *herself* acted to cause plaintiffs' alleged constitutional injuries, the allegations in the FAC fail to state a claim against her.  Out of an abundance of caution, I will allow plaintiffs leave to amend their allegations against Abdulhadi.[18]

**CONCLUSION**

Defendants' motions to strike are DENIED.  Defendants' motions to dismiss are GRANTED and plaintiffs' FAC is DISMISSED in full with leave to amend.  A Second Amended Complaint shall be filed within twenty days of the date of this Order or the case will be

---

[17] As another example of just how stretched plaintiffs' allegations against Abdulhadi are, plaintiffs respond to the defendants' criticism that the Abdulhadi-related allegations are made on "information and belief" by highlighting their allegations that Abdulhadi "effectively conscripted" COES students to hold a hunger strike and that one of the concessions sought by *unidentified* student hunger-strike negotiators (in addition to additional funding for COES and other initiatives), was a commitment from President Wong to not punish students for the disruption of the Barkat event. Pls. Abdulhadi Oppo. at 4-5 (citing FAC ¶¶ 81, 126).  Plaintiffs also point to the allegations that a "Joint Agreement" between COES and SFSU announced by Wong to end the hunger strike affirmed that SFSU did not intend to take disciplinary action against "faculty" who have taken part in unspecified "protests and advocacy" efforts. *Id*.  From this *string* of inferences, plaintiffs then rhetorically ask "why would the agreement need to protect faculty," unless Abdulhadi was seeking protection for herself? *Id*. at 5.  This is plaintiffs' only example of "express" allegations against Abdulhadi.  But not only are these allegations based on strings of unsupported inferences, they *all* post-date the constitutional claims asserted against Abdulhadi.

[18] Because it is unclear whether plaintiffs will be able to assert a constitutional claim against Abdulhadi, I will not address Abdulhadi's other claim-based grounds for dismissal, including standing and qualified immunity.

United States District Court
Northern District of California

dismissed.[19]

**IT IS SO ORDERED.**

Dated: March 9, 2018

William H. Orrick
United States District Judge

United States District Court
Northern District of California

---

[19] The parties disagree on whether discovery should proceed pending a showing or ruling that plaintiffs have or will be able to state a claim.  Dkt. No. 123.  While a pending motion to dismiss does not typically stay discovery, given the significant question whether plaintiffs will be able to allege facts to support their constitutional or Title VI claims, discovery is STAYED until the pleadings are settled or upon further order.

38