1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

David L. Mandel (SBN 152271)
c/o Jewish Voice for Peace
1611 Telegraph Ave, Suite 1020,
Oakland, CA 94612
Phone: 916 769-1641
Fax: 510 465-1616
dlmandel@gmail.com

Attorney for Amici Curiae
Jewish Studies Scholars

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JACOB MANDEL, et al. | CASE NO. 3:17-CV-03511-WHO |
| Plaintiffs, | |
| vs. | [PROPOSED] BRIEF OF AMICI CURIAE |
| BOARD OF TRUSTEES OF THE | JEWISH STUDIES SCHOLARS: |
| CALIFORNIA STATE UNIVERSITY, | • Daniel Boyarin |
| SAN FRANCISCO STATE | • Hasia Diner |
| UNIVERSITY, et al., | • Marjorie N. Feld |
| Defendants | • Gil Hochberg |
| | • Ari Y. Kelman |
| | • Chana Kronfeld |
| | • Charles H. Manekin |
| | • Benjamin Schreier |
| | • Joshua Schreier |
| | • Aaron Hahn Tapper |
| | • Barry Trachtenberg |
| | • Diane L. Wolf |

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................3

I.      INTRODUCTION ...................................................... ....................................................7

II.     CREDENTIALS OF AMICI CURIAE ........................................................................10

III.    ARGUMENT
        **A.** The exact nature and meaning of antisemitism are deeply contested among
            Jewish studies scholars. A judge should not create legal authority on an issue
            when even those most directly engaged in its study have no detailed consensus...........16
        **B.** The Lawfare complaint relies on the U.S. State Department definition of
            antisemitism, which is overly expansive as it characterizes criticism of the
            State of Israel and its supporters as antisemitic …….................................................18
        **C.** The State Department definition has no place on campus as a speech code.
            Even the author of the definition opposes its application to campuses in
            the United States…….................................................................................................24

IV.     CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

Page

*Stifling Dissent: How Israel's defenders use false charges of antisemitism to limit the debate over Israel on campus*, Jewish Voice for Peace, 2015, available at
https://jewishvoiceforpeace.org/stifling-dissent/ ...................................................................7

*The Palestine Exception to Free Speech: A Movement Under Attack in the U.S.*,
Palestine Legal and the Center for Constitutional Rights (September 2015),
available at  http://palestinelegal.org/the-palestine-exception/.............................................7

Year-In-Review: Palestine Legal Responded to 308 Suppression Incidents in 2017, Nearly
1,000 in Last 4 Years, Palestine Legal and the Center for Constitutional Rights (September
2018), available at  https://palestinelegal.org/2017-report... ...................................................7

Letter from Zachary Pelchat, Team Leader, Department of Education Office for
Civil Rights, San Francisco, to UC Irvine Chancellor Michael Drake, OCR Case
No. 09-07-2205 (Aug. 19, 2013), available at
https://ccrjustice.org/sites/default/files/assets/files/OCR-
UCIrvine_Letter_of_Findings_to_Recipient.pdf..................................................................8

Letter from Zachary Pelchat, Team Leader, Department of Education Office for
Civil Rights, San Francisco, to Carole E. Rossi, Chief Campus Counsel, UC Santa
Cruz, OCR Case 09-09-2145 (August 19, 2013), available at
http://news.ucsc.edu/2013/08/images/OCR_letter-of-findings.pdf. ....................................8

Letter from Zachary Pelchat, Team Leader, Department of Education Office for
Civil Rights, San Francisco, to UC Berkeley Chancellor Robert Birgeneau, OCR
Case No. 09-2-2259 (August 19, 2013), available at http://news.berkeley.edu/wp-
content/uploads/2013/08/DOE.OCR_.pdf. ..........................................................................8

Letter from Emily Frangos, Compliance Team Leader, Department of Education
Office for Civil Rights, New York, to Morton A. Klein, President, Zionist
Organization of America, re case No. 02-11-2157 (July 31, 2014), available at
https://www.documentcloud.org/documents/1300803-ocr-decision-on-title-vi-
complaint-7-31-14.html. ......................................................................................................8

*Plaintiffs in Felber v. Yudof case dismiss lawsuit,* Dan Mogulof in Berkeley News, July 12,
2012, available at http://news.berkeley.edu/2012/07/12/plaintiffs-in-felber-v-yudof-case-
dismiss-lawsuit/....................................................................................................................9

*Standing Up for Jewish Students*, Kenneth Marcus, *Jerusalem Post* (September 9,
2013), available at http://www.jpost.com/Opinion/Op-Ed-Contributors/
Standing-up-for-Jewish-students-325648. ..........................................................................9

3

*Israel lawfare group plans "massive punishments" for activists,* Ali Abunimah, Electronic
Intifada (June 25, 2016), available at https://electronicintifada.net/
blogs/ali-abunimah/israel-lawfare-group-plans-massive-punishments-activists. .................10

Jewish Voice for Peace website, jvp.org ...........................................................................10

*On Antisemitism: Solidarity and the Struggle for Justice,* Haymarket Books, 2017, see
http://onantisemitism.com/.................................................................................................11

Standards of Partnership for Israel Activities, Hillel International, in Hillel Israel Guidelines:
Hillel Guidelines for Campus Israel Activities, undated, see
http://www.hillel.org/jewish/hillel-israel/hillel-israel-guidelines.........................................11

Open Hillel website, http://www.openhillel.org/about/ .......................................................11

*Safe on the Sidelines: Jewish Students and the Israel-Palestine Conflict on Campus,*
Ari Y. Kelman et al (September, 2017), available at
https://stanford.app.box.com/v/SafeandontheSidelinesReport. ..............................................13

*Merriam-Webster Dictionary,* definition of antisemitism: https://www.merriam-
webster.com/dictionary/anti-Semitism ................................................................................16

*Defining Anti-Semitism,* United States Department of State (January 20, 2017),
available at https://www.state.gov/s/rga/resources/267538.htm............................................16

International Holocaust Remembrance Alliance (IHRA), Bucharest, definition of
antisemitism, available at
https://www.holocaustremembrance.com/sites/default/files/press_release_document_antise
mitism.pdf ...........................................................................................................................19

*Defining Anti-Semitism*, United States Department of State (previous version, Jan. 20,
2017), available at
https://web.archive.org/web/20180117193205/https://www.state.gov/s/rga/resources/267538
.htm .....................................................................................................................................19

*Newt Gingrich compares FBI raids of Trump associates to Stalin and the Gestapo*, Media
Matters, April 11, 2018, available at https://www.mediamatters.org/video/2018/04/11/newt-
gingrich-compares-fbi-raid-michael-cohen-stalin-and-gestapo/219908...............................19

*Sean Spicer Takes his Questionable Claims to a New Level in Hitler-Assad Comparison*,
Washington Post, (April 11, 2017), available at https://www.washingtonpost.com/news/the-
fix/wp/2017/04/11/sean-spicer-someone-as-despicable-as-hitler-didnt-even-sink-to-using-
chemical-weapons/?utm_term=.f6976c3a1640 ...................................................................21

4

Anne Kornblut and Charles Sennott, *Saddam the new Hitler, Bush tells Europeans*, Sydney Morning Herald, Nov. 22, 2002, available at https://www.smh.com.au/articles/2002/11/21/1037697805270.html ...................................21

Daniel J. Roth, *U.S. Jewish Groups Rebuke Newt Gingrich After Comparing FBI to Nazi Gestapo*, Jerusalem Post, April 13, 2018, available at https://www.jpost.com/American-Politics/US-Jewish-groups-rebuke-Newt-Gingrich-after-comparing-FBI-to-Nazi-Gestapo-549707 .........................................................................................................................21

*Israeli Ambassador in Norway Compares Norwegian Critics to Nazi Allies*, The Nordic Page: Norway (April 4, 2018), available at https://www.tnp.no/norway/politics/israeli-ambassador-in-norway-compares-norwegian-critics-to-nazi-allies ......................................22

*Israel Says it will Scrap Controversial Plan to Deport African Migrants*, France 24 (April 2, 2018), available at http://www.france24.com/en/20180402-israel-african-migrants-UN-deportation ...........................................................................................................................22

*David Friedman, Trump's Ambassador to Israel, on the Issues*, New York Times (December 16, 2016), available at https://www.nytimes.com/interactive/2016/12/16/world/middleeast/David-Friedman-Israel-Palestinians-Trump-quotes.html ...............................................................................22

Database of discriminatory laws maintained by Adalah, an Israeli civil and human rights legal organization: https://www.adalah.org/en/content/view/7771 ........................................22

Butler, Judith: *Parting Ways: Jewishness and the Critique of Zionism*, Columbia University Press, 2012 ...........................................................................................................................23

Laor, Yitzhak: *The Myths of Liberal Zionism* (Verso, 2010) ................................................23

Rose, Jacqueline: *The Question of Zion* (Princeton University Press, 2007) .......................23

*This Day in Jewish History 1948: N.Y. Times Publishes Letter by Einstein, Other Jews Accusing Menachem Begin of Fascism*, Ha'aretz, December 4, 2014, available at https://www.haaretz.com/jewish/features/.premium-1.629813 ...............23

Anti-Semitism Awareness Act, S 10 -- https://www.congress.gov/bill/114th-congress/senate-bill/10/text .....................................................................................................24

*Will Campus Criticism of Israel Violate Federal Law?* Kenneth Stern, New York Times (December 12, 2016), available at https://www.nytimes.com/2016/12/12/opinion/will-campus-criticism-of-israel-violate-federal-law.html ......................................................................................................................24

Letters from UC Academic Council chair Jim Chalfant and University Committee on
Academic Freedom chair Hugh Roberts,
https://senate.universityofcalifornia.edu/_files/reports/JC-JN-anti-semitism-awareness-
act.pdf...............................................................................................................................24

Letter to Members of Congress, Kenneth Stern, Justus & Karin Rosenberg
Foundation (Dec. 6, 2016), available at http://jkrfoundation.org/wp-
content/uploads/2016/12/Stern-Letter-links-corrected.pdf.  ...................................................25

[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

## **INTRODUCTION**

Together, the 11 scholars in the field of Jewish studies identified above respectfully submit this amicus curiae brief in support of Defendant Rabab Abdulhadi's and the Board of Trustees of California State University, San Francisco State University's (SFSU) motions to dismiss and motions to strike in the referenced case.

The present lawsuit is but one of the latest fronts in an all-out offensive by groups determined to stigmatize and when possible, suppress advocacy for Palestinian rights and its corollary, criticism of Israeli policies and U.S. support for them, on campuses across the United States

Israel-aligned groups already have a history of flooding officials, including legislators, state attorneys general and especially, university administrators, with complaints that political activity critical of Israeli policies constitutes antisemitic "hate speech" and must be stopped. Jewish Voice for Peace, a national organization with chapters on many campuses, published a report in 2015 detailing how these groups distort the meaning of antisemitism to include such speech.[1] The Center for Constitutional Rights and Palestine Legal have published a report documenting the extent and nature of incidents of censorship that have resulted from such pressures.[2] Although these complaints have consistently been found to be without merit, they are

---

[1] *Stifling Dissent: How Israel's defenders use false charges of antisemitism to limit the debate over Israel on campus*, Jewish Voice for Peace, 2015, available at https://jewishvoiceforpeace.org/stifling-dissent/

[2] *The Palestine Exception to Free Speech: A Movement Under Attack in the U.S.*, Palestine Legal and the Center for Constitutional Rights (September 2015), available at http://palestinelegal.org/the-palestine-exception/.See also a recent update, Year-In-Review: Palestine Legal Responded to 308 Suppression Incidents in 2017, Nearly 1,000 in Last 4 Years, Palestine Legal and the Center for Constitutional Rights (September 2018), available at https://palestinelegal.org/2017-report. Out 958 total reported incidents, 291 occurred in California.

costly in terms of time and resources expended investigating and defending against false accusations.

Israel-aligned groups have filed numerous Civil Rights Act Title VI complaints nationwide with the U.S. Department of Education's Office for Civil Rights (DOE-OCR), alleging that political activity on campus critical of Israeli policies creates a "hostile" environment for Jewish students.[3] To date no such complaint has been sustained or found to have legal merit. DOE dismissed cases against University of California (UC) Irvine, UC Santa Cruz and UC Berkeley in 2013, and Rutgers in 2014, with written determination letters stating that the First Amendment protects speech critical of the state of Israel and that such speech does not constitute a civil rights violation.[4] DOE noted that "in the university environment, exposure to

---

[3] Complaints were filed against University of California (UC) Irvine, UC Santa Cruz, UC Berkeley, Rutgers University, Barnard College and Brooklyn College. *See*, Palestine Legal, *Palestine Exception to Free Speech*, supra.

[4] Letter from Zachary Pelchat, Team Leader, Department of Education Office for Civil Rights, San Francisco, to UC Irvine Chancellor Michael Drake, OCR Case No. 09-07-2205 (Aug. 19, 2013), available at https://ccrjustice.org/sites/default/files/assets/files/OCR-UCIrvine_Letter_of_Findings_to_Recipient.pdf;

Letter from Zachary Pelchat, Team Leader, Department of Education Office for Civil Rights, San Francisco, to Carole E. Rossi, Chief Campus Counsel, UC Santa Cruz, OCR Case 09-09-2145 (August 19, 2013), available at http://news.ucsc.edu/2013/08/images/OCR_letter-of-findings.pdf;

Letter from Zachary Pelchat, Team Leader, Department of Education Office for Civil Rights, San Francisco, to UC Berkeley Chancellor Robert Birgeneau, OCR Case No. 09-2-2259 (August 19, 2013), available at http://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf;

Letter from Emily Frangos, Compliance Team Leader, Department of Education Office for Civil Rights, New York, to Morton A. Klein, President, Zionist Organization of America, re case No. 02-11-2157 (July 31, 2014) https://www.documentcloud.org/documents/1300803-ocr-decision-on-title-vi-complaint-7-31-14.html.

such robust and discordant expressions, even when personally offensive and hurtful, is a circumstance that a reasonable student in higher education may experience."[5]

Like determinations were made by a federal judge in a 2011 case making similar accusations against administrators at UC Berkeley and demanding they suppress Palestinian rights advocacy. After an initial dismissal, the plaintiffs themselves dismissed their amended complaint with the university agreeing only to take a closer look at some of its policies regarding campus speech.[6]

Although the DOE complaints and the Berkeley lawsuit were meritless, all resulted in lengthy investigations and caused reputational damage to students and faculty as they dragged on. Director Kenneth Marcus of the Brandeis Center, which has filed numerous Title VI complaints, has encouraged others to continue to file them in order to chill campus speech. He wrote, "These cases – even when rejected – expose administrators to bad publicity. … No university wants to be accused of creating an abusive environment. … Needless to say, getting caught up in a civil rights complaint is not a good way to build a resume or impress a future employer."[7]

At a June 2, 2016, conference organized by major Israel lobby leaders, titled "BDS – the New Anti-Semitism," Lawfare Project director Brooke Goldstein, attorney for plaintiffs on the

---

[5] Letter from DOE to Chancellor Drake, *supra*, at page 6; Letter from DOE to Carole E. Rossi, *supra,* at page 3; Letter from DOE to Chancellor Robert Birgeneau, *supra*, at page 3.

[6] *Plaintiffs in Felber v. Yudof case dismiss lawsuit*, Dan Mogulof in Berkeley News, July 12, 2012, available at http://news.berkeley.edu/2012/07/12/plaintiffs-in-felber-v-yudof-case-dismiss-lawsuit/

[7] *Standing Up for Jewish Students*, Kenneth Marcus, *Jerusalem Post* (September 9, 2013), available at http://www.jpost.com/Opinion/Op-Ed-Contributors/Standing-up-for-Jewish-students-325648

present case, called on supporters to "make the enemy pay." She disclosed that the group was preparing more Title VI complaints, naming SFSU and UC Irvine as targets, and that it and other groups were encouraging Jewish students to file police complaints against Palestine solidarity activists. Israeli Ambassador to the United Nations, Danny Danon, assured attendees at the same event that such efforts have the full support of the Israeli state.[8]

The current lawsuit is a continuation of the effort to chill campus speech through judicial and formal administrative complaints, along with a torrent of informal demands to campus officials that political activities supporting Palestinian human rights and highly critical of Israel be highly restricted if not banned altogether.

## CREDENTIALS OF AMICI CURIAE

**Daniel Boyarin** is the Taubman Professor of Talmudic Culture at UC Berkeley and chair of the Rhetoric Department there. He has written articles and chapters of books on the cultural history of Zionism. He taught for many years at Ben-Gurion and Bar-Ilan universities in Israel, where he was chair of the board of the Alternative Information Center, a resource for unbiased news on Israel/Palestine for journalists and parliamentarians. He is on the Academic Advisory Boards of both Jewish Voice for Peace[9] and Open Hillel.[10]

---

[8] *Israel lawfare group plans "massive punishments" for activists*, Ali Abunimah, Electronic Intifada (June 25, 2016), available at https://electronicintifada.net/blogs/ali-abunimah/israel-lawfare-group-plans-massive-punishments-activists.

[9] Jewish Voice for Peace is a national, grassroots organization with 65 chapters and 250,000 members and supporters, "inspired by Jewish tradition to work together for peace, social justice, equality, human rights, respect for international law and a U.S. foreign policy based on these ideals." JVP " opposes anti-Jewish, anti-Muslim, and anti-Arab bigotry and oppression … and seeks an end to the Israeli occupation of the West Bank, Gaza Strip, and East Jerusalem; security and self-determination for Israelis and Palestinians; a just solution for Palestinian refugees based on principles established in international law; an end to violence against civilians; and peace and

(continued . . .)

**Hasia Diner** is a professor at New York University, with a joint appointment in the NYU Department of History and the Skirball Department of Hebrew and Judaic Studies. An expert in the field of American Jewish history, she has written widely on various aspects of this subject. Her two most recent books, both published by Yale University Press, are *Roads Taken: The Great Jewish Migrations to the New World and The Peddlers Who Forged the Way* (2016); and *Julius Rosenwald: Repairing the World* (2017), which is part of the Jewish Lives Series of YUP. She has twice won the National Jewish Book Award and lectures widely around the United States and abroad.

**Marjorie N. Feld** earned her B.A. in history and Judaic studies at State University of New York at Binghamton in 1992 and her Ph.D. in history at Brandeis University in 2001. Her research interests lie in U.S. Jewish history and the intersection of American Jewish activism with global liberation and human rights movements. Her first book, *Lillian Wald: A Biography*, published in 2008 by University of North Carolina Press, won the Saul Viener Book Prize of the American Jewish Historical Society, an award presented biannually to an "outstanding book in American Jewish History." Her second book, *Nations Divided: American Jews and the Struggle Over Apartheid,* was published by Palgrave MacMillan in July 2014. Based on her research for this book, she has been cited in popular articles as an expert on contemporary Black/Jewish

---

(continued …)

justice for all peoples of the Middle East." See https://jewishvoiceforpeace.org/mission/. JVP published a collection of essays in its 2017 book, *On Antisemitism*. See http://onantisemitism.com/.

[10] Open Hillel formed as a national, multi-campus organization in 2014 to "promote pluralism and open discourse on Israel-Palestine in Jewish communities on campus and beyond. It aims to eliminate Hillel International's Standards of Partnership for Israel Activities (http://www.hillel.org/jewish/hillel-israel/hillel-israel-guidelines), which exclude individuals and groups from the Jewish community on campus on the basis of their views on Israel." See http://www.openhillel.org/about/

relations and on American Jewish anti-Zionism. She is a member of the Jewish Women's Archive Academic Advisory Council and the Academic Council of the American Jewish Historical Society, and is professor of History at Babson College in Massachusetts.

**Gil Hochberg** is Ransford Professor of Hebrew and Comparative Literature, and Middle East Studies at Columbia University. Her research focuses on the intersections among psychoanalysis, postcolonial theory, nationalism, gender and sexuality. Her first book, *In Spite of Partition: Jews, Arabs, and the Limits of Separatist Imagination* (Princeton University Press, 2007), examines the complex relationship between the signifiers "Arab" and "Jew" in contemporary Jewish and Arab literatures. Her most recent book, *Visual Occupations: Vision and Visibility in a Conflict Zone* (Duke University Press, 2015), is a study of the visual politics of the Israeli-Palestinian conflict.

**Ari Y. Kelman** is a social scientist with expertise in the sociology of American Jewry. Since 2012 he has held the Jim Joseph Professorship in Education and Jewish Studies at Stanford University's Graduate School of Education, where he is also serving as the interim director of the Taube Center for Jewish Studies. His research focuses on the intersection of education and religion, and he has written three books on the subject, with a fourth currently in press. He has published and presented widely, in both scholarly and popular contexts, on issues pertaining to education and American Jews, including higher education. Recently, he released the first

12

qualitative study of how Jewish students on college campuses understand and engage with the politics of the Israel-Palestine conflict on their campuses.[11]

**Chana Kronfeld** is an Israeli-American Professor of Hebrew, Yiddish and Comparative Literature at the University of California, Berkeley. Her book, *On the Margins of Modernism*, received the MLA Scaglione Prize for best book in Comparative Literary Studies and she is the author, most recently, of *The Full Severity of Compassion: The Poetry of Yehuda Amichai*. Kronfeld is the winner of the Israeli Akavyahu Lifetime Achievement Award for her research on Hebrew and Yiddish poetry.

**Charles H. Manekin** is a professor of philosophy at the University of Maryland, and until recently (2011-2017) director of the Joseph and Rebecca Meyerhoff Center of Jewish Studies. He specializes in the history of philosophy, specifically medieval Jewish and Islamic philosophy. He is also interested in the history of science among Muslims and Jews. He has written books on Gersonides and Maimonides and has edited a collection of articles on general and Jewish perspectives on freedom and moral responsibility. He has also edited and translated collections of Jewish philosophy for Routledge and Cambridge University Press. He received a National Endowment of the Humanities Collaboration Grant for translating and updating Moritz

---

[11] *Safe on the Sidelines: Jewish Students and the Israel-Palestine Conflict on Campus*, Ari Y. Kelman et al (September, 2017), available at https://stanford.app.box.com/v/SafeandontheSidelinesReport. The study surveys Jewish undergraduates at five California campuses, including SFSU. It finds the subjects overwhelmingly felt safe, had experienced little antisemitism and had no trouble differentiating it from political debate regarding Israel-Palestine, all contrary to the picture drawn by The Lawfare Project.

[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

Steinschneider's *The Hebrew Translations of the Middle Ages*, the first volume of which recently appeared.

Prof. **Benjamin Schreier** of Penn State University studies post-1900 American and Jewish American literature and culture. The major focus of his current research is an analysis of identity and intellectuality in literature and literary scholarship. He is the author of *The Impossible Jew: Identity and the Reconstruction of Jewish American Literature* (NYU Press, 2015) and *The Power of Negative Thinking: Cynicism and the History of Modern American Literature* (UVA Press, 2009). He has been the editor of Studies in American Jewish Literature, a journal published by Penn State Press.

**Joshua Schreier**, professor of history at Vassar College, works at the intersection of Middle Eastern, Algerian, Jewish and French histories. His research focuses on North African Jews in the first decades of the French occupation of Algeria, in the middle decades of the 19th century. He is interested in how the invasion affected local commercial networks and alliances, how the occupiers turned to local notables for help and expertise, and how pre-colonial elites continued to exercise influence under the new order. He also looks at how the French deployed the ideology of "civilization" to consolidate colonial rule, even while local actors co-opted, reformulated or deflected this ideology.

**Aaron J. Hahn Tapper**, the Mae and Benjamin Swig Professor in Jewish Studies at the University of San Francisco and founding Director of the Swig Program in Jewish Studies and Social Justice, has been at USF since 2007. An educator for more than two decades, his primary academic interest is the intersection among identity formation, social justice and marginalized groups. He is the director of USF's Center for Transformative Education, and he was a Fulbright Senior Scholar for the 2013-2014 academic year, which he spent conducting research on how

14

Aboriginal and Torres Strait Islanders (sometimes referred to as the "First Peoples" of Australia) received former Prime Minister Kevin Rudd's political apology, delivered in February 2008. He is currently writing a book on this research.

**Barry Trachtenberg** is a scholar of modern Jewish history and the Nazi Holocaust. Since July 2016, he has been employed as The Michael H. and Deborah K. Rubin Presidential Chair of Jewish History and Associate Professor at Wake Forest University in Winston-Salem, North Carolina, where he directs the interdisciplinary program in Jewish Studies. He also serves on the Board of Scholars of Facing History and Ourselves and on the Academic Council of the Holocaust Educational Foundation of Northwestern University. Prior to working at Wake Forest, he taught from 2003 to 2016 at the State University of New York at Albany, where he directed the programs in Judaic Studies and Hebrew Studies from 2010 to 2016. He is the author of two books, most recently *The United States and the Holocaust: Race, Refuge, Remembrance* (Bloomsbury, 2018), and various articles – both scholarly and popular – on many aspects of modern Jewish history and the Holocaust. For many years, he has taught academic courses and given community lectures on modern Jewish history, Zionism, Israel, antisemitism and the Nazi Holocaust. He is on the Academic Advisory Boards of both Jewish Voice for Peace and Open Hillel.

**Diane L. Wolf** is professor of sociology at UC Davis, where she recently stepped down from directing the Jewish Studies Program after 10 years. She is also an active member of the university's Human Rights Program. Her work focuses on trauma and memory as related to the post-Holocaust family dynamics of survivors and their offspring. She has written three books and edited two books. She is currently writing a book on *Recalibrating Post-Memory: Trauma and the Children of Holocaust Survivors*. She is on the Academic Advisory Board of Open Hillel.

Currently, she is a Visiting Senior Fellow at the Zentrum für Antisemitismusforshung (Center for the Study of Antisemitism) at the Technical University in Berlin until September 2018.

## ARGUMENT

**A. The exact nature and meaning of antisemitism are deeply contested among Jewish studies scholars. A judge should not create legal authority on an issue when even those most directly engaged in its study have no detailed consensus.**

Scholars of antisemitism have a variety of views regarding details beyond a short dictionary definition of the term: "Hostility toward or discrimination against Jews as a religious, ethnic, or racial group;"[12] or even the slightly longer opening line of what has become known as the "State Department definition of antisemitism (see discussion below): "[A] certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[13]

Historically, hatred of Jews goes back at least to the Middle Ages in Europe. The term "antisemitism," however, dates back only to the late 19th century and was first advanced as a means to insist upon the fundamental incompatibility of Jews with European society. Since that time, it has come to have a range of negative and often hurtful associations, from a relatively "mild" distaste for the imagined over-identification of Jews in certain areas of culture, politics and the economy, to viewing Jews as a biological threat to "white races." At other times, antisemitic characterizations have not been limited to Jews but have included non-Jewish people

---

[12] https://www.merriam-webster.com/dictionary/anti-Semitism

[13] https://www.state.gov/s/rga/resources/267538.htm

believed to have originated from the Middle East. Scholars frequently debate as to its causes, its

relationship to previous manifestations of anti-Jewish hatred, its impact on the lives of European

Jews at the time of its coining, its role in shaping Allied nation's refugee policies in the 1930s

and '40s, the extent to which it was a factor in the Nazi Holocaust, and whether there exists a

"new" antisemitism since the establishment of the state of Israel.[14]

The root of one major current debate on antisemitism lies in a seemingly intractable

problem of how to critique Jewish collective power in a way that does not immediately resonate

with a long history of antisemitism. Throughout the last thousand years of European history,

Jews were regularly characterized as an incommensurate and exceptionalist element who sought

to undermine the established religious, political and/or economic order. They were accused of

being killers of Christ and of seeking to repeat this offense through the murder of innocent

Christian children. Such accusations led at times to blood libels (the classic antisemitic allegation

that Jews used non-Jewish children's blood to make matza, the ritual flatbread of Passover) and

pogroms (violent and often deadly mob attacks on Jewish communities). In more recent

centuries, Jews have been characterized simultaneously as disloyal citizens, capitalist schemers

and revolutionary subversives. Such allegations have led to discriminatory legislation, riots,

---

[14] In the Library of Congress alone, there are over 5,000 books with word "antisemitism" in the title. According to the Online Computer Library Center, there are over 25,000. For a broad spectrum of authoritative recent viewpoints on the history and development of antisemitism, see Saul Friedländer, "Redemptive Anti-Semitism," in *Nazi Germany and the Jews: Volume 1: The Years of Persecution 1933-1939* (Harper Perennial, 1998); Albert S. Lindemann, *Esau's Tears: Modern Anti-Semitism and the Rise of the Jews* (Cambridge University Press, 2000); David Nirenberg, *Anti-Judaism: The Western Tradition,* (W. W. Norton, 2014); James Renton and Ben Gidley, eds., *Antisemitism and Islamophobia in Europe: A Shared Story?* (Palgrave Macmillan, 2017); Alvin H. Rosenfeld, ed. *Deciphering the New Antisemitism* (Indiana University Press, 2015); Frederick M. Schweitzer and Marvin Perry, *Anti-Semitism: Myth and Hate from Antiquity to the Present* (Palgrave Macmillan, 2005); Enzo Traverso, *The Origins of Nazi Violence* (New Press, 2003).

[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

expulsions and physical violence. In the early 20th century, Jews were branded as a biological/racial threat and entire armies rose up to exterminate them. In each of these moments, Jews were imagined as a united group that possessed power and authority far beyond their actual numbers.

Yet, in 1948, with the founding of Israel as a Jewish state, the calculus changed. For the first time, some Jews – identifying as a national group – gained actual, not imaginary, state power. The state of Israel has borders, police, courts, a military, a nuclear arsenal, political parties and a (mostly) representative and (somewhat) democratic system of government. Like all other states, its actions are – and must be permitted to be – a matter of public debate and discourse. But speech that is critical of Israel still strikes some as inherently antisemitic.

The problem, quite simply, is that it remains a challenge to criticize Israel's *actual* political power and its claim to represent Jews around the world in ways that do not, for some, echo much older, antisemitic depictions of *imaginary* Jewish power. This is not only on account of the long history of anti-Jewish hatred in the West. It is also because to characterize any speech critical of Israel as intrinsically antisemitic has been a highly effective tool employed by those who uncritically support any action of Israel and seek to stigmatize all critics.

It would be inappropriate for a federal judge to create legal authority on a definition of antisemitism that is so complex and deeply contested among Jewish studies scholars, both historically and in contemporary debates.

**B. The Lawfare complaint relies on the U.S. State Department definition of antisemitism, which is overly expansive as it characterizes criticism of the state of Israel and its supporters as antisemitic.**

Plaintiffs' case against San Francisco State University (SFSU) and Professor Rabab Abdulhadi cites as the definition of antisemitism not only the mostly unobjectionable opening

18

line of the U.S. State Department referenced above, but also a much more controversial litany of examples of what it says could constitute manifestations of antisemitism.[15] These include some appropriate examples of antisemitism, such as, "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion;"[16] "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews;"[17] and "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust."

Many of these examples, however, imply questionable and even disturbing implications about what does or does not constitute antisemitism and about the motivations of those who may be accused of it. Several of the examples can be easily read as inappropriately characterizing political (and therefore highly protected under the First Amendment) criticisms of the state of Israel and its supporters also as antisemitic. These include 1) "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations;" 2) "Drawing comparisons of contemporary Israeli policy to that of the Nazis;" and

---

[15] The State Department now cites a declaration promulgated in 2016 by the International Holocaust Remembrance Alliance (IHRA) in Bucharest: https://www.holocaustremembrance.com/sites/default/files/press_release_document_antisemitism.pdf

[16] Actually, plaintiffs' Second Amended Complaint misquotes the State Department, citing a previous version of its definition. The phrasing in paragraph 33, for instance, reads: "Calling for, aiding, or justifying the killing or harming of Jews (often in the name of a radical ideology or an extremist view of religion)." The previous version can be viewed at Defining Anti-Semitism, United States Department of State (Jan. 20, 2017), available at https://web.archive.org/web/20180117193205/https://www.state.gov/s/rga/resources/267538.htm

[17] Similarly, the plaintiffs quote the previous version of this example: "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, the state of Israel, or even for acts committed by non-Jews." *Id.*

3) "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a state of Israel is a racist endeavor."[18]

In the first of these examples, the State Department's definition posits as an example of antisemitism the accusation of greater loyalty to Israel or to "Jews" than to one's own nation of residence. While applying such an accusation sweepingly to Jews in general would clearly be a classic example of antisemitism because it would describe all Jews based on the actions of particular individuals, this claim could be seen as an accurate descriptor with regard to some supporters of Israel, who might proudly claim, following a core tenet of Zionism since its late 19th-century founding, that they are members of the "Jewish nation" first and foremost.

The second example is also misleading as it encompasses what in other contexts would clearly be classified as political speech criticizing the behavior or policies of a foreign government. For example, while we agree that using "classic" antisemitic symbols and images is inappropriate in any context (although not illegal), there is nothing *inherently* antisemitic about comparing actions of Israel to those of the Nazis, especially since "comparing" two things means analyzing both their similarities and their differences. In fact, comparisons of foreign leaders and countries to Nazism are made regularly. In April 2018, for example, former U.S. House Majority Leader Newt Gingrich compared tactics of the Federal Bureau of Investigation to the Nazi Gestapo.[19] In 2017, then-White House spokesperson Sean Spicer compared actions by Syrian President Bashar Assad to those of Hitler, stating (erroneously), "You know, you had someone

---

[18] Again, plaintiffs quote an even more objectionable, now deleted version: "Denying the Jewish people their right to self-determination, and denying Israel the right to exist." *Id.*

[19] *Newt Gingrich compares FBI raids of Trump associates to Stalin and the Gestapo*, Media Matters, April 11, 2018, available at https://www.mediamatters.org/video/2018/04/11/newt-gingrich-compares-fbi-raid-michael-cohen-stalin-and-gestapo/219908.

[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

as despicable as Hitler who didn't even sink to using chemical weapons."[20] **President George W.**

**Bush in 2002 compared Iraqi leader Saddam Hussein to Adolf Hitler.**[21] While these political

leaders were chastised by some major Jewish organizations for inappropriate comparisons, they

were not accused of antisemitism for making them.[22]

Given that comparisons of government policies and leaders to Nazism occur regularly,

across the political spectrum, the State Department's definition that declares comparing

"contemporary Israeli policy with that of the Nazis" creates a special realm for speech

concerning Jews and Israel. Contrary to the intention of the definition, such exceptions

potentially serve to reaffirm antisemitic claims that Jews are a fundamentally different people

and therefore need to have a special category of laws that apply only to them.

Even among Jews, one often hears Nazi-era imagery in accusations leveled against critics

of Israel. In April 2018, for example, Israeli Ambassador to Norway Raphael Schutz accused

Norwegians who are critical of Israel's policies of being descendants of Vidkun Quisling,

---

[20] *Sean Spicer Takes his Questionable Claims to a New Level in Hitler-Assad Comparison*, Washington Post, (April 11, 2017), available at https://www.washingtonpost.com/news/the-fix/wp/2017/04/11/sean-spicer-someone-as-despicable-as-hitler-didnt-even-sink-to-using-chemical-weapons/?utm_term=.f6976c3a1640.

[21] Anne Kornblut and Charles Sennott, *Saddam the new Hitler, Bush tells Europeans*, Sydney Morning Herald, Nov. 22, 2002, available at https://www.smh.com.au/articles/2002/11/21/1037697805270.html.

[22] See, e.g., Daniel J. Roth, *U.S. Jewish Groups Rebuke Newt Gingrich After Comparing FBI to Nazi Gestapo*, Jerusalem Post, April 13, 2018, available at https://www.jpost.com/American-Politics/US-Jewish-groups-rebuke-Newt-Gingrich-after-comparing-FBI-to-Nazi-Gestapo-549707.

Norway's infamous Nazi ally during World War II.[23] In the same month, Israeli Jewish activists compared Prime Minister Netanyahu's attempt to forcibly deport African migrants to Nazi actions against Jewish refugees.[24] See also the 2016 debate over the nomination of U.S. Ambassador to Israel David Friedman, who famously criticized even liberal supporters of Israel as being "worse than kapos" for not taking a sufficiently hard line in defense of the state.[25]

Finally, the third highlighted example, "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a state of Israel is a racist endeavor," ignores the facts that a) for many Jews critical of Israel now and since its founding, the state is decidedly *not* an expression of self-determination by or for Jews everywhere; and b) many Jews consider it as an ethical obligation to challenge the establishment of Israel as a Jewish state, since many of its laws discriminate against non-Jewish citizens.[26] Growing numbers of advocates for

---

[23] *Israeli Ambassador in Norway Compares Norwegian Critics to Nazi Allies*, The Nordic Page: Norway (April 4, 2018), available at https://www.tnp.no/norway/politics/israeli-ambassador-in-norway-compares-norwegian-critics-to-nazi-allies.

[24] *Israel Says it will Scrap Controversial Plan to Deport African Migrants*, France 24 (April 2, 2018), available at http://www.france24.com/en/20180402-israel-african-migrants-UN-deportation.

[25] *David Friedman, Trump's Ambassador to Israel, on the Issues*, New York Times (December 16, 2016), available at https://www.nytimes.com/interactive/2016/12/16/world/middleeast/David-Friedman-Israel-Palestinians-Trump-quotes.html.

[26] See the database of discriminatory laws maintained by Adalah, an Israeli civil and human rights legal organization: https://www.adalah.org/en/content/view/7771.

**[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS**
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

equal rights, including many U.S. Jews, reject the "existence" of a state that is predicated on the displacement and oppression of non-Jews within its borders.[27]

What matters most in such situations is context. Ignoring it subjects what should be protected speech to a high risk of unjustified censorship. It matters whether criticisms of Israel and its supporters are made at a rally advocating political change or as part of a meeting of a hate group advocating violence with anti-Jewish overtones. There is a difference between criticism directed against a state – even of its founding principles – and attacks on the entire people whom that state purports to represent. One can easily point, for example, to many instances – dating back at least a century – of Jews who have made forceful criticisms of Zionism and (since the state's founding in 1948) of Israel, even comparing them to Nazism. One famous example was Albert Einstein's letter published in the New York Times on December 4, 1948, comparing future Prime Minister Menachem Begin's Herut party, then competing in Israel's first parliamentary election, to "Nazi and Fascist parties."[28]

By including protected political speech regarding a state and its supporters in its definition of antisemitism, the State Department has advanced a viewpoint is that is both flawed and overly expansive. By relying upon the State Department definition, The Lawfare Project is improperly asking the court to redefine as antisemitic what are in fact protected instances of

---

[27] See, for example, Judith Butler, *Parting Ways: Jewishness and the Critique of Zionism* (Columbia University Press, 2012); Yitzhak Laor, *The Myths of Liberal Zionism* (Verso, 2010); and Jacqueline Rose, *The Question of Zion* (Princeton University Press, 2007).

[28] *This Day in Jewish History 1948: N.Y. Times Publishes Letter by Einstein, Other Jews Accusing Menachem Begin of Fascism*, Ha'aretz, December 4, 2014, available at https://www.haaretz.com/jewish/features/.premium-1.629813.

[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

speech and political protest against the policies of the state of Israel – and to open the door to unconstitutional suppression of such speech.

**C. The State Department definition has no place on campus as a speech code. Even the author of the definition opposes its application to campuses in the United States.**

Given the flaws in the State Department's definition of antisemitism, it must *not* form the basis for campus speech codes, let alone any legal sanction. Kenneth S. Stern, the author of a "Working Definition of Anti-Semitism" issued in 2005 by the European Monitoring Center on Racism and Xenophobia, upon which the IHRA's 2015 definition of antisemitism and the State Department's document are based, agrees. Addressing proposed federal legislation[29] that would adopt the State Department definition as broadly applied policy, Stern wrote in a December 2016 New York Times op-ed: "The worst remedy is to prohibit speech deemed offensive, disparaging or bigoted that would otherwise be protected by the First Amendment."[30] He further stated that the purpose of the definition he formulated was "intended for data collectors writing reports about anti-Semitism in Europe. It was never supposed to curtail speech on campus."

In July 2017, UC Academic Council chair Jim Chalfant and University Committee on Academic Freedom chair Hugh Roberts also both issued strongly worded letters opposing the proposed act, citing in particular the problematics of the State Department definition.[31]

---

[29] The Anti-Semitism Awareness Act, S 10 -- https://www.congress.gov/bill/114th-congress/senate-bill/10/text -- passed the U.S. Senate in December 2016 but was not taken up in the House. A hearing on its content was held in the House in 2017, but it has not been reintroduced.

[30] *Will Campus Criticism of Israel Violate Federal Law?* Kenneth Stern, New York Times (December 12, 2016), available at https://www.nytimes.com/2016/12/12/opinion/will-campus-criticism-of-israel-violate-federal-law.html.

[31] https://senate.universityofcalifornia.edu/_files/reports/JC-JN-anti-semitism-awareness-act.pdf

As academics with decades of teaching experience at the college level, we agree fully with them and with Stern, who stated in a letter to Congress that "antisemitism – like all forms of bigotry – has an impact on some campuses. The worst way to address it is to create a de facto hate speech code, which is what this bill proposes to do."[32]

Although discussions around Israel and Zionism may often be uncomfortable for their supporters and detractors alike (as we witness in our classes), it is the responsibility of students and educators to foster dialogue and not limit it, to understand the historical implications of our speech, and to allow for the meaning and definition of fraught terms to develop and change as a consequence of informed deliberation and debate.

## CONCLUSION

The attempt by The Lawfare Project to limit critical discourse on Israel and challenges of its supporters' views is detrimental to public debate. Ironically, it serves only to once again affirm the antisemitic belief that Jews are a fundamentally different people: that the Jewish state cannot be protested or objected to, that collective Jewish power cannot be analyzed or debated, or that Jews, because they were once victims of one of humanity's greatest genocidal crimes, are somehow immune from becoming perpetrators of acts of violence against other peoples.

Moreover, and perhaps most dangerously of all, attempts to broaden the definition of antisemitism to encompass phenomena that are clearly not anti-Jewish can only make it more difficult to recognize, isolate and oppose actual antisemitic hatred when it really does appear.

---

[32] Letter to Members of Congress, Kenneth Stern, Justus & Karin Rosenberg Foundation (Dec. 6, 2016), available at http://jkrfoundation.org/wp-content/uploads/2016/12/Stern-Letter-links-corrected.pdf.

[PROPOSED] BRIEF OF AMICI CURIAE JEWISH STUDIES SCHOLARS
*Mandel v. Board of Trustees*; United States District Court, Northern District of California, Case No. 3:17-cv-03511-WHO

1

2

       For the reasons discussed herein, we respectfully submit that this court should grant Defendant Rabab Abdulhadi's and the Board of Trustees of California State University, San Francisco State University's motions to dismiss and motions to strike the plaintiffs' referenced case.

Dated: May 18, 2018

Respectfully submitted,

 /s/ David L. Mandel_____

DAVID L. MANDEL

Attorney for Amici Curiae