1  Robb C. Adkins (SBN 194576)
   radkins@winston.com
2  Krista M. Enns (SBN 206430)
   kenns@winston.com
3  Seth Weisburst (SBN 259323)
   sweisburst@winston.com
4  WINSTON & STRAWN LLP
   101 California Street, 35th Floor
5  San Francisco, CA 94111-5840
   Telephone:   (415) 591-1000
6  Facsimile:   (415) 591-1400

7  Steffen N. Johnson (*pro hac vice*)
   sjohnson@winston.com
8  Lowell D. Jacobson (*pro hac vice*)
   ljacobson@winston.com
9  Adrianne Rosenbluth (*pro hac vice*)
   arosenbluth@winston.com
10 WINSTON & STRAWN LLP
   1700 K Street, N.W.
11 Washington, D.C. 20006-3817
   Telephone:   (202) 282-5000
12 Facsimile:   (202) 282-5100

13 Attorneys for Plaintiffs
   JACOB MANDEL, CHARLES VOLK,
14 LIAM KERN, SHACHAR BEN-DAVID,
   MICHAELA GERSHON, MASHA MERKULOVA,
15 and STEPHANIE ROSEKIND

Lawrence M. Hill (*pro hac vice*)
lhill@winston.com
Alexa Perlman (*pro hac vice*)
aperlman@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:   (212) 294-6700
Facsimile:   (212) 294-4700

Brooke Goldstein (*pro hac vice*)
brooke@thelawfareproject.org
Amanda Berman (*pro hac vice*)
amanda@thelawfareproject.org
THE LAWFARE PROJECT
633 Third Avenue, 21st Floor
New York, NY 10017
Telephone:   (212) 339-6995

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

17 | JACOB MANDEL, CHARLES VOLK, LIAM
18 | KERN, SHACHAR BEN-DAVID, MICHAELA
   | GERSHON, MASHA MERKULOVA, and
19 | STEPHANIE ROSEKIND,
20 |                Plaintiffs,
21 |        v.
22 | BOARD OF TRUSTEES of the CALIFORNIA
   | STATE UNIVERSITY, SAN FRANCISCO
23 | STATE UNIVERSITY, RABAB ABDULHADI,
   | in her individual capacity, and LESLIE WONG,
24 | MARY ANN BEGLEY, LUOLUO HONG,
   | LAWRENCE BIRELLO, REGINALD
25 | PARSON, OSVALDO DEL VALLE, KENNETH
   | MONTEIRO, RABAB ABDULHADI, BRIAN
26 | STUART, and MARK JARAMILLA, in their
   | official and individual capacities,
27 |                Defendants.

**Case No. 3:17-CV-03511-WHO**

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF 42 U.S.C. § 1983, TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, RECORDS PURSUANT TO CAL. GOVT. CODE § 6250 ET SEQ., AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

# **TABLE OF CONTENTS**

**Page**

BACKGROUND AND SUMMARY OF THE ACTION ............................................................. 1

JURISDICTION .................................................................................................................... 2

VENUE ................................................................................................................................. 2

THE PARTIES ...................................................................................................................... 2

FACTUAL BACKGROUND ................................................................................................ 4

    DEFINITION OF ANTI-SEMITISM ...................................................................... 4

ALLEGATIONS ................................................................................................................... 6

    SFSU'S CULTURE OF ANTI-SEMITISM AND DISCRIMINATION AGAINST
    JEWS AND ISRAELIS.............................................................................................. 6

    HILLEL'S HOSTING OF MAYOR BARKAT WAS SHUNTED TO AN OBSCURE
    FOR-FEE LOCATION ON THE OUTSKIRTS OF CAMPUS BASED ON THE
    APPLICATION OF AN UNWRITTEN, UNANNOUNCED, ARBITRARY POLICY
    RELATING TO "CONTROVERSIAL" SPEAKERS ............................................. 10

    THE UNIVERSITY'S DIRECT ROLE IN SILENCING MAYOR BARKAT'S
    PLANNED SPEECH ................................................................................................ 13

    SFSU'S DEFICIENT RESPONSE TO THE SHUTDOWN OF THE BARKAT
    EVENT CONTRIBUTED TO THE ONGOING PERVASIVELY HOSTILE
    ENVIRONMENT DEPRIVING PLAINTIFFS MANDEL, VOLK, AND KERN
    OF FULL AND EQUAL EDUCATIONAL ACCESS, WHICH CONTINUED
    UNABATED ............................................................................................................. 18

    THE INTENTIONAL AND DISCRIMINATORY EXCLUSION OF HILLEL FROM
    THE "KNOW YOUR RIGHTS" FAIR ................................................................... 25

FIRST CAUSE OF ACTION .............................................................................................. 34

SECOND CAUSE OF ACTION .......................................................................................... 36

THIRD CAUSE OF ACTION ............................................................................................. 37

FOURTH CAUSE OF ACTION .......................................................................................... 39

FIFTH CAUSE OF ACTION .............................................................................................. 40

SIXTH CAUSE OF ACTION.............................................................................................. 42

SEVENTH CAUSE OF ACTION ................................................................. 44

EIGHTH CAUSE OF ACTION ................................................................... 45

NINTH CAUSE OF ACTION ..................................................................... 47

REQUEST FOR RELIEF ............................................................................ 48

DEMAND FOR JURY TRIAL..................................................................... 50

Jacob Mandel, Charles Volk, Liam Kern, Shachar Ben-David, Michaela Gershon, Masha Merkulova, and Stephanie Rosekind ("Plaintiffs"), by and through their attorneys, allege upon knowledge as to themselves and their own conduct, and otherwise upon information and belief, including based on investigation of counsel, the facts stated in the public record, press releases, media reports and articles, as follows:

## BACKGROUND AND SUMMARY OF THE ACTION

1.    San Francisco State University ("SFSU" or "the University") is largely recognized as being among the most anti-Semitic campuses in the country. As recently as December 2016, SFSU was ranked among the top 10 worst campuses for Jewish students in North America.[1]

2.    Plaintiffs bring this action against Defendants Leslie Wong, Mary Ann Begley, Luoluo Hong, Lawrence Birello, Reginald Parson, Osvaldo del Valle, Kenneth Monteiro, Rabab Abdulhadi, Brian Stuart, and Mark Jaramilla, (collectively the "Defendant Individuals"),[2] and Defendants Board of Trustees of the California State University ("CSU"), and San Francisco State University ("SFSU"), to hold Defendants accountable for their violations of Plaintiffs' civil rights and bring about the necessary systemic changes to prevent these problems in the future.

3.    SFSU has fostered and sanctioned anti-Semitism and discrimination against Jews and Israelis from the highest levels, and has been deliberately indifferent to every warning sign, report of anti-Semitism, news article documenting anti-Semitism, concern of Jewish community members, conclusions of its own investigative reports, and explicit threats against Jewish and Israeli students and community members, including Plaintiffs.

4.    **President Wong** has acknowledged the existence of a pervasively hostile environment for Jewish and Israeli students on numerous occasions over the last several years. He has taken no affirmative steps to protect the victims despite more than a dozen promises to do so. Wong's policy of deliberate indifference has affirmed the actions of hostile, aggressive, and disruptive students to continue targeting Jewish and Israeli students, including Plaintiffs Ben-David,

---

[1] See https://www.algemeiner.com/the-40-worst-colleges-for-jewish-students-2016/.
[2] Other than Defendant Abdulhadi, who is only being sued in her individual capacity, each of the Defendant Individuals is named in their official and individual capacities.

SECOND AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

Mandel, Volk, Kern, and Gershon ("Student Plaintiffs"), whom the University promised to provide a safe learning environment the moment it admitted them.

## JURISDICTION

5. This Court has subject matter jurisdiction over the entire action pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (a)(4), as Plaintiffs bring claims under the First and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), and pursuant to 28 U.S.C. § 1367(a), as Plaintiffs' California Public Records Act Claim under Cal. Govt. Code § 6250 et seq. is so related to their § 1983 claims concerning exclusion of Hillel from the "Know Your Rights" fair such that it forms part of the same case or controversy.

6. The Court has personal jurisdiction over the Defendant Individuals because, upon information and belief, each of the Defendant Individuals either resides in the Northern District of California or has sufficient contacts with the Northern District of California due to their employment or relation to SFSU to establish this Court's jurisdiction over them. The Court has personal jurisdiction over Defendants CSU and SFSU because they are based in and operate in California.

7. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

8. This Court has jurisdiction to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## VENUE

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims for relief stated in this Complaint occurred in this District, and because Defendants are subject to personal jurisdiction in this District or may be found in this District.

## THE PARTIES

10. Plaintiff Jacob Mandel is a Jewish SFSU alumnus with Israeli ancestry, the former student President of Hillel at SFSU, and was a registered student at SFSU from August 2013 through December 2016, graduating in January 2017.

11.     Plaintiff Charles Volk is Jewish and was a registered student at SFSU from August 2013 to May 2017.

12.     Plaintiff Liam Kern is a Jewish student at SFSU, who has been registered at SFSU from August 2015 through the present time.

13.     Plaintiff Michaela Gershon is a Jewish SFSU student with Israeli ancestry who has been registered at SFSU from August 2016 through the present time.

14.     Plaintiff Shachar Ben-David is a Jewish and Israeli alumna of SFSU who was enrolled as a student at SFSU beginning in Fall 2012 and graduated following spring semester 2014.

15.     Plaintiffs Masha Merkulova is a Jewish member of the community who came to SFSU with her son on April 6, 2016 to hear Mayor Barkat's speech.

16.     Plaintiff Stephanie Rosekind is a Jewish member of the community who came to SFSU on April 6, 2016 to hear Mayor Barkat's speech.

17.     Plaintiffs Mandel, Volk, and Kern also attended the Barkat event.

18.     Plaintiffs Mandel, Volk, Kern and Gershon ("KYRF Plaintiffs") would have attended the "Know Your Rights" fair had Hillel not been excluded from participating.

19.     Plaintiffs Mandel, Volk, Kern, Ben-David, and Gershon ("Title VI Jewish Plaintiffs") have all experienced the hostile educational environment at SFSU towards Jews, and have been deprived of equal access to educational opportunities or benefits compared to similarly-situated students who are not Jewish.

20.     Plaintiffs Mandel, Ben-David, and Gershon ("Title VI Israeli Plaintiffs") have all experienced the hostile educational environment at SFSU toward Israelis, and have been deprived of equal access to educational opportunities or benefits compared to similarly-situated students who are not of Israeli national origin and/or ancestry.

21.     Defendant Board of Trustees of the California State University adopts regulations and policies governing the entire CSU system, including SFSU; its committees control educational policy, finance, campus planning, facilities, and other areas for the CSU system, including SFSU.

22.     Defendant SFSU is a state university located in San Francisco, California. SFSU is

3

part of the CSU system.

23.    Defendant Mary Ann Begley is SFSU's Interim Associate Vice President and Dean of Students.

24.    Defendant Leslie Wong is the President of SFSU.

25.    Defendant Luoluo Hong is SFSU's Vice President for Student Affairs & Enrollment Management, Title IX Coordinator & DHR Administrator.

26.    Defendant Lawrence Birello is SFSU's Student Organization Coordinator.[3]

27.    Defendant Reginald Parson is currently SFSU's Deputy Chief of Police, but served as Chief of Police during the Mayor Barkat event on April 6, 2016.

28.    Defendant Osvaldo del Valle is SFSU's former Assistant Dean of Students & Director of Student Conduct.

29.    Defendant Rabab Abdulhadi is a professor within SFSU's College of Ethnic Studies ("COES"), the faculty advisor for the General Union of Palestine Students ("GUPS"), and Senior Scholar for Arab and Muslim Ethnicities and Diasporas Studies ("AMED").

30.    Defendant Kenneth Monteiro is SFSU's Dean of COES.

31.    Defendant Brian Stuart is SFSU's Assistant Dean of Students & Director, New Student Programs.

32.    Defendant Mark Jaramilla is SFSU's Coordinator, Meeting & Events Services.

## FACTUAL BACKGROUND

### Definition of Anti-Semitism

33.    The U.S. State Department has adopted the following non-legally binding working definition of anti-Semitism by the International Holocaust Remembrance Alliance ("IHRA")[4]: "Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish

---

[3] As Student Organization Coordinator, **Defendant Birello**'s responsibilities include management of student organization events such as Mayor Barkat's speech and the "Know Your Rights" fair. SFSU's website directs questions regarding orientation sessions for student organizations, reserving space on campus, completing event applications, or securing tabling permits to Mr. Birello.

[4] Available at https://www.state.gov/s/rga/resources/267538.htm (visited May 30, 2018).

individuals and/or their property, toward Jewish community institutions and religious facilities." According to the IHRA definition (reproduced on the U.S. State Department's website), the following examples may serve as illustrations:

> "Manifestations [of anti-Semitism] might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for 'why things go wrong.' It is expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits.  Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:

- Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.

- Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

- Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.

- Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust).

- Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.
- Holding Jews collectively responsible for actions of the state of Israel.

**Antisemitic acts are criminal** when they are so defined by law (for example, denial of the Holocaust or distribution of antisemitic materials in some countries).

**Criminal acts are antisemitic** when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews.

**Antisemitic discrimination** is the denial to Jews of opportunities or services available to others and is illegal in many countries."

34.    Hillel is an SFSU recognized student group, and has been an SFSU-recognized student group at all times relevant to this Complaint.[5] Hillel is the only Jewish organization that represents all Jews on campus *as Jews*, regardless of political ideology, gender, national origin, or any other characteristic. Student Plaintiffs were each members of Hillel while enrolled at SFSU and attended numerous Hillel events.

## **ALLEGATIONS**

### **SFSU'S CLIMATE OF ANTI-SEMITISM DISCRIMINATES AGAINST JEWS & ISRAELIS**

35.    SFSU's long-engrained history of fomenting anti-Jewish and anti-Israeli animus on campus includes an equally long list of anti-Semitic and/or anti-Israeli speakers, at events sponsored, funded, promoted, and celebrated by the University and its administrators and faculty.

36.    GUPS and individuals and organizations GUPS hosts on campus support the anti-Semitic "BDS" movement which calls for the boycott, divestment, and sanctions against Israel, and for targeted economic discrimination against Israeli Jews, aiming to isolate, delegitimize and ultimately bankrupt the Jewish state and economically marginalize Jewish people.  The "anti-normalization" mandate of the BDS movement requires that activists disrupt, isolate, and silence all opposing viewpoints, even moderate opinions such as those acknowledging Israel's actual existence, right to existence, or advocating for a peaceful two-state solution to the Arab/Israeli conflict.

---

[5] The SFSU Student Organization Directory is available at http://www.sfsu.edu/~sicc/organizationdirectory.html.

37.     **Defendant Abdulhadi**, GUPS's faculty advisor and a co-founder of the U.S. Campaign for the Academic and Cultural Boycott of Israel,[6] subscribes to the anti-normalization mandate of the BDS movement, which *requires* the disruption and silencing of divergent viewpoints relating to the Israeli-Palestinian conflict, based on the theory that the very process of an open dialogue should be resisted because it would "normalize" Israel's existence.

38.     **Defendants Monteiro** (the Dean of COES) and **Abdulhadi** actively and regularly spearhead on-campus programming advocating for the elimination of the Jewish state and the application of the anti-normalization mandate of BDS as official policy of AMED and COES.

39.     The adoption of a policy of anti-normalization within their academic programs and departments mandates these state actor Defendants to engage in and support efforts to disrupt speech and gatherings in support of Jewish sovereignty and bar Israelis, Zionists, and anyone who *acknowledges Israel's actual existence* from publicly expressing themselves.   This anti-normalization policy, which is fundamentally contrary to the First Amendment, contributes to a pervasively hostile environment for Jews and Israelis on campus, and violates the civil rights of Jews and Israelis on campus, including Student Plaintiffs.

40.     Consistent with this policy, GUPS, AMED, and COES have sponsored and continue to sponsor numerous on-campus events where it is stated that the "Zionist Jew" is not welcome on campus, that SFSU is a "Zionist-free campus," and that they will take steps to ensure that SFSU remains free of "Zionist Jews."

41.     During a November 7, 2013 rally on campus, GUPS organizers handed out stencils so people could paint placards saying "My heroes have always killed colonizers," and images of notorious Palestinian terrorist and two-time plane hijacker, Leila Khaled, carrying a machine gun, with the declaration "Resistance is not Terrorism."

42.     That same message, "My Heroes Have Always Killed Colonizers," was written in chalk on the stage on Malcolm X Plaza in a "State of Emergency" rally held on December 5, 2013.

---

[6] See http://www.usacbi.org/advisory-board/ (visited March 29, 2017). USCBI's website offers "guidelines" for its "academic boycott," recommending that its supporters "work towards the cancellation or annulment of events, activities, agreements, or projects . . . [that] promote the normalization of Israel in the global academy . . . ."

43.     Afterward, on December 6, 2013, **President Wong** issued a statement saying he was "deeply disturbed" and "dismayed by the glorification of violence" in the message—although the statement did not even identify GUPS and failed to promise any action to protect Jewish and Israeli students who reasonably felt threatened. Despite the actual threats of killing, and **Wong**'s clear recognition that these statements reflected anti-Semitism, Wong *retracted* his condemnation of the incident after GUPS and AMED expressed outrage over even that general criticism.

44.     The President of GUPS at the time, Mohammad Hammad, also posted a statement on Tumblr after the rally, affirming that the "colonizers" being referred to were "Israelis" and his "only regret" being that "not all colonizers [Israelis] were killed."

45.     Hammad repeatedly posted his fantasies about stabbing and killing Israelis and Israel supporters (i.e., Jews) on social media websites. Alarmingly, one of Hammad's posts was a picture of himself brandishing a large knife with a caption that read (emphasis added):

> I seriously can not [*sic.*] get over how much I love this blade. It is the sharpest thing I own and cuts through everything like butter and **just holding it makes me want to stab an Israeli soldier.**

Posting his deep-seated desire to kill IDF soldiers as well as anyone he perceives as supporting them (which by definition includes **Plaintiff Ben-David**), Hammad wrote (emphasis added):

> I'm sitting here looking through pictures of that f—ing scum [female Israeli soldier Nofar Mizrahi] … Anyone who thinks there can be peace with animals like this is absolutely delusional, and **the only 'peace' I'm interested in is the head of this f—ing scum on a plate, as well as the heads of all others like her, and all others who support the IDF**. The Liberation of Palestine can only come through the destruction and decimation of this Israeli plague and it can't possibly come soon enough.

46.     SFSU administrators including **Defendant Wong** were aware of Hammad's lurid and violent postings by December 2013, but took no concrete action in response.

47.     In her International Relations class with Hammad, Israeli **Plaintiff Ben-David** had openly and repeatedly spoken about her military service and her support for Israel. After **Ms. Ben-David** realized that her classmate was the same person making these notorious threats, she emailed Professor Monshipour: "I feel threatened by his presence and feel that his actions have truly created a hostile environment, in which I am seriously concerned for my personal safety." Because of this legitimate fear for her personal safety in the academic environment, sanctioned by SFSU, **Ben-**

8

**David** was removed from the class's final exam location and placed in a separate room to take the final exam, disrupting her education and ostracizing her from her classmates.

48.    **Plaintiff Ben-David** also went to Dean Greenwell, then-Dean of Students, to discuss how to deal with these violent threats by Hammad, which Ms. Ben-David reasonably felt were directed at her. She told Greenwell, "I also strongly believe that as a student, I should not be subject to such hostility and real intimidation on such a constant basis, let alone during this final exam." Greenwell offered a psychological referral and a campus security escort if she felt unsafe, but refused to do anything to actually address the problem itself—Hammad and his violent threats. Ms. Ben-David made sure that someone knew where she was at all times during finals week, and  walked on campus with a Campus Police security escort.

49.    Robert Nava, SFSU's Vice President for University Advancement, reported to the *Jewish Press* in 2014—two months after being on notice of the threats, with no steps having been taken to protect or reassure Jewish and Israeli students, including Plaintiffs, of their safety—that Hammad was "no longer a student on campus," and no longer in student housing or enrolled at SFSU. However, Hammad either remained or shortly thereafter became once again a registered student at the University and was *surreptitiously permitted back on campus* to complete his degree and receive his diploma—without any warning, let alone implementation of any measures of protection, to Jewish or Israeli students, including **Ben-David.**  When he was seen on campus by terrified Jewish and Israeli students, they felt even more vulnerable knowing that the school had permitted him to return despite their explicit knowledge of the threat he presented to their lives.

50.    On September 30, 2015, SFSU hosted notorious Palestinian polemicist Bassem Tamimi in an event sponsored by GUPS and AMED.[7]  In direct contrast to SFSU's practice

---

[7] Numerous members of the Tamimi family have been imprisoned for the murder of Jews, Americans and Israelis, including Bassem's cousin Ahlam Tamimi for participating in the heinous 2001 Sbarro suicide bombing.    While on his nationwide speaking tour, Tamimi reposted on Facebook modern variants of the vile anti-Semitic "blood libel," alleging that Israelis arrest Palestinian children to steal their organs, which is covered up by the "Zionist" i.e., "Jewish-controlled" media. Although the views and actions of Bassem Tamimi and his family are abhorrent to Plaintiffs and many other members of the SFSU community, and although they have for years presented a literal threat to the physical safety of Jews and Israelis around the world—and are

regarding expression by Jews, neither Tamimi nor any other "controversial" speakers hosted by GUPS, AMED, or COES were banished to for-fee locations on the outskirts of campus on the basis of either perceived "controversy" of the events, their content, or any worries about protest activity.

51.      Despite GUPS's proactive and constant posturing as a group dedicated to silencing and standing against the campus Jewish community, and its student president's disturbing, explicit, and frequent threats of violence, **President Wong** directly contributes to the pervasively hostile environment for Jews on campus at SFSU by *praising* and *encouraging* the group and its behavior, which includes its commitment to effectuation of anti-normalization, as mandated by **Dr. Abdulhadi**. As one example, in April 2015, President Wong addressed AMED and GUPS, saying:

> I want to offer my personal congratulations to the student leadership of GUPS. They have been an inspiration for me. And they have helped me when I have to tell other community groups to mind their own business. **GUPS is the very purpose of this great university.**

The "other community groups" was an obvious reference to Jewish organizations including Hillel, Federation, ADL and JCRC, who have been actively working for years with Jewish students to help them address SFSU's discrimination and unequal treatment against them and to protect their rights and physical safety on SFSU's campus.

### Hillel's Hosting of Mayor Barkat Was Shunted to an Obscure For-Fee Location on the Outskirts of Campus Based on the Application of an Unwritten, Unannounced, Arbitrary Policy Relating to "Controversial" Speakers

52.      Beginning the morning of March 28, 2016, Hillel arranged for Nir Barkat, the Mayor of Jerusalem, to speak at the University on April 6, 2016, with nine days to plan. The event was titled: "Jerusalem Mayor Nir Barkat: How is a Visionary From the High-Tech Sector Leading a Diverse and Scrutinized City?"

53.      Defendants were aware that certain individuals would try to disrupt and shut down the event. On March 29, 2016, Oliver Benn, Hillel Director, emailed **Defendants Parson, Hong, Begley**, and Hillel Assistant Director Rachel Nilson, saying (emphases added):

> I think the main thing is to make sure that the **Dean [Begley]**/campus police [led by

directly responsible for the murder of dozens—SFSU's Jewish and Israeli community members did not attempt to disrupt the event or silence the speaker.

SECOND AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO

**Defendant Parson**] have a really seriously thought out protocol in place for: 1) if people try to block access to wherever the event will be held**; 2) If people disrupt the event in an organized way either briefly or to try to cancel it**…**#2 is quite likely based on past GUPS actions...**"

54.    **Plaintiff Mandel**, as Campus Engagement Intern and Hillel Student President, organized the permits to attempt to secure a room, first in Jack Adams Hall in the Cesar Chavez Student Center (CCSC) in the heart of the campus—but was told it was unavailable.  Then, Hillel received confirmation from **Defendant Birello** that the event had been assigned to a different room in CCSC, Rosa Parks A-C.  Hillel received numerous confirmations (including from **Defendant Birello)** of the availability of a room in CCSC and approving Mayor Barkat's speech "as an authorized organization/member event" in that location.  **Defendants Begley, Stuart, and Birello** were informed via email that Hillel had "acquired one of the Rosa Parks rooms for their event," and the director of Associated Students, Aimee Barnes, stated that she saw "no indication of a conflict."

55.    Ms. Nilson communicated with Dave Rodriguez from SFSU's University Police Department (UPD), who told her they expected protesters,[8] and they would erect barriers and a designated protest area (which police called a "free speech zone") outside Seven Hills. In setting up a "free speech zone" for lawful protest *outside* the event room, administrators and UPD recognized that any actual disruption *inside*—especially one in clear violation of SFSU's time, place, and manner policies that continued the entire time allotted for the event—did not constitute free speech.

56.    This expectation of a protest is what drove the determination by **Defendants Begley, Hong, and Jaramilla,** acceded to by **Defendants Stuart, Birello, and Wong** (collectively, "**Barkat Removal Defendants**"), that the event was "controversial."

57.    On March 29, **Defendant Begley** emailed **Defendants Hong, Stuart, and Parson**:

Lee, from Student Activities and Events, just made Brian Stuart and me aware of a classroom request for a student org event that will likely **feature a controversial speaker and may draw protest activity**. Hillel is the event sponsor. The proposed speaker is the Mayor of Jerusalem … **If this may draw protest activity, I'm concerned about**

---

[8] The report summarizing SFSU's commissioned investigation faulted Student Affairs, run by **Defendant Hong**, for failing to adequately prepare for the Mayor Barkat event. With more than a full week to prepare, the university knew and should have known that an attempt by GUPS to disrupt the event—likely in an unlawful way—was a near-certain eventuality.

11

**reserving classroom space during the middle of the day. We may direct them to Seven Hills or another location that would have less impact on classes in the area.**

58.     **Defendant Hong** told **Defendant Wong** her desire that the Barkat event not occur, preferring that the event go "along to another venue" because of her worries about "powder kegs all over campus in search of a lit fuse." **Hong** also emailed **Defendants Begley and Parson** saying

> [M]y preference is that we defer until later and if they can, wish them well in finding another location. However, if we are stuck, then I would actually prefer anything away from CCSC. . . . If there is any incident, we are going to so regret we agreed to do this.

59.     On March 31, **President Wong** lamented in an email to **Defendant Hong** that the event was occurring at all: "From where I sit, there may be no options for us."

60.     When it became apparent that Defendant administrators, including **President Wong**, were actively seeking a way to stop the event from happening, **Defendants Begley, Hong, Stuart, Birello, and Jaramilla** collectively applied an unwritten, unannounced, never-before-enforced and entirely discretionary, standardless policy of moving "controversial speakers" away from CCSC and to a remote and poorly-known location. While any room in CCSC would have been free of charge, Defendants forced Hillel to host the event at Seven Hills, a for-fee conference center located in the outskirts of campus. **Defendant Wong** knew of, acquiesced in, and ratified the execution and application of this discriminatory policy.

61.     A Hillel student reported to Hillel Assistant Director Rachel Nilson that "Mark [Jaramilla] from Associated Students/CCSC [told the student] to tell Hillel that the [CCSC] room was unavailable **to us [Hillel]**"; and an hour later, **Defendant Jaramilla** wrote to **Birello** that a conflict had arisen and he could "no longer host this [Barkat] event." **Begley** then wrote to the group: "Rosa Parks A-C is in fact NOT available on April 6th and no other spaces are open in the CCSC that day. The only other option **under consideration** right now is Seven Hills."[9]

62.     Ultimately, Seven Hills was confirmed for the Barkat event. In order to hold the room, **Plaintiff Mandel** delivered a check from Hillel for $356.50 to the office manager of Seven Hills. Most SFSU students Mr. Mandel spoke with had no idea where Seven Hills was located, and

---

[9] Troublingly, Begley did not even want to offer Seven Hills for the event, emailing Defendant Birello and others on March 30, 2016, that "the big room is available in Seven Hills but one of the smaller rooms is being used by a paying client. I'm reluctant to put this event in there as a result."

forcing this event to occur in a largely unknown and inconvenient location had the effect of decreasing the number of individuals who attended. SFSU's delay in confirming the location had a significant impact on Hillel's ability to publicize the event, which directly hampered attendance.

63.     The "controversial" nature of this event was never communicated to Hillel; instead, Hillel members and staffers were falsely told that there was no space available in the CCSC. The determinations of who is "controversial" according to this "policy" were left solely to the arbitrary discretion of the **Barkat Removal Defendants**, who did not explain the *ad hoc* discriminatory "policy" to Hillel. No one—either internally within the administration, or externally to anyone affiliated with Hillel—explained the baseline by which Mayor Barkat was determined to be "controversial" or the criteria used to determine whether other speakers/events would satisfy such a standard. Nor did they identify any speaker or events in the past that were deemed "controversial."

64.     A policy is on its face unconstitutional if it gives unchecked discretion to a state actor to decide what is "controversial". This policy was also clearly applied to target speech based on content. The determination by **Defendants Hong and Begley** that the Mayor Barkat event was "controversial" was not based on the logistical impact on classes of **an** event occurring in **that** location at **that** time, but on the view that certain individuals and groups on campus would *consider* the content provocative and shut it down through actions that might also disrupt academic activity.

65.     Defendants' application of this "controversial speaker policy" was motivated not by the logistics of the Mayor's speech but instead over concerns about the effects of protest activity—making it an impermissible accession to the heckler's veto in violation of the First Amendment rights of **Plaintiffs Mandel, Volk, and Kern** (collectively, "**Barkat Removal Plaintiffs**").

**The University's Direct Role in Silencing Mayor Barkat's Planned Speech**

66.     Ms. Nilson emailed **Defendant Begley** to ask what types of disruptions inside the facility would trigger a disruptor being ejected. **Begley** did not respond.

67.     On April 4, 2016, **Defendant Parson** emailed **Defendants Hong and Begley** directing that any "protest" should be occurring exclusively outside of the room where the event was taking place, so that the protest would not disrupt—or completely shut down—the lawful assembly.

"Preemptively," he emailed **Defendants Hong and Begley**, "we can consider having a counter-protest area (near Seven Hills) so people who are against the event can assemble. We can pre-stage the barricades…This would allow us to have an area to direct people to, if they choose to protest the event." He continued: "If there's a disruption, we will need a Citizen's Arrest form completed and signed by someone from Hillel to remove people from the event."

68.     On the day of the Barkat event, **Plaintiffs Mandel, Volk, Kern, Merkulova and Rosekind** (collectively, "**Barkat Shutdown Plaintiffs**") each arrived at Seven Hills before the event began. Approximately 30 individuals (mostly members of GUPS and their allies from COES) began filing into Seven Hills a few minutes after the Mayor's arrival and sat together.

69.     Shortly after Mayor Barkat began his speech, GUPS President Lubna Morrar and Vice President Linda Ereikat sat down next to each other. At some point, Morrar gave a signal to Ereikat, and they began leading the entire group in the loud shouting of antagonizing and threatening phrases, through sound amplification devices that were proscribed by the Student Code of Conduct, such as "Get the fuck off our campus," "We don't want you on our campus," "Long live the Intifada! Intifada, Intifada!," and more. These chants were directed at Mayor Barkat, Plaintiffs, and the other students and audience members who came to hear Mayor Barkat speak, with the intent to and effect of preventing him from communicating with the non-disrupting attendees who came to listen to him—and who had a First Amendment right both to listen and to assemble.

70.     **Defendant Abdulhadi** is GUPS's faculty advisor and a mentor to its members, and had a particularly close relationship with GUPS then- President and Vice President, Linda Ereikat and Lubna Morrar. On information and belief, in her capacity as GUPS's faculty advisor, **Dr. Abdulhadi** mandated that the group and all of its members implement anti-normalization at every opportunity on campus, including, explicitly, during Hillel's event featuring the Jerusalem Mayor. Consistent with this mandate, Ereikat and Morrar, along with the other GUPS members, who were also mentees of Dr. Abdulhadi, worked to disrupt and shut down the Barkat event.

71.     The Mayor stopped speaking as he could not be heard. He gestured to those who were trying to hear him, including Plaintiffs, to form a huddle around him so he could try and speak above

the amplified shouting of the disruptive students. **Barkat Shutdown Plaintiffs** still could not hear what he was saying, even though they were all in a circle no more than a few feet away from him.

72.    An investigation of the Mayor Barkat event commissioned by SFSU concluded that the group's use of amplified sound violated school policy, and that it disrupted the event, which expressly violated University policies (Sections IV.C. and VI of SFSU's University Executive Directive #89-13: Time, Place, and Manner: Use of Buildings and Grounds, in addition to several broader policies the group violated from SFSU's Code of Student Conduct).   This indisputable violation of both the SFSU Code of Student Conduct and/or the Seven Hills Conference Center rules has been acknowledged by **Defendants Wong, Begley, Parson, Stuart, Birello, and del Valle**.

73.    **Defendants Wong, Begley, Parson, Hong, Stuart, and del Valle**, along with other administrators, have also conceded several other apparent violations of SFSU's Code of Student Conduct, state civil and criminal law, and federal law by the disruptors during the event:

> **Defendant Wong** emailed the SFSU community the day after the event: "[T]he Mayor's talk, held at Seven Hills, was disrupted…Members of our community who attended the event were deprived of an opportunity to hear from the mayor."

> **Defendant Begley**, in a timeline written on or about April 15, 2016, concluded that the disrupting students violated campus policies at the Mayor Barkat event. In her April 26, 2016 narrative of the event, **Begley** wrote, "**based on my observation, members of GUPS participated in behavior that was in violation of campus policies.** They are as follows":
> Violation of the Time, Place, and Manner Policy: Employing unauthorized sound amplification
> Violations of the Student Code of Conduct (EO 1098):
> - Willful, material and substantial disruption or obstruction of a University-related activity, or any on-campus activity.
> - Participating in an activity that substantially and materially disrupts the normal operations of the University, or infringes on the rights of members of the University community.
> - Disorderly, . . . behavior at a University related activity, or directed toward a member of the University community.
> - Violation of any published University policy, rule, regulation or presidential order.
> - Failure to comply with directions of, or interference with, any University official or any public safety officer while acting in the performance of his/her duties.

> In his narrative of the event, **Defendant Brian Stuart** listed code violations including the same violations listed by **Defendant Begley**.

On May 3, 2016, University Counsel Daniel Ojeda emailed **Defendants Hong, Begley, and del Valle** saying "I noticed the following conduct procedures SFSU has developed in cases involving student organizations: http://www.sfsu.edu/~sicc/socb.html. **These would seem to apply to GUPS. Are you** *not* **applying these in the case pending against GUPS? If not, why not?** . . . I'm anticipating more questions on these issues from the attorneys who are representing the students and GUPS and I want to be sure I understand the process SFSU is following, and the rationale for the campus approach."

**Defendant del Valle** told the primary orchestrators of the disruption during the student conduct process that "**what you did was not free speech, but in fact free speech suppression. You impeded another group's ability to engage in free dialogue with your disruption**."

SFSU's Vice President for University Advancement Robert Nava admitted in an April 12, 2016 email that "**The protest was disruptive and the protestors did not follow campus policies** and guidelines. The office of Student Affairs is reviewing possible administrative sanctions" and in an email on May 10, 2016 that "the Mayor's talk held at Seven Hills was disrupted by a small but loud group of protestors. **The protestors used bull horns and infringed on the right of the speaker to express his views and denied the audience the right and opportunity to listen to the presentation.**"

74.     Like all of these statements by Defendants acknowledging wrongdoing by GUPS, Morrar, and Ereikat, SFSU's commissioned investigation of the Mayor Barkat event confirmed that the presentation was in fact disrupted. The report also noted that **Defendant Begley** recognized that the protest, with sound amplification, was louder than the Mayor, even with his microphone.

**Defendants' Liability for Free Speech and Equal Protection Violations Based on the "Stand Down" Order, the Refusal to Intervene to Protect Plaintiffs' Rights, and the Post Hoc Ratification of These Decisions by Senior SFSU Administration Officials**

75.     The report of SFSU's commissioned investigation concluded that the administrators' refusal to engage the disruptors impliedly sanctioned the disruption of the event, with **Defendant Parson** being left as "the only one saying stop."

76.     The disruptors were clearly emboldened by the decisions of **Barkat Shutdown Defendants** in the room allowing the disruption to continue and escalate, and ramped up their verbal attacks and threatening gestures.  Despite the "free speech zone" outside, when the disruption was at its height and Plaintiffs and other audience members were asking what would be done to restore order, **Defendant Begley** issued a "stand down" order—implemented by **Defendant Parson** with the knowledge of **Defendant Birello**—to the police demanding that they contravene established

policies and enable the unlawful disruption of the event.

77.    **Mr. Mandel** asked **Parson** how they were going to address this situation, who replied that he would try to get the group to move to the designated protest area.  According to the SFSU commissioned report, as well as numerous statements from Defendants, **Parson** approached the shouting and threatening individuals and asked them to leave, but was ignored. There was no threat of arrest or other action behind this purported request, nor were there any other steps attempted, let alone taken, that could have restored the event to order, such as requesting or confiscating the unapproved and unlawful sound amplification equipment being used to drown out Mayor Barkat.

78.    After conversing with **Defendant Parson**, Mr. Mandel approached **Defendants Begley and Birello**, asking what steps would be taken to allow the event to proceed; they told him that the situation was being dealt with internally and that he should "not worry about it. The administrators left shortly thereafter without taking any steps to enable the event to proceed.

79.    **Plaintiff Merkulova** stepped into the hall to call 9-1-1 because she felt scared for her physical safety, especially in view of the inaction of the officers in attendance.  She was informed that police officers were already present at the event.  After finding the officers, they told her that they had been directed not to intervene in order to protect the disruptors' "free speech."

80.    **Plaintiff Rosekind** told a uniformed officer that she did not feel safe, although the room was so unrelentingly loud that it was difficult for them to converse.

81.    **Plaintiffs Mandel and Volk** also feared for their physical safety and the safety of the other non-disrupting attendees at the Barkat event, a number of whom were crying in fear from the threats of the encroaching disruptors. Plaintiff Kern was on high alert and aware that things could escalate at any moment to physical violence. He believed that the attendees' fears were reasonable and he physically shielded his friends, including those who were crying.

82.    Aaron Parker, a community member in attendance at the event, asked a uniformed police officer what the police were going to do to enforce the Student Conduct Code and ensure that the event could proceed.  The officer told Mr. Parker that he was awaiting approval from **Chief Parson** before taking action. Mr. Parker told Chief Parson he did not feel safe, and in response was

asked if he would complete a Citizen's Arrest form; Mr. Parker said he would, but **Chief Parson** never returned with the form.  Mr. Parker was soon after informed by SFSU University Corporation Director Jason Porth, who had spoken to the Defendant administrators in the back of the room, that the administrators did not want to remove the disruptors.

83.    **Chief Parson** told **Mr. Mandel** that the "**stand down**" instruction from **Defendants Begley, Birello**, and the other administrators present was an order to the police by their superiors to ignore protocol, which was to remove the disruptors to the designated protest area. The other officers that had arrived also told **Mandel** that, despite protocol, they had been instructed to "stand down."

84.    In her capacity as the most senior member of the SFSU administration in attendance and supervisor of the campus police, **Defendant Begley's** issuance of the stand down order unequivocally deprived the Plaintiffs of their First Amendment rights to **listen**, speak, and assemble.

85.    In various communications after the Barkat event, **President Wong** ratified the actions of **Defendants Begley, Parson,** and **Birello**, by publicly declaring his support for their conduct, and took no steps to reprimand them or even acknowledge wrongful behavior.

### SFSU's Deficient Response to the Shutdown of the Barkat Event Contributed to the Ongoing Pervasively Hostile Environment Depriving Plaintiffs Mandel, Volk, and Kern of Full and Equal Educational Access, Which Continued Unabated

86.    After Mayor Barkat left the room, the disrupting individuals cheered proudly and continued to shout "Get the fuck off our campus!" to the **Barkat Shutdown Plaintiffs** and others.

87.    The threat to **Barkat Shutdown Plaintiffs'** physical safety and their constitutional rights was amplified by the fact that the attendees were under **Barkat Shutdown Defendants'** power and protection. The "stand down" order by Defendants created and contributed to an unsafe and threatening environment for Plaintiffs and other Jewish students and members of the community. This action by **Barkat Shutdown Defendants** exemplifies Defendants' utter indifference to direct threats against Jewish individuals who attended the event.

88.    The response to the Barkat incident by administration Defendants reinforced the long-held belief by **Student Plaintiffs** that they were unsafe and unwelcome in classes hosted by COES. In an explicitly anti-Semitic trope, consistent with his department's institutionalization of anti-

18

normalization, **Defendant Monteiro,** Dean of COES, emailed **Defendants del Valle, Hong** and **Begley** after the event comparing Mayor Barkat to "a member of the KKK or Nazi party."

89.     Shortly after the Mayor Barkat event, **Plaintiff Mandel** was physically intimidated by a male GUPS member who recognized him as the Hillel president and hastened himself towards, walked directly at, and stopped immediately in front of **Mandel**, less than one foot away, scowling at him threateningly.  Because of his aggressive physical posture, **Mandel** thought that this student was deliberately trying to initiate an altercation and was about to strike **Mandel**.   **Mandel** had been similarly "stared down" before by GUPS members at various times on campus in other instances, and has felt unsafe on campus since his freshman year. **Mandel** has missed class due to concerns about his physical safety. Mr. Mandel reported these and other concerns to SFSU (including EO 1097 claims[10] on April 6, 2016 and May 2, 2016) and SFSU refused to act upon them. Demonstrating deliberate indifference, the University took no action on **Mr. Mandel's** complaints relating to the Mayor Barkat event and left him continuously vulnerable until summer break.

90.     Likewise, the day after the Mayor Barkat event, **Plaintiff Volk** felt sufficiently threatened by constant hateful stare down from a GUPS member in his Israeli Conflict class that his anxiety forced him to leave midway through. Unable to concentrate in class while feeling the kind of stress brought on by the events of the day before and the active intimidation, he realized he would not be able to focus or benefit from class, so he sought safety and comfort outside of the classroom.

91.     The report summarizing SFSU's commissioned investigation of the Barkat event confirms that three students affiliated with Hillel, including **Mandel,** filed complaints shortly after the event regarding the misconduct of the GUPS disruptors. However, not one of these complaints even received acknowledgment, let alone an adequate response, from anyone at SFSU.

The investigator noted that these complaints were not provided in her initial interviews with **Defendants del Valle and Begley**, and after several requests, she came to believe that the delay "further exhibits the lack of attention given to the three students and their concerns" by the SFSU administration.

---

[10] EO 1097 is the CSU systemwide policy prohibiting discrimination, harassment, or retaliation.

92.    Following the Barkat event, **Defendant Begley** stated that the disruptors' identities were all known to Student Affairs and promised that there would be follow-up. There was none.

93.    When **Defendant del Valle**, then-Assistant Dean of Students and Director of Student Conduct, met with the two primary instigators of the disruption to carry out the full student conduct process (with **Defendant Abdulhadi** also present as the faculty advisor of GUPS) he asked them why Mayor Barkat would "travel half way around the world to come to SF State? … Why come to a [school with] no significant Jewish population and [] a reputation for being anti-semetic (sic)?" **Del Valle** then told the students that "You have been plaid, (sic)", and proceeded to inform them "it was the mayor's intention to come to campus to illicit (sic) such behavior from students such as yourself to galvanize the Jewish American community for political gain. To what end, we do not know." **Del Valle** acknowledged the students' clear violations of the Student Code of Conduct.

94.    After intimating that the two instigators of the campus code-violating disruption were actually victims of a Jewish conspiracy, del Valle then issued a "No Action Letter with a verbal warning," concluding that the "students have learned from their mistakes and are not likely to repeat the behavior." On information and belief, no oversight of **del Valle's** determination was performed.

95.    **Del Valle** later confirmed that nobody in Student Conduct wanted to bring any charges against GUPS students for disrupting the Barkat event. No actions were ever taken by SFSU against the disruptive students, no disciplinary charges were ever filed, and no sanctions were ever imposed against GUPS as a group, Lubna Morrar, Linda Ereikat, Defendant Abdulhadi for her actions in encouraging and directing the shutdown of speech, or any other individuals responsible for committing widely recognized and acute violations of the Student Code of Conduct.

96.    Instead of providing support for its Jewish and Israeli and "Zionist" students following Mayor Barkat's speech, the environment on campus was so toxic for Jewish students that some Jewish students did not feel comfortable going to their classes, or even walking on the campus with anything on their clothing or person that could identify them as being Jewish.

97.    **Plaintiff Mandel** skipped a political science class because of the increasingly intimidating nature of the GUPS and COES "hunger strike," in which participants were chanting

slurs at and about "Zionists" and expressing their discontent at the investigation into their conduct in shutting down the Barkat event. He had an in-person meeting with Professor García-Castañon to describe his fear of walking on campus and the experiences of harassment that he had been enduring since the event—and which were the basis for his two EO 1097 complaints that were ultimately disregarded by SFSU. **Mandel** recalls constantly telling peers, family members, professors, Hillel staff, and administrators of his very real fears of being on campus; his advice to fellow Jewish and Israeli students was to avoid certain areas of campus, take circuitous routes to on-campus spaces, tuck in Stars of David, and wear hats over yarmulkes in order to avoid being conspicuous as Jews.

98.    **Defendant Wong** was fully aware of the feelings of real fear and intimidation of Jewish students on campus after the Barkat event. In an email memorializing a meeting between **Wong** and several Hillel students and staff members, Hillel Director Oliver Benn wrote **Wong**, "I appreciated how moved you were by the Jewish students who expressed their fears of wearing Stars of David or otherwise outwardly identifying as Jewish on campus, because of the way Israel, Zionism and Judaism are treated in some quarters on campus, including in the classrooms." Nevertheless, instead of ensuring that these students felt welcomed on campus, he disregarded their concerns, alienating them even more.

99.    A meeting was held on June 3, 2016 to discuss the concerns of Jews on campus, and **Wong** expressed his displeasure with a list of what he called "demands" from Jewish leaders. **Mandel** explained that they were not "demands" but "recommendations" to make students like him feel safer and more accepted at SFSU. **Wong** also expressed that he partially blamed Hillel for the Barkat event disruption because Hillel did not give him or the University enough time to prepare.

100.    In the same meeting, **Defendant Wong** also attempted to distance himself from Jewish students and their serious distress regarding SFSU's campus culture and environment. Prior to the meeting, **Wong** had sent an email directing Hillel to send future concerns to either **Defendants Hong, Begley, and/or Parsons**. In the meeting, he said the Jewish community's concerns were "not a presidential issue" and complained that Jewish students took up a disproportionate amount of his time. He also expressed that Jewish students had too much access to the President of the University.

101.    When confronted about this comment, **Defendant Wong** refused to acknowledge that this reference to Jews' "disproportional power" was a well-established anti-Semitic stereotype— even after Jewish leaders present in the meeting explained the history of such comments and described their personal offense at the insinuation. A Jewish SFSU professor present in the meeting asked **Wong** if his sentiment had been adopted from the GUPS statement on the Barkat disruption. **Wong** nodded "yes." Concerned and confused as to why **Wong** was regurgitating disturbing anti-Semitic tropes ascertained straight from GUPS, and why he was not walking the statement back after such a revelation, a Jewish community leader reiterated that the "Zionist power" and "Jewish power" allusion was categorically anti-Semitic. **Wong** again nodded "yes."

102.    In a follow up letter from the meeting's attendees memorializing the conversation, Jewish leadership mentioned the offensive nature of **Wong's** "Jewish power" implication, to give **Wong** the opportunity to express regret for having perpetuated it. He did not. When Jewish Studies professor Marc Dollinger brought it up again in a December meeting with **Wong** and other Jewish community members, Wong replied: "I am the president of all students, not just the Jews."

**Continuing Pervasively Hostile Environment for Jewish and Israeli Students at SFSU Who Face a Deliberately Indifferent Administration and Increasingly Disruptive Peers**

103.    The pervasively hostile environment for Jewish and Israeli students at SFSU operates on a series of levels. These students' peers—members of the campus community who demonize Jews, "Zionists" and Israelis and ascribe political viewpoints to Jewish groups and their members on the basis of their Jewish identities—engage in a constant campaign of intimidation, marginalization, and threatening behavior. The peer-on-peer harassment that occurs on a daily basis at SFSU is, depending on the incident, encouraged, tolerated, not adequately addressed, or ignored by school employees and officials. Plaintiffs have brought complaints and notifications to school officials and administrators regarding anti-Jewish and/or anti-Israeli animus; **not once** have they been taken seriously, addressed without interminable delay, or responded to with any tangible action for protection or to stop the harassment.

104.    **Wong** was personally aware of numerous discrimination complaints by Jewish

students, including Plaintiffs, and promised appropriate follow-up in a May 23, 2016 email, saying

> [W]e have received two complaints by two individual Jewish students for incidents both separate from the Mayor of Jerusalem's visit. Both are being investigated under applicable CSU policies. . . . As I committed to the community in my 'J' article, we are quite serious about thoroughly reviewing all of these incidents and ensuring the safety of Jewish students. . . . I regret that this is taking so long but I want to reassure you that we will be thorough and fair.

Yet, on information and belief, no follow up—"thorough and fair" or otherwise—ever occurred.

105.    The harassment endured by Jewish and Israeli students takes many forms, including but not limited to verbal threats and name-calling ("F[ ]ck Zionists," "Long live the Intifada," "Zionists should get the f[ ]ck off our campus," perpetuation of anti-Semitic blood libels); graphic and written statements, including graffiti ("Zionists NOT Welcome," welcoming Zionists on campus is a "declaration of war against Arab and Muslim" students, "Zionists support genocide," "F[ ]ck Zionists"); flyers on campus ("Zionists are **NOT** Welcome on This Campus", comparisons of Zionism to white supremacy); social media intimidation (posts by Mohammad Hammad and other GUPS leaders, by **Dr. Abdulhadi**, and on AMED Facebook page, as described throughout this Complaint), and conduct that may be physically threatening, harmful and humiliating, all of which is based on a Title VI-protected race (Jewish) and national origin/ancestry (Israeli). Taken in sum, the conduct is sufficiently severe, pervasive and persistent so as to limit the student Plaintiffs' abilities to participate in or benefit from the services, activities, and opportunities offered at SFSU.

106.    The harassment occurs in plain sight and is widespread, well-known to students, staff, and administrators, and occurs all over campus—including in the most widely trafficked areas of SFSU, such as the CCSC and Malcolm X Plaza. The public nature of the hostile environment would be enough to put Defendants on notice, which should have triggered (at bare minimum) an investigation and an action plan to rectify it. Instead, Defendants have doubled down and refused to engage, strategize, or effectuate new policies or training programs to educate students and staff alike on anti-Semitism and anti-Israeli discrimination, and ensure an improvement in the campus climate.

107.    While murals exist representing a wide and diverse array of various university minority constituencies (including Pacific Islander students, Hispanic students, Palestinian students, and Native  American students), and despite repeated requests by Jewish students for many years for

their own representative mural, permission was never granted, even after an official "Jewish Mural Project" team, led by **Plaintiff Volk**, worked with the university community to try and install one.

108.   On the first day of school in September 2016 school year, three different Jewish groups (Hillel, AEPi fraternity, and Lambda Chi Mu sorority) were denied their tabling permits at the New Student Recruitment Fair on the campus quad, during which campus groups introduce themselves to new students and invite them to join their student groups. **Defendant Birello** publicly berated **Plaintiff Mandel** regarding the paperwork necessary for the permits to be awarded. When **Mandel** explained to **Birello** that he had completed all of the required paperwork the previous semester, **Birello** mocked him in front of all the other students. It turned out that **Birello** had simply "forgotten" to click "approve" in the SFSU system awarding the permits to Hillel. The other two Jewish groups spent a week lobbying the administration for the permits and lost 4-5 full days of tabling and recruiting in the process. On information and belief, no other group except for the three Jewish groups had any problems obtaining permits to table at the fair.

109.   In November 2016, **President Wong** requested that several Jewish faculty members join a meeting with the Koret Foundation, on December 8, 2016.  Koret, a major Jewish donor, had pledged a $1.7 million gift to SFSU, but held back because of concerns about anti-Jewish animus on campus, especially after SFSU's failures vis-à-vis the Barkat incident. **Wong** wanted them to reassure the Jewish donor so that the pledge would not be withheld. They openly communicated to **Wong** that they perceived the request as an exploitation of their Jewishness, an attempt to capitalize on their identities, and a conflict of interest: They did not want SFSU to lose the gift, which would hurt students, but they were also not willing to whitewash the extent of the University's "Jewish problem" to protect the administration.

110.   The faculty members requested a separate meeting with **Defendant Wong** in advance of the Koret meeting, during which time **Wong** remarked that in his entire career he had never had a donor invoke "political reasons" to withhold a gift. When asked whether "political reasons" referred to the anti-Israel or anti-Zionist culture on campus—bringing light to the fact that these terms are often conflated at SFSU—**Wong** said that "political reasons" referred to the general campus climate

for Jews. Given that the climate for Jews is pervasively hostile, discriminatory, and threatening, one faculty member explained: "**The physical safety of Jewish students is never a political issue.**" **Wong** responded: "**On this we will have to agree to disagree.**"

111.    Asked by J. Weekly in May 2017 whether Zionists are welcome at SFSU, **President Wong** stated "That's one of those categorical statements I can't get close to…Am I comfortable opening up the gates to everyone? Gosh, of course not." In later telling Jewish students he believed the term "Zionism" to mean "the right of every Jewish person to be Jewish," **Wong** made clear that, by his own definition, Jews who wanted to be Jews were not necessarily welcome at SFSU.

### The Intentional and Discriminatory Exclusion of Hillel from the "Know Your Rights" Fair

112.    **KYRF Plaintiffs'** rights of free speech, association, and religious expression were infringed upon by the intentional exclusion of Hillel from the "Know Your Rights" Fair (KYRF) held on Tuesday February 28, 2017 at Jack Adams Hall in the Cesar Chavez Student Center, located in SFSU's main campus center.

113.    The fair was an official SFSU event, sponsored by (among others) the SF State California Faculty Association, the Cesar E. Chavez Institute, COES (an academic department headed by **Defendant Monteiro**), the Dream Resource Center, the Ethnic Studies Student Organization, GUPS, Improving Dreams, Equity, Access and Success (IDEAS), and the Muslim Student Association. It was to feature a speaker from the ACLU, workshops on legal resources and immigrant rights, and tabling opportunities for student organizations. According to the "Know Your Rights" Fair page on SFSU's website (http://cci.sfsu.edu/resist), the event was "an informational and training fair for vulnerable populations who may be feeling targeted in the new political climate in the country since the presidential election."

114.    Jewish members of the SFSU community are a "vulnerable population who may be feeling targeted in the new political climate in the country since the presidential election." Any suggestion that Jews are not marginalized and not entitled to engage in, or be represented during, campus discussions of vulnerable populations, is itself a tragic but ironic example of the classic anti-Semitic stereotype of Jews as a disproportionately powerful population.

115.    Advertised on the SFSU website as an "attempt to inform our students, faculty, staff and public about potential threats to their rights given the new political reality" by bringing "student groups" to represent their respective communities, KYRF's ostensible "goal [was] to inform the public about our rights and how we can defend ourselves and become involved in the resistance movement." Plaintiffs, seeking to both share and receive information about their experience as a vulnerable, targeted population, and engage in discussions addressing ways to handle potential threats to their rights or their bodily integrity, sought to participate in, and benefit from the fair. They expected and planned to participate as members of the student group that represents them: Hillel.

116.    Plaintiffs had a right for Hillel, to be included on the same basis as and with equal opportunity to participate as any other group. Plaintiffs and other similarly-situated students had a right to participate, be informed of their rights, and engage in constructive dialogue pertaining to the protection of those rights. However, on information and belief, other groups—namely GUPS— threatened to dissolve the fair if Hillel were included.

117.    On information and belief, Hillel was invited to the fair by accident; after the invitation was extended, the KYRF organizers (including COES and GUPS) worked to find a way to rescind it. Hillel staffer Jason Steckler received an email asking if he would like to table at the event, and he responded affirmatively on behalf of Hillel. He was then subjected to a viewpoint-based test before being invited to participate in the fair: the organizers asked his opinion about a postering campaign by an off-campus group with which Plaintiffs and Hillel had and continue to have no affiliation whatsoever. After providing what was apparently a satisfactory response to the questions regarding those posters, Jason received word that Hillel was welcome to participate.

118.    After receiving this confirmation, on information and belief, the fair organizers surreptitiously changed the registration cut-off date with the intention of excluding Hillel and its members—Jewish students—from the event on the basis of an inferred viewpoint, derived from and attributed to their Jewish identity. In order to fully participate in the fair and receive training and information about "knowing one's rights," each participating group was able to table and host experts relating to their experiences. In excluding Hillel, the only registered student organization

representing all Jewish students on campus, the fair organizers—with ratification from **KYRF Defendants**—intentionally left Jewish students vulnerable to continued violations of their civil rights without offering an equal opportunity as other groups.

119. **Defendants Begley** and **Montiero** consciously and intentionally knew of and permitted Hillel's exclusion. Saliem Shehadah, one of the self-described organizers of the Fair, admitted publicly that Hillel was intentionally excluded.  As a GUPS member and a COES Graduate Student, Mr. Shehadeh worked very closely with **Dr. Abdulhadi**, who was not only GUPS's faculty advisor but was also the personal and academic focus of Mr. Shehadeh's graduate studies.[11]

120. Consistent with her anti-normalization mandate and her deliberate conflation of Jews, Israelis and Zionists, upon becoming aware that Hillel had been invited to the KYRF, **Abdulhadi** encouraged Shehadeh and other GUPS members retract the invitation. **Abdulhadi** pulled the strings on the exclusion of Hillel from KYRF on the basis of a perceived "Zionist" viewpoint that she, Shehadeh, and GUPS and its allies wrongly attributed to Hillel and anyone affiliated with it. As GUPS's faculty advisor and a faculty member in COES, with knowledge of the intentional exclusion of Hillel from the fair, **Abdulhadi's** refusal to take steps to ensure that all groups wishing to participate in the fair was, at minimum, ratification of the decision to intentionally exclude Hillel.

121. Even if Hillel were "only" excluded from KYRF on the basis of a perceived "Zionist" viewpoint, it is bigoted and discriminatory to attribute a viewpoint to Hillel *because of its Jewish identity and role as the only organization serving the entire campus Jewish community.*

122. **Defendant Begley** was made aware of the fair organizers' intention to exclude Hillel thirteen days in advance of the event, and was told by **Defendant Hong** that excluding Hillel would be a problem. Yet neither **Begley** nor **Hong** took any steps, despite having authority and superiority to compel the inclusion of Hillel. Two days before the event, **Begley** received another reminder of Hillel's exclusion when Hillel Director Oliver Benn contacted **Begley** about the issue. Yet, **Begley** and **Hong** allowed the event to proceed with impunity, ratifying the discriminatory exclusion.

---

[11] Notwithstanding their extensive personal and academic relationship, Defendant Abdulhadi was on the committee that approved Mr. Shehadeh's hagiographic thesis, submitted in partial fulfillment for his Master of Arts in Anthropology in May 2017.

123.   **Defendant Monteiro** became aware that a problem was unfolding with KYRF and reversed his previous acceptance of an invitation to deliver a keynote address. As Dean of COES (a division of SFSU and official sponsor of the event), he was empowered to compel the organizers to include all interested student groups—or else to shut the event down. At the very least, COES's continued sponsorship of the event was an official ratification by **Monteiro** of Hillel's exclusion.

124.   SFSU commissioned a non-legal investigation into Hillel's exclusion from KYRF, but to date, has not released that report to the public.  On information and belief, a summary of the report's findings was released to certain individuals on or about July 21, 2017, and the full report was released to certain individuals on or about August 18, 2017, both of which included findings that Hillel was in fact intentionally excluded from KYRF, and that the Fair's organizers were  responsible for retaliation and intentional discrimination against Hillel and Jewish students at SFSU.

125.   According to an article in J. Weekly, an SFSU communications officer stated in an August 4, 2017 email to that newspaper that the investigation found that:

> Hillel was improperly excluded from the Know Your Rights Fair by the self-organized and self-appointed planning committee … The unfortunate decision by this group to exclude Hillel from the Fair represents an unacceptable breach of the University's values, policies, and standards for inclusion and respect expected of all members of our University community.

126.   As reported in JWeekly, in an August 7, 2017 email to that newspaper, Hillel Executive Director Oliver Benn said of the report:

> **The university found discrimination and retaliation against Hillel.** Given this finding, the unanswered question is what the university will do to address what **[Defendant] Wong** has himself described as **'institutionalized anti-Semitism,'** rather than just the 'campus climate' generally.

127.   On information and belief, **Defendants Birello** and **Jaramilla** are each responsible for coordinating and managing student organization events such as KYRF, including ensuring that no registered student organization is discriminated against, improperly excluded, or otherwise subject to violations of established SFSU policies (including the Non-Discrimination Policy) or state or federal law. On information and belief, despite these responsibilities, **Defendants Birello** and **Jaramilla** had the power to prevent but nevertheless took no steps to stop the admitted intentional discrimination and exclusion of Hillel. Knowingly and actively allowing Hillel to be excluded from

28

a SFSU-sponsored public forum on the basis of a viewpoint (wrongly) attributed to Hillel and any students affiliated with it, no matter how remotely, because of their Jewish identities, directly violated Plaintiffs' rights under the First and Fourteenth Amendments.

### Despite Repeated Promises and Declarations, SFSU Has Failed to Cure these Systemic Problems and Has Buried Information Relating to their Cover Up in Violation of the CPRA

128.    On more than a dozen occasions over the last approximately two years, **Defendants,** including **SFSU** and **Board of Trustees of CSU**, and especially including **President Wong**, have publicly acknowledged an anti-Semitism problem that pervades SFSU and but have made only empty and disingenuous promises to take steps to address the problem.

129.    Yet, despite these repeated acknowledgements of this longstanding issue, *zero* effective steps have been taken to cure the problem or to effectuate any of the promises made in the aforementioned empty statements about addressing the pervasively hostile environment for Jewish and Israeli students on campus at SFSU. On information and belief:

- Recently announced positions for professionals on campus climate remain unfilled, and individuals interviewed for certain positions came from within COES.
- There have been no efforts undertaken to ensure the proper training on or enforcement of existing policies relating to free speech, free assembly, inclusion of all members of the campus community, or time, place and manner regulations.
- There have been no new policies identified or implemented to ensure that the campus operates consistent with all University, state and federal laws and regulations.
- Investigations into violations of various Student Conduct Code provisions and federal and state law, even when Defendants have acknowledged clear, rampant and repeated violations, have resulted in absolutely no consequences against the perpetrators.
- There have been no mandated training or informational sessions on anti-Semitism or other forms of bigotry to educate the campus community or the University staff/faculty on issues of harassment and discrimination that they may face in their professional roles.
- Despite a finding in the University's own commissioned investigation of the KYRF incident that Hillel was intentionally excluded, there has not been a single communication from any Defendant with an apology or an acknowledgment of wrongdoing, or, on information and belief, the imposition of any consequences upon the students, student groups, or state actors responsible.
- According to a February 12, 2018 article in the J. Weekly by Jewish Studies professors Dollinger and Astren, "The university president [**Defendant Wong**] has not agreed to a single face-to-face meeting with campus or community Jewish leaders interested in partnering to address the serious issues that confront our university."
- The Working Group on Campus Climate that was announced in September 2017 dissolved almost immediately. According to the same article by Professors Dollinger and Astren, "When the working group, by unanimous vote, invited President Wong to attend

future meetings so that we could partner together for a better SFSU, he refused. Without support from our university president, the working group on campus anti-Semitism never met again."

- The Task Force on Anti-Semitism that was announced in September 2017 also dissolved only after a few months because of the total indifference of the administration. According to professors Dollinger and Astren, "Without direction, focus or authority, task force members — volunteers from across the university and larger communities — asked for a clear charge from the university administration, more representative membership on the task force and participation on the part of the president himself. When no reasonable and workable responses materialized, a series of resignations followed. At an impasse, President Wong's task force suspended itself after only a few months."

- Professors Dollinger and Astren asked CSU Chancellor Timothy White to disavow President Wong's May 2017 statement, refusing to affirm that Zionists were welcome at SFSU: "We teach at a university where our president made a public statement discriminating against individuals based on a political opinion linked to religious and ethnic identity, refused to retract it, yet claims that Jews are welcome on campus. Chancellor White, in the name of the CSU, please issue a retraction of President Wong's statement and affirm the right of all Zionists to study and to work at SFSU. Leverage your authority to turn this awful, divisive moment into a teachable one." They have received no response.

- Professors Dollinger and Astren asked CSU Chancellor Timothy White to "please issue a clear public statement condemning the exclusion of SFSU Jewish students from campus programs" after explaining that "[p]residential silence on the shutting out of Hillel students only further nourishes a hostile campus climate for Jews." They have received no response.

130.    In fact, the pervasively hostile environment for Jewish and Israeli students at SFSU has only metastasized, especially of late:

- Since the filing of the original Complaint, Jewish and Israeli students have either been excluded from, discriminated against, or proactively decided to self-censor in events relating to International Women's Day, the anniversary of the Balfour Declaration, Yom Ha'Atzmaut (Israel Independence Day), and a speech by Jewish Israeli LGBTQ activist Hen Mazzig—all because there is an overt and universally recognized threat of disruption and even physical violence if they attempt to participate fully and equally.

- Because of lack of faith in Defendants to abide their legal obligations, and out of fear for the physical safety of Jewish students and community members on campus, Hillel has itself adopted a new policy of only doing religious events on campus and avoiding any Israel or cultural programming that could be deemed offensive or provocative. This is not an environment in which Jewish members of the SFSU community are able to express themselves or take advantage of the same academic, social, extracurricular or educational opportunities as any other student on campus.

- On February 22, 2018, 13 Jewish students, including **Plaintiff Gershon**, had a meeting with **Defendant Wong** to "restart dialogue that had stalled for nearly a year" relating to Jewish life at SFSU. After the meeting, they sent **Wong** a letter, saying "As some students expressed, two years ago, they listened to you express similar upset about students' fears of publicly identifying as Jewish on campus. They listened to you then promise action. Some are now close to graduation and are dismayed that things are worse, not better… Today we felt you were unprepared for the conversation you initiated, and the process you seek. You told us how in November you realized your prior failings in ensuring an inclusive environment for Jewish students at SF State. From there, you

took three months to invite us to meet. And in that time, you apparently did not prepare any plan for how to take accountability or steps to mitigate the undisputed discrimination we students have experienced. We were very frustrated today that you kept looking to the victims of discrimination for next steps, rather than providing tangible, concrete answers about what the Administration would do to improve the conditions for the Jewish campus community. Your comments in the meeting displayed an unwillingness to effectively utilize the role of the President. The students concluded by reminding **Wong:** "You stated that to change the campus environment for the Jewish community, courage would be needed from you and your staff. We hope that you find this courage by recalling the courage that we, as students, display every day walking onto a campus that has been complicit in allowing hate and discrimination against our community to go unaddressed."

- On February 23, 2018, in response to **Wong's** recent reversal of his previous position that Zionists were not necessarily welcome on campus, **Defendant Abdulhadi** declared on her personal FACEBOOK page—which she then shared to the official AMED page—that she "[C]onsider[s] [**Wong's**] statement…to be a declaration of war against Arabs, Muslims, Palestinians…I am ashamed to be affiliated with SFSU administration and demand the immediate retraction of this racist, Islamophobic and colonialist statement. . . it is embarrassing to have our campus leadership cater to…the Israeli lobby."

- In "solidarity" with **Abdulhadi**, the Women and Gender Studies department at SFSU published an official statement saying "The Women and Gender Studies Department is deeply concerned about the motivation, tenor, and potential effects of this statement, which comes as the latest missive in a longstanding debate about Zionism, the impact of Israeli state policy, and the struggle for Palestinian freedom as they affect the social justice mission of San Francisco State University...Wong's statement fails to express concern or support for Palestinian, Arab, and Middle Eastern students and their allies that are harmed by Zionism…the Department of Women and Gender Studies unequivocally rejects the equation of Zionism with Judaism, and stands by all of our SFSU students and their right to a university committed to intellectual inquiry and social justice."

- It is apparent that multiple official academic studies and faculty groups are openly hostile and explicitly unwelcome to anyone, including Student Plaintiffs, who identifies as a "Zionist." Under these circumstances, it is preposterous to expect any Jewish or Israeli student at SFSU would feel comfortable taking courses in either discipline, physically or intellectually, even if those courses are required for the completion of their degrees. This reality puts them in an impossible situation in terms of choosing between their academic success at SFSU and their physical safety/right to participate in sincere academic debate.

- Following these statements, GUPS and other campus groups including the Black Student Union, African Student Association, Black Residents United in Housing, and Black Business Student Association also expressed their opposition to the president's apology in published statements making clear that "Zionists" were in fact not welcome at SFSU. Photos have surfaced showing Malcolm X plaza with chalkings saying "Zionists NOT Welcome," "Zionism Equals Genocide," and "Say No to Zionism," and signs plastered on bulletin boards across campus saying the same. As SF Hillel Director Ollie Benn recently stated, Jewish students are also exposed on a daily basis to posters all over campus "equating their religious and/or political views to white supremacists. This has severely and unfairly challenged Jewish students' identities and feelings of safety on campus."

- On March 14, 2018, eight Jewish students, including **Plaintiff Gershon**, sent an email to the AMED program (of which **Defendant Abdulhadi** is the only faculty member), expressing their anguish. "**The definition of Zionism that we hold personally is the liberation movement of the Jewish people**. We understand that our narratives and histories are different, therefore resulting in different definitions of Zionism. However, by

31

posting Zionists aren't welcome many, although not all, have internalized it as Jews and supporters of Israel, who may also be supporters of Palestine and an independent state of Palestine alongside the State of Israel, are not welcome on SFSU's campus…We read AMED's post as taking the position that Zionists should be excluded from SF State's campus. If this is not AMED's departmental position, please let us know its official position, by 2:00 pm Friday, March, 16th, 2017." They did not receive a response.

▪ On March 16, 2018, after being ignored by **Abdulhadi**, the same students emailed **Defendant Wong**: "This has been a challenging few weeks for the Jewish community on campus. When you met with Ollie and I last week, he shared photos, screenshots, and personal messages from students of the pain and fear we are feeling right now. In particular, as Jewish SF State students, we are concerned about academic departments encouraging and promoting illegal discrimination on the basis of viewpoint, religion, or national origin…We should not be afraid to walk across campus on the basis of our religion, viewpoints or national origin."

▪ On March 21, 2018, Jennifer Summit, Interim Provost and Vice President for Academic Affairs, emailed the students and said "Thank you for reaching out to **President Wong**; because your concern focuses on an academic department, he has asked me to reply on his behalf…while [the author of the post, **Defendant Abdulhadi**] has the right to express controversial political opinions, the appearance of those opinions on a department social media site raises justifiable alarm. We have therefore asked that the post be removed to ensure that there can be no implication that the views expressed are those of the University."

▪ On March 26, 2018, nearly a full month after the statement was first posted to the AMED Facebook page, **Wong** finally issued his own statement, saying "While she is entitled to voice her own opinion, it cannot be done in a way that implies university endorsement or association…As a result, SF State is taking corrective action…"

▪ With Jewish students at SFSU feeling more threatened, vulnerable, and unwelcome than ever before, **Defendant Wong** remained stunningly silent for 36 days. When **Wong** and Jennifer Summit, who was speaking on his behalf, finally made statements, they both made clear that the continued existence of the post on the AMED Facebook page implicated the University in the perception that Jewish and Israeli students hold that they are not welcome on campus. Yet, 38 days after the statement was first posted to AMED, and as of the date of the filing of this Complaint, the post remains on the AMED Facebook page and its author (**Defendant Abdulhadi**) remains a tenured professor at SFSU.

131.     **Wong**'s 36-day silence—when chalkings, flyers, posters and statements were made by registered students and student groups as well as by tenured professors and official SFSU academic programs—followed initially by a private message to Jewish students through an intermediary, stands in stark contrast to his personal, passionate, public and immediate response to an outside, non-campus group posting flyers on campus in October 2016 suggesting a relationship between Abdulhadi and certain foreign terrorists. The very next day, Wong declared: "I was angered to hear … [that f]lyers were posted by an outside extremist group in numerous locations, singling out one of our faculty members, our students and vandalizing our campus…Let me be clear, this is not

an issue of free speech; this is bullying behavior that is unacceptable and will not be tolerated on our campus…This attack happened to our whole campus community."

132.    Moreover, notwithstanding numerous California Public Records Act ("CPRA") requests, defendants SFSU and CSU have refused legal requirements to provide requested material necessary to understanding the full scope of the aforementioned problems

133.    On June 13, 2016, The Director of the Lawfare Project, Brooke Goldstein, submitted a request for documents to Jonathan Morales, the Public Records Act Contact for SFSU, pursuant to the California Public Records Act ("CPRA"). Goldstein identified the Lawfare Project as a non-profit, non-taxable, charitable organization working on behalf of aggrieved students of SFSU and members of non-academic San Francisco community, including Plaintiff Mandel in this action, who were attendees of the Mayor Barkat event on April 6, 2016 at SFSU. The Lawfare Project made 12 document requests pertaining to the Mayor Barkat event.

134.    On April 13, 2017, the Lawfare Project submitted its second addendum to its outstanding request pursuant to the CPRA, requesting "all records and communications pertaining to the Know Your Rights Fair on Tuesday, February 18, 2017" at SFSU (the "Second Addendum"). Among those requests included "records or communications, which . . . may regard . . . an internal or external investigation of the event" and "[a]ll records or communications illuminating any internal processes that were undertaken or are being undertaken, or considering being undertaken, to determine whether any repercussions should be levied against any groups or participants or individuals pertaining to Hillel's exclusion from the fair."

135.    After the exclusion of SFSU Hillel from the Know Your Rights Fair on February 18, 2017, SFSU conducted an internal investigation that resulted in a report (the "Know Your Rights Report"). That report, based on SFSU's own internal review procedures, concluded that SFSU Hillel was improperly excluded from the Know Your Rights Fair based on their assumed status as Zionists and in retaliation for their decision to invite Mayor Barkat to campus.

136.    The Know Your Rights Report is a record describing an investigation of the "Know Your Rights" Fair, and a record illuminating the internal processes at SFSU that were undertaken to

1  determine whether the individuals who purposely excluded Hillel from the "Know Your Rights" Fair

2  should be subject to any repercussions.

3      137.    SFSU has not produced a single document pursuant to the Lawfare Project's Second

4  Addendum relating to the KYRF sent almost one year ago.

5                                    **FIRST CAUSE OF ACTION**

6  **CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FIRST AMENDMENT
   TO THE UNITED STATES CONSTITUTION**

7
8  **(Banishment of Mayor Barkat Event to Seven Hills)
   (Asserted by Barkat Removal Plaintiffs against Barkat Removal Defendants)**

9      138.    Plaintiffs reallege and incorporate by reference each and every allegation above as if

10  fully set forth herein.

11      139.    Under the First Amendment to the United States Constitution, States "shall make no

12  law… abridging the freedom of speech… or the right of the people to peaceably assemble...." The

13  First Amendment applies to state university campuses.

14      140.    SFSU is a state university, and part of the California State University system.

15      141.    Barkat Removal Defendants are state actors.

16      142.    Barkat Removal Defendants, have, in their individual and official capacities, deprived

17  and continue to deprive Barkat Removal Plaintiffs of their First Amendment rights, including but not

18  limited to the right to assemble and the right to listen or the right to hear, as secured by the First

19  Amendment to the United States Constitution and made applicable to the States by the Fourteenth

20  Amendment, by acceding to worries about the Heckler's Veto and banishing Mayor Barkat's planned

21  speaking event from an available free room at the center of campus to an obscure, for-fee location on

22  the outskirts of campus based on concerns about a "controversial" speaker potentially drawing

23  protest activity.

24      143.    Barkat Removal Defendants' actions based on worries about protest activity against

25  lawful speech, listening, dialogue, and assembly constituted unconstitutional viewpoint and content

26  discrimination.

27      144.    Barkat Removal Defendants, have, in their individual and official capacities, violated

28                                                34

Barkat Removal Plaintiffs' First Amendment rights (including but not limited to the right to assemble, the right to listen or the right to hear) by preventing Barkat Removal Plaintiffs from proceeding with and participating in the planned and approved event hosting Mayor Barkat as a speaker duly invited by an SFSU student group on April 6, 2016 at Cesar Chavez Student Center.

145.    This deprivation of Barkat Removal Plaintiffs' rights secured by the First Amendment was caused by Barkat Removal Defendants acting under color of state law.

146.    President Wong had knowledge of, acquiesced to, and ratified the removal of the Barkat event to Seven Hills based on the content anticipated to be expressed at that event. The other Barkat Removal Defendants participated in the execution of that removal on the basis of worries about "protest activity" and a "policy" about "controversial speakers" and thus not only knew of but specifically intended the removal of that event from the center of campus based on its content.

147.    As Barkat Removal Defendants, acting under the color of state law, have deprived Barkat Removal Plaintiffs of rights or privileges secured by the Constitution, they are liable to Plaintiffs for damages in their individual capacities.

148.    Barkat Removal Defendants are persons under 42 U.S.C. § 1983. Barkat Removal Plaintiffs seek—and are entitled to—injunctive relief based on Barkat Removal Defendants' conduct in their official capacities.

149.    Barkat Removal Defendants failure to comply with the First Amendment to the United States Constitution on March 29–April 6, 2016 has resulted in harm to Barkat Removal Plaintiffs, and will continue to result in harm to Barkat Removal Plaintiffs, unless and until Barkat Removal Defendants are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the First Amendment to the United States Constitution.

150.    There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Barkat Removal Plaintiffs' rights under the First Amendment, or if such an interest does exist, the state action undertaken by Defendant Individuals was not narrowly tailored to serve such an interest.

**SECOND CAUSE OF ACTION**

**CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

**(Banishment of Mayor Barkat Event to Seven Hills)**
**(Asserted by Barkat Removal Plaintiffs against Barkat Removal Defendants)**

151.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

152.    Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

153.    Barkat Removal Defendants, have, in their individual and official capacities, deprived Barkat Removal Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution by applying differential treatment to Barkat Removal Plaintiffs that trenched upon their fundamental First Amendment Rights, including the rights to listen and assemble.

154.    On information and belief, no other events were banished to for-fee locales on the outskirts of campus based on concerns about controversial speakers drawing protest activity.

155.    This deprivation of Barkat Removal Plaintiffs' rights secured by the Fourteenth Amendment was caused by Barkat Removal Defendants acting under color of state law.

156.    Barkat Removal Defendants' failure to comply with the Fourteenth Amendment to the United States Constitution on March 29–April 6, 2016 has resulted in harm to Barkat Removal Plaintiffs, and will continue to result in harm to Barkat Removal Plaintiffs, unless and until Barkat Removal Defendants are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the Fourteenth Amendment to the United States Constitution.

157.    There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Barkat Removal Plaintiffs' rights under the Fourteenth Amendment, or if such an interest does exist, the state action undertaken by Barkat Removal Defendants was not narrowly tailored to serve such an interest.

1

## THIRD CAUSE OF ACTION

2

**CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

3

**(Shutdown of Mayor Barkat Event -- April 6, 2016)**
**(Asserted by Barkat Shutdown Plaintiffs against Defendants Begley, Birello, Parson, del Valle, and Abdulhadi ("Barkat Shutdown Defendants"))**

4

5

158.    Plaintiffs reallege and incorporate by reference each and every allegation above as if

6

fully set forth herein.

7

159.    Barkat Shutdown Defendants, have, in their individual and official capacities,[12]

8

deprived and continue to deprive Barkat Shutdown Plaintiffs of their First Amendment rights,

9

including but not limited to the right to assemble, the right to listen or the right to hear, as secured by

10

the First Amendment to the United States Constitution and made applicable to the States by the

11

Fourteenth Amendment, by deviating from normal protocols, state law, and the SFSU Code of

12

Student Conduct, and by giving an affirmative "stand down order" to campus police, during

13

Jerusalem Mayor Nir Barkat's planned speaking event.

14

160.    Barkat Shutdown Defendants' conduct before and during this previously anticipated

15

disruption prevented Mayor Barkat from speaking in a way that Barkat Shutdown Plaintiffs could

16

hear him and/or engage in dialogue with him.

17

161.    Barkat Shutdown Defendants, have, in their individual and official capacities,[13]

18

violated Barkat Shutdown Plaintiffs' First Amendment rights (including but not limited to the right

19

to assemble, the right to listen or the right to hear) by preventing Barkat Shutdown Plaintiffs from

20

proceeding with and participating in the planned and approved event hosting Mayor Barkat as a

21

speaker duly invited by an SFSU student group on April 6, 2016.

22

162.    Barkat Shutdown Defendants have, in their individual and official capacities,[14]

23

deprived and continue to deprive Barkat Shutdown Plaintiffs of their rights as secured by the First

24

Amendment to the United States Constitution, by improperly instructing SFSU police and other

25

administrators and faculty members as to the appropriate way to handle disruption of campus

26

---

[12] Rabab Abdulhadi is only named as a Defendant in her individual capacity.

27

[13] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

[14] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

28

speakers, even after committing to a training program and the implementation of new and adequate university policies following the culmination of the university-commissioned investigation into the Mayor Barkat disruption.

163.   This deprivation of Barkat Shutdown Plaintiffs' rights secured by the First Amendment was caused by Barkat Shutdown Defendants acting under color of state law.

164.   Defendant Begley ordered Defendant Parson to have the UPD "stand down" as Defendant Birello stood by. Each Barkat Shutdown Defendant had knowledge of the unconstitutional "stand down" order, and Defendants Birello and Begley knowingly acquiesced in its execution.   Defendant Abdulhadi, a faculty member and GUPS faculty advisor, encouraged the unconstitutional shouting down of the Barkat event in violation of Barkat Shutdown Plaintiffs' First Amendment Rights.

165.   As Barkat Shutdown Defendants, acting under the color of state law, have deprived Barkat Shutdown Plaintiffs of rights or privileges secured by the Constitution, they are liable to Barkat Shutdown Plaintiffs for damages in their individual capacities.

166.   Barkat Shutdown Defendants are persons under 42 U.S.C. § 1983. Barkat Shutdown Plaintiffs seek—and are entitled to—injunctive relief based on Barkat Shutdown Defendants' conduct in their official capacities.[15]

167.   Barkat Shutdown Defendants' failure to comply with the First Amendment to the United States Constitution on April 6, 2016 has resulted in harm to Barkat Shutdown Plaintiffs, and will continue to result in harm to Barkat Shutdown Plaintiffs, unless and until Barkat Shutdown Defendants are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the First Amendment to the United States Constitution.

168.   There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Barkat Shutdown Plaintiffs' rights under the First Amendment, or if such an interest does exist, the state action undertaken by Barkat Shutdown

---

[15] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

Defendants was not narrowly tailored to serve such an interest.

## FOURTH CAUSE OF ACTION

### CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

#### (Shutdown of Mayor Barkat Event -- April 6, 2016)
#### (Asserted by Barkat Shutdown Plaintiffs against Barkat Shutdown Defendants)

169.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

170.    Barkat Shutdown Defendants, have, in their individual and official capacities,[16] deprived and continue to deprive Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution by deviating from normal protocols, state law, and the SFSU Code of Student Conduct during Mayor Barkat's planned speaking event, leaving Plaintiffs vulnerable to violations of their civil rights by a previously anticipated disruption which successfully and intentionally prevented Mayor Barkat from speaking in a way that Barkat Shutdown Plaintiffs could hear him, engage in dialogue with him, or peaceably assemble.

171.    Barkat Shutdown Defendants, have, in their individual and official capacities,[17] discriminated against and continue to discriminate against Barkat Shutdown Plaintiffs by providing differential treatment that trenched upon fundamental First Amendment rights, including the right to hear or listen, the right to speak, and the right to assemble.  On information and belief, "stand down" orders were not promulgated to the UPD for events where other viewpoints were expressed.

172.    As Barkat Shutdown Defendants, acting under the color of state law, have deprived Barkat Shutdown Plaintiffs of rights or privileges secured by the Constitution, they are liable to Barkat Shutdown Plaintiffs for damages in their individual capacities.

173.    Barkat Shutdown Defendants' failure to comply with the Fourteenth Amendment to the United States Constitution on April 6, 2016 has resulted in harm to Barkat Shutdown Plaintiffs, and will continue to result in harm to Barkat Shutdown Plaintiffs, unless and until Barkat Shutdown Defendants are ordered by this Court to appropriately and permanently change their policies,

---

[16] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.
[17] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

practices, and procedures that affect the civil rights protected by the Fourteenth Amendment to the United States Constitution.

174.    There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Barkat Shutdown Plaintiffs' rights under the Fourteenth Amendment, or if such an interest does exist, the state action undertaken by Barkat Shutdown Defendants was not narrowly tailored to serve such an interest.

**FIFTH CAUSE OF ACTION**

**CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

**("Know Your Rights" Fair -- February 2017)**
**(Asserted by KYRF Plaintiffs against Defendants Wong, Begley, Birello, Monteiro, Abdulhadi, and Jaramilla ("KYR Defendant Individuals"))**

175.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

176.    The KYRF Defendants are state actors.

177.    The February 2017 "Know Your Rights" Fair was sponsored and administered by SFSU and the KYR Defendant Individuals, who intentionally excluded Hillel from the fair based on the Jewish identity of Hillel's members, including KYRF Plaintiffs.

178.    The KYR Defendant Individuals have, in their individual and official capacities,[18] deprived and continue to deprive Plaintiffs of their First Amendment rights, including but not limited to the right to assemble, the right to listen or the right to hear, as made applicable to the States by the Fourteenth Amendment, by denying the Jewish student organization to which Plaintiffs Jacob Mandel, Charles Volk, and Liam Kern belong—and thereby denying Plaintiffs—the opportunity to speak and hear about their rights at the February 2017 "Know Your Rights" Fair as members of a "vulnerable population...feeling targeted" in the political climate at the time.

179.    The KYR Defendant Individuals have, in their individual and official capacities,[19] deprived and continue to deprive Plaintiffs of their rights as secured by the First Amendment to the

---

[18] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.
[19] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

40

United States Constitution, by inadequately training faculty, administrators, and other student organizations as to the appropriate way to administer university events.

180.   The KYR Defendant Individuals have either intentionally discriminated against Plaintiffs as Jewish students or acted with deliberate indifference, including by responding to known discrimination in a manner that is clearly unreasonable.

181.   Despite multiple complaints in writing to SFSU, including to certain KYR Defendant Individuals, the KYR Defendant Individuals continue to fail to ensure that Plaintiffs, as Jewish students, are treated equally and that their civil rights on campus are protected.

182.   This deprivation of Plaintiffs' rights secured by the First Amendment was caused by KYR Defendant Individuals acting under color of state law.

183.   As KYR Defendant Individuals, acting under the color of state law, have deprived Plaintiffs of rights or privileges secured by the Constitution, they are liable to Plaintiffs for damages in their individual capacities.

184.   The KYR Defendant Individuals are persons under 42 U.S.C. § 1983. Plaintiffs seek—and are entitled to—injunctive relief based on the KYR Defendant Individuals' conduct in their official capacities.[20]

185.   The KYR Defendant Individuals' failure to comply with the First Amendment to the United States Constitution in their conduct related to the "Know Your Rights" Fair in February 2017 has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs who remain on campus, unless and until the KYR Defendant Individuals are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the First Amendment to the United States Constitution.

186.   There exists no overriding or even legitimate governmental state interest, let alone a compelling one, to justify these violations of Plaintiffs' rights under the First Amendment, or if such an interest does exist, the state action undertaken by KYR Defendant Individuals was not narrowly tailored to serve such an interest.

---

[20] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

41

1

## SIXTH CAUSE OF ACTION

2

### CLAIM UNDER 42 U.S.C. § 1983 BASED ON VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

3

#### ("Know Your Rights" Fair -- February 2017)
#### (Asserted by KYRF Plaintiffs against KYRF Defendants)

4

5       187.    Plaintiffs reallege and incorporate by reference each and every allegation above as if

6   fully set forth herein.

7       188.    KYRF Defendants are state actors.

8       189.    The February 2017 "Know Your Rights" Fair was sponsored and administered by

9   SFSU and the KYRF Defendants, who intentionally excluded Hillel from the fair based on the

10  Jewish identity of Hillel's members, including KYRF Plaintiffs and for a presumed viewpoint

11  attributed to Hillel on the basis of its Jewish identity alone

12      190.    KYRF Defendants have, in their individual and official capacities,[21] deprived and

13  continue to deprive KYRF Plaintiffs of equal protection under the laws, as secured by the Fourteenth

14  Amendment to the United States Constitution, by denying the Jewish student organization to which

15  KYRF Plaintiffs belong a spot in the KYRF—and thereby denying KYRF Plaintiffs the opportunity

16  to speak and hear about their rights, and peaceably assemble on the same basis that other similarly

17  situated SFSU students were.

18      191.    KYRF Defendants, have, in their individual and official capacities,[22] discriminated

19  against and continue to discriminate against KYRF Plaintiffs on the basis of their Jewish identities,

20  violating their right to equal protection, as secured by the Fourteenth Amendment to the United

21  States Constitution, by denying the Jewish student organization to which KYRF Plaintiffs belong,

22  thereby denying them—the opportunity to meaningfully participate in the "Know Your Rights" Fair

23  on the same basis as other current and former SFSU students.

24      192.    KYRF Defendants have, in their individual and official capacities,[23] deprived and

25  continue to deprive KYRF Plaintiffs of their rights as secured by the Fourteenth Amendment to the

26  ---
[21] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

27  [22] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

[23] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

28

42

United States Constitution, by inadequately training faculty, administrators, and other student organizations as to the appropriate way to administer university events.

193.    KYRF Defendants intentionally discriminated against KYRF Plaintiffs, as Jewish students on the basis of their Jewish identity and on the basis of a perceived viewpoint attributed to them and their representative student organization, Hillel, on the basis of that identity. KYRF Defendants thus knew of, permitted, acquiesced to and/or ratified the differential treatment of KYRF Plaintiffs, via the exclusion of their representative student organization, Hillel, which trenched upon a fundamental right.

194.    Despite multiple complaints in writing to SFSU, including to certain KYRF Defendants, KYRF Defendants continue to fail to ensure that KYRF Plaintiffs, as Jewish students, are treated equally and that their civil rights on campus are protected.

195.    This deprivation of KYRF Plaintiffs' rights secured by the Fourteenth Amendment was caused by KYRF Defendants acting under color of state law.

196.    As KYRF Defendants, acting under the color of state law, have deprived Plaintiffs of rights or privileges secured by the Constitution, they are liable to KYRF Plaintiffs for damages in their individual capacities.

197.    KYRF Defendants are persons under 42 U.S.C. § 1983.  KYRF Plaintiffs seek—and are entitled to—injunctive relief based on the KYRF Defendants' conduct in their official capacities.[24]

198.    KYRF Defendants' failure to comply with the Fourteenth Amendment to the United States Constitution in their conduct related to the "Know Your Rights" Fair in February 2017 has resulted in harm to KYRF Plaintiffs, and will continue to result in harm to Plaintiffs who remain on campus, unless and until the KYRF Defendants are ordered by this Court to appropriately and permanently change their policies, practices, and procedures that affect the civil rights protected by the Fourteenth Amendment to the United States Constitution.

199.    There exists no overriding or even legitimate governmental state interest, let alone a

---

[24] As noted above, Rabab Abdulhadi is only named as a Defendant in her individual capacity.

1    compelling one, to justify these violations of KYRF Plaintiffs' rights under the Fourteenth

2    Amendment, or if such an interest does exist, the state action undertaken by KYRF Defendants was

3    not narrowly tailored to serve such an interest.

4                                **SEVENTH CAUSE OF ACTION**

5    **CLAIM UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d** *et seq.*

6            **(Asserted by Title VI Jewish Plaintiffs against Defendants CSU and SFSU)**

7            200.    Plaintiffs reallege and incorporate by reference each and every allegation above as if

8    fully set forth herein.

9            201.    SFSU and CSU receive financial assistance from the U.S. Department of Education

10   and are therefore subject to suit under Title VI of the Civil Rights Act of 1964 ("Title VI").

11           202.    Discrimination against Jews is prohibited under Title VI, as reflected in the written

12   policies of the Department of Education's Office for Civil Rights.

13           203.    Title VI Jewish Plaintiffs are Jewish, and their status and identification as members of

14   the Jewish race brings them within the scope of Title VI's protections.

15           204.    Title VI Jewish Plaintiffs have been excluded from participation in, and have been

16   denied the benefits of educational and other programs at SFSU.

17           205.    Title VI Jewish Plaintiffs have been subjected to discrimination by SFSU and CSU

18   based on their Jewish ancestry and religion.  SFSU's and CSU's actions and conduct had, and

19   continue to have, a differential or disparate impact upon Title VI Jewish Plaintiffs as Jews. SFSU's

20   and CSU's actions and conduct were, and continue to be, intended to treat Title VI Jewish Plaintiffs

21   differently as Jews than similarly situated non-Jewish students.

22           206.    SFSU and CSU have directly and intentionally discriminated against Title VI Jewish

23   Plaintiffs.

24           207.    SFSU and CSU have also failed to prevent harassment and intimidation of, and

25   discrimination against Title VI Jewish Plaintiffs by other SFSU students, faculty, and administrators.

26           208.    At least Plaintiffs Kern and Gershon are entitled to appropriate injunctive relief under

27   Title VI, as SFSU and CSU have had knowledge of, and have been and continue to be deliberately

28                                        44

indifferent to a racially hostile environment that is severe, persistent, and pervasive.

209.    Title VI Jewish Plaintiffs are entitled to monetary damages under Title VI, as SFSU and CSU have had knowledge of, and have been and continue to be deliberately indifferent to a racially hostile environment that is so severe, persistent and pervasive.

210.    The racially hostile environment at SFSU is sufficiently severe, persistent, and pervasive that it can be said to deprive Jewish students, including Title VI Jewish Plaintiffs, of equal access to the educational opportunities and benefits provided by SFSU and CSU.

211.    SFSU and CSU are not only aware of the racially hostile environment towards Jewish students, they themselves have actively and intentionally engaged in and condoned this pattern of severe and/or pervasive discrimination.

212.    SFSU and CSU acted with deliberate indifference towards the pervasively hostile, anti-Jewish environment Title VI Jewish Plaintiffs, as Jewish students, faced and continue to face.

213.    SFSU also acted with deliberate indifference to the discrimination and other unlawful acts against the Title VI Jewish Plaintiffs as stated herein which were objectively offensive, severe, and/or pervasive, and in violation of Title VI.

214.    SFSU and CSU have failed to cure or otherwise adequately address this discrimination against Title VI Jewish Plaintiffs or the racially hostile environment suffered by Title VI Plaintiffs and other Jewish students on SFSU's campus.

215.    Title VI Jewish Plaintiffs have suffered damages as a result of the violations of Title VI by SFSU and CSU as set forth above.

## **EIGHTH CAUSE OF ACTION**

**CLAIM UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d *et seq*.**

**(Asserted by Title VI Israeli Plaintiffs against Defendants CSU and SFSU)**

216.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

217.    SFSU and CSU receive financial assistance from the United States Department of Education and are thus subject to suit under Title VI of the Civil Rights Act of 1964 ("Title VI").

218.    Discrimination against Israelis on account of their national origin and/or ancestry is prohibited under Title VI, as reflected in the written policies of the Department of Education's Office for Civil Rights.

219.    Title VI Israeli Plaintiffs are of Israeli national origin or ancestry, and their status and identification as Israeli brings them within the scope of Title VI's protections.

220.    Title VI Israeli Plaintiffs have been excluded from participation in, and have been denied the benefits of educational and other programs at SFSU.

221.    Title VI Israeli Plaintiffs have been subjected to discrimination by SFSU and CSU based on their Israeli national origin and/or ancestry. SFSU's and CSU's actions and conduct had, and continue to have, a differential or disparate impact upon Title VI Plaintiffs as Israelis. SFSU's and CSU's actions and conduct were, and continue to be, intended to treat Title VI Plaintiffs differently as Israelis than similarly situated non-Israeli students.

222.    SFSU and CSU have directly and intentionally discriminated against Title VI Israeli Plaintiffs.

223.    SFSU and CSU have also failed to prevent harassment and intimidation of, and discrimination against Title VI Israeli Plaintiffs by other SFSU students, faculty, and administrators.

224.    At least Plaintiffs Kern and Gershon are entitled to appropriate injunctive relief under Title VI, as SFSU and CSU have had knowledge of, and have been and continue to be deliberately indifferent to a hostile environment based on national origin that is severe, persistent, and pervasive.

225.    Title VI Israeli Plaintiffs are entitled to monetary damages under Title VI, as SFSU and CSU have had knowledge of, and have been and continue to be deliberately indifferent to a national origin/ancestry-based hostile environment that is severe, persistent and pervasive.

226.    The hostile environment based on national origin/ancestry is sufficiently severe, persistent, and pervasive that it can be said to deprive Israeli students, including Title VI Israeli Plaintiffs, of equal access to the educational opportunities and benefits provided by SFSU and CSU.

227.    SFSU and CSU are not only aware of the hostile environment based on national origin/ancestry towards Israeli students, they themselves have actively and intentionally engaged in

and condoned this pattern of severe and/or pervasive discrimination.

228.    SFSU and CSU acted with deliberate indifference towards the pervasively hostile, anti-Israeli environment Title VI Israeli Plaintiffs, as Israeli students, faced and continue to face.

229.    SFSU also acted with deliberate indifference to the discrimination and other unlawful acts against the Title VI Israeli Plaintiffs as stated herein which were objectively offensive, severe, and/or pervasive, and in violation of Title VI.

230.    SFSU and CSU have failed to cure or otherwise adequately address this discrimination against Title VI Israeli Plaintiffs or the hostile environment based on national origin/ancestry suffered by Title VI Plaintiffs and other Israeli students on SFSU's campus.

231.    Title VI Israeli Plaintiffs have suffered damages as a result of the violations of Title VI by SFSU and CSU as set forth above.

## NINTH CAUSE OF ACTION

### CLAIM UNDER THE DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 and 2202

**(Asserted by Title VI Jewish Plaintiffs against all individual Defendants other than Abdulhadi)**

232.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

233.    Title VI Jewish and Israeli Plaintiffs are entitled to obtain declaratory relief pursuant to 28 U.S.C §§ 2201 and 2202.

234.    Providing Title VI Jewish and Israeli Plaintiffs with declaratory relief will clarify the rights of the Title VI Plaintiffs and similarly situated individuals, and settle the legal issues presented in an efficient matter.   Title VI Plaintiffs seek declaratory relief based on the conduct of Defendants Wong, Hong, Birello, Begley, Stuart, del Valle, Parson, Montiero and Jaramilla ("Declaratory Defendants") in their official capacities.

235.    As set forth above, Declaratory Defendants have violated Title VI Jewish and Israeli Plaintiffs' rights under the Title VI of the Civil Rights Act of 1964 42 U.S.C. §§ 2000d *et seq*, giving rise to an actual controversy such that the Court can accurately determine the facts, resolve the conflict, and grant specific and conclusive relief.

236.   As set forth above, Declaratory Defendants have violated Title VI Plaintiffs' rights under the First Amendment and Fourteenth Amendments of the United States Constitution, giving rise to an actual controversy such that the Court can accurately determine the facts, resolve the conflict, and grant specific and conclusive relief.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs have suffered an irreparable injury for which remedies available at law are inadequate to compensate, and considering the balance of hardships between Plaintiffs and Defendants a remedy in equity is warranted, and the public interest would not be disserved by permanent injunctive relief, Plaintiffs respectfully request that the Court enter judgment against Defendants alleged in this Complaint and award the following relief:

a.   An injunction preliminarily and permanently enjoining Defendants and their agents from establishing, maintaining, or executing policies, practices, or procedures that penalize, discriminate against, or violate the free speech or equal protection rights of Jewish students or visiting Jewish members of the community in any way;

b.   Declaratory judgment, adjudging and declaring that the actions of Defendants:

   1.   Violated, and continue to violate, the First Amendment of the United States Constitution;

   2.   Violated, and continue to violate, the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

   3.   Violated, and continue to violate, the requirements of Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d *et seq.*

c.   The records requested in the Lawfare Project's Second and Third Addenda

d.   Monetary damages for intentional discrimination in an amount to be proven at trial;

e.   Compensatory damages for the emotional distress suffered by Plaintiffs caused by Defendants' denial of equal protection of the laws and Defendants' violation of Plaintiffs' First Amendment rights, in an amount to be proven at trial;

f.   Damages for Defendants' denial of equal protection of the laws pursuant to the Fourteenth Amendment and Defendants' violation of Plaintiffs' First Amendment rights;

1    g.    Punitive damages to sanction Defendants' deliberate misconduct and to deter Defendants and

2    others from engaging in similar racially discriminatory and retaliatory actions in the future;

3    h.    Plaintiffs' reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, costs of suit and

4    reasonable expenses;

5    i.    Pre-and post-judgment interest at the maximum rate allowable by the law; and

6    j.    Any other relief which this Court may deem just and proper, including but not limited to any

7    appropriate mechanism for the oversight and continued enforcement of injunctive relief

8    against Defendants.

9    Dated:  May 31, 2018        WINSTON & STRAWN LLP

By:  */s/ Robb C. Adkins*

Robb C. Adkins
Lawrence M. Hill (*pro hac vice*)
Krista M. Enns
Steffen N. Johnson (*pro hac vice*)
Lowell Jacobson (*pro hac vice*)
Seth Weisburst
Alexa Perlman (*pro hac vice*)
Adrianne Rosenbluth (*pro hac vice*)
WINSTON & STRAWN LLP

Brooke Goldstein (*pro hac vice*)
Amanda Berman (*pro hac vice*)
THE LAWFARE PROJECT

Attorneys for Plaintiffs
JACOB MANDEL, CHARLES VOLK, LIAM KERN, SHACHAR BEN-DAVID, MICHAELA GERSHON, MASHA MERKULOVA, and STEPHANIE ROSEKIND

49

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  May 31, 2018                          WINSTON & STRAWN LLP

By:  */s/ Robb C. Adkins*

Robb C. Adkins
Lawrence M. Hill (*pro hac vice*)
Krista M. Enns
Steffen N. Johnson (*pro hac vice*)
Lowell Jacobson (*pro hac vice*)
Seth Weisburst
Alexa Perlman (*pro hac vice*)
Adrianne Rosenbluth (*pro hac vice*)
WINSTON & STRAWN LLP

Brooke Goldstein (*pro hac vice*)
Amanda Berman (*pro hac vice*)
THE LAWFARE PROJECT

Attorneys for Plaintiffs JACOB MANDEL,
CHARLES VOLK, LIAM KERN, SHACHAR
BEN-DAVID, MICHAELA GERSHON,
MASHA MERKULOVA, and STEPHANIE
ROSEKIND

SECOND AMENDED COMPLAINT
Case No. 3:17-CV-03511-WHO