UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JACOB MANDEL, et al.,

          Plaintiffs,

    v.

BOARD OF TRUSTEES OF THE
CALIFORNIA STATE UNIVERSITY, et
al.,

          Defendants.

Case No. 17-cv-03511-WHO

**ORDER GRANTING MOTIONS TO
DISMISS**

Re: Dkt. Nos. 131, 136, 138, 141, 151

In this action, plaintiffs allege that defendants have tolerated and, in some instances, fostered or encouraged anti-Semitic conduct on the San Francisco State University campus. On the prior motions to dismiss, I dismissed the FAC as to all defendants after exhaustively reviewing the 76-page, 248 paragraph First Amended Complaint ("FAC") and explained in detail why plaintiffs' allegations were insufficient to support their claims. Dkt. No. 124 (the "March 2018 Order"). Plaintiffs filed a Second Amended Complaint ('SAC'), adding new plaintiffs and dropping some defendants but maintaining the same essential causes of action. Perhaps to avoid the import of my prior ruling, plaintiffs shifted their theories away from claims of invidious discrimination based on religion and national origin and towards viewpoint discrimination based on political positions that plaintiffs allege are tied to their Jewish identity or Israeli ancestry.

This shift in theories, however, does not save the SAC from dismissal. While I understand that these plaintiffs, and some other members of the Jewish or Israeli community in or around SFSU, feel deeply that SFSU has not done enough to curtail others' anti-Semitic behaviors and to foster a better environment for Jewish and pro-Israeli students, the acts described in the SAC do not adequately allege a violation of federal anti-discrimination laws so that liability may be imposed on SFSU, its administrators, or its faculty.

# BACKGROUND

## I. FACTUAL BACKGROUND

Plaintiffs, five current and former Jewish students who attended or attend San Francisco State University and two Jewish community members,[1] filed this suit generally alleging that the defendants have tolerated, and in some instances fostered or encouraged, anti-Semitic conduct on the SFSU campus.[2] The SAC alleges a rise in anti-Semitism in general and an alleged long history of toleration of anti-Semitism and anti-Israeli sentiments at SFSU in particular.

The general allegations regarding anti-Semitic and anti-Israel activity at SFSU center on events supported by and positions taken by the GUPS, COES, and AMED. The SAC focuses specifically on positions taken by defendants Abdulhadi and Monteiro calling for the academic and cultural boycott of and elimination of Israel ("anti-normalization policy"). SAC ¶¶ 36-38.[3]

[1] Plaintiff Jacob Mandel is a Jewish SFSU alumnus (attending from 2013-2016) and was the former student President of Hillel at SFSU. Second Amended Complaint (SAC) ¶ 10. Charles Volk is Jewish and was a registered student at SFSU from 2013-2017. *Id.* ¶ 11. Liam Kern is a current SFSU student (starting 2015) who is Jewish. *Id.* ¶ 12. Michaela Gershon is a Jewish student with Israeli ancestry who has been registered at SFSU since 2016. *Id.* ¶ 13. Shachar Ben-David is a Jewish and Israeli alumnus who was enrolled as a student from 2012-2014. *Id.* ¶ 15. Plaintiff Masha Merkulova is a Jewish member of the community who came to SFSU with her son to hear a speech by Jerusalem's mayor Nir Barkat. *Id.* ¶ 15. Plaintiff Stephanie Rosekind is a member of the community who came to SFSU to hear the Barkat speech. *Id.* ¶ 16. As used below, the "Barkat Removal Plaintiffs" are Merkulova, Rosekind, Mandel, Volk and Kern. *Id.* ¶¶ 15, 16, 17. The "Know Your Rights Fair (KYRF) Plaintiffs" are Mandel, Volk, Kern, and Gershon. *Id.* ¶ 18. The "Title VI Jewish Plaintiffs" are Mandel, Volk, Kern, Ben-David, and Gershon. *Id.* ¶ 19. The "Title VI Israeli Plaintiffs" are Mandel, Ben-David, and Gershon. *Id.* ¶ 20.

[2] Defendants the Board of Trustees of the California State University (CSU) and SFSU are referred to as the "Entity Defendants." Defendants Mary Ann Begley (SFSU's Interim Associate Vice President and Dean of Students), Leslie Wong (President of SFSU), Luoluo Hong (SFSU's Vice President for Student Affairs & Enrollment Management, Title IX Coordinator & DHR Administrator), Lawrence Birello (SFSU's Student Organization Coordinator), Reginald Parson (SFSU's Deputy Chief of Police and former Chief of Police), Osvaldo del Valle (SFSU's former Assistant Dean of Students & Director of Student Conduct), Kenneth Monteiro (SFSU's Dean of the College of Ethnic Studies (COES)), Brian Stuart (SFSU's Assistant Dean of Students & Director New Student Programs), and Mark Jaramilla (SFSU's Coordinator of Meeting & Event Services) are referred to as the "Administration Defendants." SAC ¶¶ 23-28, 30-32. Also named as a defendant, and separately represented, is Professor Rabab Abdulhadi, a professor within COES, the faculty advisor to the student group General Union of Palestine Students (GUPS), and a senior scholar of the Arab and Muslim Ethnicities and Diasporas Initiative (AMED). SAC ¶ 29. The individually-named Administration Defendants plus Abdulhadi will be collectively referred to as "Individual Defendants."

[3] In support of her Reply, Abdulhadi requests that the court take judicial notice of the "guidelines"

2

Plaintiffs allege that the adoption of the policy of "anti-normalization" in the COES and AMED departments "mandates" that Abdulhadi and Monteiro "engage in and support efforts to disrupt speech and gatherings in support of Jewish sovereignty and bar Israelis, Zionists, and anyone who acknowledges Israel's actual existence from publicly expressing themselves." The anti-normalization policies adopted by the departments and individuals have allegedly created a hostile environment at SFSU for Jewish and Israeli students. *Id.* ¶ 39; *see also id.* ¶¶ 40-51 (describing two GUPS/AMED sponsored anti-Israel or anti-Zionist events held on campus in 2013 and 2015, describing the violent messages issued at those events, as well as violent threats made by the former president of GUPS and SFSU's alleged failure to respond to those threats).[4] Plaintiffs assert that instead of adequately addressing the threats to Jewish and Israeli-identified students, defendant Wong "directly" contributed to this "pervasively hostile environment for Jews on campus" by praising and encouraging GUPS and its behavior and disregarding the concerns of Jewish groups like Hillel. *Id.* ¶ 51.

Plaintiffs contend that SFSU's discrimination and anti-Semitic attitude are most recently exemplified by two specific events.

## II.    MAYOR BARAK EVENT

On March 28, 2016, the student group Hillel arranged for the Mayor of Jerusalem, Nir Barkat, to speak on SFSU's campus at an event on April 6, 2016 titled "Jerusalem Mayor Nir Barkat: How is a Visionary from the High-Tech Sector Leading a Diverse and Scrutinized City?"

---

for the academic and cultural boycott of Israel, because plaintiffs rely on these guidelines in support of their opposition to the motion to dismiss and cite them in footnote 6 of the SAC and reference the issuing organization at paragraph 37 of the SAC. RJN (Dkt. No. 154), Ex. F. Plaintiffs oppose, arguing that despite their own reliance on these guidelines Abdulhadi's reliance on the full language is simply an attempt to soften or ignore the import of her anti-normalization policy. Dkt. No. 162. The request is GRANTED as to the guidelines that plaintiffs themselves rely on in their SAC, but only for purposes of noting the content of those guidelines.

[4] Plaintiff Ben-David describes violent threats made by the former President of GUPS in 2013, including wanting to kill Israeli soldiers, as a direct threat of violence to her as she is a former Israeli soldier and was in a class with the student who made the threats. *Id.* ¶¶ 47-49. Plaintiffs complain that insufficient actions were taken to protect Jewish or students identified with Israel in general and Ben-David in particular, and that despite his threats, administration officials allowed the student who made the violent threats to finish his degree. *Id.* ¶ 49.

SAC ¶ 52.[5]

### A.    Pre-Event Conduct.

Hillel gave SFSU administrators nine days notice in advance of the event. *Id.* On March 29, 2016, Hillel's director emailed defendants Parson, Hong, and Begley, recommending that the Dean of Students and campus police have a protocol in place in case protestors, particularly GUPS, attempted to disrupt the event. *Id.* ¶ 53. Plaintiff Mandel attempted to secure the permits and a room for the event. *Id.* ¶ 54. Hillel received confirmation from defendant Birello – whose job includes managing student organization events, including assigning space and approving permits for student-sponsored events – that the event was assigned to a room in the Cesar Chavez Student Center (CCSC) in the heart of campus; plaintiffs allege that Begley and Stuart knew of that central campus assignment. *Id.*

Plaintiffs contend that defendants believed protestors would attend and perhaps try to disrupt the event, and that this expectation of a protest is what drove defendants Begley, Hong and Jaramilla, and acceded to by Stuart, Birello, and Wong (collectively the Barkat Removal Defendants), to label the event as controversial and have it moved to a fee-based location on the outskirts of campus. *Id.* ¶ 56. They point to a March 29 email from Begley to Hong, Stuart, and Parson expressing Begley's opinion that the speaker is controversial, that the event may draw protest activity, and that she was concerned "about reserving classroom space during the middle of the day. We may direct them to Seven Hills or another location that would have less impact on classes in the area." *Id.* ¶ 57.

Hong told Wong in an email that she preferred the event happen somewhere else, but if SFSU was "stuck" then she would prefer anything away from CCSC in case there is an incident

[5] The SAC alleges that "Hillel is an SFSU recognized student group, and has been an SFSU-recognized student group at all times relevant to this Complaint. Hillel is the only Jewish organization that represents all Jews on campus *as Jews*, regardless of political ideology, gender, national origin, or any other characteristic. Student Plaintiffs were each members of Hillel while enrolled at SFSU and attended numerous Hillel events." SAC ¶ 34 (emphasis in original). Proposed Amicus Open Hillel disputes that, contending that Hillel excludes Jewish students who do not support Israeli policy and, therefore, cannot represent all Jews on campus. Dkt. No. 141-1 at 6. Open Hillel's motion for leave to file an amicus brief to dispute the "key controversy" of whether Hillel is a home for all Jewish students regardless of political ideology (Dkt. No. 141 at 5) is DENIED. On this motion to dismiss, I assume the truth of plaintiffs' allegations.

given the "powder kegs" all over campus. *Id.* ¶ 58. Wong "lamented" in an email to Hong on March 31, that "there may be no option for us." *Id.* ¶ 59.

Plaintiffs allege that when they became aware that administrators, including Wong, were actively seeking a way to stop the event, Begley, Hong, Stuart, Birello and Jaramilla (with Wong's knowledge of and acquiescence in) "collectively applied an unwritten, unannounced, never-before-enforced and entirely discretionary, standardless policy of moving 'controversial speakers' away from CCSC and to a remote and poorly-known location," which required a fee. *Id.* ¶ 60. Jaramilla informed a Hillel student that the room at CCSC was not available and wrote to Birello that a "conflict" has arisen and the event could not be hosted at CCSC. *Id.* ¶ 61. Begley then confirmed in an email that CCSC was not available and the only other space under consideration was Seven Hills. *Id.* The Seven Hills room required a $356.60 fee (the CCSC room did not), and Hillel paid the fee. *Id.* ¶ 62. According to Mandel, many students with whom he spoke had no idea where Seven Hills was located. *Id.* Plaintiffs allege that the forced-use of Seven Hills and the delay in confirming the location directly hampered Hillel's ability to publicize the event and resulted in deceased attendance. *Id.*

Plaintiffs complain that the "policy" of moving the event to a distance and fee-based room based upon a determination that the event or speaker was "controversial" is arbitrary, subject to ad hoc unchecked and discriminatory application, and applied to target speech based on content, making it unconstitutional. *Id.* ¶¶ 63-65. Plaintiffs complain that in "direct contrast to SFSU's practice regarding expression by Jews," neither a "controversial Palestinian speaker" hosted by GUPS and AMED in 2015 nor any other "controversial" speakers hosted by GUPS, AMED, or COES "were banished to for-fee locations on the outskirts of campus on the basis of either perceived 'controversy' of the events, their content, or any worries about protected activity." *Id.* ¶ 50.

SF Hillel Assistant Director Rachel Nilson communicated with a member of SFSU Police Department, Dave Rodriguez, in the days leading up to the event. Rodriguez informed Nilson that the police expected protesters and intended to erect barriers and have a designated protest area outside the event. *Id.* ¶ 55. Nilson also emailed Begley to ask about what types and levels of

disruption at the event would trigger ejections, but Begley did not respond. *Id.* ¶ 66. Prior to the event, defendant Parson, then-Chief of Police, informed defendants Hong and Begley that "we should consider" having a designated counter-protest area and that if there was a disruption, the police would need a Citizen's Arrest form signed by someone from Hillel in order to remove people from the event. *Id.* ¶ 67.

Plaintiffs allege that Abdulhadi – GUPS's faculty advisor and mentor to its members – "had a particularly close relationship" to the then-President of GUPS Linda Ereikat and the then-Vice President of GUPS Lubna Morrar. *Id.* ¶ 70. Plaintiffs, on information and belief, assert that Abdulhadi mandates that GUPS adopt anti-normalization efforts and, consistent with that "directive" from Abdulhadi, Ereikat and Morrar along with other GUPS members worked to disrupt and shut down the Barkat event. *Id.*

**B.  Conduct During the Event.**

Plaintiffs allege that a group of protestors, including many members of the GUPS and at the direction and with the lead of Ereikat and Morrar, disrupted the event soon after Mayor Barkat started speaking with chants and shouts and used sound amplification devices prohibited by the SFSU Student Code. *Id.* ¶ 69. The chants and shouts were antagonizing and threatening, and made with the intent to prevent the speech from continuing. *Id.*

Mandel asked Parson how the situation was going to be addressed, and Parson replied that he would try to get the group removed to the designated protest area outside. *Id.* ¶ 77. Parson approached the protestors and asked them to leave, but he was ignored. *Id.* The Barkat Shutdown Defendants (Begley, Birello, Parson, del Valle, and Abdulhadi) declined to take any steps to stop or remove the protestors despite the existence of the "free speech zone" set up outside the event. Begley issued a "stand down" order, implemented by Parson with the knowledge of Birello, preventing the police from taking any affirmative actions to stop or remove the protestors. *Id.* ¶ 76. There was no threat of arrest or other action taken by the Barkat Shutdown Defendants to affirmatively get the protestors to stop and allow the event to resume, other than Parson's unenforced request for them to stop and leave. *Id.* ¶ 77. Parson and other officers told Mandel that the "stand down" order was an order to the police from their superiors to ignore protocol

(which was to remove the protestors to the designated protest area). *Id.* ¶ 83.

Plaintiff Merkulova stepped into the hall to call 911 because she felt scared for her physical safety; she was informed that officers were already present. *Id.* ¶ 79. When she approached the officers at the event, they told her they were directed not to intervene in order to protect the protestors' "free speech." *Id.* Plaintiff Rosekind informed a uniformed officer that she did not feel safe. *Id.* ¶ 80. Plaintiffs Mandel and Volk feared for their safety and for the safety of others at the event and plaintiff Kern sought to physically protect them. *Id.* ¶ 81. Aaron Parker (a former named plaintiff who was omitted from the SAC) told Chief Parson that he did not feel safe. Parson asked if Parker would complete a citizen's arrest form but Parson never returned with the form. *Id.* ¶ 82. During the event, Parker was informed by SFSU University Corporation Director Jason Porth that the Barkat Shutdown Defendants did not want to remove the protestors. *Id.*

After Mayor Barkat left the room, the protestors cheered proudly and continued to shout, "Get the fuck off our campus!" to the Barkat Shutdown Plaintiffs. *Id.* ¶ 86. The stand down order created and contributed to this unsafe and hostile environment. According to plaintiffs, it showed the defendants' "utter indifference" to direct threats against Jewish individuals who attended the event. *Id.* ¶ 87.

**C.      Conduct and Investigations After the Event**

In written responses regarding the disruption of the event, as well as in a SFSU-commissioned investigation into the event ("Barkat Report"),[6] SFSU administrators and the Barkat Report concluded that the protestors' use of amplified sound violated school and student policies and disrupted the event. *Id.* ¶¶ 72-74. According to plaintiffs, the Barkat Report concluded that the administrators' refusal to engage the disruptors, and the fact that Parson was the only administrator who told the protestors to stop, meant the administrators "impliedly sanctioned" the disruption. *Id.* ¶ 75.

President Wong, in his communications following the event, "ratified" the actions of Begley, Parson, and Birello, by publicly declaring his support for their conduct and failing to take

---

[6] Various findings of fact from the Barkat Report were cited in the FAC and I took Judicial Notice of that document. March 2018 Order at 5 n.3.

7

any steps to reprimand any of the administrators or publicly state that their behavior was wrong. *Id.* ¶ 85. Defendant Monteiro, in an explicitly "anti-Semitic trope," emailed del Valle, Hong, and Begley after the event comparing Mayor Barkat to "a member of the KKK or Nazi party." *Id.* ¶ 88.

As noted in the Barkat Report, following the shutdown of the event, three students affiliated with Hillel (including Mandel) filed complaints regarding the misconduct of GUPS, but the complainants never received an acknowledgment much less an adequate response from anyone at SFSU. *Id.* ¶ 91. In addition, the complaints were not initially provided to the investigator hired by SFSU (who ultimately issued the Barkat Report), and the investigator characterized that delay as further exhibiting the lack of attention given to the three complaining students and their concerns by the SFSU Administration. *Id.*

Despite Begley promising "follow-up" with respect to the student protestors who disrupted the event, there was none. *Id.* ¶ 92. Defendant del Valle, when meeting with two student protestors from GUPS (with Abdulhadi present as the faculty advisor of GUPS), intimated that the student protestors were "played" and were thus victims of the event because Barkat was brought to SFSU campus to elicit the protests from GUPS and "galvanize the Jewish American community for political gain." *Id.* ¶ 93. Despite acknowledging that the Student Code of Conduct was violated during the protest, del Valle issued a "No Action Letter with a verbal warning," concluding that the GUPS students had learned from their mistakes and were not likely to repeat their behavior. *Id.* ¶ 94. Plaintiffs allege that del Valle later confirmed that no administrator in Student Conduct wanted to bring any charges against GUPS students for disrupting the event and no actions were ever taken against the GUPS student leaders who orchestrated the protest or Abdulhadi who advised and "encouraged" GUPS. *Id.* ¶ 95.

Plaintiffs state that following the Barkat event, the environment on SFSU's campus was toxic. *Id.* ¶ 96. Mandel alleges that he was "stared down" by a male GUPS member shortly after the Barkat event. *Id.* ¶ 89. He asserts that he has been similarly stared down by other GUPS members at "various times on campus" and has felt "unsafe on campus since his freshman year." *Id.* He skipped a political science class because of the "increasingly intimidating" nature of the

8

GUPS and COES "hunger strike," in which participants were chanting anti-Zionist slogans and complaining about the investigation of GUPS students' behavior at the Barkat event. *Id.* ¶ 97. He reported these and "other concerns" to a professor and to SFSU in two EO 1097 complaints on April 6, 2016 and May 2, 2016. *Id.* ¶¶ 89, 97.[7] Those complaints were "disregarded" by SFSU. *Id.* ¶ 97.

Plaintiff Volk felt "sufficiently threatened" by a constant stare down from a GUPS member in his Israeli Conflict class the day after the Mayor Barkat event that anxiety forced him to leave mid-way through class. *Id.* ¶ 90.[8]

Plaintiffs allege that Wong was aware of the fear and intimidation faced by Jewish students on campus following the Barkat event, as confirmed by an email sent by Hillel's director to Wong after Wong held a meeting with students where those students expressed concerns about wearing Stars of David or otherwise outwardly identifying as Jewish on campus. *Id.* ¶ 98. Yet, when Wong held a meeting to discuss the concerns of Jews on campus on June 3, 2016, he was displeased with a list of "demands" made by attendees and expressed his belief that Hillel was partially to blame for the Barkat event disruption given the lack of advance notice. *Id.* ¶ 99. He also conveyed to the students that their concerns were not appropriately directed to him but should be raised with other, lower-level administrators. *Id.* ¶ 100. Wong refused to acknowledge that his concern about the Jewish students having "disproportional access" to him was an anti-Semitic stereotype. *Id.* ¶¶ 101-102. Plaintiffs fault Wong for attempting to get Jewish faculty members to ignore or minimize the problems faced by Jewish students on campus in order to secure a grant from a major Jewish funder. *Id.* ¶¶ 109-110. And plaintiffs argue that Wong has given conflicting definitions of Zionism and "intimated" that "Jews who wanted to be Jews" were not welcome at SFSU. *Id.* ¶ 111.

---

[7] EO 1097 is the CSU systemwide policy prohibiting discrimination, harassment, or retaliation. SAC ¶ 89 n. 19.

[8] Plaintiff Kern's allegations about being subject to verbal assaults and his reluctance to enroll in COES classes, contained in the FAC, have been removed from the SAC. *See* FAC ¶ 24.

### III.    FEBRUARY 2017 KNOW YOUR RIGHTS FAIR.

The KYR Fair plaintiffs[9] allege that in February 2017, Hillel was intentionally excluded from a Know Your Rights Fair ("KYRF").  *Id.* ¶ 112.  Plaintiffs contend that the Fair was an "official event" sponsored by the SF State Faculty Association, the Cesar Chavez Institute, COES, GUPS, and other groups.  *Id.* ¶ 113.  The purpose of the Fair was to inform members of the SFSU community about threats to rights following the last Presidential election.  *Id.* ¶¶ 114-115.  Plaintiffs believe Hillel was invited by accident, and after the invitation was extended KYRF organizers including COES and GUPS worked to find a way to rescind it; "on information and belief" GUPS threatened to dissolve the Fair if Hillel were included.  *Id.* ¶¶ 116-117.

To exclude Hillel, the organizers changed the registration cut-off with the intention of excluding Hillel from the event based on an "inferred viewpoint, derived from and attributed to their Jewish identity."  *Id.* ¶ 118.  Plaintiffs allege Hillel – which is the "only registered student organization representing all Jewish students on campus" – was intentionally excluded.  *Id.* ¶ 119.  Plaintiffs assert that GUPS member and COES graduate student Saliem Shehadeh admitted to intentionally excluding Hillel, and allege that Shehadeh "worked very closely" with Abdulhadi in her graduate studies.  *Id.*  They allege that, consistent with her anti-normalization policy, once Abdulhadi became aware Hillel had been invited, she encouraged Shehadeh and "pulled the strings" resulting in Hillel's exclusion on the basis of Hillel's "Zionist" viewpoint.  *Id.* ¶ 120.[10]  They contend that if Hillel were excluded from the KYRF because of its perceived "Zionist" viewpoint, it is "bigoted and discriminatory to attribute a viewpoint to Hillel" because of its Jewish identity and role as the only organization serving the entire campus Jewish community.  *Id.*

---

[9] The KYR Fair plaintiffs are Mandel, Volk, Kern, and Gershon.  *Id.* ¶ 18.

[10] Abdulhadi requests judicial notice of Shehadeh's post-KYR Fair statement in full, which plaintiffs rely on in paragraph 119 of the SAC.  Dkt. No. 135, Ex. C.  Plaintiffs oppose the request to the extent there are disputed adjudicative facts (regarding why Hillel was excluded) and contend that the reference to the Shehadeh post is "vague" and not "extensive."  Plaintiffs, however, do not dispute that RJN, Ex. C *is* the source of the Shehadeh "public statement" allegation.  Plaintiffs cannot have it both ways.  The RJN is GRANTED under the doctrine of incorporation by reference, but for the limited purpose as to the fact Shehadeh made the statements therein, but not as to the truth is disputed adjudicative facts.  However, Abdulhadi's RJN of Exhibit D, a letter from David Spero, is DENIED.  That letter has not been relied on by plaintiffs and is not otherwise appropriate for incorporation by reference.

¶ 121.

Plaintiffs assert that Hillel's exclusion was "ratified" by the other KYR Fair defendants.[11] In particular, Begley was made aware of the organizers' intent to exclude Hillel 13 days in advance and was informed by Hong that excluding Hillel would be a problem. *Id.* ¶¶ 122. But neither Begley nor Hong took any steps to force the organizers to include Hillel or shut down the event "despite having the authority" to do so. Hillel's director spoke directly to Begley about the exclusion two days before the event, yet again Begley did not act, ratifying the decision. *Id.*

Monteiro also became aware of that an unspecified "problem was unfolding" with the Fair and reversed a prior decision to speak at the event. *Id.* ¶ 123. Plaintiffs contend that as Dean of COES he was empowered to compel the organizers to admit all interested groups or else shut down the event. He did neither, and his failure to act was a ratification of Hillel's exclusion. *Id.* Similarly, Birello and Jaramilla's job titles make them responsible for coordinating and managing student events at SFSU. As a result, they had the power to prevent the intentional exclusion of Hillel but took no steps to do so, and actively allowed Hillel to be excluded because of a viewpoint. *Id.* ¶ 127.

Plaintiffs assert that SFSU commissioned a non-legal investigation into Hillel's exclusion, but has not released the report to the public (KYRF Report). On information and belief, the KYRF Report concluded that Hillel was intentionally excluded and organizers were responsible for "retaliation and intentional discrimination" against Hillel in violation of SFSU's policies. *Id.* ¶¶ 124-125, 135. The intentional discrimination, according to the KYRF Report, was not based on religious discrimination but on viewpoint discrimination, and the retaliation was against specific Hillel-identified students who filed EO complaints related to the Barkat event.[12]

---

[11] The KRY Fair defendants are Wong, Begley, Birello, Monteiro, Abdulhadi, and Jaramilla.

[12] Defendant Abdulhadi asks me to take judicial notice under the doctrine of incorporation of the April 13, 2018 "Executive Order 1096/1097 (Revised) Appeal Response" issued by the CSU's Chancellor's Office of Investigations, Appeals and Compliance. RJN (Dkt. No. 135), Ex. E. Abdulhadi contends this Response is the final action following the SFSU internal investigation and Know Your Rights Report discussed in paragraph 135 of the SAC. The Response describes the conclusions' SFSU reached in its KYRF Report; that Hillel was intentionally excluded from the KYR Fair because of its viewpoint and in retaliation for EO complaints made by Hillel members following the Barkat event, but Hillel was not excluded because of its Jewish religious

## IV.  HARASSMENT AND HOSTILE ENVIRONMENT ALLEGATIONS

To support their Title VI claim, plaintiffs generally describe a "pervasively hostile" environment at SFSU for Jewish and Israeli students.  These allegations generally do not identify specific events or individuals who witnessed or suffered harassment, despite my direction to do so in the March 2018 Order.  Instead, plaintiffs complain that "not once" have incidents of harassment or the fear of Jewish students been taken seriously or addressed "without interminable delay" or responded to with any tangible action by the University.  SAC ¶ 103.  The SAC describes generally verbal threats against "Zionists" and against Israel and in support of Palestinian armed resistance made in graffiti, flyers on campus, social media intimidation (by GUPS leaders, Abdulhadi, and on the AMED Facebook page), as well as conduct that "may be physically threatening, harmful, and humiliating which was made on Title VI-protected race (Jewish) and national origin/ancestry (Israeli) grounds.  *Id*. ¶ 105.[13]  Plaintiffs argue that this "harassment occurs in plain sight and is widespread" and occurs all over campus so must have been known by defendants.  *Id*. ¶ 106.

Apart from these broad and vague statements, only a few incidents of harassment allegedly

---

or identity affiliation.  Plaintiffs oppose this Request for Judicial Notice, arguing that they dispute the facts and findings of CSU, specifically the fact that Hillel's exclusion was not the result of religious discrimination.  Dkt. No. 146.  They also argue because this document has not been publicly released or provided to plaintiffs, it cannot be subject to judicial notice.  *Id*.  I will not take judicial notice of the adjudicative facts contained in the Response for the purpose of *establishing* facts at issue in this case.  However, plaintiffs themselves characterize the findings of SFSU's KYRF Report in their SAC (SAC ¶¶ 124, 125, 135) and do not dispute the Response's characterization of those findings.  Therefore, the RJN is GRANTED in limited part, and judicial notice is taken of the scope of the investigation and conclusions of the Report.  However, the RJN for a post-KYR Fair blog post by Abdulhadi (Dkt. No. 135, Ex. B) is DENIED as that document is not cited to or relied on in the SAC.

[13] The threats presumably are the ones from the former GUPS member in 2013, described by Ben-David, and the two instances of stare-downs described by Mandel and Volk in 2016.  The references to Palestinian armed resistance, presumably, were made during the GUPS-sponsored events in 2013 and 2015.  The social media intimidation, presumably, is Abdulhadi's statement, posted to AMED's Facebook page that Wong's statement that Zionists would be welcome at SFSU was a "declaration of war."  Abdulhadi requests that I take judicial notice of the full content of her Facebook post that plaintiffs rely on in paragraph 130 of the SAC.  Dkt. No. 135, Ex. A.  Plaintiffs oppose that request, arguing that their reliance on the post is not extensive to support incorporation by reference, but then justify their reliance on the post to show Abdulhadi's "reactionary" equation of welcoming Zionists on campus to a declaration of war supporting their "inference" that she Abdulhadi instructed the shutdown of the Barkat event and exclusion of Hillel from the KYRF.  Dkt. No. 146.  Plaintiffs cannot disclaim reliance and affirm reliance at the same time.  The RJN based on the doctrine of incorporation is GRANTED.

1    targeted as specific individuals are identified.  The two "stare downs" suffered by Mandel and

2    Volk following the Barkat event in 2016, and the threats that Ben-David felt were directed at her

3    in 2013, came from fellow students.

4        There is also the added allegation that on the first day of school in September 2016, three

5    Jewish groups (Hillel, AEPi fraternity, and Lambda Chi Mu sorority) were denied tabling permits

6    at the New Student Recruitment fair.  Birello "berated" Mandel regarding what paperwork was

7    necessary to secure the permits for Hillel, but it later turned out Birello was at fault for forgetting

8    to "click" approve in the SFSU system for Hillel.  *Id*. ¶ 108.  The other two groups lost out on 4-5

9    days of tabling in their attempt to get permits and, on information and belief no other groups had

10   "trouble" securing permits.  *Id*.

11       Presumably to bolster their Title VI claim, plaintiffs seek leave to file a "supplement" to

12   the SAC.  Dkt. No. 151.  That supplement details the experiences plaintiff Gershon had in and

13   outside of class with Professor Simmy Makhijani, who taught the "South Asians in America" class

14   through COES.  Gershon alleges that Makhijani learned that Gershon was Jewish and had Israeli

15   ancestry (through an assignment where Gershon focused on her personal experiences witnessing a

16   pattern of targeting and discrimination at SFSU based on both Israeli national origin and Jewish

17   identity).  Dkt. No 151-1, ¶ 4.  After this, Gershon complains that she was frequently "called out in

18   class" and encouraged to join anti-Zionist groups, criticized for her beliefs that people at SFSU

19   demonized Israelis, and lectured that those harassing and targeting Zionists were doing so because

20   of their own oppression.  *Id*. ¶¶ 4-5.  Despite Gershon informing Makhijani that she did not want

21   to have those conversations in front of her peers, the professor continued to target and harass

22   Gershon in and outside of class.  *Id*. ¶ 8.  Based on her observations, Gershon believes that COES

23   faculty "perpetuates a consistent narrative that denies the humanity, civil rights and right to self-

24   determination" of members of her Jewish and Israeli communities.  *Id*.  While Gershon became

25   increasingly uncomfortable, nervous, and upset because of her treatment by the professor, to

26   protect her grade in the class she knew she had to continue showing up and participating.  Gershon

27   is afraid to take any additional classes at COES because she believes she will face the same

28   intimidation, harassment, and discrimination from all COES faculty.  *Id*. ¶ 12. Gershon filed an

EO 1097 complaint with SFSU on May 22, 2018. *Id*. ¶ 11.[14]

More generally, towards the end of the SAC plaintiffs assert – again without any details as to who, when or why, despite being directed to include those sorts of details in their SAC – that "[s]ince the filing of the original Complaint, Jewish and Israeli students have either been excluded from, discriminated against, or proactively decided to self-censor their participation in various events because there is a "universally recognized threat of disruption and even physical violence if they attempt to participate fully and equally." SAC ¶ 130. They allege that Hillel has decided to refrain from holding any events on campus other than religious events because SFSU is not an environment where Jewish students can fully participate in cultural programming. *Id*. But plaintiffs do not support these allegations with facts or by identifying who at Hillel (students or non-student employees) has made those decisions. *Id*.

Plaintiffs point out that when Wong apparently back-tracked and indicated that Zionists *would* be welcomed on campus, Abdulhadi described that statement – in a post on AMED's Facebook page – as a "declaration of war." *Id*. ¶ 130. Various other departments and student groups issued messages in "solidarity" with Abdulhadi's statement and reiterated anti-Zionist statements. *Id*. Following Abdulhadi's Facebook post, anti-Zionist graffiti and posters were found around campus "almost on a daily basis." *Id*. Students, including Gershon, felt that the anti-Zionist statements from Abdulhadi, as well as the graffiti and posters on campus, contributed to the fear and pain Jewish students were feeling. *Id*.

After 36 days, Wong finally spoke on the issue, admitting the Abdulhadi's post could imply "university endorsement." Wong and the Interim Provost were concerned about the perception of SFSU's endorsement of Abdulhadi's comments, and publicly committed to seeing that the post was removed. *Id*. ¶ 130. As of the filing of the SAC, it was still up. *Id*.[15]

---

[14] Defendants object to the request for leave because amendment to include the claims and facts alleged by Gershon would not save the Title VI claim and, therefore, amendment would be futile. Dkt. No. 157. To allow for a clear record, the motion for leave to file is GRANTED and I will fully consider the claims and facts Gershon alleges. As discussed below, even considering those claims and facts, the SAC still fails to allege a viable Title VI claim.

[15] Plaintiffs contrast this delay with Wong's next-day response condemning posters on campus linking Abdulhadi with foreign terrorists. SAC ¶ 131.

Plaintiffs contend that on more than a dozen occasions over the last two years, SFSU, its Board of Trustees and Wong have publicly acknowledged an anti-Semitism problem that pervades SFSU, but have made only "empty and disingenuous promises" to take steps to address the problem. *Id.* ¶ 128. They point to various ineffectual efforts defendants have taken, including: (i) investigations into violations of the Student Code and allegations of discrimination that have resulted in no consequences against the perpetrators, (ii) the existence of unfilled positions for campus climate professionals, (iii) the Working Group on Campus Climate (announced in September 2017) was dissolved almost immediately because of lack of support from Wong; and (iv) that the same fate met the Task Force on Anti-Semitism (also announced in September 2017), which dissolved in the face of no support from Wong or the administration. *Id.* ¶ 129.

Then plaintiffs point to measures they have presumably asked for but SFSU has not implemented, including: (i) training on the existence and enforcement of free speech and time place and matter policies; (ii) training on anti-Semitism; (iii) official apologies for Hillel's intentional exclusion from the KRY Fair; (iv) affirmation by Wong that Zionists are welcome on campus; and (v) further face-to-face meetings by Wong with Jewish campus or community leaders.

Finally, plaintiffs complain that despite Jewish student requests, there is no "representative mural" for Jewish students on campus despite there being others for various minority communities. *Id.* ¶ 107.

## V. CAUSES OF ACTION

Based on these allegations, as amended, the following causes of action are asserted in the SAC:

1. Violation of 42 U.S.C. § 1983 (asserted by the "Barkat Removal Plaintiffs" against the "Barkat Removal Defendants"[16]) based on the violation of these plaintiffs' First Amendment "right to assemble, the right to listen or the right to hear" when these

---

[16] The Barkat Removal Plaintiffs are Mandel, Volk, and Kern. SAC ¶ 65. The Barkat Removal Defendants are Begley, Hong, Jaramilla, Stuart, Birello, and Wong. SAC ¶ 56.

defendants moved the Barkat event to an obscure, for-fee location based on the content or anticipated content of the event and concerns about protests, SAC ¶¶ 138-181;

2. Violation of 42 U.S.C. § 1983 (asserted by the Barkat Removal Plaintiffs against the Barkat Removal Defendants) for denial of equal protection guaranteed by the Fourteenth Amendment, by applying differential treatment to these plaintiffs because, on their information and belief, no other events were banished to for-fee locales on the outskirts of campus based on concerns about controversial speakers drawing protect activity, SAC ¶¶ 151-157;

3. Violation of 42 U.S.C. § 1983 (asserted by "Barkat Shutdown Plaintiffs" against "Barkat Shutdown Defendants"[17]), based on the violation of these plaintiffs' First Amendment "right to assemble, the right to list or the right to hear" when these defendants deviated from normal protocols, state law, and the SFSU Code of Student Conduct and by giving an affirmative "stand down order," SAC ¶¶ 158-16;

4. Violation of 42 U.S.C. § 1983 (asserted by Barkat Shutdown Plaintiffs against Barkat Shutdown Defendants) for denial of equal protection guaranteed by the Fourteenth Amendment, by leaving plaintiffs vulnerable to the violation of their civil rights from a previously anticipated disruption which successfully and intentionally prevented Mayor Barkat from speaking to plaintiffs, and these defendants differentially treated plaintiffs because on information and belief these defendants did not issue "stand down" orders for events "where other viewpoints were expressed," SAC ¶¶ 169-174;

5. Violation of 42 U.S.C. § 1983 (asserted by "KYRF Plaintiffs" against "KYRF Defendants"[18]) based on violations of plaintiffs' First Amendment rights to free speech and assembly related to their exclusion as Jewish students from the KYR Fair, SAC ¶¶ 175-186;

---

[17] The Barkat Shutdown Defendants are Begley, Birello, Parson, del Valle, and Abdulhadi. Abdulhadi is sued for this claim only in her individual capacity. SAC ¶ 159 n. 12.

[18] KYRF Defendants are Wong, Begley, Birello, Monteiro, Abdulhadi, and Jaramilla. Abdulhadi is sued in her individual capacity. SAC ¶ 178 n.18.

6. Violation of 42 U.S.C. § 1983 (asserted by KYRF Plaintiffs against KYRF Defendants) based on denial of equal protection guaranteed by the Fourteenth Amendment, related to their Jewish student organization's intentional exclusion based on the student's Jewish identity and perceived viewpoint from the KYR Fair, denying them the meaningful opportunity to speak and hear about their rights provided to other similarly situated SFSU students, SAC ¶¶ 187-199;

7. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (asserted by "Title VI Jewish Students" against defendants CSU and SFSU), related to SFSU's discrimination against and exclusion of plaintiffs from the benefits of education at SFSU based on their status and identification as members of the Jewish race, Jewish ancestry, and Jewish religion; SAC ¶¶ 200-215;

8. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (asserted by "Title VI Israeli Students" against defendants CSU and SFSU), related to SFSU's discrimination against and exclusion of plaintiffs from the benefits of education at SFSU based on their national origin or ancestry and their identification as Israeli, SAC ¶¶ 216-231; and

9. A claim for Declaratory Relief under 28 U.S.C. §§ 2201, 2202 (asserted by Title VI Jewish Plaintiffs against all defendants other than Abdulhadi).[19]

Defendants, again, move to dismiss, arguing that the newly added factual allegations and clarified theories still do not state a claim against any defendant.[20]

A group of Jewish Studies Scholars and Open Hillel have filed motions for leave to appear as Amicus Curiae, which are opposed by plaintiffs.[21]

---

[19] The SAC's causes of action break out some of plaintiffs' claims into separate causes of action, but encompass the same claims as presented in their FAC.

[20] Defendant Abdulhadi had moved to strike the SAC's quotation of the U.S. State Department's definition of Anti-Semitism, arguing it was distorted and not accurate. Dkt. No. 134. Pursuant to the parties' stipulation, the SAC was amended to correct the quotation of that definition and Abdulhadi's motion was withdrawn. Dkt. No. 144. As before, Abdulhadi separately moves to dismiss the claims asserted against her.

[21] The Jewish Studies Scholars seek leave to file an amicus brief in support of the motions to

17

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." Id. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

**I.    SECTION 1983 CONSTITUTIONAL CLAIMS AGAINST ADMINISTRATION DEFENDANTS**

The Administration Defendants argue that the few additional factual allegations added to the SAC, and plaintiffs' reorganization of their claims into additional causes of action, have not

---

dismiss to demonstrate the "unacceptability of the so-called 'State Department Definition of Antisemitism' that plaintiffs seek to employ in establishing the viability of their complaint." Dkt. No. 138. Plaintiffs oppose the Scholar's motion, arguing that the proposed Amici's filing does not comply with the Northern District's rules and I have already accepted the definition at issue as "potentially relevant." Dkt. No. 140. As an initial matter, although I declined the strike the definition on the prior round of motions, that does not mean I have accepted the definition and rejected any debate over the meaning of anti-Semitism as plaintiffs imply. I only concluded that it should not be stricken from the case. However, the appropriate scope of the definition of anti-Semitism is not key to the resolution of the pending motions. Therefore, the Jewish Studies Scholar's motion for leave (Dkt. No. 138) is DENIED. As noted above, Open Hillel's motion for leave to file an amicus brief to rebut plaintiffs' theory that Hillel represents all Jewish students regardless of political beliefs regarding Israel (Dkt. No. 141) has been DENIED for purposes of ruling on the pending motions to dismiss.

cured the fundamental deficiencies I identified in the March 2018 Order. They urge that plaintiffs fail to plead plausible facts showing intent of invidious discrimination by the Administration Defendants and differential treatment by the Administration Defendants to support plaintiffs' discrimination and equal protection claims.

Plaintiffs switched theories to attempt to avoid the intent hurdles. They now claim that their injuries were not caused by invidious discrimination based on race or religion but were the result of unconstitutional viewpoint discrimination. Defendants argue the new theories do not apply to the types of claims asserted here and cannot save plaintiffs' Section 1983 claims.

As an initial matter, the parties spend significant portions of their briefs arguing whether, in light of my prior, very detailed Order, the Administration Defendants could simply identify how plaintiffs had not cured the deficiencies I identified, or whether the Administration Defendants needed to more exhaustively address plaintiffs' claims. The parties also spend significant time debating whether plaintiffs were given leave to change their theories of discrimination in the SAC, or whether that was prevented by the "law of the case" doctrine. For purposes of the resolution of this case, I will give full consideration to both sides' arguments and theories. The fundamental question before me is straight forward: have plaintiffs stated a claim in their SAC?

**A. First Amendment Claims – Barkat Event**

The essence of plaintiffs' First Amendment Claims surrounding the Barkat event remains the same in the SAC. Plaintiffs claim that the student and community plaintiffs' rights to assemble, listen or hear were infringed by: (i) intentionally assigning the Barkat event to a remove, fee-based location; and (ii) defendants' failure to remove or otherwise stop the protestors and allowing the protestors the shut down the event.

**1. Official Capacity**

As I noted in the March 2018 Order, in order to allege a claim against the individual Administration Defendants in their official capacities, plaintiffs must allege facts plausibly showing that a policy or custom led to their injuries. The FAC did not do so. March 2018 Order at 16. In the SAC, plaintiffs allege a new theory: they were injured when "Defendants Begley, Hong, Stuart, Birello, and Jaramilla collectively applied an unwritten, unannounced, never-before-

enforced and entirely discretionary, standardless policy of moving 'controversial speakers' away from CCSC and to a remote and poorly-known location." SAC ¶ 60.

This "policy" assertion is devoid of any facts regarding its development, adoption, and dissemination to the alleged enforcers of the "policy." The lack of facts is particularly significant here where, as plaintiffs repeatedly admit, SFSU commissioned an in-depth investigation and report (Barkat Report) covering SFSU's conduct before, during, and after the Barkat event. Plaintiffs rely on that Report when it is in their favor, yet cite no facts from the Report or any other source that plausibly suggest this "policy" exists.[22]

As to the second half of their claim, plaintiffs do not attempt to allege a policy with respect to the Administration Defendants' conduct during the Barkat event (the "stand down" order). To the contrary, plaintiffs allege that some of the individual defendants decided to *not* enforce protocols that were in place (*i.e.*, protocols allowing the police to stop or remove the protestors disrupting the event).

Therefore, the only type of liability at issue for the individual Administration Defendants is personal liability. As such, plaintiffs are required to plead specific facts showing that each named defendant directly engaged in culpable conduct. March 2018 Order at 17.

## 2. Individual Liability

In the March 2018 Order I also held that plaintiffs' claims relating to the Barkat event were based on invidious discrimination--the actions by the defendants were taken "because of the plaintiffs' Jewish religion, ethnicity, or perceived pro-Israeli beliefs." March 2018 Order at 17. As such, plaintiffs needed to allege facts showing specific intent against each defendant to hold

---

[22] I recognize that to suffice as an official policy, a policy need not be written; an unwritten and previously unenforced policy can qualify as an official policy. *OSU Student All. v. Ray*, 699 F.3d 1053, 1057 (9th Cir. 2012). But that does not excuse plaintiffs from the burden of pleading facts that plausibly show a policy *exists*, as it admittedly did in *OSU*. *Id*. at 1059. I also recognize that in certain instances a one-time approval of actions by a government body (for example a vote by a legislative body) or a one-time action by a municipal officer who holds final policymaking authority can create *Monell*-policy liability. *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Those cases are inapposite here, where there are no facts alleged that could plausibly support that any particular final policymaking Administration Defendant created, disseminated, or enforced any policy.

them liable.  *Id.*[23]  In order to avoid that holding – likely because as noted in the prior Order even plaintiffs' own allegations and reliance on the Barkat Report showed that defendants took their actions because of fear of disruption to classes, not because of the religious or political content of the talk – plaintiffs now assert they suffered from viewpoint discrimination under the standardless "policy" regarding controversial speakers.  Plaintiffs contend that all the defendants can be held liable for their mere knowledge, even if they did not personally act to move the event to a distant fee-based room.

The fundamental problem with this switch to a theory of viewpoint discrimination, as discussed above, is that plaintiffs plead no facts to support their contention that the location for the event was changed as a result of any official yet standardless policy that could allow for or result in viewpoint discrimination.  Nor did plaintiffs even attempt to allege a policy with respect to the stand down order.[24]

The lack of specific intent alleged for any individual remains an insurmountable problem for both the pre-event removal as well as the stand down order.

### 3.  Infringement of First Amendment Rights – Pre-Event "Removal"

Another reason that this newly broken out claim does not survive is the continued failure to allege infringement on the plaintiffs' fundamental rights.  As I noted in my prior Order, in addition to the lack of allegations to plausibly show that the move to a distant fee-based room was the result of intentional or even viewpoint discrimination, that move *did not* result in an

---

[23] In my prior Order, I explained why plaintiffs' reliance on "cases arising under the Eighth and Fourteenth Amendments that discuss 'deliberate indifference' when conditions of confinement are involved" and allow supervisory liability based on deliberate indifference are irrelevant to the facts of this case.  March 2018 Order at (distinguishing the *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011) line of cases and discussing the distinction recognized in *OSU*, 699 F.3d at 1071).

[24] The "heckler's veto" cases repeatedly relied on by plaintiffs do not support them here.  *See, e.g., Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (striking down an ordinance that failed to contain adequately defined and constrained criteria for setting permit fees because of the danger of unbridled content-based discrimination in setting the fee); *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 787 (9th Cir. 2008) ("If the statute, as read by the police officers on the scene, would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'").

unconstitutional denial of assembly. The event was assigned a room, the fee was paid (and did not prevent assembly), and plaintiffs were able to assemble, at least initially. On the facts alleged, "the fact that [an organizations' members] cannot assemble at that precise location does not equate to a denial of assembly altogether." *San Jose Christian College v. City of Morgan Hill*, 360 F.3d at 1033. Similarly, there are no allegations that the fee imposed a serious burden, affected in a significant way, or substantially restrained the ability of plaintiffs to associate. *Id*.[25]

### 4. Infringement of First Amendment Rights – Barkat "Stand Down" Order

Addressing the newly broken out claim regarding defendants' conduct during the event – failing to stop or remove the protestors – as I noted in my prior Order the claim failed because "[w]hat is lacking from the FAC are plausible allegations that the Administrative Defendants took those intentional acts or intentionally failed to act because of the content of the event's speech, the preferential content for the protectors' speech, or the views or religious beliefs of the attendees or organizers of the event." March 2018 Order at 19. None of these deficiencies have been cured. The new allegations are that the defendants, by failing to prevent or stop the protestors and by issuing the "stand down" order to the police, went against protocol and facilitated or sanctioned the disruption of the event. But without facts plausibly suggesting that the Administration Defendants did so because of the content of the Barkat speech or because of the race, religion, or national origin of the plaintiffs who wished to hear Barkat speak, this claim does not survive.[26]

The final hurdle to this claim is that the injury caused to plaintiffs – their inability to hear the speech by Mayor Barkat – was caused *by the protestors*. Given the facts alleged, and absent any facts that the Administration Defendants intentionally and actively fostered the conduct of the protesters, the claim cannot survive. *Felber v. Yudof*, 851 F.Supp.2d 1182, 1186 (N.D. Cal. 2011) ("[E]ven assuming that plaintiffs have alleged, or could amend to allege, sufficient acts of

---

[25] As I noted in my prior Order, "cases discussing facial or as applied challenges to statutes, permit processes, and other policies that could 'reduce[ ] the size of a speaker's audience can constitute an invasion of a legally protected interest,' are inapposite." March 2018 Order at 18 (quoting *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 130 (4th Cir. 2011)).

[26] As noted above with respect to the pre-event conduct, the heckler's veto cases relied upon by plaintiffs do not assist them here.

harassment and intimidation directed against them based on their religion to be deemed as an interference with their free exercise of that religion, they simply have no basis for pursuing such constitutional claims against defendants. With exceptions not implicated here, state actors have no constitutional obligation to prevent private actors from interfering with the constitutional rights of others.").

Plaintiffs have not stated a First Amendment claim under any of their theories based on any conduct related to the Barkat event.

**B.      Equal Protection Claim – Barkat Pre-Event "Removal"**

To the extent this claim is based on the application of the "standardless previously unenforced policy," it survives only to the extent that First Amendment claim survives. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012) ("[T]he complaint properly alleges that the University infringed plaintiffs' speech rights by employing a standardless policy to draw a distinction between the Liberty and the Barometer and by engaging in viewpoint discrimination. Therefore, the complaint also states equal protection claims for differential treatment that trenched upon a fundamental right."). As noted above, plaintiffs have failed to allege facts supporting their First Amendment claim.

To the extent this claim is based (as it was on the prior round of briefing) on the theory that plaintiffs were denied equal protection because they were subject to treatment (assignment of a distant fee-based room) when others similarly situated were not, they have again failed to plead facts to plausibly support this claim. Plaintiffs plead only on information and belief that other groups with controversial speakers were not treated similarly. SAC ¶ 154 ("On information and belief, no other events were banished to for-fee locales on the outskirts of campus based on concerns about controversial speakers drawing protest activity."). There are no facts, nor even assertions, that other events held in the middle of the day, during class time, in class space, and that were likely to draw protest activity were treated differently than plaintiffs' event, much less that any differential treatment was based on a protected category (race, religion, national origin) or because of the Administration's disapproval of the speaker's content.

Plaintiffs complain that this lack of facts is not their fault, as all of the facts reside in

defendants' possession.  Oppo. to Admin. Def. at 8 & n.11.  Not only does this ignore the admitted reality – the existence of the detailed Barkat Report and investigation – but it is contrary to case law requiring something more than a mere assertion.  *See, e.g.*, *Hightower v. City and County of San Francisco*, 77 F. Supp. 3d 867, 883 (N.D. Cal. 2014), *aff'd sub nom. Taub v. City and County of San Francisco*, 696 Fed. Appx. 181 (9th Cir. 2017) (unpublished) ("Generally, a plaintiff demonstrates an intentionally discriminatory government action by reference to a 'control-group,' against which the plaintiff may contrast enforcement practices."); *compare OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012) (noting the complaint plead facts regarding differential treatment between a number of specifically identified newspapers); *with Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (dismissing complaint where plaintiffs "do not allege specific examples of the Town's proceedings, let alone applications that were made by persons similarly situated."); *see also Moss v. U.S. Secret Serv*., 572 F.3d 962, 971–72 (9th Cir. 2009) (dismissing complaint despite a "non-conclusory factual allegation" of specifically identified differential treatment because while the alleged "facts do not rule out the possibility of viewpoint discrimination, and thus at some level they are consistent with a viable First Amendment claim, [] mere possibility is not enough. The factual content contained within the complaint does not allow us to reasonably infer that the Agents ordered the relocation of Plaintiffs' demonstration because of its anti-Bush message, and it therefore fails to satisfy *Twombly* and *Iqbal*.").

### C.  Equal Protection Claim – Barkat Event "Stand Down" Order

I dismissed this claim on the prior round of briefing because "plaintiffs fail to allege any facts that in materially similar circumstances – an open event where protestors had access, protestors started to disrupt the event, and protestors used prohibited amplification – the Administration Defendants present at the event acted differently. In other words, plaintiffs need to allege that these same defendants have acted in similar circumstances to remove student protestors or instructed the police to do so, in order for a plausible inference to arise that the Administrator Defendants acted the way they did because of Plaintiffs' Jewish identify."  March 2018 Order at 24.

Plaintiffs assert they have done that in the SAC by pointing to evidence that, in this instance, the police were directed to act against established protocol. SAC ¶ 83 ("Chief Parson told Mr. Mandel that the 'stand down' instruction from Defendants Begley, Birello, and the other administrators present was an order to the police by their superiors to ignore protocol, which was to remove the disruptors to the designated protest area. The other officers that had arrived also told Mandel that, despite protocol, they had been instructed to 'stand down.'"). I agree with plaintiffs that this more specific allegation gets them closer, but it still fails to plausibly allege that the "stand down" order was issued *because* Hillel and the Jews in attendance were Jewish or that the decision-makers issued the stand-down order *because* they disagreed with the content of the speech or favored the content of the protestors' speech.[27] Absolutely no facts have been alleged to support their mere assertion of differential treatment.

Plaintiffs have not stated an Equal Protection claim under any of their theories based on any conduct related to the Barkat event.

### D.    First Amendment Claim – KYR Fair

The essence of plaintiffs' First Amendment claim surrounding Hillel's exclusion from the KYR Fair likewise remains the same: plaintiffs were denied the right to assemble, listen or hear, and speak about their rights at the Fair. On the prior round of briefing, this claim was dismissed primarily because plaintiffs failed to allege any facts showing that any Administration Defendant acted to exclude Hillel, and plaintiffs' own specific allegations place responsibility for Hillel's exclusion on the student organizers of the event. March 2018 Order at 20-21.

In the SAC, not surprisingly, the allegations regarding the actual decision makers (students) have been removed. The allegations against the two Administration Defendants

---

[27] I note that there are no facts alleged about the content of the "established" protocol that plaintiffs allege the Administration Defendants violated when issuing the stand down order. Plaintiffs simply assert the established protocol was "to remove the disruptors to the designated protest area," *see* SAC ¶ 83, but allege nothing about the origin, content, or application of that protocol in any circumstance. In paragraph 171 of the SAC plaintiffs' merely assert that "[o]n information and belief, 'stand down' orders were not promulgated to the UPD for events where other viewpoints were expressed." That conclusory allegation provides no details about any other events, much less whether the Administration Defendants were faced with conditions similar to those during the Barkat event.

United States District Court
Northern District of California

plaintiffs focus on – Begley and Monteiro – largely remain the same, but defendant Hong is also alleged as having been "aware" that Hillel might be excluded and that exclusion "would be a problem." SAC ¶ 122. With respect to Begley and Hong, plaintiffs state that despite their advance knowledge of the situation, they took no action "despite having authority [] to compel the inclusion of Hillel." *Id*. Plaintiffs assert that the lack of action by Begley and Hong "ratified" the discriminatory exclusion. *Id*. The allegations against Monteiro are the same that I concluded were deficient last time, except that plaintiffs add an allegation that Monteiro was "empowered" to stop the exclusion and COES' continued sponsorship of the event (even after Monteiro backed out from giving the keynote) constitutes Monteiro's official ratification of the exclusion. *Id*. ¶ 123.

As an initial matter, there are no specific facts added to the SAC that plausibly suggest any of these three Administration Defendants specifically and intentionally excluded Hillel or encouraged Hillel's exclusion. In addition, plaintiffs cite no authority that because these defendants did not act to prevent discrimination by the student organizers – assuming plaintiffs are correct that they had the authority to do so[28] – that they can be placed on the hook for *individual liability* where there are no allegations that any of these Administration Defendants acted (or more accurately failed to act) pursuant to an official policy.[29]

Plaintiffs' reliance on information and belief concerning the conclusions of an investigation by SFSU into this event (KYRF Report) states that "Hillel was in fact intentionally excluded from KYRF, and that the Fair's organizers were responsible for retaliation and intentional discrimination against Hillel and Jewish students at SFSU." *Id*. ¶ 124. But even according to plaintiffs, the KYRF Report put the blame on *the organizers* – who do not include the

---

[28] Plaintiffs simply assert that these Administration Defendants had the authority to either compel the inclusion of Hillel or shut down the Fair upon their knowledge of Hillel's exclusion, but they cite to nothing in any defendant's job description or campus or CSU policy in support. *But see* SAC ¶ 26 & n.3 (describing duties of Student Organization Coordinator); 73 (referring to the CSU Student Code of Conduct (EO 1098)).

[29] The only case provided by plaintiffs on this point is *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995), where the Ninth Circuit held that a "prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" to prevent harm. As noted repeatedly in my prior Order and above, this line of authority from the Eighth Amendment as applied to prisoners is inapposite. *See OSU*, 699 F.3d at 1071 (distinguishing Eighth Amendment cases).

three identified Administration Defendants. *See also* SAC ¶ 125 (describing the planning committee as "self-organized and self-appointed"). Plaintiffs do not allege that any of the Administration Defendants were organizers, nor do they assert that the KYRF Report (or the Response on the appeal from the Report issued by the CSU Chancellor's office) identified any misconduct by any Administration Defendant with respect to the KYR Fair. This is significant and undercuts plaintiffs' continued reliance on the *OSU* opinion.

In *OSU*, the Ninth Circuit concluded that when dealing with the application of a law or official policy that impacted free speech rights, supervisors could be liable for their knowing acquiescence in the acts of their subordinates. *OSU*, 699 F.3d at 1075. Here we are not dealing with application of a law or official policy with respect to the KYRF Fair and the student organizers are not employee-subordinates of the Administration Defendants. As I noted in the prior Order, plaintiffs are attempting to stretch this line of cases into a wholly different context than the employee-employer context out of which it arose.[30]

As to plaintiffs' theory that these Administration Defendants' failure to stop the organizers "ratified" the unconstitutional exclusion of Hillel making them personally liable, plaintiffs cite only one case to support their theory. That case is, again, inapposite. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (recognizing established precedent that a "policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification. Instead, a plaintiff must prove that the policymaker approved of the subordinate's act," and finding sufficient evidence of approval in light of affirmative acts by the supervisor in support of the subordinate's actions).

The allegations against Birello and Jaramilla on this claim are even thinner. Plaintiffs

---

[30] In addition, while plaintiffs repeatedly argue they have adequately alleged viewpoint discrimination by these three Administration Defendants, in order to fall within the holding of *OSU*, they continue to ignore that with respect to the KYR Fair exclusion they have failed to allege the existence of any *policy* that these defendants were allegedly applying in a viewpoint-discriminatory manner. *But see* OSU, 699 F.3d 1066-67 (concluding plaintiffs pleaded sufficient facts to support inference that officials were "enforcing the policy in a viewpoint-discriminatory fashion."). Putting the policy issue aside, there are no facts supporting an inference that *these defendants* acted in order to favor one viewpoint over another with respect to their alleged failure to require the organizers to admit Hillel or their failure to shut the KYR Fair down.

contend that these two Administration Defendants are "each responsible for coordinating and managing student organization events such as KYRF" and "despite these responsibilities, Defendants Birello and Jaramilla had the power to prevent but nevertheless took no steps to stop the admitted intentional discrimination and exclusion of Hillel." *Id.* ¶ 127. There are no allegations that either Birello or Jaramilla had advance knowledge of Hillel's exclusion, and even if facts supporting their knowledge could be added, there are no facts supporting plaintiffs' assertion that Birello and Jaramilla would have been required to act to prevent Hillel's exclusion.

Despite multiple opportunities to amend, plaintiffs have failed to allege facts to state their First Amendment claim against any of the Administration Defendants with respect to the KYR Fair.

### E.     Equal Protection Claim – KYR Fair

In the prior Order, I dismissed this claim against the Administration Defendants because "there are no facts alleged that these individuals had the power to do what plaintiffs seek (require the students to admit Hillel or force the student organizers to cancel the Fair), nor that they acted with the specific intent to deprive the Student Plaintiffs of their equal protection rights because of their Jewish identity." March 2018 Order at 25-26. The SAC does not address these deficiencies other than making assertions that these individuals had the authority and power to compel Hillel's attendance (without any citation to SFSU or more general CSU policies regarding on-campus but student-run events or other facts). More problematic is the continuing inability of plaintiffs to cite facts plausibly showing that these defendants acted with the specific intent to discriminate against plaintiffs and deny them benefits as to which other, *similarly situated* groups are entitled or that defendants exercised their supposed powers and authority in favor of other groups and against plaintiffs.

Also, as I noted in my prior Order, the text of Abdulhadi's blog post was relied on by plaintiffs for evidence that Hillel was intentionally excluded and relied on by Abdulhadi (and to a lesser extent the Administration Defendants) to show that another group representing Jews (Jews for Peace) was allowed to participate in the Fair. March 2018 Motion at 24-25. At that juncture I declined to take judicial notice of the blog post because the full text had not been provided, but

specifically noted that the inclusion of another group representing Jews could create an insurmountable barrier to this claim. *Id*. at 25. Plaintiffs attempt to avoid this issue by characterizing Hillel in the SAC as the only group representing all Jews on campus, a position as noted above that is disputed by proposed Amicus Open Hillel. Taking plaintiffs' allegation about Hillel as true for purposes of this motion and ignoring that in Abdulhadi's blog post (of which I have now taken judicial notice) there is mention of "Jews for Peace" attending the KYRF, this claim still fails. Plaintiffs have not alleged facts showing that the Administration Defendants were required upon notice to step in and either force Hillel's inclusion or shut down the Fair. Even if they had cleared that hurdle, they still fail to allege facts supporting the inference that Hillel was excluded because it represented the interests or viewpoint of Jews and that the Administration Defendants treated other groups, representing other interests or viewpoints, differently.

Despite being given multiple opportunities and guidance about how they could allege their Section 1983 claims against the Administration Defendants, and despite trying new theories, plaintiffs have failed to state their claims. The Section 1983 claims against the Administration Defendants are DISMISSED WITH PREJUDICE.

## II. SECTION 1983 CLAIMS AGAINST ABDULHADI

In the prior Order, I dismissed the Section 1983 claims against Abdulhadi with respect to the Barkat event and the KYR Fair because of the lack of facts supporting a plausible inference that Abdulhadi played any role with respect to what happened at those events, as well as the lack of facts that she acted with specific intent to discriminate against plaintiffs. March 2018 Order at 34-37. I specifically rejected plaintiffs "attempt to build a bridge between Abdulhadi's alleged anti-Zionist and anti-Israel stances, her pro-Palestinian resistance support, and her academic pursuits to support an inference that she must have encouraged GUPS or others to engage in the acts of discrimination complained of." *Id*. at 37.

The SAC made one helpful clarification; plaintiffs repeatedly state that they only sue Abdulhadi in her personal capacity, apparently acknowledging that there was no unconstitutional SFSU "policy" that she is alleged to have created or imposed on plaintiffs. Despite that acknowledgment, they now try to pin on her responsibility for imposing her "anti-normalization"

29

views as *a policy* that COES and its professors, AMED, GUPS (the student group she advises), and her mentee students are required to adhere to and carry out. As an alleged result of Abdulhadi's personal and professional adoption of the anti-normalization policy and her mandate that others follow that policy, plaintiffs contend the Barkat event disruption (started by two of Abdulhadi's mentee students and GUPS leaders) must have been caused by Abdulhadi. Similarly, the exclusion of Hillel from the KYR Fair must have been caused by GUPS members following Abdulhadi's imposed policy, because that policy requires disruption of all "normalization" events.

As an initial matter, none of the "policy" cases discussing the parameters of supervisory liability for supervised-employee's constitutional violations relied on by plaintiffs address the fundamentally different context of a faculty advisor to students and student groups at a university. The employment-liability cases relied on by plaintiffs provide no support for extending the supervisory liability line to this context, especially since Abdulhadi is sued in her personal capacity.

But even if these cases could stretch that far, there is nothing other than conjecture supporting plaintiffs' assumption that Abdulhadi had knowledge of the planned disruption of the Barkat event or exclusion of Hillel, or had the authority or responsibility to stop either situation from unfolding. Her anti-Zionist beliefs, her personal and academic view that Israel should not exist and that no one who believes Israel should exist should be given a public forum to discuss that, and her opposition to allowing Zionists on SFSU's campus, are not facts establishing that Abdulhadi had knowledge of the intent by the student protestors to disrupt the Barkat speech or by the organizers of the KYRF to exclude Hillel. The same goes for plaintiffs' theory that Abdulhadi "caused" the events to unfold the way they did because she "imposed" her anti-normalization policy on GUPS members and mentee students. As before, plaintiffs' conjecture does not support "reasonable inferences" and cannot put Abdulhadi on the hook for personal liability for the conduct of individuals who plaintiffs admit were the direct cause of their injuries.

Plaintiffs' "ratification" argument is similarly misplaced. Even if following the two events, Abdulhadi took actions or spoke out in a way that conveyed her stamp of approval of the involved-students' conduct, that "ratification" is irrelevant. The harm had already been inflicted

30

on the plaintiffs. And, as noted above, this is not an "official policy" or "supervisory liability" case where post-hoc ratification by an official of actions of their supervised-employee make the supervisor or policymaker liable or support an inference of the existence of an official policy. *See, e.g., Dorger v. City of Napa*, 12-CV-440 YGR, 2012 WL 3791447, at *5 (N.D. Cal. Aug. 31, 2012) (recognizing that post-hoc conduct by policymakers and supervisors of their employee or subordinate's behaviors can constitute evidence of an official policy under *Monell*); *see also OSU*, 699 F.3d at 1076.

Plaintiffs, again, complain that their lack facts plausibly supporting the claim that Abdulhadi took direct action (or knowing inaction) with respect to the students' conduct during the Barkat event or KYR Fair is due to those facts being within Abdulhabi's possession. That, again, ignores that there have been investigations into these events (conducted or initiated by SFSU or CSU) and reports issued that plaintiffs themselves repeatedly cite as support for their other factual assertions. But more significantly, the only facts plaintiffs have alleged are: Abdulhadi subscribes to anti-Zionist and anti-normalization policies; Abdulhadi is a faculty member of COES and AMED and COES and AMED have sponsored anti-Zionist events at SFSU; Abdulhadi is the faculty advisor to GUPS; and Abdulhadi has a mentee relationship with some of the students who disrupted the Barkat event and excluded Hillel. These allegations do not, contrary to plaintiffs' assertion, plausibly or even reasonably suggest Abdulhadi directed or caused the injuries to the plaintiffs.

The claims against Abdulhadi are DISMISSED, and given the multiple opportunities plaintiffs have had to amend, it is dismissed WITH PREJUDICE.[31]

## III.  TITLE VI CLAIMS

In dismissing the Title VI claim in the FAC, I found that plaintiffs had not adequately alleged facts: (i) showing a pervasive hostile environment towards Jewish students (created either

---

[31] As such, I need not consider Abdulhadi's additional arguments that plaintiffs lack standing, that Abdulhadi was not acting as a "state actor" and did not exercise sufficient control over the students to satisfy the "joint action" test, that Abdulhadi is protected by qualified immunity, and that plaintiffs' theory impermissibly seeks to hold Abdulhadi liable for her own First Amendment protected academic freedom and speech.

United States District Court
Northern District of California

by peers or by SFSU employees); (ii) that SFSU and its responses to the complaint rose to the level of "deliberate indifference" to the harassment; and (iii) that the plaintiffs suffered a sufficient, concrete, and negative effect on their education. March 2018 Order at 28-33. In the SAC, plaintiffs break out their Title VI claims into two sub-claims: one on behalf of Jewish students (race) and one on behalf of Israeli students (national origin/ancestry). Presumably, they do so because a significant amount of the acts and speech they complain of were allegedly targeted at Zionists and (by implication) Israel.

Plaintiffs add more details regarding the alleged incidents of harassment and hostility, as to the Administration Defendants' notice of those incidents, and how the harassment and hostility has impacted the plaintiffs' education. They also move for leave to "supplement" the SAC to add allegations regarding the harassment plaintiff Gershon suffered from a professor in COES because of her Jewish identity and/or Israeli ancestry. I will consider these supplemented allegations,[32] but the Title VI claims must still be dismissed even when those allegations are combined with all of the other specifically alleged incidents of harassment and hostility alleged in the SAC.

### A. Direct Discrimination

As described in the prior Order, the allegations of direct discrimination generally rise and fall with the Section 1983 claims addressed and rejected above. March 2018 Order at 28. In the SAC, however, plaintiffs argue that the individual defendants engaged in instances of "direct discrimination" in addition to the events surrounding the Barkat event and the KYR Fair already discussed.

To state a claim for direct discrimination under Title VI, plaintiffs need "to plead facts demonstrating that (1) they are part of a protected class, (2) they were treated differently from similarly situated individuals, and (3) this treatment was motivated by their protected status. *See Rashan v. Geissberger*, 764 F.3d 1179, 1182 (9th Cir. 2014); *see also TC v. Valley Cent. School Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011) ("[A] claim of discrimination under Title VI must plead (1) that defendants discriminated against them on the basis of race, (2) that the

---

[32] Plaintiffs' motion for leave to file their supplement (Dkt. No. 151) is GRANTED.

discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for defendants' actions.").") March 2018 Order at 27.

These incidents of direct discrimination are identified as including "but are hardly limited to" "President Wong's intimation that Jews who want to be Jews are not welcome on campus, Defendant Abdulhadi's statement that Zionists being welcome on campus was 'a declaration of war,' and the statements offered in support by other faculty and academic departments." Oppo. at 12. However, even plaintiffs do not contend that these discrete statements constitute direct discrimination *against* Jewish or Israeli students on campus that led directly to a denial of equal access to education or educational opportunities. Instead, they say that these allegations are part of their showing of a hostile environment and the administration's alleged failure to respond appropriately.

### B. Hostile Environment

A hostile environment is one that is "so severe, pervasive, and objectively offensive, and that so detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999) (discussing the standard for harassment claims under the analogous Title IX framework); *see also Monteiro*, 158 F.3d at 1033 (a "hostile environment" adequately alleged "if it is sufficiently severe that it would interfere with the educational program of a reasonable person of the same age and race as the victim"); *Hayut v. State U. of New York*, 352 F.3d 733, 745 (2d Cir. 2003) (pervasive means more than episodic, they must be sufficiently continuous and concerted).[33]

As to peer-to-peer conduct, those incidents include: (i) anti-Zionist and anti-Israeli graffiti and posters on campus;[34] (ii) Mandel being stared down immediately after the Barkat event and at

---

[33] In the March 2018 Order I explained that the incidents that could support a hostile environment claim under Title VI should have occurred shortly before and during the time the Title VI plaintiffs attended SFSU so that plaintiffs were aware of those incidents. March 2018 Order at 29-30; *see also Felber v. Yudof*, 851 F.Supp.2d 1182, 1188 (N.D. Cal. 2011) ("[A]cts occurring years before plaintiffs ever enrolled at UC Berkeley, and/or on different campuses entirely, does little to demonstrate that plaintiffs suffered severe and pervasive harassment.").

[34] The only indication of the contents of this graffiti and these flyers is found in paragraph 105:

"various times" by GUPS members and having felt unsafe on campus since his freshman year; (iii) Volk being "stared down" by a GUPS member in one of his classes on one day; (iv) the threats of violence the former GUPS member (who was in the same class as plaintiff Ben-David) made against Israelis and Israeli soldiers and who was allowed to return to school; (v) the fact that some unidentified students hide or do not wear Stars of David on campus; (vi) and "self-censoring" undertaken by unidentified students who avoid attending or participating in events or identifying as Jewish to avoid expected hostility from peers.

As to hostile conduct by University employees – in addition to the anti-Zionist comments made by Wong and then Abdulhadi, and by other departments in support of Abdulhadi – plaintiffs identify the following: (i) one instance in September 2016 where tabling permits were denied to three Jewish groups in (one, admittedly due to the error of a defendant Birello); (ii) the additional complaints by Gershon regarding her alleged harassment by Professor Makhijani (Dkt. No. 151-1); (iii) complaints about SFSU's and the Administration's failure to respond to Jewish students' complaints about their fears for safety; and (iv) allegations of a lack of any "real" progress on meeting Jewish student and faculty concerns about anti-Semitism and the safety of Jewish students on campus. Reading the SAC generously, plaintiffs may also be alleging, (v) that Abdulhadi and Monteiro create a hostile environment through their efforts to have anti-normalization be the official policy of COES and AMED. SAC ¶¶ 38-39.

Viewed in totality, it is highly questionable whether these incidents are so severe and pervasive as to constitute a hostile environment under Title VI. Most of the peer-to-peer incidents were isolated (*e.g.*, two incidents of stare downs, one set of threats of violence), and the others are vague and lack substantiating specifics (existence of undated graffiti/posters of unknown duration, unidentified students and identified student groups self-censoring from unspecified events during during unspecified times).

---

"Zionists NOT Welcome," "Zionists support genocide," "F[ ]ck Zionists," "Zionists are NOT Welcome on This Campus," with comparisons of Zionists to white supremacists. SAC ¶ 105. There are no specific dates provided as to when these flyers and the graffiti were seen, although the Hillel director characterized these events as occurring on a "daily basis" after Wong's allegedly pro-Zionist statement and Abdulhadi's reaction to the same came out. *Id.* ¶¶ 130 – 131.

34

United States District Court
Northern District of California

As to the conduct by the Administration, the alleged failures to address the concerns of students are more appropriately considered in the "adequacy of the response" section below. Plaintiffs cite no case law holding that University's response to complaints can, itself, be considered part of the *creation* of the hostile environment. The conduct with respect to Gershon's professor could be considered hostile as to Gershon herself, but plaintiffs do not allege that any other students knew of this conduct or that it impacted *their* environment; it is instead offered as evidence that anti-Jewish or anti-Israeli sentiment is pervasive in COES. But this is the only first-hand allegation of discrimination towards Jewish or Israeli-identified students from professors within COES. This set of incidents between Gershon and her professor are more appropriately considered in weighing the allegations of a deficient response by the Administration to complaints of harassment. *See, e.g., Thomas v. City College of San Francisco*, 15-CV-05504-HSG, 2017 WL 1315592, at *3 (N.D. Cal. Apr. 7, 2017), *aff'd sub nom. Thomas v. San Francisco Community College Dist.*, 708 Fed. Appx. 398 (9th Cir. 2017) (unpublished) (rejecting Title VI claim based on conduct between a professor and students because allegations "address only [professor's] conduct rather than any failure on the part of [College], and could not support a finding that Plaintiff was exposed to a racially hostile environment of which [the College] had notice, and to which [the College] failed to respond.").

The only remaining affirmative conduct alleged are the anti-Zionist statements by Wong and Abdulhadi (and then offers of support to Abdulhadi), the alleged efforts of Abdulhadi and Monteiro to have COED and AMED adopt anti-normalization as their official policy, and the one instance of tabling permits being denied.[35] As to the tabling permits, there are no facts alleged that the Jewish-identified groups were denied permits *because of* their Jewish-identity or assumed Israeli ancestry. This discrete incident can only be assumed to have occurred because the groups were Jewish-identified, and assumption by itself is not enough. As to the imposition of the anti-

---

[35] Plaintiffs also allege that SFSU's "cultivation" of the hostile environment is supported by an email Monteiro sent to Defendants del Valle, Hong and Begley after the Barkat event comparing Mayor Barkat to "a member of the KKK or Nazi party." Oppo. at 12; SAC ¶ 88. However, there is no evidence that any student knew of this email and no allegation that and defendant other than Monteiro adopted this sentiment.

35

normalization policy within COES and AMED, there are no facts alleged to support this allegation (such as when the policy was adopted, how it was adopted, how it is implemented). Again, mere assertion is not sufficient.

As to the conduct of Wong, Abdulhadi, and Monteiro, their statements and anti-Zionist efforts can only be considered hostile if I assume the truth of plaintiffs' allegation that anti-Zionist comments are inherently hostile to Jewish identified students or students of Israeli ancestry and reject defendants' argument that the complained-of statements are political speech that is protected, especially on a college campus, by the First Amendment and related notions of academic freedom. The concept of whether anti-Zionist statements are necessarily anti-Jewish or anti-Israeli is, as noted by defendants and the proposed Amici, hotly disputed.

It is a close question whether plaintiffs have plausibly alleged a hostile environment for Jewish and Israeli-ancestry identified students at SFSU. For purposes of this Order, however, I will assume that they have. I do this in large part because I find that the next two issues are dispositive: plaintiffs have not plausibly alleged that defendants acted with deliberate indifference and that their conduct had a significant injurious impact on plaintiffs' education.

C. **Response of University**

I assume that plaintiffs have adequately alleged a hostile environment and likewise assume that SFSU and the Administration were on notice of the hostile events complained of (having been made aware of them in meetings with students, Hillel representatives, and faculty as well as through the EO complaints of Mandel and unspecified others). However, as noted in the March 2018 Order, plaintiffs are also required to plead facts plausibly supporting that SFSU was deliberately indifferent to the complaints. March 2018 Order at 30; *see also Doe v. Willits Unified School Dist.*, 473 Fed. Appx. 775 (9th Cir. 2012) ("Damages under Title IX are available only if an official with authority to address the alleged discrimination and institute corrective measures has actual knowledge of the discrimination and fails to adequately respond—i.e., acts with deliberate indifference." (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

The test for deliberate indifference is "whether a reasonable fact-finder could conclude that the College's response was 'clearly unreasonable in light of the known circumstances.' . . . In

other words, we must decide whether, on this record, one could find that the College made 'an official decision . . . not to remedy the violation.'" *Oden v. Northern Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 641 (1999) and *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998)).

To "meet this high standard there must, in essence, be an official decision not to remedy the violation and this decision must be clearly unreasonable." *Doe v. Willits Unified School Dist.*, 473 Fed. Appx. at 775–76; *see also Monteiro*, 158 F.3d at 1034 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–92 (1989)) ("[T]he district is liable for its failure to act if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that 'it can be said to have been deliberately indifferent to the need.'").

In the SAC, plaintiffs admit that the University has investigated both the Barkat and the KYR Fair incidents. Plaintiffs do not allege there were unreasonable delays or inadequate efforts in those investigations. *See Oden*, 440 F.3d at 1089 ("[T]his record does not permit an inference that the delay was a deliberate attempt to sabotage Plaintiff's complaint or its orderly resolution."). Instead, plaintiffs complain about the outcome of those investigations, in particular that no students or student groups were disciplined as a result of the Barkat and KYR Fair events. They do not allege that the University has not met with the complaining students or student groups. Instead, they complain that in those meetings (and after the meetings) administrators (including Wong) invoked anti-Semitic tropes about undue access of Jewish students to Wong and that little has occurred to resolve the students' and community members' concerns about the environment for Jews and Israeli ancestry students on campus. SAC ¶¶ 100-102.

Plaintiffs are obviously upset that none of the students have been disciplined who were involved in disrupting the Barkat event or in excluding Hillel from the KYR Fair. They may also be upset that none of the administrators who were faulted for not preparing adequately for the protests expected at the Barkat event were sanctioned for their conduct nor otherwise publicly criticized by Wong or others.[36] But plaintiffs are entitled to a fair process, not "the precise remedy

---

[36] Plaintiffs complain that "[d]espite a finding in the University's own commissioned investigation of the KYRF incident that Hillel was intentionally excluded, there has not been a single

that he or she would prefer." *Oden*, 440 F.3d at 1089. Moreover, plaintiffs point to nothing from the various SFSU policies and Student Codes that they have cited throughout this litigation that questions whether ultimate findings of the Reports (or EO complaints) were unreasonable or whether SFSU's response to those findings were unreasonable. There are no allegations that the efforts undertaken by SFSU to remedy the hostile environment are known by SFSU to be inadequate and that SFSU has failed to take additional steps. See *Flores v. Morgan Hill Unified School District*, 324 F.3d 1130, 1335–36 (9th Cir.2003) (finding of deliberate indifference for failure to take any further steps once remedial measures were known to be inadequate).

Significantly, throughout the SAC and including the proposed amendments regarding the alleged harassment of Gerson by her professor, plaintiffs repeatedly recognize that SFSU has taken steps to address their concerns (although they contend those steps have been ineffectual without providing supporting details). *See, e.g.*, SAC ¶ 129 ("Recently announced positions for professionals on campus climate remain unfilled, and individuals interviewed for certain positions came from within COES"); *id.* (noting that both the Working Group on Campus Climate and the Task Force on Anti-Semitism were disbanded shortly after they were announced in September 2017).[37] Similarly, as to Mandel's two EO 1097 complaints (submitted following the Barkat event and describing his missing class and fears about his physical safety), plaintiffs say only that "SFSU refused to act on them" and Mandel's complaints were "disregarded." SAC ¶¶ 89, 97. That is, at best, ambiguous because plaintiffs do not indicate whether the University ignored or refused to investigate the complaints, whether the University is investigating them but taking

---

communication from any defendant with an apology or an acknowledgment of wrongdoing, or, on information and belief, the imposition of any consequences upon the students, student groups, or state actors responsible." SAC ¶ 129.

[37] Plaintiffs' complaint that the positions are unfilled does not show that SFSU isn't committed to filling these positions (by, for example, explaining how long they have been unfilled) or that these positions won't help improve the climate for Jewish students at SFSU. Similarly, plaintiffs' complaint that members of COES have interviewed for these open positions is, again, part of plaintiffs' unsubstantiated, broad brush attack on COES. Plaintiffs specifically identify Professors Abdulhadi and (in supplement) Makhijani as having engaged in what they characterize as harassing behavior – and they seek to extend that characterization to other professors in COES unsubstantiated by facts (other than by Gershon).

unreasonably long, or whether the University resolved them in a way that Mandel felt was insufficient under Title VI.  These allegations do not rise to the level of deliberate indifference.

As to Ben-David, the plaintiff who believes she was the target of threats by the former student and GUPS member, plaintiffs admit that she was given a separate room to take her final exam (presumably so she would not be exposed to the student) and that the then-Dean of Students heard her complaints and "offered a psychological referral and a campus security escort if she felt unsafe."  Plaintiffs complain that the then-Dean and other administrators "refused to do anything to actually address the problem itself—Hammad and his violent threats." *Id*. ¶¶ 47- 48.  But they also state that Ben-David made sure that someone knew where she was at all times during finals week and walked on campus with a Campus Police security escort.  She did not allege that she was unable to attend classes or that her education suffered as a result of the threats.  *Id*.  The allegations regarding SFSU's response to Ben-David do not rise to the level of deliberate indifference.

As to Gershon, plaintiffs admit that her EO 1097 complaint was responded to the next day by an SFSU official, although the follow up meeting had not taken place between its May 22, 2018 filing the June 13, 2018 filing of plaintiffs' supplement.  Clearly, that process is ongoing and plaintiffs have not alleged facts amounting to deliberate indifference.[38]

Considering the totality of the allegations, plaintiffs' own allegations show that SFSU is not ignoring the hostile environment alleged by plaintiffs, but at most assert that SFSU's responses were not sufficient to satisfy plaintiffs and that some of the processes are still ongoing.  Deliberate indifference has not been alleged.

### D.    Impact on Education

Finally, the plaintiffs who are or were students during the relevant time must show that the hostile environment they were subjected to caused "concrete, negative effect" on the victims' education, for example creating "disparately hostile educational environment" relative to a peer,

---

[38] To the extent that Gershon might have a standalone Title VI claim, my Order dismissing her allegations as part of this action, essentially because they are not ripe, would not preclude Gershon from filing a separate claim on her own behalf.

"forcing the student to change his or her study habits or to move to another district," or "lowering the student's grades," or causing anxiety sufficient to require "alternative study arrangements." *Fennell v. Marion Independent School Dist*., 804 F.3d 398, 410 (5th Cir. 2015); *see also Gabrielle M. v. Park Forest-Chicago Heights, IL. School Dist*. 163, 315 F.3d 817, 823 (7th Cir. 2003) ("negative impact on access to education may include dropping grades . . . becoming homebound or hospitalized due to harassment . . . or physical violence"; in that case there was no evidence that plaintiff was denied access to an education where although "she was diagnosed with some psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase."); *Felber*, 851 F. Supp. 2d at 1188 (noting "it was not clear that activities on Sproul Plaza or at Sather Gate necessarily would significantly impede any student's access to the educational services offered by the University" when the incidents alleged "did not occur in the context of her educational pursuits" but when plaintiff was attempting to exercise free speech).

Here, the impacts on the plaintiffs' education are slim. Volk left one class halfway through (the day after the Barkat incident). There are no facts that he missed more classes, he changed his study habits to his detriment, or his grades deteriorated. Mandel skilled skipped one class (again, immediately following the Barkat incident). There are no facts that he missed more classes, he changed his study habits to his detriment, or his grades deteriorated. Ben-David was given an accommodation for her final exam and an escort for her final week on campus, but apparently graduated otherwise without incident. Gershon, perhaps, has the most concrete evidence of an impact on her education. Having had a first-hand experience of harassment by a COES professor, she is afraid to take any other COES classes and does not intend to register for such classes in the future because of her fear of harassment for her religion, beliefs, or perceived national origin/ancestry. However, as to Gershon, because the investigation of her complaint is admittedly ongoing, her allegations standing alone do not save the Title VI claim.

Finally, the fact that some unidentified students self-censored and did not attend, participate or identify as Jewish events because of their fear of hostility is not only fatally vague but also questionable as to the impact on their education. *See, e.g., Felber*, 851 F. Supp. 2d at

40

1188 (noting "it was not clear that activities on Sproul Plaza or at Sather Gate necessarily would significantly impede any student's access to the educational services offered by the University" when the incidents alleged "did not occur in the context of her educational pursuits" but when plaintiff was attempting to exercise free speech).

Reviewing the totality of the Title VI claims on behalf of Jewish students and Israeli-ancestry students, they do not survive because the allegations do not amount to deliberate indifference nor allege sufficient impact on the education of the complaining plaintiffs.

As with the other claims, plaintiffs were given detailed explanations of the multiple deficiencies in their FAC and an opportunity to amend their Title VI claims. They amended but still do not state a claim. In their Opposition to the Administration Defendants' Motion to Dismiss, plaintiffs assert that they are "aware of a large body of information supporting their Title VI claims that are in the possession of third party Hillel" and assume other supporting facts are in defendants' possession. Oppo. to Admin. Defs. at 16. Plaintiffs provide no reason why these facts from Hillel were not included in their SAC and did not explain in their opposition (or at the hearing given my tentative ruling) what those facts are or how they would save the Title VI claims. Plaintiffs are represented by numerous experienced counsel. They have had ample opportunities to attempt to state their Title VI claims but have not been able to do so. Plaintiffs' Title VI claims are DISMISSED WITH PREJUDICE.[39]

## CONCLUSION

For the foregoing reasons, plaintiffs' SAC is DISMISSED WITH PREJUDICE. The Clerk shall enter Judgment.

**IT IS SO ORDERED.**

Dated: October 29, 2018

William H. Orrick
United States District Judge

---

[39] Having dismissed with prejudice each of the substantive claims, the attendant declaratory relief claim likewise fails and must be dismissed.