1  Mark Allen Kleiman (SBN 115919)
2  Law Office of Mark Allen Kleiman
   2907 Stanford Avenue
3  Venice, CA 90292
4  Telephone: (310) 306-8094
   Facsimile: (310) 306-8491
5  Email: mkleiman@quitam.org

6  Ben Gharagozli (SBN 272302)
   Law Offices of Ben Gharagozli
7  2907 Stanford Avenue
8  Marina Del Rey, CA 90292
   Telephone: (661) 607-4665
9  Facsimile: (855) 628-5517
10 Email: ben.gharagozli@gmail.com

11 Attorneys for RABAB ABDULHADI

12              **UNITED STATES DISTRICT COURT**

13             **NORTHERN DISTRICT OF CALIFORNIA**

14 JACOB MANDEL, CHARLES VOLK,        ) Case No.: 3:17-CV-03511-WHO
   LIAM KERN, SHACHAR BEN-DAVID,      )
15 MICHAELA GERSHON, MASHA            )
   MERKULOVA, and STEPHANIE           ) **DECLARATION OF MARK KLEIMAN**
16 ROSEKIND,                          ) **IN SUPPORT OF DEFENDANT,**
                                      ) **RABAB ABDULHADI'S MOTION FOR**
17         Plaintiffs,                ) **SANCTIONS PURSUANT TO 28 U.S.C.**
                                      ) **§ 1927 AND THE COURT'S**
18         v.                         ) **INHERENT AUTHORITY**
19 BOARD OF TRUSTEES of the           )
   CALIFORNIA STATE UNIVERSITY,       )
20 SAN FRANCISCO STATE UNIVERSITY,    ) Date:   May 29, 2019
   RABAB ABDULHADI,                   ) Time:   2:00 p.m.
21 in her individual capacity, and LESLIE ) Location:  Courtroom 2, 17th Floor
   WONG, MARY ANN BEGLEY, LUOLUO      ) Judge:  William H. Orrick
22 HONG, LAWRENCE BIRELLO,            ) Original Action Filed:  June 19, 2017
   REGINALD PARSON, OSVALDO DEL       ) Judgment Entered:  October 29, 2018
23 VALLE, KENNETH MONTEIRO, BIRAN     ) Appeal Dismissed:  March 29, 2019
   STUART, and MARK JARAMILA, in their ) Remand to District Court:  April 8, 2019
24 official and individual capacities,   )
25                                     )
           Defendants.                )
26                                     )
                                      )
27                                     )
   _____ )
28
   _____
      DECLARATION OF MARK KLEIMAN IN SUPPORT OF DEFENDANT, RABAB
      ABDULHADI'S MOTION FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927
                  AND THE COURT'S "INHERENT AUTHORITY"
   Case No. 3:17-CV-03511-WHO            1

### DECLARATION OF MARK ALLEN KLEIMAN

I, Mark Allen Kleiman, hereby declare as follows:

I am an attorney at law, duly licensed to practice before all courts in the State of California, and am one of the attorneys of record for Dr. Rabab Abdulhadi.  If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge.

### Qualifications and Experience

1.   I have practiced law continually since 1984.  In addition to the being admitted to the State Bar of California, I am admitted to practice and have practiced before the United States Supreme Court, the District of Columbia Court of Appeals, the Ninth Circuit Court of Appeals, and the Northern, Eastern, Central, and Southern Districts of California.

2.   Although I specialize in representing whistle blowers under the federal False Claims Act, I have also represented plaintiffs in cases brought under 42 U.S.C. §1983 in cases alleging police misconduct or the retaliatory firing of government employees for the exercise of their First Amendment rights.  False Claims Act cases I have filed have led to the recovery of over $700 million for the United States.  I have also won multi-million dollar verdicts in consumer fraud and related cases against proprietary schools and hospitals.

3.   I have lectured at the Columbia University School of Law and the University of North Carolina School of Law.  I have also lectured or presented on panels for the American Bar Association, Federal Bar Association, American Health Lawyers Association, National Employment Lawyers Association, the Los Angeles County Bar Association, Taxpayers Against Fraud, and numerous other specialized organized bar groups.

4.   My co-counsel, Mr. Ben Gharagozli is a 2010 *cum laude* graduate of UC Hastings College of Law where he served as the Development Editor of the Hastings International and Comparative Law Review, with a published Note in 33 Hastings Int'l & Comp. L. Rev., at 203. He has also studied at the International Law Programme at the University of London.  Mr. Gharagozli also earned an M.Phil. at the University of Cambridge in International Relations and Politics where he focused on Middle Eastern Politics.  He served as a judicial extern for Judge

Patel in this Court and a legal extern for the United States Attorney's Office in the Central District of California, which provided him valuable experience in federal legal writing and research.  In private practice since 2010, he has handled matters involving civil rights, employment, constitutional law, defamation, and commercial litigation and successfully argued before the Ninth Circuit Court of Appeals.  Mr. Gharagozli's practice frequently involves both trial and law and motion work.

**The Nature of This Lawsuit and the Activities Necessary**

**to Effectively Defend Her**

5.   Plaintiffs' Counsel repeatedly accused Dr. Abdulhadi of leading an "inherently anti-Semitic movement." Dkt. No. 1, ¶56 and Dkt. No. 57, ¶56.  Had these false allegations somehow stuck it would have been the death penalty for her academic career (including termination from her academic post, disciplinary proceedings and severe reputational harm from being labeled an anti-Semite by a Federal Court).  This is the fate which has befallen Norman Finkelstein, fired from DePaul University, and Steven Salaita, fired from the University of Illinois at Champaign-Urbana.  Neither of these professors was anti-Semitic (in fact, the former is the son of Holocaust survivors), but both were accused of it because of their criticisms of Israel.  Because of the nature of Plaintiffs' Counsel's baseless claims, Dr. Abdulhadi faced dire consequences.   Since Plaintiffs' Counsel chose to draft three wide-ranging complaints which combined, contained allegations that stretched across two hundred pages comprising over 750 paragraphs, our duty was to gain a thorough understanding of the factual claims advanced by Plaintiffs' Counsel.

6.   Under the circumstances, a reasonable inquiry into such facts required acquiring a detailed understanding of the pertinent facts surrounding the Mayor Barkat event in 2016 and the exclusion of Hillel from a student-organized Know Your Rights Fair in 2017.  This is so because Plaintiffs' Counsel accused Dr. Abdulhadi of having directed some of the students most involved in these two events.  Because SFSU organized extensive investigations into each, there were extremely detailed investigative reports, and witness interviews to review.

7.   Similarly, because the three complaints crafted by Plaintiffs' counsel alluded to reports, official university statements, alleged university policies, and statements by nonparty organizations, we had to review numerous documents, comb through university policies, and study press accounts and statements by nonparty organizations.

8.   The strategic problem, which must always be considered before filing a motion under Fed. R. Civ. P. 12(b)(6) is that defendants risk (a) educating plaintiffs' counsel about the exact deficiencies in the factual predicates for plaintiffs' legal theories, and thereby (b) focusing plaintiffs' counsel to precisely which facts need to be developed through investigation or discovery (What is more, filing a motion to dismiss on a claim that defense counsel believes will eventually be successfully amended and prosecuted would only add to the defendant's attorneys' fees liability at the end of the matter.).  A successful strategy requires defendants to gain a firm grasp of the facts so that they understand what plaintiffs' counsel will <u>not</u> be able to allege in a complaint consistent with Counsel's Rule 11 obligations so that the 12(b)(6) motion alerts the court's attention to what those missing facts are and why their absence is significant. Understanding the facts was essential to Dr. Abdulhadi's success in this case.  As an example, Plaintiffs' Counsel could not allege that Dr. Abdulhadi was a supervisor, so they were forced to omit this from their original complaint and amended complaints while trying to argue it in their oppositions and even blurting it out in court. (Dkt. No. 117,  16:3, August 8, 2018.) Similarly, our careful analysis of the documents and organizations Plaintiffs' Counsel invoked or alluded to enabled us to select documents for inclusion in Dr. Abdulhadi's requests for judicial notice.

9.   Plaintiffs' Counsel chose to base most of their allegations against Dr. Abdulhadi on 42 U.S.C. §1983.  Although the statutory language may be straightforward, the thicket of jurisprudence which has sprung up around it is highly technical and extremely demanding, requiring a deep understanding of the outer limits of state action and qualified immunity.  While we were able to benefit from very helpful advice from co-counsel Alan Hunter, the unique

1    factual setting of this case required us to understand the many nuances of these doctrines so we

2    could apply them to this case.

3         10.  The multiparty nature of this litigation also contributed significantly to the effort this

4    case demanded.  Because the Board of Trustees of California State University (and numerous

5    administrators) were also defendants, we had to analyze CSU's two motions to dismiss and two

6    opposition briefs to ensure that our respective positions were not unnecessarily in conflict.

7                    The Reasonable Value of Legal Services, Services Provided. and Costs

8         11.  Just last month Winston & Strawn established the baseline for hourly rates in the

9    Northern District for comparably experienced lawyers.  See Exhibit C, Declaration of Jeffrey L.

10   Kessler in Support of Motion for Attorneys' Fees, Expenses, and Service Awards in In Re:

11   National College Athletic Association Grant-in-Aid Cap Antitrust Litigation, 4:14-MD-02541-

12   CW, Dkt. No. 1169-1, filed in Northern District of California, March 26, 2019.  In a declaration

13   seeking over twenty-four million dollars in legal fees for Winston & Strawn, Mr. Kessler told

14   Judge Wilken that the reasonable hourly value of an attorney with the same amount of

15   experience as Mr. Kleiman was $1,120 per hour in 2017, $1,185 per hour in 2018, and $1,245

16   per hour in 2019. (See pp 10-11 of the Kessler declaration, and p. 26 of Exhibit A showing that

17   Winston partner David Feher graduated from law school in 1984, just as Mr. Kleiman was.)

18        12.  Kessler similarly averred that the reasonable hourly value of an attorney with a

19   similar amount of experience as Mr. Gharagozli was $760 per hour in 2017 and  $820 per hour in

20   2018.  (See pp 10-11 of the  Kessler declaration, and p. 14 of Exhibit A showing that Winston

21   partner Sean Meenan graduated in 2008).  Mr. Gharagozli graduated in 2010, placing him

22   halfway between the attorney class of Mr. Meenan, and the attorney class of Winston & Strawn

23   associate, Jeanifer Parsigian.  (See pp.10-11 of the Kessler declaration and p. 19 of Exhibit A.)

24   Ms. Parsigian's hourly rate was $645 per hour in 2017 and  $720 per hour in 2018. Accordingly,

25   in the below chart the hourly rate for Mr. Gharagozli is calculated as the median between the rate

26   of Mr. Meenan and Ms. Parsigian.   Since the Kessler declaration did not furnish fee data for

27

28

1  2019 for Mr. Meenan or Ms. Parsigian, for 2019, an increase of 5% (the same as for Mr. Feher)

2  is projected, showing that the value of Mr. Gharagozli's time in 2019 should be $805.

3      13.  It is likely that the three Winston & Strawn leaders in the present case charge

4  comparable rates.  Lawrence M. Hill chairs the firm's federal tax controversy practice, and

5  previously served in the Office of Chief Counsel for the Internal Revenue Service and was cross-

6  designated as a Special Assistant United States Attorney.  Attached hereto as Exhibit "A",  pp.

7  1-12 is a true copy of Winston and Strawn's biographical profile of Mr. Hill, found on the firm's

8  website at https://www.winston.com/en/who-we-are/professionals/hill-lawrence-m.html.  (Last

9  visited April 19, 2019.)  Since Mr. Hill has represented the Saudi Royal family in a criminal tax

10 investigation, the inference is that his hourly fee is commensurate with such work.

11     14.  Robb C. Adkins co-chairs Winston & Strawn's White Collar practice and is head of

12 litigation for all of the firm's California offices.  As a government attorney he successfully

13 prosecuted Kenneth Lay and managed the U.S. Attorney's Office for the Southern Division of

14 the Central District of California.  In his twelve years in private practice he has represented

15 mortgage servicing companies and other financial institutions.  Attached hereto as Exhibit "A",

16 pp. 13-16 is a true copy of Winston and Strawn's biographical profile of Mr. Adkins found on

17 the firm's website at https://www.winston.com/en/who-we-are/professionals/adkins-robb-

18 c.html. (Last visited April 19, 2019.)  Since Mr. Adkins represents such large, well-resourced

19 institutions in high-stakes matters, it is likely that his hourly fee is commensurate with such work.

20     15.  Seth Weisburst specializes in defending investigations and prosecutions of financial

21 institutions accused of SEC,  FINRA, and other securities-related fraud, along with his defense

22 of a wide-range of commercial fraud-based torts.  Attached hereto as Exhibit "A",  pp. 17-18 is

23 a true copy of Winston and Strawn's biographical profile of Mr. Weisburst found on the firm's

24 website at https://www.winston.com/en/who-we-are/professionals/weisburst-seth.html#full-bio.

25 (Last visited April 19, 2019.)  White collar defense before the SEC and other regulatory bodies

26 with the power to impose multi-million dollar fines makes it likely that Mr. Weisburst commands

27 a reasonably high hourly fee.

28

16.  Dr. Abdulhadi therefore submits that sanctions for fees should be based upon the following rates:

| Lawyer | 2017 | 2018 | 2019 |
|--------|------|------|------|
| Kleiman | 1,120 | 1,185 | 1,245 |
| Gharagozli | 700 | 770 | 805 |

17.  We believe the rates established by Winston & Strawn are fair and appropriate in this case.  However, out of an abundance of caution, we also refer the Court to the Laffey Matrix, http://www.laffeymatrix.com/see.html, last visited April 18, 2019.  Per the Laffey Matrix, the fees could be based upon the following rates:

| Lawyer | 6/1/17-5/31/18 | 6/1/18-6/1/19 |
|--------|----------------|----------------|
| Kleiman | 864 | 894 |
| Gharagozli | 636 | 658 |

18.  Copies of time records would require a significant investment of resources to review and redact for attorney-client privileged communications and work product, however, they are available upon the Court's request.  The general categories for each attorney break down as follows:

| Lawyer | 2017 (beginning 7/17) | 2018 | 2019 |
|--------|------------------------|------|------|
| **Kleiman** | | | |
| Communication w Co-counsel, Client | 29.1 | 9 | 1.5 |
| Fact Investigation | 22.4 | 0 | 0 |

| | | | |
|---|---|---|---|
| Pleading preparation and review (inc. research and hearing) | 84.3 | 38.2 | 17.9 |
| **Total** | 135.8 | 47.2 | 19.4 |
| **Gharagozli** | | | |
| Communication w Co-counsel, Client | 21 | 15 | 2.5 |
| Fact Investigation | 47 | 3 | 0 |
| Pleading reparation and review (inc. research and hearing) | 109 | 46 | 22 |
| **Total** | 177 | 64 | 24.5 |

19.  Counsel have exercised billing judgement in the following ways:  We have not billed for any time spent on press communications or communications with a political group of concerned scholars, students, and community members which formed to support Dr. Abdulhadi, even though our client requested (and received) our assistance in explaining the case publicly.

20. Defendant has incurred the following liability for fees:

| Lawyer | 2017 | 2018 | 2019 | |
|---|---|---|---|---|
| Kleiman | 135.8 x1120 = 152,096 | 47.2 x1,185 = 55,932 | 19.4 x1,245 = 24,153.00 | |
| Gharagozli | 177 x 700 = 123,900 | 64 x 770 = 49,280 | 24.5 x 805 = 19.722.50 | |
| Total | 275,996 | 105,212 | 43,925.50 | $425,133.50 |

**Costs**

21.  Our necessary litigation costs incurred are listed below:

| Travel | $2,398.96 |
|---|---|
| Pacer/Lexis | $506.33 |
| Shipping/Mailing | $388.16 |
| Miscellaneous | $463.81 |
| Total | $3,757.26 |

22.  Attached hereto as Exhibit "B" is a true and correct copy an article from the Jewish News of Northern California (JWeekly) covering this Court's March 9, 2018 ruling dismissing the First Amended Complaint.  Page two of the article quotes "Lawrence Hill, Lawfare Project chairman and partner at Winston & Strawn" as saying "[W]e will be submitting an amended complaint that clearly and concisely lays out the claims of our plaintiffs".

https://www.jweekly.com/2018/03/12/judge-rejects-lawsuit-alleging-anti-semitism-s-f-state/, last visited April 19, 2019.

23.  Attached hereto as Exhibit "C" is a true and correct copy of the Declaration of Jeffrey L. Kessler in Support of Motion for Attorneys' Fees, Expenses, and Service Awards in In Re: National College Athletic Association Grant-in-Aid Cap Antitrust Litigation, 4:14-MD-02541-CW, Dkt. No. 1169-1, filed in Northern District of California, March 26, 2019.  Pages 10 and 11 establish the fees Winston & Strawn lawyers were charging in 2017-2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 19, 2019 in Venice, California.

_Mark Kleiman_

Mark Kleiman

---

# EXHIBIT A

# Lawrence M. Hill

Partner in New York
lhill@winston.com
+1 212-294-4766 (New York)



**Larry is recognized as one of the world's preeminent tax litigators and advisors. He focuses his practice on the resolution of complex domestic and cross-border civil tax disputes through the IRS administrative process and litigation. He also represents clients in high-profile white collar investigations and criminal trials.**

| | |
|---|---|
| **Services** | Federal Tax Controversy, Tax, White Collar, Regulatory Defense & Investigations, Banking Litigation |
| **Sectors** | Financial Services & Banking, Technology |
| **Admissions** | New York |
| **Court Admissions** | U.S. Tax Court, U.S. Court of Federal Claims, USCA – 2nd Circuit, USCA - 3rd Circuit, USCA - 5th Circuit, USCA – 7th Circuit, USCA - 9th Circuit, Southern District of New York, Eastern District of New York, Northern District of Illinois, District of Colorado, Federal Circuit Court of Appeals |
| **Education** | George Washington University, JD, 1984 |
| | George Washington University, LLM, 1989 |
| | Binghamton University, BA, 1981 |

Lawrence M. Hill is a tax partner in the firm's New York office and is chair of the firm's federal tax controversy practice. Prior to joining Winston, he served as a senior partner and global head of tax controversy and litigation at several major international law firms. Earlier in his career, Larry was a trial attorney and National Tax Shelter Project Attorney with the Office of Chief Counsel of the Internal Revenue Service and a Special Assistant United States Attorney with the United States Attorney's Office in Washington, DC. The IRS honored him twice with Special Achievement Awards for his work as a top trial attorney in the country. Larry also previously served as Assistant General Counsel to a "Big Four" accounting firm.

## Experience

His representations include:

Financial Institutions and Products

- Leading provider of financial services. Lead partner for the Bank in the largest criminal tax investigation in United States history, resulting in one of the few non-prosecution agreements. Also lead partner in the United States Senate Permanent Subcommittee on Investigations hearings; in its IRS promoter penalty investigation; in multiple federal appeals and in over one thousand civil lawsuits and arbitrations involving claims by high net worth customers.
- Lead partner representing a global financial services company in a billion dollar IRS examination involving the deductibility of settlements to government sponsored enterprises and regional Federal Reserve Banks, which resulted in close to a full IRS concession.

- Leading Islamic financial institution. Lead partner in the representation of the Saudi Royal family in a criminal tax investigation and IRS civil examination involving Swiss and Bahamian financial institutions.
- Leading global bank. Lead partner in many of its largest IRS examinations involving a variety of financial products and structured transactions.
- Nine prominent, international financial services companies in IRS examinations and/or IRS Appeals involving complex structured financial products and risk management related matters.
- Three prominent, international financial services companies and a number of other financial institutions in IRS procedural and audit related matters.
- A Swiss Bank as Independent Examiner in conjunction with the United States Justice Department's Swiss Bank Settlement Program resulting in a non-target letter.
- A hedge fund in a German criminal tax investigation and a Swiss tax investigation involving so-called "cum ex trades."
- One of the world's largest banking and financial services organizations. Lead counsel to organization's witnesses in several criminal trials and DOJ investigations involving unreported foreign bank accounts of its customers.
- Lead counsel to a major South American financial institution in a voluntary disclosure proceeding and IRS examination.
- Leading global financial services firm. Lead Appellate Counsel in Third Circuit Court of Appeals cases involving tax penalties.
- Government-sponsored enterprise as a tax litigation consultant in its seminal hedging case victory before the United States Supreme Court.
- One of America's largest private companies. Brought in after trial and successfully mediated a multimillion dollar federal district court decision pending Third Circuit appeal.

High Net Worth Individuals

- The Chairman of the Board of two major public corporations. Lead trial attorney in a multimillion dollar gift tax case in the United States Tax Court that was featured "as a big winner," by *The Wall Street Journal*, in an article entitled, "How Taxpayers Fight, and Win, Against IRS" (February 14–15, 2017).

- The Chief Executive Officer of one of the world's largest hedge funds in successfully quashing a Tax Court subpoena for his testimony.
- Numerous high net worth individuals in voluntary disclosures in conjunction with the IRS's offshore voluntary disclosure initiative.

- Lead counsel to thirty family trusts in a transferee liability case involving a leading telecommunications service provider.

Insurance Industry

- Representing a large micro-captive insurance company in an IRS promoter penalty investigation and related tax cases involving the IRS's position that the insurance does not qualify as insurance and that the arrangements are shams.
- Prominent mono-line insurance financial services holding company. Lead partner in its bankruptcy tax litigation against the United States in United States Bankruptcy Court for the Southern District of New York, where the IRS sought repayment of an $800 million "quickie" tax refund received by Debtor prior to bankruptcy. The highly successful settlement of the bankruptcy tax dispute, included an 87 percent concession by the IRS and Justice Department, after extensive fact and expert discovery and lengthy mediation. This was a case of first impression involving the tax treatment of credit default swaps. The settlement enabled the company to come out of bankruptcy.
- A major telecommunications company in the IRS's examination of its captive insurer.
- A Fortune 500 American Multinational Insurance Company and Financial Services Organization in disputes with the IRS.
- One of the world's largest insurance, banking and financial conglomerates in the review of tax structured insurance products.
- A dozen Fortune 500 corporations in the IRS's challenge and litigation of leveraged corporate-owned life insurance.
- Several financial institutions in advice pertaining to Bank-Owned Life Insurance.
- Represented one of the largest life insurance companies in the U.S., in civil litigation and insurance insolvency proceedings involving its liquidation.

Media and Entertainment

- A multinational conglomerate in a multibillion dollar IRS examination involving a so-called inversion transaction, which resulted in almost a full concession by the IRS.

Pharmaceutical Industry

- One of the world's largest pharmaceutical companies in the IRS's challenge of the tax status of a multibillion dollar merger.
- Global leading provider of diagnostic information services. Lead trial attorney in a tax refund suit of first impression in the United States Court of Federal Claims, involving the deductibility of penalties under the False Claims Act.

Accounting/Professional Services

- Formerly Assistant General Counsel with a Big Four accounting firm. Responsible for national litigation of tax malpractice suits; threatened litigation; government investigations; disciplinary investigations and issues pertaining to tax opinions; tax engagements; IRS procedural matters, such as 9100 relief, and standards of tax practice. Responsibilities included trial of cases as well as supervision of outside counsel in trials of cases.
- Represented four international accounting firms in IRS Promoter Penalty Investigations. This included summons and John Doe summons defense; IRS interviews and technical and procedural issues. Also included, in some instances defense of civil law suits brought by high net worth individuals. Also represented international banks, insurance companies and law firms in IRS tax shelter investigations that included a Senate PSI investigation; the largest criminal tax investigation in U.S. history; IRS promoter penalty investigations and over a thousand civil suits involving high net worth individuals.
- Represented an international accounting firm in two independent counsel investigations, one of which included the quashing of a Grand Jury subpoena seeking information outside of the scope of the Independent Counsel's investigation.
- Represented witnesses of an international accounting firm before the grand jury and at trial in the BCCI investigation as well as in other grand jury investigations.
- Represented tax and actuarial partners and principals of an international accounting firm before the Director of Practice of the Treasury Department with respect to disciplinary claims.
- Represented a number of partners of an international accounting firm before State Boards of Accountancy and the AICPA and in defense of return preparer penalties.
- Provided comments to Senate Finance Counsel related to the enactment of IRC Section 7525 and successfully litigated a seminal case applying the joint defense privilege to Section 7525.
- A coalition of the Big Four Accounting firms and the world's largest member association representing the accounting profession in successful unauthorized practice of law litigation before the Supreme Courts of Florida and South Carolina.
- Principal Drafter for the ABA of Comments pertaining to Circular 230 Rules of Practice Before the IRS.
- Represented a coalition of corporations related to IRS proposals pertaining to Schedule UTP.
- Testified before the ABA Commission on Multidisciplinary Practice.

## Honors & Awards

*The New York Times* recognizes Larry as "a leading member of the American tax bar." According to *The Legal 500*, Larry "stands out as one of the country's preeminent advisors in tax controversy, procedure and administration." Additionally, *Chambers USA* credits him with "winning acclaim from all corners." Larry has been recognized in *The Best Lawyers in America* in the field of Tax Litigation and Controversy, and named to the New York Super Lawyers list. He was also recognized as a preeminent attorney by *Martindale-Hubbell*, a leader in tax controversy by the *International Tax Review,* and a featured lawyer in *Who's Who Legal: Corporate Tax*.

Larry is valued for his judgment, common sense and depth of experience as well as his trial, negotiation, procedural and tactical skills in resolving complicated tax disputes. He is appreciated for his thorough and prudent evaluation of sophisticated tax structures and the pragmatic risk management guidance he provides to clients.

## Activities

- Fellow, American College of Tax Counsel
- Committee Member, ABA Section of Taxation Appointments to the United States Tax Court
- Former Chair, Court Procedure and Practice Committee of the Tax Section of the American Bar Association
- Life Fellow, American Bar Foundation
- Member, Wall Street Tax Association
- Member, The Tax Club
- Editor, *Focus on Tax Controversy and Litigation Newsletter*
- Member, Advisory Board of the *Journal of Tax Practice & Procedure*

## Credentials

Larry received his B.A., with highest honors, from State University of New York at Binghamton, where he was inducted into Phi Beta Kappa. He obtained his J.D. and LL.M. (Taxation) from George Washington University Law School.

## Publications & Speaking Engagements

- "IRS Announces New Voluntary Disclosure Procedures," *New York Law Journal* (December 24, 2018)
- " 2nd Circ. Opines On Variable Prepaid Forward Contract Gains," *Law360* (December 3, 2018)
- "Brazil-United States Tax Issues Post-Election," Co-Hosted with Bichara Advogados, São Paulo, Brazil (November 27, 2018)
- "First Amendment on Campus," Federal Bar Council, New York, NY (November 8, 2018)
- "Leadership and Structural Changes at the IRS: A Preview," Tax Executives Institute 73rd Annual Conference, San Diego, California (October 29, 2018)
- "Managing Uncertainty: A Survival Guide to the Tax Cuts and Jobs Act of 2017," *Tax Executive* cover story (September & October 2018)
- "International Tax Enforcement in the Post-OVDP Era," MAS America, Jerusalem, Israel (September 20, 2018)
- "Cross-border transactions: The Importance of Proactive Risk Management Under the U.S./Mexico Regulatory Framework," Winston & Strawn and Kaye Trueba Abogados Co-Hosted Program, Mexico City, Mexico (August 7, 2018)
- "OECD Model Disclosure Rules Target Intermediaries to Prevent CRS Avoidance," *Tax Notes International* (July 16, 2018)

- "Developments in the Large Business and International Division: Where We are Now and What's Coming Next," New York University School of Professional Studies 10th Annual Tax Controversy Forum, New York, New York (June 21, 2018)

- "IRS Penalty Assessments Without Due Process?" *Tax Notes* (June 18, 2018)
- "Mazzei Case Educed An Unusual Tax Court Response," *Law360* (June 5, 2018)
- "Ethics for In-House Tax Professionals," Wall Street Tax Assocation & Wall Street Tax Educational Corp. Breakfast Seminar, New York, New York (June 5, 2018)
- "Cryptocurrency Crackdown: What You Need to Know about Enhanced IRS/Government Scrutiny of Cryptocurrency Transactions," Winston & Strawn Seminar, New York, New York (May 16, 2018)
- "Preparing for Witness Interviews," Tax Executives Institute (TEI), Audits & Appeals Seminar, New Orleans, Louisiana (May 1, 2018)
- "Hedge Funds and IRS Partnership Audit Rules: Advanced Tax Strategies in Structuring Private Investment Funds in Light of New IRS Rules," Strafford Publications Nationwide Webinar (April 26, 2018)
- "Doing Your Homework: How to Prepare a Case for Tax Court," NYU School of Professional Studies 9th Annual Tax Controversy Forum, New York, New York (June 15–16, 2017)
- "Towards Free and Fair Financial Markets," Paris Europlace International Financial Forum, New York, New York (May 23, 2017)
- "Avoiding the Front Page.  The Criminalization of Transfer Pricing: Drawing the Lines Between Aggressive Tax Positions and Criminal Conduct," Committee on Banking Institutions on Taxation, New York, New York (May 15, 2017)
- "The Attorney-Client Privilege and the Work Product Doctrine," Committee on Banking Institutions on Taxation, New York, New York (May 15, 2017)
- "Cross-Border Tax Investigations and Enforcement Initiatives," Securities Industry and Financial Markets Association (SIFMA), Cross-Border Wealth Management Working Group, New York, New York (October 13, 2016)
- "Hedge Funds and The New IRS Partnership Audit Rules," Strafford Publications Nationwide Webinar (October 10, 2016)
- "The Unprecedented Extraterritorialization of Tax Crimes," Tax Notes International (August 1, 2016)
- "The Growing Threat Of Transferee Liability In Midco Deals" (Co-Authored with Richard A. Nessler), Law360, New York, New York (July 5, 2016)
- "What Does the New IRS Position Paper on Disgorgement Mean for FCPA Settlements?" *The FCPA Report* (June 29, 2016)
- "The Panama Papers And The Voluntary Disclosure Conundrum" (Co-Authored with Richard A. Nessler), Global Tax Weekly (June 9, 2016)
- "Midco Transactions and the Expanding Universe of Transferee Liability" (Co-Authored with Richard A. Nessler), The Tax Club, New York, New York (April 20, 2016)
- "Second Circuit Determines That Tax Memo Shared Between Taxpayers and Banks is Protected Under The Common Interest Doctrine and Subject to Work Product Protection" (Co-Authored with Matthew Craner and Richard A. Nessler), Journal of Tax Practice & Procedure (December 2015-January 2016)
- "Federal Tax/Financial Products Panel" Wall Street Tax Association, Spring Seminar (May 11, 2015)

- "Fresenius Opens Door To FCA Tax Breaks" (Co-Authored with Laurence M. Bambino and Richard A. Nessler), Law 360, New York, New York (August 25, 2014)
- Contributing Author, "Transfer Pricing and Dispute Resolution," *IBFD* (2011)
- "Global Tax Gaps, Transparency and Compliance," Institute of International Bankers, New York, New York (June 14, 2011)
- "IRS Audit Developments," Wall Street Tax Educational Corp. & Tax Association, Washington, DC (May 25, 2011)
- "U.S. Swap and Assign Transaction was Disguised Loan, Court Rules," Practical International Tax Strategies (May 31, 2011)
- "Avoiding IRS Controversies Involving Financial Products," New York State Society of CPAs, New York, New York (March 3, 2011)
- "Ethics for In-House Tax Professionals," Wall Street Tax Educational Corp. and Wall Street Tax Association, New York, New York (March 4, 2011)
- "Audit Issues," Wall Street Tax Association – Fall Tax Seminar, New York, New York (November 8, 2010)
- "Proactively Managing Audit Risks and Compliance – 15 Dos and Don'ts to Properly Prepare your Organization," 2010 Global Structured Financial Products Forum, Paris, France (October 20, 2010)
- Co-author, "IRS Releases Final Schedule UTP and Accompanying Instructions," Practical International Tax Strategies (October 2010)
- "D.C. Circuit Rejects Categorical Exceptions to Work Product Protection, Finds Protection Not Waived by Disclosure to Independent Auditors," CCH Journal of Tax Practice and Procedure (September 2010)
- Institute of International Bankers; Seminar on U.S. Taxation of International Banks; "FIN 48- The IRS Version," New York, New York (June 21, 2010)
- "Partnering with the Board for Proper Tax Risk Oversight," Corporate Executive Board, Webinar, New York, New York (May 25, 2010)
- "Is Nothing Confidential Any More?" Reinsurance Association Tax Conference, Philadelphia, Pennsylvania (May 18, 2010)
- TEI Spring Seminar, "Requiem for the Policy of Restraint? Announcement 2010-9 and Tax Accrual Work papers, Post-Textron," Nashville, Tennessee (April 29, 2010)
- Co-author, "Developments in Reporting Obligations Applicable to Foreign Accounts and a Review of Recently Proposed FBAR Regulations," *International Tax Planning US* (April 2010)
- "Definitely Avoid 'Utter Failure': Dodging Risk Can Be a Taxing Job," *Corporate Counsel* at www.law.com (with Seth C. Farber, April 7, 2010)
- "Taxpayer Wins LILO Case in the Court of Federal Claims," (Co-Authored), Real Estate Finance Journal (April 2010)
- Wall Street Tax Association Breakfast Seminar, "Uncertain Tax Position Reporting and the Impact on Privilege," New York, New York (March 16, 2010)
- BNA/Cite Conference, "Resolving IRS Tax Controversies" (February 22–23, 2010, Las Vegas, Nevada; January 25–26, 2010, Coral Gables, Florida)
- Strafford Teleconference, "Castle Harbour Decision: The Case and Implications" (January 14, 2010)
- Wall Street Tax Association Tax Seminar, "Current Issues in Tax Audits," New York, New York (November 17, 2009)

- 25th Annual LICONY Tax Conference, "Attorney Work-Product Doctrine: Recent Developments in the Context of Tax Accrual Work Papers," New York, New York (November 12, 2009)
- 2009 European Structured Financial Products Summit, "Dealing with the Revenue Authorities and Audits of Cross-Border Financial Products Controversies," Paris, France (November 3–4, 2009)
- UCLA Extension 2009 Annual Tax Controversy Institute, "Representation Techniques: From Examination to Tax Court Litigation," Beverly Hills, California (October 27, 2009)
- Strafford Teleconference, "U.S. v. Textron: Implications for Corporate Taxpayers – Strategies for Protecting Confidentiality of Tax Accrual Work Papers" (September 24, 2009)
- Institute of International Bankers, 2009 Annual Tax Seminar on U.S. Taxation of International Banks, "International Enforcement Issues Relating to U.S. Tax Information Reporting and Withholding, Qualified Intermediary (QI) Agreements, FBAR Filings," New York, New York (June 18, 2009)
- New York University, School of Continuing and Professional Studies, First Annual Tax Controversy Forum, "Responding to IRS Requests for Information: Strategies and Tips for Managing an Audit," New York, New York (June 12, 2009)
- Taxation of European & U.S. Cross-Border Financial Products Conference, "Regulatory Developments Regarding Tax Advantaged Financial Products," London, England (June 10, 2009)
- ABA Section of Taxation May Meeting, Court Procedure and Practice Committee, "From Madoff-Stanford: Representing Victims of Investor Fraud," Washington, DC (May 8, 2009)
- Co-author, "Switzerland and UBS Resist IRS Effort to Force Disclosure of Bank Account Holder Information," Practical European Tax Strategies (April 2009)
- AICPA Telephone Seminar, "Practical Aspects of Providing Tax Advice to Madoff Victims" (March 11, 2009)
- ALI-ABA Telephone Seminar/Audio Webcast, "Advising Investment Fraud Victims: Tax, Securities, and Bankruptcy Issues" (February 24, 2009)
- Client CLE Seminar/Audio Webcast, "Textron: Victory or Academic Result," New York, New York (February 6, 2009)
- ABA Section of Taxation Midyear Meeting, Court Procedure and Practice Committee, "Effective Preparation & Use of Fact Witnesses at Trial," New Orleans, Louisiana (January 9, 2009)
- Tax Executives Institute, New York Chapter Federal Committee Meeting, "The Corporate Tax Legislative Outlook Under the Obama Administration," New York, New York (November 20, 2008,)
- Wall Street Tax Association Tax Seminar, "Tax Controversies," New York, New York (November 17, 2008)
- 24th Annual LICONY Tax Conference, "Ethical Considerations for Tax Practitioners," New York, New York (November 13, 2008)
- 2008 European Structured Financial Products Summit, "Update on Recent U.S. Litigation as Related to Financial Products with Specific Reference to Business Purpose/Economic Substance," Paris, France (October 28–29, 2008)
- "The Increasingly Vital Role of International Tax Law, *International Tax Law Best Practices*," Inside the Mind Series, Aspatore (2008)
- ABA Section of Taxation, Court Procedure Committee Meeting, "The Use of Jury Trials in Civil Tax Cases," San Francisco, California (September 2008)

- "IRS Disallows Foreign Tax Credits Claimed for Cross-Border Trust," (Co-Authored with Alexander Roberts), Practical International Tax Strategies (August 14, 2008)
- Co-author, "IRS Issues Regulations on 'Killer B' Reorganizations Involving Foreign Corporations," Practical US/International Tax Strategies (June 30, 2008)
- Client CLE Conference, "International Tax Investigations and Litigation, To Be or Not to Be: Surviving or Altogether Avoiding a Transatlantic Corporate Fraud Crisis," New York, New York (June 26, 2008)
- International Institute of Bankers Annual Tax Seminar, "Interplay of Developments in the §6694 Tax Preparer Rules and Circular 230," New York, New York (June 24, 2008)
- "Treasury, IRS Continue Attack on Abusive Tax Transactions: Final Regulations for Reportable Transactions Issued," (Co-Authored), Derivatives Financial Products Report (September 2007)
- ABA Section of Taxation May Meeting, Court Procedure and Practice Committee, "FIN 48: Impact on Litigation and Settlements," Washington, DC (May 11, 2007)
- Co-author, "What Tax-Exempt Entities Must Know to Avoid Costly Excise Taxes," Tax Notes (May 7, 2007)
- United States Tax Court Judicial Conference, "Trying Cases in the Electronic Age," Williamsburg, Virginia (April 19, 2007)
- "Tax Policy Gone Wild: Harsh Penalties as Revenue Raisers," Tax Notes (April 2, 2007)
- "Let the Sun Shine In? Transparency Has its Limits," Journal of Tax Practice and Procedure (October–November 2006)
- "2007 Tax Shelter Update: Increased Disclosure and Costly Penalties," National Constitution Center (November 2, 2006 – Audio conference)
- National Constitution Center Audio Conference, "2006 Tax Shelter Update: Status of IRS Disclosure and Penalty Rules" (November 2, 2006)
- Client CLE Conference, "Trends and Challenges in Complex Litigation, White Collar Crime and Government Investigations," New York, New York (November 1, 2006)
- 2006 European Structured Financial Products Summit, "U.S. Tax Shelter Promoter Audits and Litigation Developments," Paris, France (October 24–25, 2006)
- UCLA Extension 2006 Annual Tax Controversy Institute, "Tax Enforcement: Priorities, Strategies and the Administrative Process," Beverly Hills, California (October 23, 2006)
- ABA Section of Taxation and Section of Real Property, Probate and Trust Law, Joint Fall CLE Meeting, "Treatment of Testifying and Non-Testifying Experts," Denver, Colorado (October 20, 2006)
- "The Economic Substance Doctrine," Tax Business (September/October 2006)
- ABA Section of Taxation, Court Procedure and Practice Committee, "Litigation of Promoter Penalties," Washington, DC (May 2006)
- The Structured Finance Institute, 2005 European Structured Financial Products Summit, "Washington Update and U.S. Tax & Regulatory Developments," Paris, France (October 25, 2005)
- The Structured Finance Institute, 2005 Structured Asset Finance and Leasing Conference, "U.S. Outbound and Inbound Cross-border Leasing Developments and the Washington Update," Paris, France (October 26, 2005)
- ABA Section of Taxation, Court Procedure and Practice Committee, "The New Policy on Tax Accrual Work papers: Transparency or Transgression?" San Francisco, California (September 16, 2005)

- Committee of Banking Institutions on Taxation, "The Application of the New Circular 230 Rules to Banking Institutions," New York, New York (June 21, 2005)
- Client CLE Conference, "The Roles and Responsibilities of In-House and Outside Counsel in Coordinating Multiple Government Investigations and Related Civil Litigations," New York, New York (June 8, 2005)
- ABA Section of Taxation, Standards of Tax Practice Committee, "New Circular 230 Written Opinion and Advice Regulations," Washington, DC (May 21, 2005)
- ABA Section of Taxation, Court Procedure and Practice Committee, "The Pitfalls and Pratfalls of Electronic Discovery," Washington, DC (May 20, 2005)
- ABA Section of Taxation, Tax Shelter Task Force, "Report on the ABA's Circular 230 Comments," Washington, DC (May 20, 2005)
- The Association of the Bar of the City of New York, "Providing Information to the IRS: Taxpayer Rights and Obligations" (May 16, 2005)
- Principal Author, ABA Section of Taxation Comments on the Final Circular 230 Regulations, (May 11, 2005)
- The Federal Bar Association, The 29th Annual Tax Conference, "Developments to Watch For on Privilege," Washington, DC (March 17, 2005)
- ABA Section of Taxation, Court Procedure and Practice Committee, "How Much Judicial Deference is Due the Administrative Determinations of the IRS?" San Diego, California (January 21, 2005)
- ABA Section of Taxation, Court Procedure and Practice Committee, "Preclusion of Expert Witnesses," Boston, Massachusetts (October 1, 2004)
- The Association of the Bar of the City of New York, "Tax Controversies: Negotiating and Resolving Disputes with the IRS," New York, New York (April 29, 2004)
- The Federal Bar Association, 28th Annual Tax Conference, "Expert Witness or Advocate: How to Draw the Line," Washington, DC (March 26, 2004)
- Client CLE Conference, "A Roadmap to the IRS's New Enforcement Initiatives," London, England (November 13, 2003)
- Client CLE Conference, "Hot Topics in IRS Practice, Procedure and Tax Litigation," New York, New York (September 19, 2003)
- ABA Section of Taxation, Standards of Tax Practice Committee, "What Remains of Section 7525?" Chicago, Illinois (September 13, 2003)
- ABA Section of Taxation, Tax Shelter Task Force, "Privilege Issues in Tax Shelter Cases," Chicago, Illinois (September 12, 2003)
- ABA Section of Taxation, Court Procedure and Practice Committee, "Litigating Accuracy Related Penalties," Chicago, Illinois (September 12, 2003)
- BNA National Tax Conference, "The Post-Shelter Era: Resolving Disputes and Following the New Rules," Washington, DC (August 6, 2003)
- "The Advent of Cost-Shifting Arrangements in Electronic Discovery Disputes," Journal of Tax Practice and Procedure (June–July 2003)
- Tax Executives Institute, New York Chapter Annual Meeting, "Tax Department Risk Management and Ethical Considerations in the Post-Enron Environment," New York, New York (December 18, 2002)
- Insurance Tax Conference, "Tax Shelters," Chicago, Illinois (November 7, 2002)

- Institute of International Bankers, Annual Seminar on the U.S. Taxation of International Banks, "Ethics & Exposure Roundtable," New York, New York (June 19, 2002)
- "Real Time Court Reporting," ABA Section of Taxation, Court Procedure and Practice Committee, Washington, D.C. (May 10, 2002)
- Tax Executives Institute, New England Regional Meeting, "The Appeals Process in the Large and Mid-Sized Business Division of the IRS," Boston, Massachusetts (February 15, 2002)
- Tax Executives Institute, "The Rite Aid Case: A Prescription for Corporate Taxpayers?" New York, New York (January 10, 2002)
- Counterpoint: The Proposed Revisions to Circular 230 Are Flawed," ABA Section of Taxation Newsletter (Winter 2002)
- "New Fast Track Dispute Resolution Pilot Programs Offer Opportunities for Taxpayers to Resolve Disputes at Exams More Efficiently," Journal of Tax Practice & Procedure (December 2001/January 2002)
- "New Fast Track Mediation and Settlement Pilot Programs Offer Opportunities for Taxpayers to Resolve Cases at Exams More Efficiently," Journal of Tax Practice and Procedure (December 2001–January 2002)
- 36th Annual Bank Tax Institute, "Bank-Owned Life Insurance in Today's Environment," Orlando, Florida (December 13–14, 2001)
- ABA Section of Taxation Annual Meeting, Administrative Practice Committee, "Circular 230 Debate," Chicago, Illinois (August 3, 2001)
- "The Circular 230 Proposals Should be Modified," Journal of Tax Practice and Procedure (June–July 2001)
- ABA Section of Taxation May Meeting, Court Procedure and Practice Section, "A Demonstration and Discussion of Hyper-text Briefs," Washington, DC (May 11, 2001)
- Testimony before the Internal Revenue Service regarding the Proposed Amendments to Circular 230, Washington, DC (May 2, 2001)
- ABA Section of Taxation Midyear Meeting, Standards of Tax Practice Committee, "MDPs and Lawyers' Ethics," (January 13, 2001)
- ABA Section of Taxation Midyear Meeting, Court Procedure and Practice Committee, "Using Videotaped Depositions- A Demonstration and Critique," Scottsdale, Arizona (January 12, 2001)
- Tax Executives Institute, "IRS Practice Procedure: What's Hot, What's New," Rye, New York (November 16, 2000)
- Tax Executives Institute, "International Penalty Issues," New York, New York (November 15, 2000)
- Tax Executives Institute, "Tax Shelter Controversies- Developments and Strategies for Exams and Beyond," New York, New York (October 18, 2000)
- "Greetings From the Corporate Tax Shelter Front," Journal of Tax Practice & Procedure (June–July 2000)
- Tax Executives Institute, "Litigating COLI Cases After Winn-Dixie," Morristown, New Jersey (May 19, 2000)
- ABA Section of Taxation May Meeting, Court Procedure and Practice Committee, "Witness Preparation – The Dos and Don'ts," Washington, DC (May 12, 2000)
- ABA Section of Taxation May Meeting, Administrative Practice Committee,
- "The Tax Audit Process Under Modernization," Washington, DC (May 12, 2000)

- ABA Section of Taxation Midyear Meeting, Standards of Tax Practice Committee, "How Will the Restatement of the Law Governing Lawyers Affect Tax Practice?" San Diego, California (January 22, 2000)
- "New Strategies for Litigating Corporate Tax Shelter Cases," Journal of Tax Practice and Procedure (December 1999–January 2000)
- "Recent Amendments to the Tax Court's Rules of Practice and Procedure: A Response to the Court's Expanded Jurisdiction" (with I.J. Sang), Journal of Tax Practice & Procedure (August–September 1999)
- "Frederick Revisited," Journal of Tax Practice & Procedure (August–September 1999)
- "The Waxing and Waning of Privilege in the Federal Tax Context," Journal of Tax Practice & Procedure (June–July 1999)
- "The New Burden of Proof in the Federal Tax Courts," Journal of Tax Practice & Procedure (April–May 1999)
- National Teleconference, Equipment Leasing Association, "Strategies for Successfully Defending a Cross-Border Leasing Audit After Revenue Ruling 99-14" (May 24, 1999)
- United States Tax Court 1999 Judicial Conference, "Privileges: What's New? What's Left?" Williamsburg, Virginia (April 9, 1999)
- ABA Tort and Insurance Practice Section, National Meeting, "Accountants' Liability: Charting New Frontiers in the New Millennium," New York, New York (March 18, 1999)
- Tax Executives Institute, "Corporate Tax Shelters – An Explanation of What They Are, IRS Initiatives and Legislative Prospects," New York, New York (March 16, 1999)
- Testimony Before the ABA Commission on "Multidisciplinary Practice," Los Angeles, California (February 5, 1999)
- ABA Section of Taxation Midyear Meeting, "The New Burden of Proof," Orlando, Florida (January 15, 1999)

# Robb C. Adkins

Partner in San Francisco and Los Angeles
San Francisco Office Managing Partner & Co-Chair White Collar Practice
radkins@winston.com
+1 415-591-1411 (San Francisco) +1 213-615-1718 (Los Angeles)



**Robb previously served as a federal prosecutor, handling the landmark trial against former Enron CEOs Ken Lay and Jeff Skilling, and served as the nation's top fraud enforcement official, leading a financial fraud task force formed by the President involving the leadership of the DOJ, SEC, and more than 25 other federal and state enforcement agencies.**

| | |
|---|---|
| **Services** | Antitrust / Competition, Corporate Governance, Litigation, Complex Commercial Litigation, Banking Litigation, White Collar, Regulatory Defense & Investigations, Government Program Fraud, False Claims, and Qui Tam Litigation, Financial Services Regulatory / Compliance, Compliance Programs |
| **Sectors** | Financial Services & Banking, Professional Services, Technology |
| **Admissions** | California |
| **Clerkships** | USCA - Fifth Circuit for the Honorable Rhesa Barksdale |
| **Court Admissions** | Central District of California, Northern District of California, USCA - 5th Circuit, USCA - 9th Circuit, USCA - 4th Circuit, Southern District of California |
| **Education** | Georgetown University, JD, 1997 |
| | Stanford University, BA, 1993 |

In addition to serving as the managing partner of the firm's San Francisco office, Robb Adkins serves as the head of litigation for Winston & Strawn LLP's California offices and is co-chair of the firm's White Collar, Regulatory Defense, and Investigations Practice. He also serves as National Vice Chair of the American Bar Association's White Collar Crime Committee.

Robb focuses his practice on white collar and internal investigations, corporate compliance, complex civil litigation, government enforcement defense, and Foreign Corrupt Practices Act (FCPA) issues. He is a nationally recognized trial attorney with deep experience in complex white collar matters involving the Department of Justice (DOJ), the Securities and Exchange Commission (SEC), and across the federal and state enforcement agencies.

Prior to joining the firm, Robb served for two years as the Executive Director of the Financial Fraud Enforcement Task Force (Task Force), working within the DOJ's Office of the Deputy Attorney General in Washington, D.C. As head of the Task Force, which was formed by the President and chaired by the U.S. Attorney General, Robb was responsible for directing the largest coalition ever assembled to combat financial fraud. Robb worked with the highest leaders of the DOJ, SEC, CFTC, and more than 25 other federal and state fraud enforcement and regulatory agencies to develop national enforcement strategies, coordinate criminal and civil initiatives, and implement nationwide training and guidance for line prosecutors and regulators. As Executive Director, Robb worked with financial fraud coordinators in every U.S. Attorney's Office to confront an array of fraud, including corporate, securities, and commodities fraud; antitrust violations; procurement fraud; False Claims Act violations; fraud within the mortgage and finance industry; oil and gas price fraud; and to implement Dodd-Frank financial regulatory reforms.

Prior to leading the Task Force, Robb spent more than eight years as a criminal prosecutor with the U.S. Attorney's Office for the Central District of California, focusing on white collar fraud prosecutions, and served as the Chief of the U.S. Attorney's Office in Orange County, California for more than two years. During his service as Chief, Robb supervised an office of more than 40 trial attorneys and staff responsible for all federal criminal matters in a county with more than three million residents. During his tenure as a line prosecutor and Chief, Robb served as lead counsel in more than 50 prosecutions and as first chair in numerous complex fraud trials.

From 2005 to 2007, Robb was a member of the Enron Task Force, serving as a trial attorney in the landmark criminal trial against Enron CEOs Kenneth Lay and Jeffrey Skilling. He also conducted a separate trial against Kenneth Lay on bank fraud charges, delivering the opening statement and closing argument, resulting in conviction on all counts. Prior to joining the DOJ, Robb served as a litigation associate at a large law firm in San Francisco and as a consultant at a major accounting firm.

Governmental experience includes serving as Executive Director, Financial Fraud Enforcement Task Force, U.S. DOJ (2010–2011), Assistant U.S. Attorney (2001–2005), Chief, Southern Division, Central District of California (2007–2010), and Enron Task Force, U.S. DOJ (2005–2007).

## Experience

**Select examples of Robb's representative matters include**:

- Tried a federal civil class action brought under California's Private Attorney General Act, resulting in a defense verdict for a Fortune 500 client.
- Led an internal investigation for the board of an international company related to potential FCPA and anti-corruption issues in Europe and Asia.
- Led an internal investigation of a large mortgage servicing company regarding a whistleblower complaint.

- Led an internal investigation for a financial institution regarding potentially fraudulent conduct by a bank manager.
- Conducted an assessment and complete overhaul of the compliance policies at a large financial entity.
- Represented a target at a Fortune 500 company in a federal grand jury investigation and subsequent criminal prosecution related to alleged Clean Water Act violations. After meeting with federal authorities, proposed charges against client were dropped.
- Oversaw a three-year monitoring agreement with a major foreign-based financial institution in lieu of prosecution.

## Honors & Awards

Robb was recognized in *The Legal 500 U.S.* 2018 and ranked in *Chambers USA* 2012–2018 as one of San Francisco's top lawyers in White-Collar Crime & Government Investigations practice. He has received widespread recognition throughout his career as a trial lawyer, including the Attorney General's "Award for Exceptional Service," the highest commendation in the DOJ. In 2006, he was selected as one of the "Top 20 Under 40" by the California *Daily Journal*, recognizing him as one of the top 20 lawyers in California under the age of 40. He has been the recipient of commendations from the U.S. Deputy Attorney General, Federal Bureau of Investigations, U.S. Secret Service, Special Inspector General for the Troubled Asset Relief Program (SIGTARP), U.S. Postal Inspection Service, Internal Revenue Service–Criminal Investigations, U.S. Marshals Service, Office of Personnel Management, and the Food and Drug Administration. Robb was named a "Rising Star" by *SuperLawyers Magazine* each year from 2006–2010, and was recognized as a "Superlawyer" for Northern California in 2015. He was also recently named a "California Litigation Star" in the 2015 edition of *Benchmark Litigation*.

## Activities

Robb has been selected to serve on the ABA Northern California regional subcommittee of the ABA. He has also served as an adjunct professor at Chapman School of Law (White Collar Crime, Criminal Procedure, and Trial Practice), University of California, Irvine (Contemporary Legal Issues), and Whittier School of Law (Trial Practice). He has lectured at several nationwide training courses for prosecutors at the National Advocacy Center in South Carolina. Robb is frequently interviewed regarding white collar matters, and has been cited by *The New York Times*, *Wall Street Journal*, *Washington Post*, and *National Public Radio,* and has served as a member of the Law360 White Collar Editorial Advisory Board.

## Credentials

Robb received his B.A. in political science, with honors, from Stanford University. He received his J.D. from Georgetown University, where he was the publications editor for the ABA publication the *Tax Lawyer*.

## Publications & Speaking Engagements

Robb is an experienced and well-respected speaker on corporate compliance and white collar matters. He has provided lectures and training to prosecutors and regulators, testified before Congress, and given presentations to companies, board members, professional associations, conferences, and academic

institutions throughout the United States and abroad.

## Publications

- "Q&A With Steve Grimes and Robb Adkins of Winston & Strawn LLP," *Corporate Compliance Insights*, December 2017
- "Improve Compliance Programs to Avoid Government Investigations," *Today's General Counsel*, April/May 2017

## Speaking Engagements

- Co-Chair of The American Conference Institute's (ACI) 11th West Coast Conference on FCPA Enforcement and Compliance, San Francisco, September 25, 2018
- "How to Manage Reputational and Regulatory Risks in High-Profile Mediagenic Matters," Philadelphia, PA, June 4, 2018
- Moderator, "Planning for and Responding to a Visit from Law Enforcement," National Association of Criminal Defense Lawyers, Corporate Counsel Conclave, Washington, D.C., April 2017
- Speaker, "Student Loans and PayDay Loans: Managing Increased Regulatory Scrutiny, Litigation, and Assessing Proposed Rules by the CFPB on Payday Loans," ACI 28th National Conference on Consumer Finance Class Actions and Litigation, New York, April 2017

# Seth Weisburst
Of Counsel in San Francisco
sweisburst@winston.com
+1 415-591-1029 (San Francisco)



**Seth's practice focuses on complex commercial litigation and arbitration, including securities and broker-dealer matters, trade secret misappropriation claims, contract disputes, business torts, and antitrust cases. In addition to his experience leading litigation matters in state and federal court and in arbitration, Seth represents clients facing regulatory inquiries and enforcement actions from the SEC, FINRA, and other state securities regulators.**

| | |
|---|---|
| **Services** | Antitrust / Competition, Corporate & Finance, Antitrust Litigation, Financial Services Regulatory / Compliance, Complex Commercial Litigation, Banking Litigation, White Collar, Regulatory Defense & Investigations, Class Actions |
| **Sectors** | Financial Services & Banking |
| **Admissions** | California |
| **Court Admissions** | Eastern District of California, Northern District of California, USCA - 9th Circuit |
| **Education** | University of California, Hastings, JD, 2008 |
| | Stanford University, BA, 1999 |
| | Stanford University, MA, 1999 |

Seth Weisburst's practice focuses on complex commercial litigation, arbitration, regulatory inquiries, enforcement actions, and white collar matters.

Seth has experience defending clients in complex commercial litigation in state and federal court against claims of breach of fiduciary duty, breach of contract, misappropriation of trade secrets, unfair competition, wrongful death, and violations of federal securities laws. Seth also has experience conducting internal investigations for a wide range of firm clients.

Seth has assisted in the defense of brokerage firms and their registered representatives against investigations launched by the SEC, FINRA, and various state securities regulators, as well as private client and issuer actions (brought in state and federal court and through FINRA arbitrations) alleging sales practice violations, and claims related to misrepresentation, underwriting claims, options trading, failure to supervise, misappropriation and theft, auction-rate securities, insider trading, and California state law.

Seth's pro bono experience includes leading parallel federal and state court actions against the California State University system and San Francisco State University that resulted in a landmark settlement safeguarding the civil rights of Jewish students as well as students of all religions and backgrounds. Seth's pro bono experience also includes representation of African-American Section 8 tenants in a civil rights class action based on municipality and police department discrimination, harassment and warrantless searches, and the successful pursuit of a claim on behalf of an individual facing online public harassment that threatened his personal and professional reputation.

## Honors & Awards

- Order of the Coif
- Thurston Honors Society, University of California, Hastings College of the Law
- President, American Constitution Society, Hastings College of the Law Chapter (2006-2007)
- Robert M. Golden Medal for Excellence in the Humanities and Creative Arts, in recognition of an honors thesis, Stanford University

## Credentials

Seth received a B.A., with honors, and an M.A. from Stanford University in 1999. He received a J.D. from the University of California, Hastings College of the Law, in 2008, where he graduated *magna cum laude* and served as articles editor of the *Hastings Law Journal.*

While in law school, Seth externed for U.S. Magistrate Judge Joseph C. Spero in the Northern District of California. His law school activities included Order of the Coif; Thurston Honors Society, University of California, Hastings College of the Law; President, American Constitution Society, Hastings College of the Law Chapter (2006-2007). He also received the Robert M. Golden Medal for Excellence in the Humanities and Creative Arts, in recognition of an honors thesis, Stanford University.

## Publications & Speaking Engagements

- Co-author, "Ninth Circuit En Banc Panel Adopts Safeguards for Subjects of Search Warrants Involving Electronically Stored Information," *Privacy & Data Security Law Journal* (November 2009)
- Co-author, "Trends in Electronic Discovery After the 2006 Amendments to the Federal Rules of Civil Procedure," *The Computer & Internet Lawyer* (May 2008)

# EXHIBIT B

4/19/2019          S.F. State anti-Semitism lawsuit: Judge dismisses with leave to amend – J.

Case 3:17-cv-03511-WHO   Document 178-1   Filed 04/19/19   Page 30 of 48





*Professor Rabab Abdulhadi (center, wearing dark glasses) demonstrates against a lawsuit against SFSU in November 2017. (Photo/Rob Gloster)*

ISRAEL ON CAMPUS

# S.F. State anti-Semitism lawsuit: Judge dismisses with leave to amend

BY **DAN PINE** | MARCH 12, 2018

A federal judge has dismissed a complaint alleging "systematic" anti-Jewish speech and activity at San Francisco State University, while giving plaintiffs leave to amend it.

4/19/2019     SF State anti-Semitism lawsuit / Judge dismisses with leave to appeal – J.

Case 3:17-cv-03511-WHO   Document 176   Filed 04/19/19   Page 31 of 48

In his March 9 ruling, U.S. District Judge William Orrick III said the complaint, the first iteration of which was filed last June, is "far too long, repetitive and full of barely relevant material, and yet so conclusory regarding the cases of action asserted that it does not state a plausible claim for relief against any defendant at this juncture."

Six Jewish students and community members filed the original lawsuit alleging decades of anti-Semitism at SFSU and focusing on two events: the campus shout-down of Jerusalem Mayor Nir Barkat by pro-Palestinian groups in April 2016 and the exclusion of San Francisco Hillel from hosting a table at a February 2017 "Know Your Rights" fair on campus.

A similar but separate lawsuit, filed last month, is currently pending in California Superior Court.

## Related: S.F. State's Jewish problem

Both suits sought monetary and punitive damages, admission of fault, and actions aimed at protecting Jews on campus.

Last week Orrick dismissed the language of the newest complaint with leave to amend, giving plaintiffs 20 days to refile.

He said he was not persuaded that Jewish students "suffered such severe, pervasive and objectively offensive discrimination" that would amount to a "hostile environment."

Said attorney Lawrence Hill, Lawfare Project chairman and partner at Winston & Strawn LLP, which is representing the plaintiffs, "We are very pleased that [Orrick] has issued a ruling allowing this case to move forward and denying the defendants' two motions to strike. In the coming days, we will be submitting an amended complaint that clearly and concisely lays out the claims of our plaintiffs, who, like many other Jewish students at SFSU, have faced systematic violations of their civil and constitutional rights. SFSU has achieved notoriety as one of the most anti-Semitic campuses in the nation, and we are proud to represent these courageous students and community members as they seek justice and equality on campus."

4/19/2019      S.F. State anti-Semitism lawsuit: Judge dismisses with leave to amend – J.

Case 3:17-cv-03511-WHO   Document 178-1   Filed 04/19/19   Page 32 of 48

J.'s work is reaching more readers than ever, but advertising revenues alone don't cover our costs. We need your help. If you value our journalism, become a J. Supporter today. You'll continue to get one-of-a-kind content only available at J. — and help secure J.'s future.

## Support J.



### Dan Pine

Dan Pine is J.'s news editor. He can be reached at dan@jweekly.com.

---

**Tags:** anti-Semitism, anti-Israel, San Francisco State University, SFSU, S.F. State, Lawfare Project

---

BAY AREA

**Palestinian SFSU prof's lawsuit alleges discrimination, JCRC influence**

ISRAEL ON CAMPUS

**Lawsuit renews allegations of systematic anti-Semitism at S.F. State**

BAY AREA

**Jewish group vows to refile suit against SFSU**

BAY AREA

**Suit against S.F. State stalled, Jewish plaintiffs vow to refile**



EXHIBIT C

Steve W. Berman (*pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steveb@hbsslaw.com*
*craigs@hbsslaw.com*

Jeff D. Friedman (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com

Bruce L. Simon (SBN 96241)
Benjamin E. Shiftan (SBN 265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:   (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

[Additional counsel listed on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Joseph A. Litman (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated
Action Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION <br><br> THIS DOCUMENT RELATES TO: ALL ACTIONS EXCEPT *Jenkins v. Nat'l Collegiate Athletic Ass'n*, Case No. 14-cv-02758-CW | Case No. 4:14-MD-02541-CW <br><br> **DECLARATION OF JEFFREY L. KESSLER IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS** <br><br> DATE:       April 30, 2019 <br> TIME:       2:30 p.m. <br> COURTROOM: Courtroom 6, 2d Floor |

I, Jeffrey L. Kessler, declare as follows:

1.     I am an attorney licensed before all the courts of the State of New York and am co-executive chairman of Winston & Strawn LLP.  I am also a partner in Winston & Strawn's New York office, co-chair of the Antitrust practice group, and co-chair of the Sports Law practice group.  I am co-lead Class Counsel for the Consolidated Action Plaintiffs in this action.  Based on personal knowledge or discussions with counsel at my firm about the matters stated herein, I could competently testify to the same if called upon to do so.

2.     This Declaration is made in support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Fee Motion"), and pursuant to Civil Local Rule 54.

3.     As detailed more fully below, Winston & Strawn attorneys were intensively involved in all aspects of this litigation regarding the injunctive relief claims.  Winston attorneys took or shared the lead on many hearings and motions, at trial, and during years of pretrial litigation, including: drafting briefs and filings; organizing and completing document review; drafting discovery requests and responses; corresponding with defense counsel; setting agendas and guiding negotiations for meet-and-confer discussions that governed document production, depositions, scheduling, and all other manner of discovery disputes; taking and defending depositions; working with experts; preparing witnesses, exhibits, and other content for trial; arguing summary judgment motions, arguing the motion to dismiss and motion for judgment on the pleadings; arguing other motions before the Court, and preparation of this case for trial and the trial itself.

4.     The very significant role played by Winston & Strawn for the injunctive-relief claims is reflected in part by Winston's much larger share of Plaintiffs' counsel's fees and expenses with respect to the prosecution of the injunctive-relief claims.  Winston did not act as Class Counsel for the damages claims, which were separately resolved, and for which our co-counsel firms served as Class Counsel.  Winston did not apply for or receive any fee award with respect to the damages class claims, as Winston's efforts have been solely and exclusively devoted to the injunctive-relief claims and Classes from the outset of this MDL.  This is another significant reason for Winston's much larger share of Plaintiffs' counsel's fees and expenses.

### I.      Summary of Work Performed

5.      Winston & Strawn initially represented just the *Jenkins* plaintiffs who filed a complaint on March 17, 2014.  All of the work that Winston performed in that initial filing, however, was of benefit to, and fully utilized in, prosecuting the injunctive relief claims in this action.  That work included the Winston team investing time and resources into researching the commercial landscape surrounding Division I basketball and FBS football, and the relationships between the NCAA, Conference Defendants, member schools, and their business partners.  It also involved working with experts to develop the claims, legal theory, and relief sought by the injunctive classes, and coordinating with various stakeholders.  Even before any JPML transfer, Winston worked with co-counsel in this action to develop the injunctive-relief claims against the NCAA and coordinate the work of the three firms.

6.      Following JPML transfer for coordination before this Court, Winston was named co-lead counsel for all Plaintiff Classes as to injunctive relief, along with Hagens Berman Sobol Shapiro LLP and Pearson Simon & Warshaw LLP.  The three firms worked together closely to avoid duplication of effort and to prosecute this case as efficiently as possible, notwithstanding the enormous scope of this case.[1]  Because the other two firms were also serving as Class Counsel to pursue damages claims, Winston often took on a disproportionate share of the work relating to the injunctive classes.

7.      During discovery, Winston prepared and acted to enforce requests for production and interrogatories, as well as gathering documents from Plaintiffs and preparing Plaintiffs' responses to Defendants' requests.  Likewise, Winston led most of the meet-and-confer negotiations held with Defendants.  For example, while negotiating the scope of Defendants' document production, Winston attorneys initiated communications about numerous subjects, drafted agendas for calls and meetings, and exchanged letters with defense counsel.  Winston attorneys also devised and cross-checked lists of search terms and custodians, testing terms with the assistance of litigation support staff to confirm that the negotiations would yield the requested documents in an efficient manner.  Winston tested specific search terms, phrases, and Boolean search formulations to confirm that discovery would meet

---

[1] A fourth firm, Pritzker Levine LLP, also provided support.

1     Plaintiffs' needs, and negotiated which phrases and sentences could be redacted in produced

2     documents pursuant to governing protective orders.

3          8.      The same was true for many other elements of the discovery process, including

4     negotiations about the number and breadth of depositions, and the scope of financial documents and

5     broadcast and sponsorship contracts to be produced. It was Winston, for instance, that led the parties'

6     efforts to negotiate terms that would govern production of various Defendant financial documents and

7     media agreements.[2] Throughout, Winston invested tremendous time and necessary resources to push

8     all of this discovery forward.

9          9.      In response to Plaintiffs' document requests, Defendants produced nearly 680,000

10    documents that spanned more than 6 million pages, some of which proved to be an important

11    foundation of the Court's factual findings in favor of the injunctive Classes at trial. Defendants'

12    responses to Plaintiffs' interrogatory requests were also massive, requiring Winston to analyze

13    thousands of pages of documents. To provide just one illustration, Defendant Southeastern Conference

14    ("SEC")—just one of twelve Defendants—responded to three of Plaintiffs' interrogatory requests in

15    its Second Set of Interrogatories to all Defendants by listing 1,060 Bates-numbered documents as

16    purported support for the SEC's proffered procompetitive justifications. Winston attorneys took the

17    time needed to investigate this ostensible evidence, an effort that was then multiplied given the number

18    of Defendants.

19         10.      Further, Winston served and enforced document subpoenas served on numerous third

20    parties, including Duke University, Florida State University, Ohio State University, Stanford

21    University, University of Kansas, University of Kentucky, University of Michigan, University of Notre

22    Dame, University of Oregon, and the University of Texas. Additionally, Winston met and conferred

23    extensively with Defendants' media partners, including CBS, FOX, and ESPN, regarding the

24    disclosure of Defendants' media contracts, and argued the successful motion to compel when the

25    networks resisted the full production of the requested documents. These third-parties produced more

---

26

27 [2] *See, e.g.*, ECF No. 473 (Notice of Agreement between Plaintiffs and Pac-12 Conference concerning production of financial documents and contracts); *see also* ECF Nos. 457, 467, 471.

28

KESSLER DECL. ISO MOT. FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS – CASE NO. 4:14-MD-02541-CW

than 6,500 additional documents that spanned nearly 40,000 pages. Again, those documents provided important support for the Court's factual findings in favor of Plaintiffs. Winston attorneys had to file motions to compel in the Northern District of Illinois (against the University of Notre Dame) and in the Middle District of North Carolina (against Duke University) to ultimately receive productions from these schools.

11. Reviewing such voluminous document productions and analyzing which documents were supportive of Plaintiffs' case was a major undertaking. Winston devised a multi-step review protocol to efficiently identify the most useful documents. To limit cost, the firm relied heavily upon in-firm "review" attorneys who specialize in e-discovery and bill at substantially lower hourly rates than what is commonly charged in the marketplace for these services. When necessary for the proper administration of the case, Winston associate attorneys were also involved, and Winston coordinated with co-counsel on document review issues to avoid duplication of effort. In total, the tremendous volume of documents produced by Defendants and third parties meant that Winston attorneys spent roughly 6,000 hours working until the close of discovery, identifying the best evidence for use at depositions and trial, as well as in pre-trial motions and for devising the case strategy.

12. Notwithstanding the hundreds of phone calls and email exchanges that were necessary to navigate this massive production process, Defendants and third-party subpoena recipients often resisted the production of relevant documents, and on many occasions up through trial, judicial intervention was necessary to resolve a discovery dispute. Winston was instrumental in briefing and, in many instances, arguing these matters, including disputes about production of documents,[3] scope of depositions,[4] and admissibility of evidence.[5]

13. Plaintiffs collectively deposed more than sixty fact witnesses and defended close to eighteen depositions. Winston attorneys acted as the "first-chair" examining or defending attorney in thirty-two of these depositions. The depositions for which Winston assumed primary responsibility included numerous witnesses with critical knowledge about the conduct at issue, and whose testimony

---

[3] *See, e.g.*, ECF No. 564, Joint Statement re Pac-12 Conference eSports Documents.
[4] *See, e.g.*, ECF No. 504, Joint Statement re NCAA 30(b)(6) Deposition Topic 10.
[5] *See, e.g.*, ECF No. 1050, Joint Submission re Plaintiffs' Exhibit 139.

1    provided important evidence in support of Plaintiffs' claims that was repeatedly cited by the Court in

2    rendering its decision.   These witnesses included NCAA Vice President Kevin Lennon; NCAA

3    Director of Research Todd Petr; NCAA 30(b)(6) designee Mark Lewis; Big 12 Conference

4    Commissioner Robert Bowlsby; Atlantic Coast Conference Associate Commissioner Brad Hostetter;

5    Ohio State University Athletic Director Eugene Smith; ESPN basketball analyst Jay Bilas; Mid-

6    American Conference Commissioner Jon Steinbrecher; Conference USA Commissioner Judith

7    MacLeod; University of Texas President Gregory Fenves; NCAA Executive Vice President of

8    Regulatory Affairs Oliver Luck; and University of North Carolina men's basketball coach Roy

9    Williams.  Winston also first-chaired the examining or defending of six out of eight testifying experts

10   in this matter.  Specifically, Winston deposed Defendants' economists, Dr. Janusz Ordover and Dr.

11   Kenneth Elzinga, and Defendants' survey expert, Dr. Bruce Isaacson, and defended Plaintiffs'

12   economists Dr. Roger Noll and Dr. Edward Lazear and consumer survey expert Hal Poret.   The

13   evidence obtained in those depositions resulted in additional crucial evidence cited by the Court in its

14   trial decision.   Winston staffed these depositions leanly to help limit costs, and it was routine for

15   Defendants' lawyers to far outnumber Plaintiffs' total lawyers, both in person and on the phone.  For

16   example, Plaintiffs sent two attorneys to defend the deposition of Plaintiffs' expert Hal Poret while

17   nine attorneys appeared for Defendants.  Six attorneys appeared for Defendants at the deposition of

18   Brad Hostetter, while two attorneys appeared for Plaintiffs.   And five attorneys appeared for

19   Defendants at the Big 12 Conference 30(b)(6) deposition of Commissioner Robert Bowlsby, though

20   Plaintiffs sent only two.

21          14.     Winston & Strawn also played a leading role in the vast majority of written submissions

22   to the Court on behalf of Plaintiffs, both before and after Winston was appointed co-lead Class Counsel

23   in all of the cases with respect to injunctive relief.  Winston attorneys were central to the briefing for

24   Defendants' dismissal motion; the injunctive class certification motion and 23(f) opposition;

25   Defendants' motion for judgment on the pleadings; the cross-motions for summary judgment and

26   Daubert motions; the pre-trial opening statement briefs; the post-trial closing briefs; discovery disputes

27   about document production, depositions, financial documents, subpoenas, and contracts; and overall

28   scheduling and case management.   Accordingly, Winston attorneys contributed the majority of

Plaintiffs' time and effort to legal research, discussion of briefing strategy, editing drafts, and supervising the manifold elements that go into various filings for a complicated antitrust class action like this one.

15.     Winston attorneys also worked closely with the experts throughout the case, retaining, along with co-counsel, the necessary experts needed to pursue this type of high stakes antitrust litigation.   Working most closely with three out of the four testifying plaintiffs' experts—Dr. Roger Noll, Dr. Edward Lazear, and Mr. Hal Poret—Winston & Strawn assisted plaintiffs' experts in identifying and gathering the relevant materials for expert analysis.  The firm also assisted these experts as they drafted their reports and testimony, formulated their analyses, and sought additional information as the case developed.  In coordination with Winston's efforts, Drs. Noll and Lazear wrote reports that helped the Court certify Plaintiffs' Rule 23(b) injunctive-relief classes; Dr. Noll wrote reports that helped to demonstrate the failings of Dr. Elzinga's and Dr. Heckman's merits reports and trial testimony; and Dr. Noll and Mr. Poret offered trial testimony that was cited as persuasive by the Court in its final judgment.  Winston also assisted in the drafting of the expert report of Dr. Daniel Rascher, Plaintiffs' other principal economist on liability, and helping to prepare him for trial.  In total, across the case, eight experts were retained; they produced eighteen reports spanning 2,850 pages; there were eleven expert depositions; there were nine expert declarations and replies submitted for trial, totaling 1,533 pages; and six experts provided live trial testimony.

16.     Preparing for trial was a tremendous undertaking and Winston played a critical role in this process for the injunctive classes.  The schedule was abbreviated to accommodate defense counsel, and the Court ordered the parties to submit written opening statements and direct expert testimony in advance, in addition to deposition designations, witness lists, exhibit lists, and motions in *limine*. Winston & Strawn worked extensively on all of these complicated pretrial tasks, including:

- Coordinating Plaintiffs' effort to identify trial exhibits for Plaintiffs' exhibit list (which totaled 285, many of them summary charts of longer documents) and to review for objections to the more than 1,000 exhibits initially proposed by Defendants.  Indeed, Defendants sent multiple drafts of their exhibit list:  the first draft listed 1,024 exhibits; a supplement to this draft grew to 1,067 exhibits; later, Defendants' revised their exhibit

list to contain 446 exhibits following the pretrial conference, but then exchanged an updated exhibit list with 548 exhibits; their list again grew to 565 exhibits before trial; and they finally submitted 622 exhibits for trial. Plaintiffs filed 285 exhibits based on the extensive pre-trial work it conducted to identify the most relevant evidence for trial. And as part of revising the final trial exhibit list, Plaintiffs' counsel worked with Defendants' counsel to submit a joint exhibit list of 45 exhibits. Working through so many documents identified by Defendants—even though most of them ultimately were not offered at trial—required many, many hours.

- Contributing centrally to writing Plaintiffs' forty-seven-page opening statement brief.
- Leading the efforts to assisting Dr. Noll and Mr. Poret in preparing their trial declarations and live trial testimony, and working with co-counsel to provide the same assistance to Dr. Rascher.
- Preparing Plaintiffs' fact and expert witnesses for direct, redirect, and cross-examination testimony; preparing with co-counsel to cross-examine the thirteen individuals listed on Defendants' fact witness list; and preparing with co-counsel to cross-examine Defendants' three expert witnesses.
- Working with co-counsel to review all deposition transcripts for designation, testimony for counter designation, and objections. Winston also participated in a lengthy meet-and-confer process to address objections raised by all parties with respect to deposition designations and documents on the exhibit lists.
- Drafting several of Plaintiffs' motions *in limine* and several portions of the omnibus opposition to Defendants' *limine* motions.
- Coordinating a lean trial team to promote efficiency and effective presentation.

17. As a result of all of the effort Winston attorneys made alongside co-counsel, Plaintiffs achieved a historic victory. The Court entered a landmark permanent injunction that will help ameliorate the "great disparity between the extraordinary revenue Defendants garner" and "the modest benefits that Class Members" may receive for their athletic services, including lifting all NCAA restraints on education-related benefits, and substantial alleviation of the NCAA's restraints on cash

7

incentives for academic achievement.  The Court did so after finding that the evidence Plaintiffs marshalled and presented at trial, much of which was marshalled and presented by Winston attorneys, demonstrated that Defendants' "amateurism" defense was largely unsupportable, and that Defendants' post-2015 actions—as established at trial—showed that consumer demand for the three sports at issue had not been harmed, and would not be harmed, by increased education-related benefits and other increased compensation paid to Plaintiffs.  Indeed, based on the factual record presented at trial by Winston attorneys and others, the Court wrote an opinion with more than sixty pages of factual findings in support of its verdict against Defendants.  The extensive efforts of Winston lawyers substantially contributed to this result.

## II.    Winston & Strawn Attorney's Fees

18.    From the inception of this MDL through trial, including the costs of preparing this Fee Motion,[6] Winston & Strawn lawyers, paralegals, and support staff have invested 41,152.05 hours over a period of approximately five years of litigation.  The value of that time, using the historic hourly billing rates of the firm at the time the services were rendered, is $24,304,239.70.  The rates used to calculate these figures are the usual and customary hourly rates charged for each attorney or staff member's services at Winston at the applicable period of time.

19.    Enclosed below is a list of Winston & Strawn attorneys and staff who worked on the case, along with their applicable historical rates and total hours worked for each year of the case.

| 2014 | | | | |
|------|------|------|------|------|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Dale, Adam | Associate | 425 | 131.25 | $55,781.25 |
| Feher, David | Partner | 960 | 321 | $308,160 |
| Furman, Rebecca | Associate | 425 | 176.71 | $75,101.75 |
| Greenspan, David | Partner | 875 | 274.65 | $240,318.75 |
| Hyppolite, Georgino | Associate | 425 | 131.85 | $56,036.25 |

---

[6] The Ninth Circuit recognizes that "[i]n statutory fee cases, federal courts, including our own, have uniformly held that time spent in establishing the entitlement to and amount of the fee is compensable." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 981 (9th Cir. 2008) (quoting *In re Nucorp Energy, Inc.*, 764 F.2d 655, 659-660 (9th Cir. 1985)).  "This is so because it would be inconsistent to dilute a fees award by refusing to compensate attorneys for the time they reasonably spent in establishing their rightful claim to the fee."  *Id.*; *see also Kinney v. Int'l Bhd. of Elec. Workers*, 939 F.2d 690, 695 (9th Cir. 1991).

| Kessler, Jeffrey | Partner | 1,180 | 109.8 | $129,564 |
|---|---|---|---|---|
| Kyritsopoulos, Corinne | Senior Paralegal | 250 | 57.1 | $14,275 |
| Litman, Joseph | Associate | 490 | 423.5 | $207,515 |
| Meenan, Sean | Associate | 605 | 196.6 | $118,943 |
| Nevius, Timothy | Associate | 605 | 957.2 | $579,106 |
| Niss, Matthew | Paralegal | 160 | 109.65 | $17,544 |
| Sarafa, Derek | Partner | 750 | 172.7 | $129,525 |
| **2014 TOTAL** | | | **3,062.01** | **$1,931,870** |

| 2015 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Blomstrom, Christine | Review Attorney | 85 | 351.25 | $29,856.25 |
| Carter, Andrew | Review Attorney | 95 | 411.75 | $39,116.25 |
| Choate, Ann | Litigation Support Manager | 250 | 86.9 | $21,725 |
| Dale, Adam | Associate | 450 | 45.35 | $20,407.5 |
| Feher, David | Partner | 1,000 | 627.8 | $627,800 |
| Furman, Rebecca | Associate | 480 | 76 | $36,480 |
| Gordon, Benjamin | Associate | 450 | 75.3 | $33,885 |
| Greenspan, David | Partner | 910 | 259.55 | $236,190.5 |
| Heebner, Lindsay | Review Attorney | 145 | 395.75 | $57,383.75 |
| Honness, David | Review Attorney | 85 | 452.5 | $38,462.5 |
| Horan, Deborah | Review Attorney | 85 | 905.25 | $76,946.25 |
| Howell, John | Review Attorney | 85 | 719.5 | $61,157.5 |
| Hyppolite, Georgino | Associate | 450 | 117.67 | $52,951.5 |
| Johnson, Steffen | Partner | 820 | 28.6 | $23,452 |
| Kessler, Jeffrey | Partner | 1,225 | 172.1 | $210,822.5 |
| Kyritsopoulos, Corinne | Senior Paralegal | 265 | 140.6 | $37,259 |
| Litman, Joseph | Associate | 555 | 997.2 | $553,446 |
| Meenan, Sean | Associate | 680 | 314.9 | $214,132 |
| Nevius, Timothy | Associate | 680 | 1,396.2 | $949,416 |
| Niss, Matthew | Paralegal | 170 | 229.55 | $39,023.5 |
| Ogunsunlade, Olayinka | Review Attorney | 85 | 1,032.25 | $87,741.25 |
| Oshin, Jill | Review Attorney | 85 | 22.75 | $1,933.75 |
| Oyler, Caitlin | Review Attorney | 105 | 250.5 | $26,302.5 |
| Parsigian, Jeanifer | Associate | 515 | 484.3 | $249,414.5 |
| Pfeiffer, David | Paralegal | 90 | 19.25 | $1,732.5 |
| Sarafa, Derek | Partner | 820 | 204.1 | $164,902 |
| **2015 TOTAL** | | | **9,816.87** | **$3,891,939.5** |

| 2016 | | | | |
|---|---|---|---|---|
| Timekeeper | Role | Historical Rate | Total Hours | Total Lodestar (Hours x Rate) |
| Choate, Ann | Litigation Support Manager | 250 | 123.4 | $30,850 |
| Cottingham, Thomas | Partner | 965 | 23.3 | $22,484.5 |
| Dale, Adam | Associate | 470 | 896.1 | $421,167 |
| Dow, Nicole | Paralegal | 170 | 165.4 | $28,118 |
| Feher, David | Partner | 1,055 | 692.75 | $730,851.25 |
| Gordon, Benjamin | Associate | 470 | 455.55 | $214,108.5 |
| Greenspan, David | Partner | 960 | 690.95 | $663,312 |
| Hyppolite, Georgino | Associate | 470 | 1,447.42 | $680,287.4 |
| Kessler, Jeffrey | Partner | 1,290 | 139 | $179,310 |
| Kyritsopoulos, Corinne | Senior Paralegal | 280 | 290.7 | $81,396 |
| Litman, Joseph | Associate | 615 | 2,175.22 | $1,337,760.3 |
| Meenan, Sean | Associate | 715 | 335.95 | $240,204.25 |
| Mendenhall, Samuel | Partner | 885 | 28 | $24,780 |
| Nevius, Timothy | Associate | 715 | 222.6 | $159,159 |
| Niss, Matthew | Paralegal | 180 | 504 | $90,720 |
| Parsigian, Jeanifer | Associate | 575 | 499 | $286,925 |
| Stewart, Jennifer | Associate | 715 | 387.65 | $277,169.75 |
| 2016 TOTAL | | | 9,076.99 | $5,468,602.95 |

| 2017 | | | | |
|---|---|---|---|---|
| Timekeeper | Role | Historical Rate | Total Hours | Total Lodestar (Hours x Rate) |
| Dale, Adam | Associate | 520 | 555.9 | $289,068 |
| Dow, Nicole | Paralegal | 180 | 264.4 | $47,592 |
| Feher, David | Partner | 1,120 | 442.25 | $495,320 |
| Gordon, Benjamin | Associate | 495 | 1,039.69 | $514,646.55 |
| Greenspan, David | Partner | 990 | 750.15 | $742,648.5 |
| Hyppolite, Georgino | Associate | 520 | 955.54 | $496,880.8 |
| Kessler, Jeffrey | Partner | 1,365 | 251.5 | $343,297.5 |
| Kyritsopoulos, Corinne | Senior Paralegal | 295 | 305.6 | $90,152 |
| Lawrenz, Kendall | Paralegal | 165 | 107.35 | $17,712.75 |
| Litman, Joseph | Associate | 690 | 1,848.8 | $1,275,672 |
| Meenan, Sean | Associate | 760 | 236.9 | $180,044 |
| Niss, Matthew | Paralegal | 190 | 148.75 | $28,262.5 |
| Parsigian, Jeanifer | Associate | 645 | 165.5 | $106,747.5 |
| Stewart, Jennifer | Associate | 760 | 276.33 | $210,010.8 |
| 2017 TOTAL | | | 7,348.66 | $4,838,054.90 |

| 2018 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Bibko, Lori | Review Attorney | 85 | 58.7 | $4,989.5 |
| Choate, Ann | Litigation Support Manager | 275 | 43.5 | $11,962.5 |
| Dale, Adam | Associate | 585 | 966.49 | $565,396.65 |
| Dow, Nicole | Paralegal | 185 | 572.85 | $105,977.25 |
| Edwards, Renee | Review Attorney | 85 | 56.75 | $4,823.75 |
| Feher, David | Partner | 1,185 | 386.75 | $458,298.75 |
| Gadsden, Nikkole | Paralegal | 340 | 255.6 | $86,904 |
| Glass, Trina | Review Attorney | 85 | 47.75 | $4,058.75 |
| Gordon, Benjamin | Associate | 545 | 1,323.63 | $721,378.35 |
| Greenspan, David | Partner | 1,050 | 1,122.8 | $1,178,940 |
| Hou, Michelle | Review Attorney | 85 | 27 | $2,295 |
| Hyppolite, Georgino | Associate | 585 | 1,229.96 | $719,526.6 |
| Johnson, Paula | Review Attorney | 85 | 56.5 | $4,802.5 |
| Jordan, Tonja | Review Attorney | 85 | 50 | $4,250 |
| Kanayeva, Nataliya | Review Attorney | 85 | 48 | $4,080 |
| Kessler, Jeffrey | Partner | 1,445 | 611.2 | $883,184 |
| Kyritsopoulos, Corinne | Senior Paralegal | 300 | 736.75 | $221,025 |
| Lawrenz, Kendall | Paralegal | 170 | 83 | $14,110 |
| Litman, Joseph | Associate | 765 | 1,934.30 | $1,479,739.5 |
| Meenan, Sean | Partner | 820 | 907.35 | $744,027 |
| Montague, Todd | Paralegal | 340 | 41.2 | $14,008 |
| Nuga, Temiloluwa | Review Attorney | 85 | 47 | $3,995 |
| Parsigian, Jeanifer | Associate | 720 | 889.9 | $640,728 |
| **2018 TOTAL** | | | **11,496.98** | **$7,878,500.10** |

| 2019 | | | | |
|---|---|---|---|---|
| **Timekeeper** | **Role** | **Historical Rate** | **Total Hours** | **Total Lodestar (Hours x Rate)** |
| Feher, David | Partner | 1,245 | 17 | $21,165 |
| Gordon, Benjamin | Associate | 615 | 117.12 | $72,028.8 |
| Greenspan, David | Partner | 1,105 | 43.35 | $47,901.75 |
| Hyppolite, Georgino | Associate | 660 | 63.37 | $41,824.2 |
| Johnson, Steffen | Partner | 1,025 | 23 | $23,575 |
| Kessler, Jeffrey | Partner | 1,515 | 25 | $37,875 |
| Litman, Joseph | Associate | 825 | 61.7 | $50,902.5 |
| **2019 TOTAL** | | | **350.54** | **$295,272.25** |

20. Copies of contemporaneously made individual attorney and staff time records, which would require a significant investment of resources to review and redact for attorney-client privileged

11

communications and attorney work product, are available at the Court's request. All of the time submitted was recorded contemporaneously in accordance with the firm's billing system.

21.     The $24,304,239.7 in fees that Winston & Strawn seeks is roughly $900,000 less than the total amount billed for this case by Winston personnel during the past five years. Winston has excluded from its application fees from certain timekeepers that worked only limited hours, or only for short periods of time, for the sake of being conservative and making sure that any possible inefficiencies are eliminated.

22.     Winston & Strawn's hourly rates are adjusted annually to comport with the legal marketplace for comparable firms. Winston monitors prevailing market rates in the regions where it works, including the Northern District of California, taking into account attorneys of comparable skill, experience, and qualification. The firm maintains a number of internal metrics to benchmark its rates relative to those charged by competitor firms, a number of which represented Defendants in this matter. The rates reflected in this petition were also the standard billing rates these timekeepers offered for their services for other matters which they worked on throughout the United States, including in the Northern District of California.

23.     Attached hereto as Exhibit A are select biographies of Winston attorneys that provide additional background about the primary team that litigated this matter. A few points are worth noting. The primary team of lawyers on this case are all experienced antitrust and sports lawyers. Indeed, Winston has one of the leading antitrust practices and sports law practices in the country, and I am the co-chair of those practices. Members of the Winston litigation team for this case have been involved in many of the most important sports antitrust cases of the last three decades or more and are considered among the most prominent practitioners in this field.

24.     Attached hereto as Exhibit B are materials about Winston & Strawn and its antitrust and sports law practices that provide additional information about the firm's well-recognized expertise and capabilities with respect to antitrust litigations in the world of sports.

25.     Attached hereto as Exhibit C is the Declaration of Daniel A. Rascher on Economic Value of Ordered Injunctive Relief, which provides detail about the larger expected economic value to the three Classes of the Court's landmark ruling.

26.     As previously noted, Winston did not participate in the damages portion of this case and thus has not received any prior fee award by the Court.  All of Winston's work has been devoted to the coordinated prosecution and proceedings on behalf of the injunctive relief classes, and Winston made this substantial investment in the litigation despite the uncertainty of the ultimate result, and thus a potential non-recovery of Winston's fees and expenses.

### III.     Winston & Strawn Costs

27.     During the pendency of this case, Winston & Strawn advanced a range of expenses necessary for the prosecution of this matter totaling $1,124,511.20.  As explained below, this does *not* include over $2 million in expert fees paid by Winston.  The costs for which we seek reimbursement are the types of costs that would be paid by a Winston antitrust or sports litigation client that hires the firm by the hour, including expenses in various categories compensable under the Clayton Act: computerized legal research, data storage, attorney travel, photocopying, service costs, mail, court costs, etc.

28.     Enclosed below is a list summarizing these necessary litigation costs:

| Category | Cost |
|---|---|
| Travel (Airfare, Hotels, Long-Distance Travel) | $224,482.48 |
| Telecommunication Services | $1,684.45 |
| Copying Costs | $220,976.41 |
| Computerized Legal Research and ECF/PACER | $72,318.97 |
| Meals | $27,584.88 |
| Document Services (Online Hosting, etc.) | $417,046.41 |
| Service of Process and Messenger/Courier | $18,977.70 |
| Professional Services | $9,957.50 |
| Shipping and Mailing | $5,004.5 |
| Court Reporting Costs | $105,808.36 |
| Local Transportation | $15,911.30 |
| Court Costs | $3,943 |
| Miscellaneous | $815.24 |
| **Total** | **$1,124,511.20** |

29.     Copies of invoices and contemporaneously made records evidencing these costs are available at the Court's request.

30.     As noted, Winston has not included among its costs the $2,235,436.48 in fees and charges incurred by expert witnesses, even though experts were essential in devising and proving

13

Plaintiffs' claims for both class certification and injunctive relief. Winston expended these millions of dollars in expert fees for the benefit of the Classes, knowing that such fees are not taxable costs under the Clayton Act, because it would not have been possible to successfully prosecute these claims on behalf of the Classes without this expert testimony. Because of the significant risks involved in prosecuting this case, as well as the substantial economic value of the injunctive relief obtained in this historic litigation, the conservative lodestar multiplier requested by Plaintiffs would help enforce the Clayton Act policy to encourage private parties to invest in and successfully prosecute antitrust violations even when a very substantial risk and investment of time and resources, including large expert fees, is required.

I declare that the foregoing is true and correct. Executed this 26th day of March, 2019, at New York, New York.

By  /s/ Jeffrey L. Kessler
        Jeffrey L. Kessler (*pro hac vice*)
        WINSTON & STRAWN LLP
        200 Park Avenue
        New York, NY 10166-4193
        Telephone: (212) 294-6700
        Facsimile: (212) 294-4700
        jkessler@winston.com
        *Class Counsel for Jenkins and Consolidated*
        *Action Plaintiffs*