Robb C. Adkins (SBN 194576)
radkins@winston.com
Seth Weisburst (SBN 259323)
sweisburst@winston.com
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

Steffen N. Johnson (*pro hac vice*)
sjohnson@winston.com
Adrianne Rosenbluth (*pro hac vice*)
arosenbluth@winston.com
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone: (202) 282-5000
Facsimile: (202) 282-5100

Lawrence M. Hill (*pro hac vice*)
lhill@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Brooke Goldstein (*pro hac vice*)
brooke@thelawfareproject.org
THE LAWFARE PROJECT
633 Third Avenue, 21st Floor
New York, NY 10017
Telephone: (212) 339-6995

Attorneys for Plaintiffs
JACOB MANDEL, CHARLES VOLK,
LIAM KERN, MASHA MERKULOVA,
SHACHAR BEN-DAVID, MICHAELA
GERSHON, and STEPHANIE ROSEKIND

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB MANDEL, CHARLES VOLK, LIAM KERN, SHACHAR BEN-DAVID, MICHAELA GERSHON, MASHA MERKULOVA, and STEPHANIE ROSEKIND,<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF TRUSTEES of the CALIFORNIA STATE UNIVERSITY, SAN FRANCISCO STATE UNIVERSITY, RABAB ABDULHADI, in her individual capacity, and LESLIE WONG, MARY ANN BEGLEY, LUOLUO HONG, LAWRENCE BIRELLO, REGINALD PARSON, OSVALDO DEL VALLE, KENNETH MONTEIRO, BRIAN STUART, and MARK JARAMILLA, in their official and individual capacities,<br><br>Defendants. | Case No. 3:17-CV-03511-WHO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT RABAB ABDULHADI'S MOTION FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927 AND THE COURT'S "INHERENT AUTHORITY" [ECF NO. 176]**<br><br>Date: May 29, 2019<br>Time: 2:00 p.m.<br>Location: Courtroom 2 (17th floor)<br>Judge: William H. Orrick<br><br>Complaint Filed: June 19, 2017<br>First Am. Complaint Filed: Aug. 31, 2017<br>Second Am. Complaint Filed: Mar. 29, 2018<br>Judgment Entered: October 29, 2018<br>Appeal Voluntarily Dismissed: March 29, 2018 |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   PRELIMINARY STATEMENT ......................................................................... 1

III.  STATEMENT OF ISSUES TO BE DECIDED .................................................. 3

IV.  FACTUAL BACKGROUND............................................................................... 3

    A.   Plaintiffs sued SF State, Abdulhadi, and others............................................ 3

    B.   Plaintiffs voluntarily amended their complaint in response to Abdulhadi's motion to dismiss. ..................................................................................... 3

    C.   The Court dismissed the FAC with leave to amend; Plaintiffs made substantial amendments in the SAC........................................................................ 5

    D.   The Court dismissed the SAC, and Plaintiffs appealed. ............................... 5

    E.   Plaintiffs dismissed their appeal as part of a settlement with CSU. ............. 6

    F.   Abdulhadi missed the deadline to file her motion. ....................................... 7

V.   LEGAL STANDARD........................................................................................... 7

    A.   Sanctions under 28 U.S.C. § 1927 ................................................................ 7

    B.   Sanctions under the Court's inherent authority ............................................. 8

VI.  ABDULHADI'S MOTION SHOULD BE DENIED........................................... 9

    A.   The motion, in its entirety, is based on three false assertions. ...................... 9

        1.   The SAC modified Plaintiffs' claims against Abdulhadi significantly and materially............................................................................... 9

        2.   The partial quote Abdulhadi relies on from Brooke Goldstein does not suggest--much less show--bad faith or an improper purpose. ....................... 10

        3.   Seth Weisburst did not make misrepresentations during oral argument........ 12

    B.   There is no basis for sanctions under 28 U.S.C. § 1927. ............................. 15

    C.   There is no evidence of bad faith to justify any sanctions against Plaintiffs' counsel under either 28 U.S.C. § 1927 or the Court's inherent powers. ................... 16

    D.   The amount of sanctions Abdulhadi seeks flouts both law and common sense. ........ 17

        1.   The motion fails to establish the reasonableness of the requested award...................................................................................... 17

        2.   The claimed fees have no connection to alleged bad-faith multiplication of proceedings. .......................................................... 18

        3.   There is no basis that fees should be recovered for Dan Siegel or Colleen Flynn, and the Court should strike their declarations........................ 19

1        4.    The motion's calculation of hourly rates has no valid basis. ........................ 20

2    E.    The motion is time-barred. …………………………………….…………………..21

3    VII.    CONCLUSION.................................................................................................................. 22

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Affymetrix, Inc. v. Multilyte Ltd.*,
5     No. C 03-03779 WHA, 2005 WL 1869405 (N.D. Cal. Aug. 5, 2005) .........................................14

6 *Blum v. Stenson*,
    465 U.S. 886, 104 S.Ct. 1541 (1984) ............................................................................................20
7

*Cancio v. Fin. Credit Network, Inc.*,
8     2005 WL 1629809 (N.D. Cal. July 6, 2005) ...................................................................18, 20, 21

9 *Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .....................................................................................................................8, 17
10

*Estate of Blas ex rel. Chargualaf v. Winkler*,
11     792 F.2d 858 (9th Cir. 1986) ............................................................................................................8

12 *Diaz v. Messer*,
    742 F. App'x 250 (9th Cir. 2018) .....................................................................................................8
13

14 *E.E.O.C. v. Banner Health*,
    402 F. App'x 289 (9th Cir. 2010) ...................................................................................................15
15

*E.E.O.C. v. Maricopa Cty.*,
16     339 F. App'x 688 (9th Cir. 2009) ...................................................................................................15

17 *ESCO Corp. v. Bradken Resources Pty Ltd.*,
18     2011 WL 1625815 (D. Or. Jan. 31, 2011) ......................................................................................9

19 *Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) ...........................................................................................13, 16, 17
20

21 *Fortinet, Inc. v. Sophos, Inc.*,
    2015 WL 12856457 (N.D. Cal. Sept. 12, 2015) ............................................................................14
22

*In re Hassan Imports P'ship*,
23     2015 WL 4572842 (C.D. Cal. Jul. 27, 2015) ...................................................................................9

24 *Matter of Yagman*,
    796 F.2d 1165 (9th Cir. 1986) .................................................................13, 14, 15, 16, 17, 18
25

26 *Mendez v. Cnty. of San Bernardino*,
    540 F.3d 1109 (9th Cir. 2008) .........................................................................................................9
27

28 *Moore v. Keegan Mgmt. Co.*,
    78 F.3d 431 (9th Cir. 1996) ........................................................................................7, 8, 15, 16, 22

iv

*New Alaska Development Corp. v. Guetschow*,
    869 F.2d 1298 (9th Cir. 1989) ...................................................................8

*OSU Student Alliance v. Ray*,
    699 F.3d 1053 (9th Cir. 2012) .........................................................5, 9, 13

*Primus Auto. Fin. Servs. v. Batarse*,
    115 F.3d 644 (9th Cir. 1997) ....................................................8, 9, 16, 17

*Prison Legal News v. Schwarzenegger*,
    608 F.3d 446 (9th Cir. 2010) .................................................................21

*Wages v. Internal Revenue Service*,
    915 F.2d 1230 (9th Cir. 1990) ...............................................................16

*Yagman v. Republic Ins.*,
    987 F.2d 622, 628 (9th Cir. 1993) .........................................................16

**Statutes**

28 U.S.C. § 1746 ...............................................................................................18

28 U.S.C. § 1927 ...................................................................................... *passim*

42 U.S.C. § 1983 ....................................................................................3, 4, 21

Fed. R. App. Proc. 42(b) ..................................................................................7

Fed. R. Civ. Proc. 11 ...............................................................................3, 5, 17

Fed. R. Civ. Proc. 15(a) ....................................................................................3

Fed. R. Evid. 401 ............................................................................................20

Fed. R. Evid. 602 ............................................................................................20

Fed. R. Evid. 701 ............................................................................................20

Fed. R. Evid. 702 ............................................................................................20

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) ...................................................21

Civil Rights Act ..................................................................................................3

Declaratory Judgment Act ..................................................................................4

False Claims Act ..............................................................................................21

I.      **INTRODUCTION**

Defendant Rabab Abdulhadi's motion for sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent authority—seeking hundreds of thousands of dollars—lacks any basis in fact or law. Abdulhadi's motion rests on three demonstrably false assertions: 1) that there are no material differences between Plaintiffs' claims regarding Abdulhadi in the first versus the second amended complaint (there are many); 2) that one of Plaintiffs' counsel, Brooke Goldstein, allegedly announced an intention to target people who advocate for Palestinian rights (her actual stated intention was to hold accountable those who violate *others'* civil rights); and 3) that another of Plaintiffs' counsel, Seth Weisburst, made intentional and material misrepresentations on August 8 during oral argument (he did not). Each assertion is demonstrably false.  If any sanctions were appropriate here, they would be issued against Abdulhadi and her counsel for filing this frivolous motion.[1]

The Court should deny the motion for at least six reasons.  *First*, as noted, the factual premise underlying Abdulhadi's motion is false.  *Second*, if Plaintiffs' civil rights action were baseless, Abdulhadi's employer would not have agreed to a ground-breaking public settlement of the claims of anti-Semitism raised here and in the related state-court action claim, which included an agreement to make substantial and costly institutional changes.  *Third*, there has been no bad faith or reckless multiplication of proceedings here, so no sanctions are justified under 28 U.S.C. § 1927.  *Fourth*, bad-faith conduct by Plaintiffs or their counsel is a prerequisite for ordering sanctions under the Court's inherent authority, yet Abdulhadi demonstrates none.  *Fifth*, Abdulhadi's calculation of requested sanctions is without proper support and is based on a deeply flawed measurement of attorneys' fees that would result in a massive windfall for Abdulhadi's counsel.  *Sixth*, the motion is time-barred.  For all these reasons, the motion should be denied.

II.     **PRELIMINARY STATEMENT**

From the start, Abdulhadi has ignored the SF State Jewish and Israeli students and community members involved in this case, the hostile environment they suffered from, and the violations of their civil rights.  She tries to cast the case instead as an effort to silence her anti-Israel

---

[1] Plaintiffs decline to seek such sanctions and further prolong these proceedings.

political advocacy.  But Plaintiffs and their counsel always have "unequivocally acknowledge[d] the right of any protester on any topic to speak openly, as long as they do not cross a line and incite imminent violence, as long as they are not impeding the rights of another, and as long as they are complying with appropriate time, place, and manner policies."  Compl. ¶ 12; First Am. Compl. ("FAC") ¶ 12.  Further, while

> contemptible speech and expression at SFSU often makes Plaintiffs feel uncomfortable and vulnerable…*Plaintiffs have never believed, and do not now believe, that this vile speech is unprotected, nor do they wish to suppress it*. They simply wish to be guaranteed the same inherent rights to speak, listen and assemble that all other members of the SFSU community—including students and academics who perpetuate the most offensive denigrations of the Jewish people and the Jewish state—are afforded at a university they all share and within which they must coexist.

*Id.*  Winston & Strawn LLP and The Lawfare Project did not sue on a *pro bono* basis to punish Abdulhadi "for her research and advocacy for justice for and in Palestine."  Mot. at 1.  They sued because Jews were being discriminated against in officially sanctioned campus events and Plaintiffs' civil rights had been violated—and it was clear that legal action was necessary to bring about necessary change.

That necessary change has been accomplished through a settlement with Abdulhadi's employer.  On March 20, 2019, the Board of Trustees of California State University agreed to make sweeping, fundamental changes to finally resolve this and the companion state-court case. Declaration of Seth Weisburst ("Weisburst Decl.") Ex. A.  If Plaintiffs' claims were "baseless," as Abdulhadi claims (Mot. at 2), it is hard to see why CSU settled in a way that acknowledges the discrimination Jews and Zionists have suffered on SF State's campus and guarantees significant measures designed to avoid such discrimination in the future.

Plaintiffs alleged that Abdulhadi proactively worked to marginalize Jewish students due to their Zionist faith and ethnic identity, and has written and stated publicly, many times, that Zionists should not be welcome on campus.[2]  The settlement commits the school to recognize and promote diverse viewpoints, including Zionism, which CSU has recognized is an important part of many Jews' identity.  The settlement directly addresses the authority others (including faculty advisors like

---

[2] *See, e.g.,* https://www.facebook.com/rabab.abdulhadi/posts/10155388256458123 (accessed May 2, 2019).  In this post, Abdulhadi publicly states that she considers "welcoming Zionists to campus" to be a "declaration of war." *Id.*

Abdulhadi) had in shutting down Jewish events, and excluding Jewish students from participating in school activities, by requiring the school to implement its anti-discrimination policy guided by "lessons learned" from the Mayor Barkat event and the Know Your Rights Fair, and committing CSU to creating a centralized campus programming system for events.

There is no basis in fact or law for *any* sanctions against Plaintiffs or their counsel here.

## III.   STATEMENT OF ISSUES TO BE DECIDED

1.   Whether, based on Abdulhadi's motion, the Court should order sanctions pursuant to 28 U.S.C. § 1927 for multiplying proceedings in this case recklessly or in bad faith.

2.   Whether, based on Abdulhadi's motion, the Court finds bad faith conduct here sufficient to justify ordering sanctions against Plaintiffs' counsel pursuant to its inherent authority.

3.   Whether Abdulhadi's motion should be denied as untimely.

## IV.   FACTUAL BACKGROUND

### A.   <u>Plaintiffs sued SF State, Abdulhadi, and others.</u>

On June 19, 2017, Plaintiffs filed their original complaint.  They asserted four causes of action under 42 U.S.C. § 1983 for First and Fourteenth Amendment violations of Plaintiffs' civil rights in connection with the removal and shutdown of Mayor Barkat's speech in April 2016 and the intentional exclusion of SF Hillel from the school-sponsored "Know Your Rights" Fair in February 2017.  These claims were asserted against certain SF State administrators and employees, including Abdulhadi, whose hostility to pro-Israel and/or Zionist students and community members is a matter of public record.[3]  Plaintiffs also asserted one cause of action against the University under Title VI of the Civil Rights Act based on a hostile environment for Jewish students on campus.   ECF 1. Abdulhadi moved to dismiss, but at no time challenged the Complaint under Rule 11.  ECF 43.

### B.   <u>Plaintiffs voluntarily amend their complaint in response to Abdulhadi's motion to dismiss.</u>

In August 2017, Plaintiffs voluntarily amended their complaint pursuant to Rule 15(a).  ECF

---

[3] Abdulhadi co-founded the U.S. Campaign for the Academic and Cultural Boycott of Israel, which according to its website "urges…work towards the cancellation or annulment of events, activities, agreements, or projects ... [that] promote the normalization of Israel in the global academy ...." Second Amended Complaint ("SAC") ¶ 37, n.6 (quoting https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/) (visited April 27, 2019).

57 ("FAC").  The FAC named Abdulhadi as a defendant in the four § 1983 causes of action, and the Declaratory Judgment Act claim.  *Id.* ¶¶ 170-227, 244-248.  While the FAC included several factual allegations regarding Abdulhadi that were not directly related to the Barkat event or the Know Your Rights Fair, these allegations both (1) provided further information to support a reasonable inference that Abdulhadi was liable for the § 1983 causes of action, and (2) supported and informed Plaintiffs' Title VI claim regarding the hostile environment for Plaintiffs Mandel, Volk, and Kern as Jewish students at SF State.

With respect to the mistreatment of Jewish students and community members at Mayor Barkat's shut-down speech (Causes of Action 1 and 2), the FAC's allegations regarding Abdulhadi focused on Abdulhadi's role as the faculty advisor for the General Union of Palestine Students group ("GUPS", her choice to disregard SF State's requirements for advisors, her encouragement of the disruptive individuals who shut down the event, and her securing an agreement from the administration that no person involved in shutting down the event—including faculty such as herself—would face disciplinary action.  *See* FAC ¶¶ 3, 17, 37, 81-82, 96, 101, 174, 176, 187, 189. A more detailed summary of these allegations from the FAC is included as **Appendix A** to this Opposition.

With respect to the exclusion of the only campus Jewish student group from the Know Your Rights Fair (Causes of Action 3 and 4), the FAC's allegations regarding Abdulhadi included that she was one of the faculty organizers of the event, that her academic college and her student group intentionally excluded the Jewish student group from the Fair, and that she had inadequately trained her student organization regarding discrimination policies despite her requirements as an advisor to assist the University in that effort.  *See* FAC ¶¶ 150, 160, 162, 204, 217-220.  A more detailed summary of these allegations from the FAC is included in **Appendix A**.  The FAC also described why Plaintiffs chose to name Abdulhadi: her own statements, the written statements of an organization she founded and on which she serves as an Advisory Board Member, and her history of hostility to campus Jews and Israelis.  A more detailed summary of these allegations from the FAC is also included in **Appendix A**.

Abdulhadi's organization, USCBI, mandates the disruption and silencing of opposing

viewpoints, based on the theory that the very process of an open dialogue should be resisted because it legitimizes Israel's existence in the community of nations. USCBI's website offers "guidelines" for its "academic boycott" that show it is part of USCBI's mission to take exactly the kind of action Plaintiffs allege she executed in the FAC—including disrupting and silencing the Mayor of Jerusalem's speech and excluding Plaintiffs' Jewish group from the Know Your Rights Fair in violation of Plaintiffs' rights.  *See* SAC ¶ 37, n.6.

### C.    The Court dismissed the FAC with leave to amend; Plaintiffs made substantial amendments in the SAC.

In September 2017, Abdulhadi moved to dismiss the FAC.  ECF 79.  Again she did not challenge it under Rule 11.  The Court granted her motion in March 2018, identifying several different issues related to the claims against Abdulhadi and granted leave to amend.  ECF 37. Plaintiffs sought to address the Court's concerns in their Second Amended Complaint ("SAC"), which included significant amendments made in direct response to the issues identified by the Court. A detailed table reflecting the Court's specific guidance in the March 9, 2018 Order, and the specific changes Plaintiffs made to the SAC in response to that Order, is included as **Appendix B**.  Examples of such changes include deleting allegations the Court took issue with Abdulhadi's past conduct and involvement in the hunger strike on campus, deleting allegations for injunctive relief brought on the basis of official capacity,[4] restructuring the causes of action related to the Barkat event to separate out those causes of action based on the removal of the event to the outskirts of campus (and not naming Abdulhadi as a defendant for those claims), amending their allegations to track *OSU Student Alliance v. Ray,* 699 F.3d 1053 (9th Cir. 2012), and adding specific allegations as to Abdulhadi's direct conduct.  *See* ECF 124 at 34-27; SAC ¶¶ 2 (n.2), 70, 95, 119-120, 180, 189, 191; Appendix B.

### D.    The Court dismissed the SAC, and Plaintiffs appealed.

In April 2018, Abdulhadi moved to dismiss the SAC.  She once again failed to identify anything in Plaintiffs' filing as sanctionable under Rule 11.  The parties argued the motion to dismiss in August, and the Court dismissed without leave to amend.  ECF 167 (Order), 168 (Judgment).

---

[4] Inexplicably, the motion describes this change as "***an attempt to circumvent the Court's prior ruling***," when it was precisely the opposite—Plaintiffs followed the Court's direction and the Court acknowledged this was a "helpful clarification."  Mot. at 6; ECF at 29.

Plaintiffs and Abdulhadi agreed a week later that:

> Any applicable time limitation for Defendant Abdulhadi to file a motion for attorney's fees and/or costs, motion for sanctions and costs bill [will] be extended to the later of either of the following:
>> a. to run until 44 days after entry of judgment (which is 14 days after Plaintiff's deadline for filing a Notice of Appeal pursuant to Federal Rule of Appeal 4);
>> b. to run 14 days after remand to the District Court following the conclusion of any appellate proceedings.

ECF 169. The Court adopted the parties' stipulation on November 7, 2018. ECF 170. On November 27, 2018, Plaintiffs filed a Notice of Appeal. ECF 172.

### E.   Plaintiffs dismissed their appeal as part of a settlement with CSU.

On March 20, 2019, roughly three weeks before Plaintiffs' opening appellate brief would have been due, Plaintiffs reached a substantial public settlement with CSU. That settlement resolves both the federal case and the state-court case, which focused solely on the Know Your Rights Fair and only asserted a state-law cause of action. The settlement includes the following key terms:

- CSU agreed to issue a public statement focused both on this case and the parallel state case that would "express its commitment to safeguarding the rights of all members of the San Francisco State University ('SFSU') community, including Jews, to practice their religion, to express their legally protected viewpoints, including Zionist and pro-Israel viewpoints, and to participate in university-sponsored activities free from discrimination based on any protected status, including their Jewish faith" (Weisburst Decl., Ex. A ¶ 2);

- SF State committed that, "going forward, its implementation of CSU antidiscrimination policy and procedure shall be guided by *lessons learned in connection with the Mayor Barkat event and the Know Your Rights Fair*; and CSU will protect SFSU students' right to be free from discrimination in CSU programs or activities based on any protected status, including the Jewish faith" (*id.*, emphasis added);

- CSU agreed to "hire a Coordinator of Jewish Student Life within the Division of Equity & Community Inclusion," who will "work to address issues of anti-Semitism on the SFSU campus through a variety of programming efforts" in suitable office space (*id.* ¶¶ 5, 8);

- SF State agreed to retain an independent, external consultant to assess SF State's procedures for enforcing its antidiscrimination policies, to assess campus policy and procedures regarding time, place and manner, and to make recommendations about best practices in these respects. SF State agreed to make these recommendations and its responses to them public (*id.* ¶ 6);

- SF State will, for 24 months, assign all complaints of religious discrimination to an independent, outside investigator—and will use this time period to take steps to ensure that internal investigators and administrators receive updated training on religious discrimination (including based on input from the Coordinator of Jewish Student Life) (*id.* ¶ 7);

- SF State will allocate an additional $200,000 to support educational outreach efforts to promote viewpoint diversity, including pro-Israel or Zionist viewpoints, and inclusion and equity based on religious identity, including Jewish religious identity (*id.* ¶ 9);

- CSU would make a $36,000 contribution to Plaintiffs' litigation expenses (*id.* ¶ 10); and

- CSU will create a more formalized campus programming system "***which would attempt to prevent the sorts of problems that arose with the Mayor Barkat and Know Your Rights Fair events***" (*id.* ¶ 11, emphasis added).

The settlement thus addressed both the Know Your Rights Fair (which was at issue in both cases) as well as the Mayor Barkat event (which was at issue only in this case). Plaintiffs agreed to dismiss their appeal in this case as part of the settlement. *Id.* ¶ 13.

### F.   Abdulhadi missed the deadline to file her motion.

Because of the settlement, Plaintiffs moved to voluntarily dismiss their appeal in this case on March 27, 2019. Appeal No. 18-17277, Dkt. No. 11. On March 29, 2019, the Court of Appeals granted Plaintiffs' motion and dismissed the appeal under Federal Rule of Appellate Procedure 42(b). *Id.*, Dkt. No. 12. The March 29 Order noted that a copy of that order was sent to the district court. *Id.* As the Court had dismissed the underlying case and the Court of Appeals had dismissed the appeal, no further action was necessary in either Court; there was no remand. Appellate proceedings concluded on March 29. As explained further in Section VI.E below, Plaintiffs' position is that, under the parties' stipulation, Abdulhadi's last day to move for sanctions or attorneys' fees was April 12, 2019—14 days after appellate proceedings concluded. But she filed her motion on April 19—seven days too late. ECF 176.

## V.   LEGAL STANDARD

### A.   Sanctions under 28 U.S.C. § 1927

Sanctions under § 1927 are warranted when attorneys file repetitive motions or generate an extraordinary volume of paperwork in the case. *Hartke v. Westman Property Management, Inc.*, 2016 WL 3286347, at *5 (S.D. Cal. June 14, 2016) (citing *Braunstein*, 683 F.3d at 1189). "Section 1927 authorizes sanctions against an attorney who 'multiplies the proceedings in any case unreasonably and vexatiously.'" *Doran v. 7 Eleven*, No. SACV 04-1125 JVS (ANx), 2005 WL 5957486, at *2 (C.D. Cal. Aug. 4, 2005) (quoting 28 U.S.C. § 1927). "Section 1927 requires a finding of recklessness or bad faith." *Id.* In the context of filings, the Ninth Circuit has explained, "For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass." *In re Keegan Mgmt. Co. Sec. Litig.*, 78 F.3d 431, 436 (9th

7

1    Cir. 1996).

2           Section 1927 "does not permit sanctions for the initial filing of the complaint; rather, the

3    sanctions only apply to subsequent filings and tactics which multiply the proceedings." *Id.* (citing

4    *Moore v. Keegan Mgmt. Co.*, 78 F.3d 431, 435 (9th Cir. 1996)).  Such sanctions "must be supported

5    by a finding of subjective bad faith."  *New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298,

6    1306 (9th Cir. 1989) (reversing award of § 1927 sanctions where the record failed to disclose

7    evidence that attorney "knowingly or recklessly" raised arguments that were frivolous or for the

8    purpose of harassment) (citing *Estate of Blas ex rel. Chargualaf v. Winkler*, 792 F.2d 858, 860 (9th

9    Cir. 1986)).  "Bad faith is present when an attorney knowingly or recklessly raises a frivolous

10   argument or argues a meritorious claim for the purpose of harassing an opponent."  *Id.*  "[F]rivolous

11   arguments alone will not support § 1927 sanctions . . . the attorneys making those frivolous

12   arguments must have also acted with subjective bad faith." *Diaz v. Messer*, 742 F. App'x 250, 253

13   (9th Cir. 2018).

14          **B.        Sanctions under the Court's inherent authority**

15          The Court's inherent powers must be exercised with restraint and discretion. *Chambers v.*

16   *NASCO, Inc.*, 501 U.S. 32, 47 (1991).  Before a court may impose inherent-power sanctions against

17   a party, it must find that the party "acted in bad faith, vexatiously, wantonly, or for oppressive

18   reasons."  *Id.* at 46.  Finding bad faith "is especially critical when the court uses its inherent powers

19   to engage in fee-shifting" because "the narrow exceptions to the American Rule effectively limit a

20   court's inherent power to impose attorney's fees as a sanction to cases in which a litigant has

21   engaged in bad-faith conduct or willful disobedience of a court's orders."  *Primus Auto. Fin. Servs.*

22   *v. Batarse*, 115 F.3d 644, 648-49 (9th Cir. 1997) (quoting *Chambers*, 501 U.S. at 47). "A party …

23   demonstrates bad faith by 'delaying or disrupting the litigation or hampering enforcement of a court

24   order.'"  *Id.* at 649.

25          The "bad faith" requirement sets a "high threshold."  *Id.* at 648.  "[S]anctions should be

26   reserved for the 'rare and exceptional case where the action is clearly frivolous, legally unreasonable

27   or without legal foundation, or brought for an improper purpose.'"  *Id.* at 649 (citation omitted).

28   "Sanctions not only may have a severe effect on the individual attorney sanctioned but also may

deter future parties from pursuing colorable claims." *Id.* at 650. "Because the district court's inherent powers are so potent, we require courts levying sanctions to assess an attorney's individual conduct and to make an explicit finding that he or she acted in bad faith." *Id.* Even in a case in which a litigant's arguments were found to be "totally frivolous," "outrageous," and "inexcusable," and his behavior "appall[ing]," the Ninth Circuit "refused to equate this characterization of conduct as synonymous with a finding of bad faith." *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1131-32 (9th Cir. 2008) (quoting *Primus*, 115 F.3d at 648) (overruled on other grounds by *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014)); *accord, In re Hassan Imports P'ship*, 2015 WL 4572842, at *5-6 (C.D. Cal. Jul. 27, 2015) (declining to award sanctions for purportedly bad faith appeal, "[m]indful of the high bar required to impose sanctions"); *ESCO Corp. v. Bradken Resources Pty Ltd.*, 2011 WL 1625815, at *21-22 (D. Or. Jan. 31, 2011) (denying motion for sanctions where party's arguments in support of its purportedly "frivolous" motion were grounded in valid federal law, and moving party had only circumstantial evidence of opposing party's bad faith).

## VI.   ABDULHADI'S MOTION SHOULD BE DENIED

### A.   <u>The motion, in its entirety, is based on three false assertions.</u>

Each of the three primary factual assertions in Abdulhadi's motion is false.

#### 1.   The SAC modified Plaintiffs' claims against Abdulhadi significantly and materially.

The motion claims that Plaintiffs' counsel have multiplied proceedings recklessly or in bad faith by filing "three separate complaints [that] did not meaningfully differ from one another as to allegations against Dr. Abdulhadi." Mot. at 2, 3, 8 (that "the three complaints did not materially differ from one another despite the Court's thirty-eight (38) page March 9, 2018 order unavoidably results in a finding that Plaintiffs' Counsel acted in bad faith"). This assertion is simply untrue: the FAC differed materially from the original Complaint, and the SAC differed materially (pursuant to the Court's guidance) from the FAC. *See* Appendix A and B, and Sections IV.B and IV.C above. The SAC (1) deleted several allegations against Abdulhadi that the Court found irrelevant; (2) articulated a policy she mandated under *OSU*; (3) limited claims against Abdulhadi to her individual capacity; (4) added allegations regarding her specific conduct in connection with the

Barkat event and the Know Your Rights Fair; and (5) amended the underlying legal theories such that there was no need to show specific intent.  Plaintiffs accept that the Court ultimately dismissed the SAC.  But it is inaccurate to say that the SAC did not materially change the allegations against Abdulhadi as compared to the FAC.  *See* Appendix A and B.

### 2. The partial quote Abdulhadi relies on from Brooke Goldstein does not suggest—much less show—bad faith or an improper purpose.

Abdulhadi's next basis for sanctions is equally misguided.  She leans heavily on an out-of-context phrase that Brooke Goldstein—one of ten lawyers named in the motion who provided services to the Plaintiffs *pro bono*—uttered a year before Plaintiffs filed their Complaint.  Specifically, Abdulhadi claims that Plaintiffs' counsel's goals in pursuing this case were "to inflict 'massive punishments' against Dr. Abdulhadi for her research and advocacy for justice for and in Palestine," and to punish those "who dare to advocate for justice for and in Palestine."  Mot. at 1.  In fact, the decision to file Plaintiffs' civil rights lawsuit was made not by Brooke Goldstein alone but rather by the Plaintiffs in consultation with a team of litigators at Winston & Strawn LLP, and the Advisory Board of The Lawfare Project.  After significant analysis and investigation, Plaintiffs proceeded with their claims based on the civil rights violations they had experienced, not based on any intent to punish Palestinian research or advocacy.

Abdulhadi's argument that Plaintiffs' Counsel has "pursuant to its self-proclaimed goal, sought to inflict 'massive punishments' against Dr. Abdulhadi for her research and advocacy for justice for and in Palestine," Motion at 1, is demonstrably incorrect.  In context, Ms. Goldstein's statement shows that The Lawfare Project's goal is to hold wrongdoers accountable ***when they violate others' civil rights***—not when they research or advocate for Palestine.  Here is the larger quote from Ms. Goldstein:

> …I looked around and what was happening to campuses, [to] students on campuses I don't have to repeat it, ***rampant violations of basic civil rights, rampant violations of Title VI guarantees, rampant violation of the constitutional rights of freedom of assembly and First Amendment*** which we'll get into later, and I said you know what I want to do, I want to work for the pro-Israel legal fund.  There are so many Jews, Jewish lawyers, you know surely there has to be a pro-Israel legal organization, there has to be a litigation fund.  The Muslims have their litigation fund, the Council on American Islamic Relations has thousands of dollars - they engage in *lawfare*, the Muslim Legal Fund for America, you have Jay Sekulow, you have evangelical legal funds, you have atheist legal funds, you have the ACLU, where is the pro-Israel legal fund?  There wasn't any.  So in

10

2010 I heard Malcolm Hoenlein speak for the first time, I was incredibly moved.  I ended up meeting with him and he helped me and the Conference of Presidents helped establish the first ever pro-Israel civil rights litigation fund for the Jewish community which I direct now.  And our goal is not to be on the defensive but to engage on the offensive.  The goal is to make the enemy pay, to hold them accountable, and to send a message—a deterrent message—that similar actions such as those that they engage in will result in massive punishments.[5]

This is not the first time that Abdulhadi has mischaracterized the Lawfare Project.  In her July 21, 2017, column on the *Mondoweiss* website, Abdulhadi included a large logo quoting Ms. Goldstein as follows: "*The goal is to make the enemy pay and to send a message [that protesting Israeli policies] will result in massive punishments*."[6]  But that is not what Ms. Goldstein said at all.  Instead, Ms. Goldstein described a very different goal—working to legally hold accountable those who violate a minority community's civil rights.  Many civil rights organizations share that goal, including the ACLU, The Southern Poverty Law Center, and the Muslim Legal Fund for America, among others.  Goldstein explained that civil rights lawsuits are meant to deter unlawful behavior, and she used the same energetic language that is often used to advocate against injustice in the civil rights arena.[7]  Neither Palestine advocacy nor Abdulhadi (who Goldstein had no familiarity with at the time) were mentioned in relation to the language Abdulhadi cites in her motion.

The Motion likewise errs when it claims that the Lawfare Project's goal is to foster "'frivolous … lawsuits brought against authors … who are brave enough to speak publicly about, or satirically on, issues of national security and public concern."  Mot. at 1 n.2 (citing https://www.thelawfareproject.org/analysis/2018/4/26/opening-remarks-brooke-goldstein).  In fact, the Lawfare Project aims to *fight* frivolous lawsuits—not to *bring* them.  This is evident from the same webpage that Abdulhadi cites: "We are dedicated to mobilizing resources and bringing interested parties from a broad spectrum of views together, in a common forum to discuss the *threat of lawfare*" (emphasis added).  It's also evident in large font on the Lawfare Project's "Issues" webpage:

---

[5] Available at https://www.youtube.com/watch?v=iSm22DhzC6k at 29:26-30:56 (accessed April 29, 2019) (emphasis added).
[6] https://mondoweiss.net/2017/07/spirit-zionism-network/ (accessed April 29, 2019).
[7] *See, e.g.,* https://www.aclu.org/blog/smart-justice/bail-reform/we-sued-end-evils-cash-bail-michigan (ACLU stating "we sued to end the evils of cash bail"); https://www.naacp.org/latest/full-text-chairman-roslyn-m-brocks-address-to-the-106th-naacp-annual-conve/ (NAACP's chairman describing their opponents as "enemies of freedom and the ambassadors of evil" and urging that liberty must be "chase[d]" and "hunt[ed]") (both accessed May 2, 2019).

11

> THE LAWFARE PROJECT ACTS ON SEVERAL FRONTS:
> We Promote Civil Rights…
> We Advance Human Rights…
> **We Fight Lawfare…**
> - The Lawfare Project produces research that educates policymakers **about the threat of lawfare—the abuse of the law as a weapon of war against western democracies**... Additionally, we produce videos to educate the public on critical issues, ranging from the prevailing threats to your freedom of speech to the recruitment of children towards terrorism.[8]

*It is not at all true* that Ms. Goldstein "confessed [her] nefarious intentions of bringing such [lawfare] lawsuits (e.g. to harass individuals like Dr. Abdulhadi who advocate for justice for and in Palestine)," as Abdulhadi claims.  Mot. at 9.  Such lawfare lawsuits are exactly what Goldstein has focused on exposing and fighting *against*.[9]  Simply stated, Abdulhadi fails to identify anything Goldstein has said or done in this litigation (or beyond it) that amounts to bad-faith conduct.[10]  The actual facts do not support Abdulhadi's motion.

### 3.   Seth Weisburst did not make misrepresentations during oral argument.

Abdulhadi is wrong to claim—repeatedly, no less—that Mr. Weisburst "made material misrepresentations in open court."  Mot. at 3, 4, 9.  Despite the repeated references to multiple misrepresentations, the motion points to only a single statement, which is not a misrepresentation: "[Dr. Abdulhadi] directed the students that she was *supervising* that she is - - she is their professor, she is there (sic) advisor she is in a position of authority. She directed them to make sure this event didn't happen. We allege it."  Mot. at 4 (emphasis in the motion).

The context underlying this statement shows that it is no misrepresentation.  During the hearing, the Court said in its tentative ruling that "[a] faculty advisor to a student group is not like a supervisor at work."  ECF 117, 6:1-5.  When the Court asked Mr. Weisburst to respond, Mr.

---

[8] Available at https://www.thelawfareproject.org/issues (accessed May 2, 2019) (emphasis added).
[9] Goldstein is an attorney of good standing and is the recipient of numerous awards, including two from the Benjamin N. Cardozo School of Law, that recognize her civil rights work.  Goldstein's writings on the improper use of legal systems to advance undemocratic goals (*lawfare*), have been widely quoted and she is recognized as an authority in her field.
[10] Plaintiffs note that several weeks before filing the motion, Abdulhadi's counsel Mark Kleiman directly discussed targeting The Lawfare Project and pro bono counsel for Plaintiffs, in the context of discussing this lawsuit: "A whole bunch of activists and lawyers are sitting down and thinking in very organized and disciplined ways about how we can push back [against] these organizations and some of the individuals who keep bringing the appeals."  Weisburst Decl. Ex. C (certified transcript of 2/27/19 event entitled "Defeating Lawfare:  Palestine, Academic Freedom & Activism," at 17).

Weisburst's argument was based on Plaintiffs' position that a faculty advisor and professor had sufficient authority to invoke supervisory liability under the case law Plaintiffs cited in their opposition to the motion to dismiss, including *OSU*. In making that argument, he pointed to allegations in the SAC that Abdulhadi was a "professor," "advisor," and "in a position of authority" over students who violated Plaintiffs' constitutional rights, and that she "directed them" to shut down Mayor Barkat's speech:

> As for Professor Abdulhadi, we allege direct action. This is not the -- the former Complaint was focused more on her role as an advisor and the policies of being an advisor.
> We allege that she directed the actors to disrupt and shut down the Barkat event. She had nothing to do with the removal. We make that clear. That was part of the reason for separating, which we think makes it more clear. We have causes of action one and two about the removal to the outskirts of campus, three and four about the shutdown.
> She directed the students that she was supervising that she is -- she is their professor, she is there [*sic*] advisor, she is in a position of authority. She directed them to make sure this event didn't happen.
> We allege it. We allege significant background material about exactly why it's completely reasonable to infer -- it's unreasonable not to infer that she had a role.

ECF 117 at 15-16. And indeed these factual allegations appear in SAC ¶¶ 29, 37, and 70. When Mr. Weisburst stated "[w]e allege it," he was referring to the allegations of direct action on Abdulhadi's part that Plaintiffs had added to the SAC. Thus, Mr. Weisburst accurately described the SAC's allegations and asserted their accuracy.

That Abdulhadi disagrees with those allegations, or the legal theory behind them, is of no moment. An "argument need not be correct to be considered made in good faith." *Matter of Yagman*, 796 F.2d 1165, 1186 (9th Cir. 1986). Nor did Mr. Weisburst make a "reckless misstatement[] of law and fact, … coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case." *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001) (cited by Mot. at 6). So even if Abdulhadi—or, for that matter, the Court—disagrees with Mr. Weisburst's statements, they do not support sanctions.

It is similarly irrelevant that the word "supervisory" does not appear in the SAC. Rule 8 does not employ a magic-words standard. Indeed, "labels and conclusion . . . will not do"; instead, a plaintiff must plead the underlying *facts* that support a legal claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And the SAC pleads facts supporting the conclusion that Abdulhadi had

1  supervisory authority over the relevant students:  she was a full-time professor at SF State; she was

2  the faculty advisor to GUPS; that as faculty advisor she had a particularly close relationship with the

3  students who led the Barkat event disruption and the Know Your Rights Fair exclusion; she abused

4  her responsibility by encouraging the students under her care to disrupt Jewish events as part of her

5  "anti-normalization" effort against Israel.  *See* SAC ¶¶ 29, 37-38, 70, 119, 120.

6  Further, even if the Court thinks the use of the word "supervising," even as qualified, was a

7  bridge too far, it still is not a sanctionable misstatement.  Abdulhadi has not "presented clear and

8  convincing evidence that this was an intentional misrepresentation, rather than an inadvertent

9  mistake," as would be required for sanctions.  *Affymetrix, Inc. v. Multilyte Ltd.*, No. C 03-03779

10  WHA, 2005 WL 1869405, at *4 (N.D. Cal. Aug. 5, 2005) (Alsup, J.).

11  Abdulhadi's silence at the hearing underscores that conclusion.  In the wake of Mr.

12  Weisburst's allegedly sanctionable statement, Abdulhadi's counsel never spoke up to correct the

13  purported misrepresentation at the time.  Indeed, the issue was not raised for over eight months.

14  That delay is relevant for two reasons.  First, it casts severe doubt on whether even Abdulhadi

15  herself believes that Mr. Weisburst offered a reckless misstatement, motivated by an improper

16  purpose.  More importantly, the delay precludes Abdulhadi from relying on that statement as a basis

17  for sanctions.  The Ninth Circuit has emphasized that to serve the "policy of deterrence" supporting

18  the rules authorizing sanctions, "the sanctionable behavior should be brought to the immediate

19  attention of the offending attorney," so that if a party alleges "attorney misconduct during a

20  hearing…the offending attorney should be put on clear and fair notice of possible liability at, or very

21  near, the time that the egregious behavior occurs."  *Yagman*, 796 F.2d at 1184; *see also Fortinet, Inc.*

22  *v. Sophos, Inc.*, 2015 WL 12856457, at *1 (N.D. Cal. Sept. 12, 2015) (Ryu, J.) (denying sanctions

23  under Section 1927 and the Court's inherent authority where counsel "could have been more

24  forthright and transparent in its communications, [but] the asserted misdeeds d[id] not amount to the

25  'gotcha' moment" sought by the movant").

26  While Abdulhadi, and ultimately the Court, did not agree with Plaintiffs' position, Mr.

27  Weisburst's argument in support of that position was zealous advocacy that was consistent with the

28  allegations in the SAC and Plaintiffs' theory of the case, not bad faith or misrepresentation, a

1    consideration the Ninth Circuit has held must be made when considering requests for sanctions

2    under 28 U.S.C. § 1927 or the Court's inherent power.  *Yagman*, 796 F.2d at 1182 (reversing

3    sanctions award for posing "a direct threat to the balance between sanctioning improper behavior

4    and chilling vigorous advocacy").

5    **B.     There is no basis for sanctions under 28 U.S.C. § 1927.**

6         "Section 1927 authorizes sanctions against an attorney who 'multiplies the proceedings in

7    any case unreasonably and vexatiously.'"  *Doran*, 2005 WL 5957486, at *2 (quoting 28 U.S.C.

8    § 1927).  "Section 1927 requires a finding of recklessness or bad faith."  *Id.*  In the context of filings,

9    the Ninth Circuit has explained, "[f]or sanctions to apply, if a filing is submitted recklessly, it must

10   be frivolous, while if it is not frivolous, it must be intended to harass." *In re Keegan Mgmt. Co. Sec.*

11   *Litig.*, 78 F.3d 431, 436 (9th Cir. 1996).  Here, Section 1927 sanctions are not warranted because

12   Plaintiffs' counsel did not file the SAC recklessly or in bad faith, nor did they engage in any other

13   conduct that multiplied the proceedings recklessly or in bad faith.

14        As an initial matter, the SAC is the only filing to which Abdulhadi's motion could

15   conceivably apply.  It cannot apply to the initial Complaint because Section 1927 "applies only to

16   unnecessary filings and tactics once a lawsuit has begun" and "cannot be applied to an initial

17   pleading." *In re Keegan*, 78 F.3d 431, 435 (9th Cir. 1996) (additional citations omitted).  Nor can it

18   apply to the FAC.  That filing cannot be sanctionable because Rule 15 entitles plaintiffs to amend a

19   complaint voluntarily as a matter of course.  Further, Plaintiffs' decision to do so here shows *good*

20   *faith*, as the FAC further clarified their allegations against Abdulhadi, making it easier for her to

21   respond.

22        Plaintiffs did not file the SAC recklessly, as the SAC is neither frivolous nor intended to

23   harass.  The SAC's substantial changes show that the SAC is not a frivolous filing.  *See* Appendix B.

24   The fact the Court was not sufficiently persuaded by the SAC's allegations and legal theories to

25   avoid dismissal does not suggest otherwise.  *See, e.g., E.E.O.C. v. Maricopa Cty.*, 339 F. App'x 688,

26   689 (9th Cir. 2009) (declining to award sanctions and reasoning while "[t]he [Plaintiff's] arguments

27   were ultimately unsuccessful, . . . a weak case is not tantamount to a frivolous case."); *E.E.O.C. v.*

28   *Banner Health*, 402 F. App'x 289, 291 (9th Cir. 2010) (while the agency may have been "profoundly

15

1  mistaken" and its approach "unprofessional," it did not act in bad faith.).  And the fact that Plaintiffs

2  made those changes in response to the Court's stated concerns shows that they did not file the SAC

3  to harass Abdulhadi.  *See* Appendix B.

4        Abdulhadi has not established that the SAC was "substantially motivated by vindictiveness,

5  obduracy, or mala fides," despite suggesting as much in the motion (at 7, quoting *Fink*, 239 F.3d at

6  992).  The Ninth Circuit "embrace[s] . . . zealous advocacy" and rejects employing sanctions "to

7  chill an attorney's enthusiasm or creativity in pursuing factual or legal theories."  *Yagman*, 796 F.2d

8  at 1182 (citation omitted).  Filing the SAC was not sanctionable conduct, but rather permissible

9  zealous advocacy in pursuing good faith factual and legal theories.

10        Moreover, Plaintiffs' underlying claims of anti-Jewish discrimination and civil-rights

11  violations were not "baseless", as Plaintiffs' comprehensive settlement with Abdulhadi's employer

12  shows.  That settlement expressly aims "to prevent the sorts of problems that arose with the Mayor

13  Barkat and Know Your Rights Fair events."  Weisburst Decl., Ex. A ¶ 11.  Abdulhadi's academic

14  college (COES) and the student group for which she is the official advisor (GUPS) were both

15  sponsors of the Know Your Rights Fair.  SF State's agreeing to the settlement shows that it

16  understands that oversight is necessary to prevent conduct like that which Plaintiffs alleged

17  Abdulhadi engaged in.  Based on Plaintiffs' detailed explanation of their reasoning for amending

18  their claims against Abdulhadi—in a substantial attempt to respond to the Court's guidance and

19  pursue factual and legal theories consistent with that guidance—there is no basis for the Court to

20  award section 1927 sanctions.

21  **C.    There is no evidence of bad faith to justify any sanctions against Plaintiffs' counsel under either 28 U.S.C. § 1927 or the Court's inherent powers.**

22

23     "In sanctioning counsel, courts may not invoke inherent powers without a specific finding of

24  bad faith."  *In re Keegan Mgmt.*, 78 F.3d at 436 (citing *Yagman v. Republic Ins.*, 987 F.2d 622, 628

25  (9th Cir. 1993)); *see also Wages v. Internal Revenue Service*, 915 F.2d 1230, 1235 (9th Cir. 1990)

26  (cited by Abdulhadi, Mot. at 2) ("Section 1927 sanctions require a bad faith showing.").  The "bad

27  faith" requirement sets a "high threshold."  *Primus*, 115 F.3d at 648. And relying on information-

28  and-belief allegations falls well short of that threshold.  *E.g.*, *Yagman*, 796 F.2d at 1186 (reversing

16

sanctions order and acknowledging that "complaints are routinely filed on information and belief"). Instead, a court's discretion to issue sanctions under inherent powers is reserved for extreme conduct such as destroying evidence, flouting a court order, repeatedly making knowingly frivolous arguments both in the district court and on appeal, and ignoring repeated warnings from the court about specific misconduct.[11]

Abdulhadi has not satisfied her high threshold here. Her motion does not cite a single case where the alleged "bad faith" is remotely similar to the Plaintiffs' counsel here.  In *Primus*, the Ninth Circuit concluded that even conduct that the district court described as "totally frivolous," "outrageous," and "inexcusable," did not meet the bad-faith standard.  *Id*. at 649.  The Ninth Circuit has also held that "mere recklessness, without more, does not justify sanctions under a court's inherent power."  *Fink*, 239 F.3d at 993-94.  Regardless, Plaintiffs' counsel was not reckless.  *See supra* Section VI.C.

Notably, Abdulhadi never once raised Rule 11 sanctions at the time Plaintiffs filed their complaint or amended complaints, which would have led to the opportunity for Plaintiffs to withdraw or correct their claims against Abdulhadi during the 21-day safe harbor period.  Fed. R. Civ. Proc. 11(c)(2).  Plaintiffs' counsel have not acted in bad faith, as explained above. The motion provides no actual evidence to the contrary.  Simply put, this is not the "rare and exceptional case" where sanctions under the Court's inherent powers would be appropriate.  *See Primus*, 115 F.3d at 649.

### D.    The amount of sanctions Abdulhadi seeks flouts both law and common sense.

#### 1.    The motion fails to establish the reasonableness of the requested award.

"When the sanctions award is based upon attorney's fees and related expenses, an essential part of determining the reasonableness of the award is inquiring into the reasonableness of the claimed fees." *Yagman*, 796 F.2d at 1184-85. To allow a significant sanctions punishment "to take the form of…a generic, all-encompassing, massive, post-trial retribution, with no indication

---

[11] *See, e.g., Chambers* 501 U.S. at 37-40, 56-57, in which sanctions were awarded against a plaintiff who (1) attempted to deprive the court of jurisdiction through fraud by selling the property at issue to a third party and preventing the remedy of specific performance; (2) defied various court orders; (3) filed various false and frivolous pleadings *and* appeals; (4) ignored multiple warnings by the court that the unethical misconduct would not be tolerated; (5) flouted these warnings and continued to engage in "other tactics of delay, oppression, harassment and massive expense."

whatsoever of reasonableness, would send shivers through the bar." *Id.* This is precisely what Abdulhadi seeks through her motion.

When seeking attorneys' fees, "[a] fee applicant has the burden of 'documenting the appropriate hours expended.' To this end, the applicant should exercise 'sound billing judgment' regarding the number of hours worked, eliminating excessive, redundant, unproductive, or unnecessary hours.'" *Cancio v. Fin. Credit Network, Inc.*, 2005 WL 1629809, *3 (N.D. Cal. July 6, 2005) (Henderson, J.) (internal citations omitted). Beyond the motion's substantive lack of merit, Abdulhadi entirely fails to meet her burden of establishing that the amount of sanctions is reasonable.  The description of work in Mr. Kleiman's declaration is impermissibly vague, and it is clear that the majority of the work claimed therein was excessive and unnecessary.[12]

The Ninth Circuit has rejected the motion's approach—that substantially all fees purportedly incurred were attributed to Plaintiffs' counsel's supposed misconduct.  *Yagman*, 796 F.2d at 1184. The Court of Appeals explained:

> It is difficult to assess the reasonableness of a lump-sum sanctions award…intended to cover a myriad of misconduct over a period of time…The task becomes impossible when the amount of the lump-sum sanctions award assumes massive proportions.

> It is crucial therefore, that a sanctions award be quantifiable with some precision and properly itemized in terms of the perceived misconduct and the sanctioning authority… [S]ection 1927 provides for the recovery of the *excess* attorney's fees incurred as a result of misconduct which multiplies the proceedings…***Obviously, a blanket award of all fees cannot square with the section's requirement that only excess amounts be allowed***.

*Id.* (emphasis added). Nevertheless, this is what Abdulhadi seeks, even without any legitimate underlying basis.

### 2.   The claimed fees have no connection to alleged bad-faith multiplication of proceedings.

Abdulhadi says that her sanctions motion seeks to recover her purported attorneys' fees and costs flowing from the alleged bad-faith multiplication of proceedings—that is, from the SAC.  Yet Abdulhadi seeks **$275,996** for work done in **2017** when the SAC was not filed until March 9, 2018. She seeks **$43,925.50** in fee-shifting sanctions for work purportedly done in **2019** even though Judgment was entered October 29, 2018.  With a breakdown only by year, and not by month, it is

---

[12] Mr. Kleiman's declaration also fails to comply with 28 U.S.C. § 1746.

18

impossible to discern from the motion how much of the sanctions sought for 2018 include time before March 9 when the SAC was filed and after August 8 when oral argument on the SAC had concluded.  But it is likely that much of the **$105,212** sought for **2018** includes unexplained time outside of this five-month period.[13]

Notably, Abdulhadi has actively engaged in fundraising for her pro bono legal defense, and the website used to collect these funds lists a goal of collecting $100,000 (more than half of which has been raised).  Weisburst Decl. Ex. B.  The claimed fees in the motion are therefore more than four times the amount Abdulhadi has sought for her legal defense through her fundraising.  *See id.*

### 3. There is no basis that fees should be recovered for Dan Siegel or Colleen Flynn, and the Court should strike their declarations.

Dan Siegel and Colleen Flynn have never been disclosed as counsel of record for Abdulhadi in this case. Yet the motion complains that "Mr. Siegel and Ms. Flynn earned nothing in this matter as they worked pro bono in defending Dr. Abdulhadi." Mot. at 2.  In their declarations, however, Siegel and Flynn make no mention of working pro bono for Abdulhadi's defense—and in fact, Ms. Flynn states "*I haven't talked with either Mr. Kleiman or his colleague Mr. Gharagozli about how they handled this case.*" ECF 176-3, ¶ 4. So Ms. Flynn's role in this litigation remains a mystery beyond her improper supporting declaration to this motion.

And far from being Abdulhadi's lawyer, Mr. Siegel appeared before this Court as counsel for an organization called "Open Hillel."  *See* ECF Nos. 141, 152,[14] 167 (at 4, n.5).  If Mr. Siegel represented both Open Hillel and Abdulhadi, he should have said so.

There is no basis to sanction Plaintiffs' counsel based on undisclosed work done by Flynn and Siegel.  While it is not entirely clear from the motion, it appears that Siegel and Flynn submitted declarations to join in Kleiman's and Gharagozli's misguided belief that Plaintiffs should be

---

[13] The motion's speculation about fees even extends to the purely theoretical as Abdulhadi attempts to criticize discovery requests that never existed: "Had the proceedings continued, Dr. Abdulhadi would have incurred tens of thousands of dollars in attorneys' fees and costs in defending herself from discovery requests that would have in all likelihood been overbroad and unreasonably intrusive." Mot. at 7.

[14] Unlike Plaintiffs' counsel, Mr. Siegel unreasonably multiplied proceedings by filing an unauthorized Reply brief in support of Open Hillel's administrative motion for leave to file an amicus brief, ECF 152, requiring a response from Plaintiffs noting that such a reply in support of an administrative motion is clearly prohibited by Local Rule 7-11.

sanctioned hundreds of thousands of dollars.  Based on the accompanying filed objections, the Court should disregard and strike the Siegel and Flynn declarations as irrelevant and improper lay witness testimony that is not based on personal knowledge and not helpful to the Court.  *See* Fed. R. Evid. 401, 602, 701, 702.

### 4.    The motion's calculation of hourly rates has no valid basis.

Although Abdulhadi bears the burden, the motion's memorandum of points and authorities fails to provide any factual or legal explanation as to the hourly rates that lead to Abdulhadi's calculation of requested sanctions based on attorneys' fees.  Mark Kleiman's declaration (ECF 176-1) provides a vague description of his work, but offers no legal authority supporting his calculations.  Under the relevant law, the hourly rates Mr. Kleiman references (like his calculation of hours for which he claims Abdulhadi's counsel should be compensated) have no valid basis.

The motion ignores the relevant standard.  To determine an appropriate hourly rate, courts must "consider the prevailing market rate in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Cancio*, 2005 WL 1629809, at *1 (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 & n.11 (1984)).  Rather than do that, Abdulhadi's lawyers mined ECF for filings in this district by lawyers associated with one of the Plaintiffs' counsel's law firms, and then attempted to use as a baseline the rates of one of those attorneys, Jeffrey Kessler, in an unrelated antitrust action.  But that practice ignores the similar-services factor, as well as the "lawyers of reasonably comparable skill, experience, and reputation" factor.

The rates included in Mr. Kessler's declaration cannot be used to determine reasonable rates for Mr. Kleiman and Mr. Gharagozli in this case for at least two reasons.  ***First***, Winston's lawyers in the NCAA Antitrust Litigation were not providing "similar services" to Abdulhadi's counsel.  Antitrust litigation and civil rights litigation are vastly different.  The detailed description in Mr. Kessler's declaration stands in marked contrast to both the level of detail and the work described in Mr. Kleiman's declaration.  ***Second***, blindly applying rates from Mr. Kessler's declaration fails to perform the required analysis of measuring the relevant attorneys' "skill, experience, and reputation."  The "skill, experience, and reputation" of these Winston antitrust and sports law attorneys in a major antitrust case is not the relevant inquiry; rather the inquiry is measuring

20

1   *Abdulhadi's counsel's* "skill, experience, and reputation" in *this* case.  As Mr. Kleiman himself

2   notes, and unlike the attorneys discussed in Mr. Kessler's declaration, this case does not fall within

3   his own specialty.  ECF 176-1, ¶ 2 (while he has represented plaintiffs in § 1983 cases, "I specialize

4   in representing whistle blowers under the federal False Claims Act").  Mr. Kleiman's email address

5   ("mkleiman@quitam.org") attests to this as well.

6        Abdulhadi is also wrong to rely on the Laffey Matrix, which courts have frequently rejected

7   as an unreliable and inappropriate measure.  *See, e.g.*, *Prison Legal News v. Schwarzenegger*, 608

8   F.3d 446, 454 (9th Cir. 2010).  Here, it should not be necessary to calculate an appropriate rate as the

9   motion for sanctions should be denied in its entirety.  If calculating a rate were necessary, however,

10  that rate should be not be calculated based on Mr. Kessler's declaration in an unrelated antitrust case,

11  but rather on the prevailing rate for cases similar to this one handled by lawyers who have

12  comparable skill, experience, and reputation to Mr. Kleiman and Mr. Gharagozli.  *See Cancio*, 2005

13  WL 1629809, at *1.  Abdulhadi's counsel fails to make any reasonable effort in their motion or

14  supporting materials to undertake this analysis.

15       **E.**    <u>**The motion is time-barred.**</u>

16       Finally, an additional reason to deny Abdulhadi's motion is that she filed it too late.  Under

17  the parties' stipulation, which the Court adopted, any sanctions motion was due "14 days after

18  remand to the District Court following the conclusion of any appellate proceedings."  ECF 170.

19  According to Abdulhadi, the "remand" in this case occurred on April 8, 2019.  Id. (caption page).

20  Not so.  There can only be a remand if there is something left for a district court to do after an appeal

21  is dismissed.  A remand is "[t]he act or instance of sending something (such as a case, claim, or

22  person) back *for further action*."  BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added); *see*

23  *also* Merriam Webster Online, retrieved April 29, 2019, from https://www.merriam-

24  webster.com/dictionary/remand? ("remand" is the act of "send[ing] back (a case) to another court or

25  agency *for further action*" or "the return of a case to another court or agency *for further action*")

26  (emphasis added).  Here, there was nothing for this Court to do once the appeal was dismissed.  As

27  such, there was not—nor could there be—a remand.

28       Although the stipulation does not expressly cover the situation where there is no remand, the

21

1   Local Rules require that any motion for sanctions "be made as soon as practical after the filing party

2   learns of the circumstances that it alleges make the motion appropriate." L.R. 7-8.   While the

3   circumstances alleged here arose long ago, based on the language of the stipulation, since there was

4   no remand, the deadline to file the motion should at the latest key off the event terminating the

5   litigation.   In this case that event was the dismissal of the appeal.   Because Abdulhadi had 14 days

6   from the dismissal order ending appellate proceedings to file her motion for sanctions, she should

7   have filed her motion no later than 14 days after March 29, which was April 12.   Abdulhadi did not

8   file her Motion until a week later, on April 19.   It is therefore untimely and should be denied for this

9   reason as well.

10  **VII.   CONCLUSION**

11       The power to sanction under 28 U.S.C. § 1927, and under the Court's inherent powers, "is an

12  extraordinary remedy, one to be exercised with extreme caution." *In re: Keegan Mgmt.*, 78 F.3d at

13  437.   There has been no bad faith on Plaintiffs' counsel's part here, and there is no basis for the Court

14  to exercise its power to sanction here.   For all these reasons, the motion should be denied.

15  Dated:  May 3, 2019                    Respectfully submitted,

16                                          WINSTON & STRAWN LLP /
                                            THE LAWFARE PROJECT
17
                                            By:   */s/ Robb C. Adkins*
18                                                Robb C. Adkins
                                                  Lawrence M. Hill (*pro hac vice*)
19                                                Steffen N. Johnson (*pro hac vice*)
                                                  Seth Weisburst
20                                                Adrianne Rosenbluth (*pro hac vice*)
                                                  WINSTON & STRAWN LLP
21
                                                  Brooke Goldstein (*pro hac vice*)
22                                                THE LAWFARE PROJECT

23                                                Attorneys for Plaintiffs
                                                  JACOB MANDEL, CHARLES VOLK,
24                                                LIAM KERN, MASHA MERKULOVA,
                                                  SHACHAR BEN-DAVID, MICHAELA
25                                                GERSHON, and STEPHANIE ROSEKIND

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT RABAB ABDULHADI'S MOTION FOR SANCTIONS
Case No. 3:17-CV-03511-WHO

## APPENDIX A

### Summary of Plaintiffs' Claims Regarding Abdulhadi in the First Amended Complaint

With respect to the mistreatment of Jewish students and community members at Mayor Barkat's shut-down speech (Causes of Action 1 and 2), the First Amended Complaint alleged the following regarding Abdulhadi:

- Abdulhadi is a "Senior Scholar" for SF State's Arab and Muslim Ethnicities and Diasporas Initiative ("AMED") and as the faculty advisor for the General Union of Palestine Students at SF State ("GUPS"). *Id.* ¶¶ 3, 37.

- "Abdulhadi, as GUPS's faculty advisor, chose to disregard" SF State's requirements that advisors must assist in upholding University policy, including the Non-Discrimination Policy and the Time, Place, and Manner Policy which prohibits unregistered amplified sound at events, and that advisors should "assist the student organization to adhere to all University policies, as well as federal and state law," as these requirements applied to GUPS's conduct surrounding the Barkat event, in violation of Plaintiffs' civil rights. *Id.* ¶ 82.

- "By aiding, abetting, and condoning the disruptors' actions within the event room," Abdulhadi "violated SFSU's Time, Place, and Manner policy, knowingly giving the disruptors free reign to ruin the Barkat event and encouraging their prohibited use of sound amplifiers to increase the volume of their threatening avowals and disruptive chants to the point where no one in the room could hear Mayor Barkat speak." *Id.* ¶ 96.

- Abdulhadi "intentionally encouraged and benefited the disruptive individuals who were threatening the Jewish individuals with violence" at the Barkat event. *Id.* ¶ 101.

- Abdulhadi's encouragement of and assistance to GUPS before the event "prevented Mayor Barkat from speaking in a way that Plaintiffs could hear him and engage in dialogue with him." *Id.* ¶ 174.

- Abdulhadi:
  - "prevent[ed] Plaintiffs from proceeding with and participating in the planned and approved event hosting Mayor Barkat as a speaker duly invited by an SFSU student group on April 6, 2016." *Id.* ¶ 17;
  - "improperly instruct[ed]" her student organization "as to the appropriate way to handle disruption of campus speakers." *Id.* ¶¶ 176, 189; and
  - "deviat[ed] from normal protocols, state law, and the SFSU Code of Student Conduct" during the Barkat event, leaving Plaintiffs vulnerable to violations of their civil rights by a previously anticipated disruption which successfully and intentionally prevented Mayor Barkat from speaking in a way that Plaintiffs could hear him, engage in dialogue with him, or peaceably assemble." *Id.* ¶ 187.

- The May 11, 2016 Joint Agreement resulting from Dr. Abdulhadi's efforts also affirmed that SF State did not intend to take disciplinary action against any "***faculty*** ... who have taken part in protest and advocacy efforts specifically for ***their participation in these activities***." *Id.* ¶ 81 (emphasis added).

With respect to the exclusion of the only campus Jewish student group from the Know Your Rights Fair (Causes of Action 3 and 4), the First Amended Complaint alleged the following regarding Abdulhadi:

- Abdulhadi was one of the "faculty organizers" of the event.  In Abdulhadi's own words, the organizers "dared challenge the status quo" by refusing to allow Hillel, "a privileged white group," to participate in the "Know Your Rights" Fair. *Id.* ¶ 160.

- Abdulhadi "intentionally excluded Hillel from the ["Know Your Rights"] fair based on the Jewish identity of Hillel's members, including Plaintiffs," denying Plaintiffs "the opportunity to speak and hear about their rights, and peaceably assemble" or to "meaningfully participate" in the event. *Id.* ¶¶ 217-19.

- Abdulhadi "inadequately train[ed]" her student organization as to the appropriate way to administer university events." *Id.* ¶¶ 204, 220.

- "The organizing committee for the fair, including COES [Dr. Abdulhadi's College] and GUPS, with SFSU's knowledge and approval, cut off registration to purposefully exclude this recognized Jewish student group, excluding other groups in the process in an effort to cover up this active discrimination." *Id.* ¶ 150.

- "Abdulhadi chose to disregard" requirements that faculty advisors must assist "in upholding University policy," including the Non-Discrimination Policy, and that advisors should assist the student organization in adhering to federal and state law "as they applied to GUPS's conduct surrounding the 'Know Your Rights' Fair, in violation of Plaintiffs' civil rights." *Id.* ¶ 162.

Additional allegations from the FAC regarding Abdulhadi include the following:

- Dr. Abdulhadi invited GUPS's previous student president, Mohammad Hammad, to join her on a University-funded trip to the Palestinian territories to visit Leila Khaled. *Id.* ¶¶ 137, 140.

- This invitation was made notwithstanding Hammad's social media posting, which included threatening posts about "taking down Hillel morons" and fantasies about murder.  This invitation to Mr. Hammad supported the plausible inference that Dr. Abdulhadi as GUPS's faculty advisor, in fact rewards members of the student group who threaten physical harm to people like Plaintiffs.  *Id.* ¶¶ 133, 140.

- Dr. Abdulhadi's adherence to the practice of "anti-normalization" strongly supported inferences of Dr. Abdulhadi's culpability regarding each of the claims against her, because "[t]he 'anti-normalization' mandate of the BDS [Boycott, Divestment, and Sanctions] movement requires that activists disrupt, isolate, and silence all opposing viewpoints, even moderate opinions such as those acknowledging Israel's actual existence, right to existence, or advocating for a peaceful two-state solution in the Arab/Israeli conflict."  *Id.* ¶ 56.

**APPENDIX B**

**Summary of the Court's Specific Guidance regarding Plaintiffs' Claims against Abdulhadi and the Corresponding Changes Plaintiffs Made in the Second Amended Complaint**

| Court's Guidance in 3/9/18 Order (ECF 124) | Changes Plaintiffs Made in the SAC in Response to the Court's 3/9/18 Order |
|---|---|
| Many of the FAC's allegations are about Abdulhadi's conduct in the past, before these events.  ECF 124 at 34. | Plaintiffs deleted allegations referenced by the Court regarding: <br>• Abdulhadi's involvement in on-campus conferences advocating anti-Semitic positions;<br>• Abdulhadi's drafting of a brochure celebrating a mural that contained an explicit anti-Semitic image;<br>• Abdulhadi's Academia.edu profile page;<br>• Abdulhadi's coordination of a program with An-Najah University, and Abdulhadi's school-sponsored travel to the Middle East during which she met with, among others, Leila Khaled. |
| No SF State "policy" is discussed that Abdulhadi was alleged to have created, applied, or could be liable for as an official actor. ECF 124 at 35. | Plaintiffs alleged a policy of anti-normalization that SF State, GUPS, and AMED adopted and applied, and that Abdulhadi mandated it.  SAC ¶¶ 39-40, 51, 70, 120. |
| No claim can be asserted against her for injunctive relief on the basis of official capacity.  ECF 124 at 35. | Plaintiffs deleted injunctive relief claims against Abdulhadi in her official capacity. *See, e.g.,* SAC ¶ 2 n.2. |
| The Court criticized the allegations related to Abdulhadi's involvement in the hunger strike.  ECF 124 at 37 n.17. | Plaintiffs deleted these allegations in the SAC pursuant to the Court's guidance. |
| "[B]ecause the constitutional claims are based on assertions of invidious discrimination, facts showing that Abdulhadi had the specific intent to discriminate against plaintiffs and that she took actions against plaintiffs causing harm to their constitutional rights need to be alleged." ECF 124 at 36:8-11; *see also id.* at 36:21-22. | Plaintiffs amended the SAC to allege claims concerning the Barkat shout-down under *OSU Student Alliance v. Ray,* which does not require specific intent: "allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First and Fourteenth Amendments," and "[a]dvancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability, no matter what the required mental state, so long as the policy proximately causes the harm—that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy."  699 F.3d 1053, 1075-76 (9th Cir. 2012).<br><br>Plaintiffs alleged specific intent with respect to Hillel's exclusion from the Know Your Rights Fair.  SAC ¶¶ 120, 180, 189, 191.<br><br>For each of the four § 1983 claims naming Abdulhadi, the SAC alleged that Plaintiffs were subjected to discrimination (based on Defendants' perception of the targeted individuals' viewpoint) with Dr. Abdulhadi's knowledge. |

| Court's Guidance in 3/9/18 Order (ECF 124) | Changes Plaintiffs Made to SAC in Response to the Court's 3/9/18 Order |
|---|---|
| The FAC did not sufficiently allege "that Abdulhadi herself took any affirmative actions against plaintiffs or otherwise acted with specific intent to discriminate against plaintiffs. Instead, there is only speculation that, because of her role as an advisor to GUPS and as a faculty of COES, she had advance knowledge of GUPS's plan to disrupt the Barkat event and failed to prevent it and also failed to prevent the organizers of KYR Fair from excluding Hillel." ECF 124 at 36. | Plaintiffs clarified the SAC by separating the claims regarding the Barkat event into § 1983 Counts 1 and 2 (regarding the removal of the event to the outskirts of campus) and § 1983 Counts 3 and 4 (regarding the shutdown of the event), and named Abdulhadi only in Counts 3 and 4.<br><br>As to those Counts, plaintiffs added specific allegations concerning Abdulhadi's involvement. SAC ¶¶ 70, 95, 119-120.[1] |

---

[1] Discovery in Volk and Kern's state court case confirmed that Abdulhadi's graduate student assistant and SF State employee Saliem Shehadeh was the driving force behind Hillel's exclusion from the Know Your Rights Fair.